# Exhibit A

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made and entered into as of June   16  , 2022 (the "Effective Date"), by and between ASTORIA OWNER LLC, a Delaware limited liability company ("Purchaser"), and CAPE FEAR MULTIFAMILY, LLC, a North Carolina limited liability company ("Seller"). Purchaser and Seller referred to herein individually as a "Party" and collectively as "Parties".

### RECITALS:

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller certain real property located in Hope Mills, North Carolina, as more particularly described in this Agreement and commonly referred to as "The Astoria Apartment Homes", pursuant to the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## INCORPORATION OF RECITALS AND INTERPRETATION

**Section 1.1    Incorporation of Recitals**.    The statements set forth above are true and correct constituting an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the parties.

**Section 1.2    Rules of Construction**.  The rules of construction set forth in this Section 1.2 shall apply to this Agreement.

(a)    All Articles, Section, Subsection, and Exhibit references used in this Agreement are to Articles, Sections, Subsections, and Exhibits to this Agreement unless otherwise specified.  The Exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.  The Article and Section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Unless the context requires otherwise, all words used in this Agreement in the singular number shall extend to and include the plural, and all words in the plural number shall extend to and include the singular. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The words "includes" or "including" mean "including without limitation," "shall" and "will" have equal force and effect, the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular Section or Article in which such words appear and any reference to a law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder.  Currency amounts references in this Agreement are in U.S. Dollars.

1

(c)     Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party or similar rule operating against the draft of an agreement shall not be applicable to the construction of this Agreement.

(d)     For purposes of this Agreement, a "business day" shall mean a day that is not Saturday or Sunday or a federal holiday as more particularly set forth in Section 13.11.

## ARTICLE II
## SALE OF PROPERTY

**Section 2.1     <u>Sale of Property</u>**.  Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, that certain apartment complex located in Hope Mills, North Carolina, containing an aggregate of 272-units and related improvements, and commonly known as "The Astoria Apartment Homes" having a principal address of 405 Grand Wailea Dr., Hope Mills, North Carolina 28348, being all of the following described property (collectively, the "<u>Property</u>"):

(a)     the real property located in Hope Mills, North Carolina and being more particularly described on **E**XHIBIT **A** attached hereto and incorporated herein by this reference, together with all rights, privileges and appurtenances pertaining to such real estate, including, without limitation, any and all rights of Seller, if any, in and to adjacent roads, alleys, easements, streets, rights-of-way, and any adjacent strips or gores or real estate (collectively, the "<u>Land</u>");

(b)     all improvements, structures, and fixtures placed, constructed or installed on the Land (collectively, the "<u>Improvements</u>"; and together with the Land, the "<u>Premises</u>");

(c)     all (i) mechanical systems and fixtures and equipment related thereto comprising part of or attached to or located upon the Premises or used exclusively in connection with the Premises or the operations at the Premises,  (ii) carpets, drapes, blinds and other furnishings and comprising a part of or attached to or located upon the Improvements, (iii) appliances, and (iv) maintenance equipment, supplies and tools to the extent the foregoing are located on the Land or used exclusively in connection with the Premises or the operations at the Premises (collectively, the "<u>Personal Property</u>"); however, Personal Property does not include any items of personal property owned by tenants

(d)     all intangible property specifically and exclusively related to the Premises, including: (1) all trade names, trademarks and other identifying material associated with the Premises, including Seller's rights and interests in the names associated with the Premises; (2) all marketing or promotional materials specific to the Premises; and (3) telephone exchange numbers and website domain names associated with the Premises (collectively the "<u>Intangible Property</u>");

(e)     Seller's rights, obligations and interests in leases, lease commitments and all other agreements for the use, occupancy or possession of all or any part of the Premises (collectively, the "<u>Leases</u>"), and all refundable security deposits or like payments, if any, paid by existing tenants of the Property to or on behalf of Seller except to the extent forfeited by such

tenants (subject to the terms and conditions of this Agreement) or returned to such tenants under the terms of their Leases;

(f)    to the extent assignable, Seller's rights, obligations and interests in, and the rights, obligations and interests of affiliates of Seller, including Seller's property manager, in, all (i) brokerage or tenant locator contracts, (ii) cable or subscription television agreements, (iii) maintenance, repair, service and pest control contracts (including but not limited to janitorial and landscaping agreements), (iv) security system agreements, and (v) all other contracts pursuant to which services or goods are provided to the Property or that would otherwise bind the owner of the Property, including all such contracts and agreements listed on **Exhibit B** attached hereto and incorporated herein (collectively, the "Service Contracts"), except to the extent expressly excluded under the terms of this Agreement and subject to Purchaser's right to elect whether to accept or reject an assignment of any Service Contract, or have Seller terminate any Service Contract as of Closing as provided in this Agreement;

(g)    Seller's rights, obligations and interests in, and the rights, obligations and interests of affiliates of Seller, including its property manager, in, all furniture, fixture and equipment leases, if any, including all such leases listed on **Exhibit B** attached hereto and incorporated herein, to the extent the same are assignable by Seller (collectively, the "Personalty Leases") except to the extent expressly excluded under the terms of this Agreement; and

(h)    Seller's interest, if any, in all Related Assets (defined herein) in connection with any of the Land, Improvements, Personal Property, Intangible Property, Leases, Service Contracts, or Personalty Leases (which conveyance of Related Assets shall, except as expressly set forth in this Agreement or the document delivered in connection with the Closing, be without any representation or warranty related thereto). The words "Related Assets" shall mean the following: (i) to the extent transferable, all wastewater and other utility rights applicable to the Property, (ii) to the extent transferable, all certificate(s) of occupancy, building, equipment or other permits, consents, authorizations, variances, waivers, licenses, utility agreements, entitlements, certificates, developmental rights and approvals from any governmental authority with respect of the Property (collectively, "Permits"), (iii) to the extent transferable and in Seller's possession or control, any warranties, guaranties, indemnities, claims, representations or guaranties relating to the ownership, development, use and operation of the Property or the Personal Property and effective as of Closing, and (iv) the books and records of the Property that do not contain attorney/client-privileged information of Seller, and plans, drawings, specifications, surveys, engineering reports, and other technical information related to the Land and Improvements, to the extent in the actual possession or control of Seller.

## ARTICLE III
## PURCHASE PRICE

**Section 3.1    Purchase Price.**  The purchase price (the "Purchase Price") for the Property shall be Sixty-Two Million Five Hundred Thousand and No/100 United States Dollars ($62,500,000.00), payable to Seller as follows:

(a)    Within three (3) business days of the Effective Date, Purchaser shall deliver to the office of Landmark Abstract Agency, LLC, 207 Rockaway Turnpike, Lawrence, NY 11559,

Attention: Jacob Rekant, Esq., Email: Jrekant@laatitle.com, Telephone: (212) 805-8120 ("Title Company"), the sum of Two Million and No/100 United States Dollars ($2,000,000.00) in immediately available funds (together with any together with any additional deposits funded pursuant to this Agreement and any interest earned thereon, the "Deposit"), which the Title Company shall deposit in a non-interest-bearing account.  Upon the consummation of the purchase and sale contemplated by this Agreement (the "Closing"), the Deposit shall be credited against the Purchase Price.  A portion of the Deposit in the amount of One Hundred Dollars ($100) shall be independent consideration for the execution of this Agreement by Seller, shall not be refundable in any circumstances, and shall be paid to Seller at the Closing or upon the earlier termination of this Agreement.

(b)     Except as expressly provided in this Agreement, the Deposit shall be nonrefundable to Purchaser, and the Title Company shall pay to Seller the Deposit upon the Closing or the earlier termination of this Agreement.  This Section shall survive the Closing or early termination of this Agreement.

(c)     Upon Closing, the balance of the Purchase Price after apportionments, credits, and prorations are made in accordance with this Agreement shall be paid to Seller by Purchaser (through Title Company) via federal wire transfer of immediately available funds.

### ARTICLE IV
### SURVEY, TITLE COMMITMENT AND INSPECTIONS

**Section 4.1     Access to Property; Inspection**.  Purchaser and its agents and contractors may, during the period beginning on the date that the Title Company has confirmed in writing receipt of the Deposit and the Closing Date, subject to the rights of tenants under the Leases, enter upon the Property to conduct all inspections and investigations of the condition and all other aspects of the Property that it may deem necessary or desirable in its sole discretion, and to review (and Seller shall provide access to) all Leases, warranties, guaranties, service agreements, maintenance records and utility invoices and other books, files and records to the Property that are in Seller's possession or control and other documentation in Seller's possession with respect to the Property (and shall provide copies to Purchaser as Purchaser shall reasonably request), other  than any appraisals or property condition reports, and which do not contain attorney/client-privileged information of the Seller.  Within five (5) business days following the Effective Date, Seller shall deliver to Purchaser copies or electronic access to the items set forth on Schedule 4.1 attached hereto to the extent in Seller's or its property manager's actual possession or control (collectively, "Seller's Deliverables").  Notwithstanding anything in this Agreement to the contrary, Purchaser shall not make any soil borings in the Property, or conduct any other invasive testing, sampling, or investigation of the Property, without having received the prior written consent of Seller, which consent may not be unreasonably withheld in the event that the Phase I environmental site inspection indicates the appropriateness of a Phase II environmental site inspection.  Purchaser shall provide Seller written notice of its intent to access the Property at least one (1) day prior to its entry (or its agents' or contractors' entry) thereon and shall not in any case be permitted to inspect occupied units unless accompanied by a representative of Seller or its property management company (provided Seller shall make such a representative available reasonably promptly following request by Purchaser for such access).  Purchaser hereby covenants and agrees to promptly restore the Property substantially to its original condition following any activity of

Purchaser thereon, and to indemnify and hold harmless Seller from any and all actual loss, liability, costs, claims, demands, direct damages (excluding consequential, special and punitive damages), causes of action and suits arising out of the exercise by Purchaser of Purchaser's rights under this Section 4.1; provided, however, the indemnity and hold harmless obligations shall not extend to (a) protect Seller from any liabilities for matters merely discovered by Purchaser (e.g., latent environmental contamination), (b) any liens, claims, causes of action, damages, liabilities or expenses that are attributable to the action or inaction of Seller or its agent or employees, or (c) any special, consequential or punitive damages (collectively, the "Indemnification Exclusions"). Purchaser shall conduct all tests, investigations and studies of the Property in a manner which does not unreasonably interfere with any residential tenant's quiet enjoyment of the Property and shall not permit any liens to attach to the Property in connection with its exercise of its rights under this Section 4.1 or any other activity it conducts on the Property prior to Closing.

**Section 4.2     Title Commitment.**  Within one (1) business day of the Effective Date, Seller, at Seller's sole cost and expense, shall order a current commitment for title insurance from the Title Company in the amount of the Purchase Price hereof, insuring good and marketable fee simple title to the Property in Purchaser (the "Title Commitment"), and shall deliver a copy of Seller's as-built ALTA survey of the Property (the "Survey"). Purchaser, at its sole cost and expense, may update the Survey.  "Good and marketable fee simple title" shall mean fee simple ownership that is (i) free of all Liens, and (ii) insurable by Title Company, in its capacity as agent on behalf of a national title insurance company, at the then current standard rates under the standard form of a 2006 ALTA Owner's Policy of Title Insurance (the "Owner's Title Policy").  No later than ten (10) days after receipt by Purchaser of both of the Title Commitment, together with legible copies of the underlying documents referred to therein, and the Survey (the "Objection Deadline"), Purchaser shall notify Seller, in writing, of its objections to any matters contained in the Title Commitment or the Survey.  In the event Purchaser notifies Seller of such objection(s) prior to the Objection Deadline, Seller will have the right, but not the obligation, to cure such objections that are nonmonetary objections, provided, however, Seller hereby agrees that Seller shall satisfy or cure any such defects or objections consisting of taxes then due and payable, mortgages, deeds of trust, mechanic's or materialmen's liens or other such monetary liens or encumbrances created by or through Seller (including, without limitation, any mechanics' liens for work or materials procured by Seller) ("Liens").  Within five (5) days after receipt of Purchaser's notice of objections, Seller will notify Purchaser in writing if Seller elects to attempt to cure such objections to the sole satisfaction of Purchaser, and if so, which objections Seller elects to cure ("Seller's Cure Notice"). If Seller provides no Seller's Cure Notice, Seller shall be deemed to have declined to cure all such objections (excluding Liens, which Seller shall in all events be obligated to cure).  If Seller does not elect to cure all such objections, then Purchaser may terminate this Agreement by notice to Seller on or before five (5) days after the deadline for Seller's delivery of Seller's Cure Notice, in which event (i) if such objection(s) is not Material (as hereinafter defined), then the Deposit shall remain nonrefundable, and shall be promptly released, to Seller and the Parties shall thereafter be relieved of all further liability hereunder except those obligations that expressly survive the termination of this Agreement, and (i) if such objection(s) is Material, then the Deposit shall be refunded, and shall be promptly released, to Purchaser and the Parties shall thereafter be relieved of all further liability hereunder except those obligations that expressly survive the termination of this Agreement.  If Seller so elects to cure any such objections, Seller will have until the Closing Date to cure such objections.  If Seller fails to cure by the Closing Date any such objection(s) that Seller elected to cure but has no obligation to cure under this Agreement (excluding Liens and

other matters that Seller is required to remove hereunder, which Seller shall in all events be obligated to cure), then Purchaser may terminate this Agreement by notice to Seller on or before the Closing Date, in which event (i) if such objection(s) is not Material (as hereinafter defined), then the Deposit shall remain nonrefundable, and shall be promptly released, to Seller and the Parties shall thereafter be relieved of all further liability hereunder except those obligations that expressly survive the termination of this Agreement, and (i) if such objection(s) is Material (as hereinafter defined), then the Deposit shall be refunded, and shall be promptly released, to Purchaser and the Parties shall thereafter be relieved of all further liability hereunder except those obligations that expressly survive the termination of this Agreement.  If Purchaser does not terminate this Agreement in accordance with its terms, then Purchaser shall be deemed to have elected to accept a conveyance of the Property subject to such uncured objection(s), and such uncured objection(s) shall be deemed Permitted Exceptions.

Any matter contained in the Title Commitment or shown on the Survey, or any revision or update thereto, to which Purchaser does not object prior to the Objection Deadline, or to which Purchaser is deemed to have waived its objection pursuant to the terms hereof, other than Liens and matters Seller is required to remove hereunder, will be deemed a "Permitted Exception" unless (i) such Objectionable Exception was first raised by the Title Company or appears in the Survey subsequent to the date that Purchaser delivered notice to Seller of Purchaser's Objectionable Exceptions and (ii) Purchaser shall notify Seller of the same within ten (10) business days after the Title Company notifies Purchaser of such Objectionable Exceptions or such Objectionable Exceptions appears on the Survey, as the case may be.  Notwithstanding anything to the contrary herein, the following are deemed included in the Permitted Exceptions:

(a)    ad valorem taxes and assessments for 2022 and subsequent years, provided the same are not yet due and payable and are prorated in accordance with the terms of this Agreement;

(b)    all applicable laws, ordinances, rules and governmental regulations (including, without limitation, those relating to building, zoning and land use) affecting the development, use, occupancy or enjoyment of the Property provided that the Premises and the current use thereof is in compliance with same;

(c)    liens affecting the Property that are created by Purchaser or its employees, agents, or contractors; and

(d)    rights of tenants-in-possession pursuant to written leases as tenants only without any right or option to purchase or ground lease all or any portion of the Property and any matter that would be discoverable upon review of an updated Survey, if Purchaser does not provide the Title Company with an updated Survey.

Purchaser's obligation to consummate the purchase of the Property on the Closing Date shall be subject to the Title Company being committed to issue the Owner's Title Policy in the form as agreed to by the Title Company prior to five (5) days after the deadline for Seller's delivery of Seller's Cure Notice.  If such condition has not been satisfied or waived in writing by Purchaser on or as of the Closing Date, then Purchaser shall have the right, at Purchaser's option, to terminate this Agreement by giving written notice to Seller, in which event all rights and obligations of the

parties under this Agreement shall expire and (i) if such change from the agreed-upon form of Owner's Title Policy is not Material (as hereinafter defined), then the Deposit shall remain nonrefundable, and shall be promptly released, to Seller, and (i) if such change from the agreed-upon form of Owner's Title Policy is Material, then the Deposit shall be refunded, and shall be promptly released.

**Section 4.3    Costs of Due Diligence**.  The costs of the inspections, tests, investigations and interviews undertaken by Purchaser pursuant to the terms of this Article 4 shall be borne solely by Purchaser and Purchaser shall indemnify and hold Seller harmless from and against any and all loss, costs, and expense, including reasonable attorneys' fees, for the costs of such inspection, tests and investigations and for damage to persons or property caused by Purchaser's inspection, testing and investigation of the Property; provided, however, the indemnity and hold harmless obligations shall not extend to the Indemnification Exclusions.

**Section 4.4    Indemnification Survival**.  The indemnification obligations contained in this Article 4 shall survive the Closing or the earlier termination of this Agreement for a period of one hundred eighty (180) days and, prior to any activity on the Property by Purchaser, Purchaser or its agents or contractors shall provide Seller evidence of commercial general liability and, as applicable, workmen's compensation coverage covering the foregoing contractual indemnity, with coverage amounts in the amount of One Million and No/100 Dollars ($1,000,000).

**Section 4.5    Service Contract and Personalty Lease Termination**.  No later than ten (10) days before the Closing Date, Purchaser will advise Seller in writing of which Service Contracts or Personalty Leases, if any, it wishes Seller to terminate (and, in the absence of such notice, Purchaser shall be deemed to have elected to terminate all Service Contracts and Personalty Leases) and, to the extent such Service Contracts or Personalty Leases can be terminated without payment or penalty by Seller, Seller shall deliver notice of termination pursuant to the terms of such Service Contracts and/or Personalty Leases such that the termination is effective upon the Closing.  Purchaser shall assume the obligations of Seller under those Service Contracts and Personalty Leases that Purchaser does not elect to terminate in accordance with the terms hereof and any Service Contracts and Personalty Leases expressly identified on **Exhibit B** attached hereto as a "Must Assume Contract" that are terminable only upon payment of a penalty (unless Purchaser agrees to pay such penalty, in which case Seller shall terminate such Service Contract upon receipt of the applicable payment from Purchaser).  If any Service Contract or Personalty Lease that Purchaser has designated for termination is not immediately terminable as of Closing (by delivery of a notice of termination by Seller no later than three (3) business days after the date that Purchaser elects to terminate such Service Contracts or Personalty Leases), Purchaser shall assume all obligations of Seller thereunder for the period of time (up to a maximum period of 30 days) between the Closing Date and the date on which such Service Contract or Personalty Lease terminates following Seller's termination notice.  Notwithstanding the foregoing, Seller covenants and agrees that effective as of (or prior to) the Closing Date, Seller shall terminate any property management agreement, any agreements with affiliates of Seller, and any brokerage or listing agreement then in effect with respect to the Property and shall bear all costs with respect thereto which obligation shall survive the Closing.

[The Astoria – Hope Mills]

# ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 5.1    Seller Representations and Warranties**.  Seller represents and warrants to Purchaser, to the best of Seller's knowledge, as follows (which representations and warranties shall be true and correct as of the Effective Date and as of the Closing Date):

(a)    Seller is a limited liability company duly organized and legally existing under the laws of the State of North Carolina; has duly and validly authorized and executed this Agreement, and has full authority to enter into this Agreement and to carry out all of its terms, none of which will result in any breach or constitute default under any agreement or other instrument to which Seller is a party or by which Seller or the Property might be bound, and no consents, approvals, waivers, notifications, acknowledgments or permissions by any third party are required, or if required have been obtained, in order for Seller to execute and perform under this Agreement;

(b)    Seller has no knowledge of, and has received no written notice of, any existing, pending or threatened litigation actions, or claims, with respect to any aspect of the Property including, without limitation, condemnation or similar proceedings, other than those evictions of residential tenants in the ordinary course of Seller's business that are set forth on **Exhibit C** attached hereto, and other than as disclosed in the Title Commitment;

(c)    Seller has no knowledge of, and has received no written notice of, any violation or non-compliance with respect to the Property in connection with any restrictive covenants or deed restrictions affecting the Property nor with any zoning, subdivision, watershed, building, health, traffic, flood control, fire safety or other applicable rules, regulations, ordinances or statutes of any local, state or federal authorities or any other governmental entities having jurisdiction over the Property which violation or non-compliance was not satisfactorily resolved and concluded;

(d)    Seller is fully seized and possessed of the Premises subject to the rights of tenants as tenants only without any right or option to purchase or ground lease all or any portion of the Premises and Seller has full power and lawful authority to sell and convey the Property. Seller has no knowledge of, and has received no written notice of, any unpaid charges, debts, liabilities, claims or obligations arising from the construction, occupancy, ownership, use or operation of the Property prior to Closing which could give rise to any mechanic's or materialman's or other statutory liens against any of the Property which will not be paid by or bonded over by Seller at Closing, or for which Purchaser will be responsible;

(e)    Seller is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended (hereinafter the "Code"), Section 1445 and 7701;

(f)    **EXHIBIT B** attached hereto contains a complete list of all Service Contracts and Personalty Leases as of the Effective Date.  The copies of all such Service Contracts and Personalty Leases delivered or to be delivered by Seller to Purchaser pursuant to this Agreement are true and complete in all material respects as of the date provided.  There are no material events of default outstanding under any of the Service Contracts or Personalty Leases;

8

       (g)     The rent roll (the "Rent Roll") attached hereto as **EXHIBIT C** is true and correct in all material respects as of the date set forth thereon.  All tenants and occupants of the Property as of the date set forth on the Rent Roll, the space leased, the Lease expiration dates, the security deposits, and the rentals are identified on the Rent Roll.  True and complete copies of all Leases have been delivered to Purchaser and each of the Leases is in full force and effect and has not been amended except as set forth on the Rent Roll.  No tenant has been given free rent, any concession in the payment of rent or any abatement in the payment of rent, except as set forth in the Rent Roll.  Seller has paid all costs required to be paid as of the date hereof by the landlord to the tenants listed on the Rent Roll in connection with the leasing and preparation of space and has paid all obligations for brokerage commissions and finders' fees incurred in entering into those Leases and, if any such additional Leases are executed after the date of this Agreement and prior to Closing, Seller shall, at or prior to Closing, pay or provide for the payment of all such costs and commissions.  The Leases to the tenants listed on the Rent Roll are in force, there are no claims of Seller's default as landlord under any Lease by tenant except as set forth on **Exhibit C**, which claims are also contained in such tenant's lease file, and no tenant is in default under the Lease and no rent is delinquent, except as set forth on the Rent Roll.  Except as otherwise shown on the Rent Roll, (i) there are no security deposits under the Leases, and (iii) no tenant under the Leases has paid any rent, fees, or other charges more than one (1) month in advance.  Seller is the landlord under each of the Leases and has not assigned, mortgaged, pledged, sublet, hypothecated or otherwise encumbered any of its rights or interests under any of the Leases, other than pursuant to any financing arrangement of Seller that will be paid off at Closing.

       (h)     Seller has not filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition with respect to its assets, suffered the appointment of a receiver to take possession of substantially all of its assets, made a general assignment for the benefit of creditors, or suffered the attachment or other judicial seizure of substantially all of its assets and is not subject to any petition for relief under any law or statute related to bankruptcy, insolvency, or relief of debtors;

       (i)     Seller's Deliverables, are true, correct and complete copies, and have not been intentionally altered, amended, redacted (except as expressly contemplated by the terms of this Agreement) or otherwise modified in anticipation of the sale of the Property or Purchaser's inspections pursuant to this Agreement.  Seller's Deliverables are relied upon by Seller, were prepared in the ordinary course of Seller's business, and to the best of Seller's knowledge, are true and accurate in all material respects.

       (j)     Seller and each person or entity owning a direct or indirect interest in Seller, is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order, or regulation (collectively, the "List"), (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of the United States law, regulation, or Executive Order of the President of the United States, and (iii) not an Embargoed Person (as hereinafter defined).  None of the funds or assets of Seller constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and no Embargoed Person has any interest of any nature whatsoever in Seller (whether directly or indirectly).  The term "Embargoed Person" means any person, entity or government

subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder;

(k)     Seller has no knowledge of and has received no written notice of any condemnation, eminent domain or similar proceeding with respect to all or any portion of the Property; and

(l)     To Seller's knowledge, except as disclosed in any environmental report delivered to or obtained by Purchaser prior to the Effective Date, there are no storage tanks on or below the Property, and no release of hazardous materials has occurred at the Property during the course of Seller's ownership.  To Seller's knowledge, the Premises is not in violation of any Environmental Law (as defined below) relating to the Premises.  To Seller's knowledge, the Premises has not been used for industrial purposes or for the storage, treatment or disposal of "hazardous substances" (as defined by CERCLA), other than equipment, cleaning solutions, maintenance materials and other products that are customarily used or stored incidental to the operation or maintenance of the Premises and that are in ordinary quantities and have been used in strict compliance with all applicable Environment Law.  The term "Environmental Law" means any law, statute, ordinance, rule, regulation, order or determination of any governmental authority or agency affecting the Premises and pertaining to health or the environment including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. §§ 9601 et seq. ("CERCLA"), the Federal Resource Conservation and Recovery Act, 42 U.S.C.A. §§ 6901 et seq. ("RCRA"), the Hazardous Materials Transportation Act, 49 U.S.C.A. §§ 1801 et seq., or any other federal, state, or local law, ordinance or other Legal Requirements now or later promulgated pursuant to such laws or pertaining to the protection of human health or the environment, including, but not limited to, asbestos containing material, presumed asbestos containing materials, radon, lead based paint or petroleum products or any fraction of the same.

(m)     To Seller's knowledge, all Permits necessary for the operation of the Premises as currently conducted are in full force and effect (and Seller has not received written notice challenging the issuance or validity of any such Permits).

(n)     Seller owns legal and beneficial title to the Personal Property and the Intangible Property free and clear of all Liens.

(o)     Seller has no employees and there are no union or employment contracts or agreements affecting the Premises.

The foregoing covenants, representations and warranties of Seller are true and correct as of the date hereof and shall be in full force and effect and deemed to have been automatically reaffirmed and restated by Seller in their entirety as of the date and time of Closing, but shall survive the Closing only for the Survival Period, except for any representation as to which Purchaser obtains actual knowledge of or any changes in any foregoing representation which cause Seller's representations and warranties not to be true and correct in any respect and is disclosed in writing by Seller to Purchaser prior to Closing (the "Disclosures"), which Disclosures shall thereafter be updated by Seller to the date of Closing, provided, however, that notwithstanding

anything contained herein to the contrary, if the misrepresentation or change in any representation is attributable to breach or default by Seller under the terms of this Agreement, then Purchaser shall have the right to exercise the remedies set forth in Section 5.5. Any Disclosure shall be in writing and shall be delivered in accordance with the notice provisions of this Agreement. If Purchaser is notified in writing of any change in any representation or a breach of a warranty or agreement under this Agreement that is Material (as hereinafter defined) individually or in the aggregate, and Seller does not cure all such changes that are Material prior to the scheduled Closing Date (without adjournment), then Purchaser may elect to (i) close and consummate the transaction contemplated by this Agreement and thereby waive such representation and/or warranty; or (ii) terminate this Agreement by notice to Seller, whereupon as Purchaser's and Seller's sole remedies the Title Company shall disburse the full Deposit to Purchaser, Seller shall deliver a Default Payment to Purchaser and thereafter the Parties hereto shall have no further rights or obligations hereunder whatsoever except for such rights or obligations that, by the express terms hereof, survive any termination of this Agreement. For purposes of this Agreement, the term "Material" means anything individually or in the aggregate that, in Purchaser's reasonable opinion, will delay Closing or has a material adverse effect on (1) the use, operation, condition (financial or otherwise), or value of the Property or the return of the transaction, (2) Purchaser's ability to finance the acquisition of the Property with Purchaser's lender on terms that are substantially similar to those that would have been offered by such lender but for the item(s) at issue, or (3) the ability of Seller or Purchaser to perform its obligations under this Agreement.

The term "knowledge" as used in Section 5.1 or Section 5.4 with respect to a party shall mean the actual present and conscious awareness or knowledge of the Designated Representative of such party, without any duty of inquiry or investigation; provided that so qualifying such party's knowledge shall in no event give rise to any personal liability on the part of the Designated Representative, or any other officer or employee of such party, on account of any breach of any representation, warranty or covenant made by such party herein. Said "knowledge" does not include constructive knowledge, imputed knowledge, or knowledge of such party or such persons do not have but could have obtained through further investigation or inquiry. No broker, agent, or party other than Seller or Purchaser is authorized to make any representation or warranty for or on behalf of Seller or Purchaser, respectively. Seller represents and warrants that Seller's Designated Representative is involved in and has the greatest knowledge of the day-to-day operations of the Property. The "Designated Representative" of Seller is Adam Fletcher, and the "Designated Representative" Purchaser is Moshe Weingarten.

With respect to any post-Closing discovery by Purchaser of a breach of Seller's representations and warranties set forth in this Section 5.1, Purchaser shall be required to provide written notice to Seller of such claim prior to the expiration of the Survival Period (defined herein), and any litigation with respect to such claim shall be instituted by Purchaser on or before (60) days following the expiration of the Survival Period or else such right shall be waived. Notwithstanding anything to the contrary herein, (i) no claim shall be made by Purchaser under this Section 5.1 unless the aggregate amount of exposure or damage claimed exceeds the sum of Fifty Thousand and No/100 Dollars ($50,000.00) (the "Liability Floor"), and if the aggregate claim amount exceeds the Liability Floor, then Seller shall be liable for the entire amount thereof, subject to the limitations set forth below, (ii) the maximum liability of Seller following the Closing under this Section 5.1 shall not exceed the aggregate sum of One Million and No/100 Dollars ($1,000,000.00), and (iii) in no event shall Seller have any liability to Purchaser with respect to a

breach of representation, warranty or covenant under this Agreement to the extent Purchaser had knowledge of such breach prior to Closing. Seller hereby covenants (which covenant shall survive Closing) that Maxus Operating Limited Partnership, a Delaware limited partnership, shall maintain a liquid net worth of not less than $1,000,000 for six (6) months following Closing (except to the extent that a claim against Seller is asserted by Purchaser prior to the six (6) months following Closing, in which case such covenant shall survive until such claim is finally resolved) to pay any potential post-Closing claims against Seller under this Agreement. The provisions of this paragraph shall survive the Closing.

      **Section 5.2    AS-IS SALE; SELLER RELEASED FROM LIABILITY**. EXCEPT AS EXPRESSLY PROVIDED FOR HEREIN OR IN THE DOCUMENTS DELIVERED IN CONNECTION WITH THE CLOSING (THE "UNDERLINE_CLOSING DOCUMENTS"), THE PROPERTY IS BEING SOLD IN AN "AS IS," "WHERE IS" CONDITION AND "WITH ALL FAULTS" AS OF THE EFFECTIVE DATE, SUBJECT TO NORMAL WEAR AND TEAR AND DAMAGE BY FIRE OR OTHER CASUALTY AS SET FORTH HEREIN. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, AND NO RESPONSIBILITY HAS BEEN OR IS ASSUMED AND/OR UNDERTAKEN BY SELLER OR BY ANY PARTNER, OFFICER, DIRECTOR, PERSON, FIRM, AGENT, ATTORNEY OR REPRESENTATIVE ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER (INCLUDING SELLER'S BROKER) AS TO, CONCERNING OR WITH RESPECT TO (A) THE CONDITION OR STATE OF REPAIR OF THE PROPERTY; (B) THE COMPLIANCE OR NONCOMPLIANCE OF THE PROPERTY WITH ANY APPLICABLE LAWS, REGULATIONS OR ORDINANCES (INCLUDING, WITHOUT LIMITATION, ANY APPLICABLE ZONING, BUILDING, HANDICAPPED ACCESSIBILITY, OR DEVELOPMENT LAWS, CODES, RULES AND REGULATIONS); THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (C) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED WITHIN THE PROPERTY; (D) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON; (D) THE VALUE, EXPENSE OF OPERATION, OR INCOME POTENTIAL OF THE PROPERTY; (E) ANY OTHER FACT OR CONDITION WHICH HAS OR MIGHT AFFECT THE PROPERTY OR THE CONDITION, STATE OF REPAIR, COMPLIANCE, VALUE, EXPENSE OF OPERATION OR INCOME POTENTIAL OF THE PROPERTY OR ANY PORTION THEREOF; (F) WHETHER THE PROPERTY CONTAINS ASBESTOS OR ANY OTHER HARMFUL, HAZARDOUS OR TOXIC SUBSTANCES OR PERTAINING TO THE EXTENT, LOCATION OR NATURE OF SAME, OR THE CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, WATER, SOIL, AND GEOLOGY OR (G) THE FINANCIAL PROSPECTS AND OTHER OPERATIONAL RESULTS OF THE PROPERTY OR THE ABILITY OF ANY TENANT THEREOF TO PAY ANY SUM(S) DUE UNDER THE LEASES. THE PARTIES AGREE THAT ALL UNDERSTANDINGS AND AGREEMENTS HERETOFORE MADE BETWEEN THEM OR THEIR RESPECTIVE AGENTS OR REPRESENTATIVES (INCLUDING PURCHASER'S BROKER AND SELLER'S BROKER)

ARE MERGED IN THIS AGREEMENT AND THE EXHIBITS HERETO ANNEXED AND THE CLOSING DOCUMENTS, WHICH ALONE FULLY AND COMPLETELY EXPRESS THEIR AGREEMENT.  PURCHASER SHALL NOT RELY UPON ANY STATEMENT OR REPRESENTATION BY OR ON BEHALF OF SELLER UNLESS SUCH STATEMENT OR REPRESENTATION IS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS.

PURCHASER ACKNOWLEDGES THAT PURCHASER IS A SOPHISTICATED BUYER WHO IS FAMILIAR WITH THIS TYPE OF PROPERTY.  PURCHASER IS ACQUIRING THE PROPERTY "AS IS," "WHERE IS" AND "WITH ALL FAULTS," IN ITS PRESENT STATE AND CONDITION, WITHOUT REPRESENTATION OR WARRANTY BY SELLER OR ANY OF ITS REPRESENTATIVES OR AGENTS (INCLUDING SELLER'S BROKER) AS TO ANY MATTERS WHATSOEVER EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, AND TO THE MAXIMUM EXTENT PERMITTED BY LAW, NO PATENT OR LATENT CONDITION AFFECTING THE PROPERTY IN ANY WAY, WHETHER OR NOT KNOWN OR DISCOVERABLE OR HEREAFTER DISCOVERED, SHALL AFFECT PURCHASER'S OBLIGATIONS HEREUNDER, NOR SHALL ANY SUCH CONDITION GIVE RISE TO ANY RIGHT OF DAMAGES, RESCISSION OR OTHERWISE AGAINST SELLER.

PURCHASER ACKNOWLEDGES THAT IT WILL HAVE THE OPPORTUNITY TO INSPECT THE PROPERTY DURING THE PERIOD BETWEEN THE EFFECTIVE DATE AND THE CLOSING DATE, AND DURING SUCH PERIOD, OBSERVE ITS PHYSICAL CHARACTERISTICS AND EXISTING CONDITIONS AND THE OPPORTUNITY TO CONDUCT SUCH INVESTIGATION AND STUDY ON AND OF THE PROPERTY AND ADJACENT AREAS AS PURCHASER DEEMS NECESSARY. BASED UPON THE FOREGOING, EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, PURCHASER FOREVER RELEASES AND DISCHARGES SELLER, AS OF THE CLOSING, FROM ALL RESPONSIBILITY AND LIABILITY TO PURCHASER, INCLUDING WITHOUT LIMITATION, LIABILITIES UNDER ANY ENVIRONMENTAL LAWS, REGARDING THE CONDITION, VALUATION, SALABILITY OR UTILITY OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PURPOSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, WITH RESPECT TO THE PRESENCE IN THE SOIL, AIR, STRUCTURES AND SURFACE AND SUBSURFACE WATERS, OF HAZARDOUS MATERIALS OR OTHER MATERIALS OR SUBSTANCES THAT HAVE BEEN OR MAY IN THE FUTURE BE DETERMINED TO BE TOXIC, HAZARDOUS, UNDESIRABLE OR SUBJECT TO REGULATION AND THAT MAY NEED TO BE SPECIALLY TREATED, HANDLED AND/OR REMOVED FROM THE PROPERTY UNDER CURRENT OR FUTURE FEDERAL, STATE AND LOCAL LAWS, REGULATIONS OR GUIDELINES, AND ANY STRUCTURAL AND GEOLOGIC CONDITIONS, SUBSURFACE SOIL AND WATER CONDITIONS AND SOLID AND HAZARDOUS WASTE AND HAZARDOUS MATERIALS ON, UNDER, ADJACENT TO OR OTHERWISE AFFECTING THE PROPERTY).  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, PURCHASER FURTHER, AS OF THE CLOSING, WAIVES (AND BY CLOSING THIS TRANSACTION WILL BE DEEMED TO HAVE WAIVED) ANY AND ALL OBJECTIONS AND COMPLAINTS (INCLUDING, BUT NOT LIMITED TO, FEDERAL, STATE AND LOCAL STATUTORY

13

AND COMMON LAW BASED ACTIONS, AND ANY PRIVATE RIGHT OF ACTION UNDER ANY FEDERAL, STATE OR LOCAL LAWS, REGULATIONS OR GUIDELINES TO WHICH THE PROPERTY IS OR MAY BE SUBJECT, INCLUDING, BUT NOT LIMITED TO, CERCLA) IT MAY HAVE AGAINST SELLER CONCERNING THE PHYSICAL CHARACTERISTICS AND ANY EXISTING CONDITIONS OF THE PROPERTY.  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, PURCHASER FURTHER HEREBY ASSUMES THE RISK THAT ADVERSE PHYSICAL CHARACTERISTICS AND CONDITIONS, INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF HAZARDOUS MATERIALS OR OTHER CONTAMINANTS, MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION.

**Section 5.3    Pre-Closing Covenants of Seller**.  Seller covenants and agrees with Purchaser as follows with respect to the period between the Effective Date and the Closing Date:

(a)    Unless such Service Contract or Personalty Lease is listed in **Exhibit B** and expressly identified therein as a "Must Assume Contract", Seller shall not enter into any Service Contracts or Personalty Leases which would continue for a period subsequent to the Closing Date without the prior written approval of Purchaser, such consent may be withheld in Purchaser's sole discretion;

(b)    Seller will use commercially reasonable efforts to lease all vacant apartment units in a manner with its customary practices, in substantial compliance with the rental standards and form lease annexed hereto as **Exhibit D** and with security deposits and at market rental rates, with no rent concessions or free rent periods after the Closing Date unless agreed to in writing by Purchaser, with lease terms of no less than thirty (30) days and no more than twelve (12) months;

(c)    Seller shall neither transfer nor remove any Personal Property or fixtures from the Property subsequent to the date hereof, except for any of such Personal Property that may be used, consumed or replaced by Seller in the ordinary course of operation of the Property with materials of like kind and quality;

(d)    Seller shall from the date hereof continue to maintain, operate and manage the Property in the same manner that it has heretofore maintained and operated the Property and all rental units shall be in "rentable condition" as of the Closing Date (i.e., broom clean, with fresh paint, cleaned carpeting and working appliances); provided, however, Seller and Purchaser acknowledge that rental units which are vacated within three (3) days prior to the Closing Date will be in varying conditions of make-ready for leasing, as is ordinary in Seller's course of business. With respect to any rental unit which is vacated on or before three (3) days prior to the Closing and not in rentable condition, such event shall not be a default of Seller, but instead Seller shall provide Purchaser with a credit against the Purchase Price due at Closing, which credit shall be equal to $750.00 per such rental unit(s);

(e)    Seller will not knowingly use or occupy, or knowingly allow the use or occupancy of, the Property in any manner which violates any governmental requirements or which constitutes a waste or a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.  Seller will not initiate any zoning reclassification of the Property or seek any variance under existing zoning ordinances

applicable to the Property. Seller will not impose any restrictive covenants, liens or encumbrances on the Property or execute or file any subdivision plat affecting the Property nor permit such imposition, execution or filings by any other party;

(f)    Seller hereby agrees that from the date hereof until Closing it will maintain in force, fire and extended coverage insurance upon the Property and public liability insurance with respect to damage or injury to persons or property occurring on the Property in such amounts as is maintained by Seller on the date of this Agreement;

(g)    Seller shall notify Purchaser of any pending or threatened litigation or governmental proceeding related to the Property or the Seller promptly after Seller has received notice thereof;

(h)    Seller shall not apply any refundable security deposits against rents unless the applicable tenant's Lease shall have expired or been terminated and such tenants shall have fully vacated and surrendered their units; and

(i)    Each month and upon request from time-to-time by Purchaser, provide to Purchaser the following periodic reports by email to max@valorresidential.com: rent roll, collections, delinquency, occupancy, move-in and move-out reports, utility bills, operating statements, default notices sent or received, proceedings affecting, or threatened against, the Property, violation of law or ordinances or applicable deed restrictions or other covenants, restrictions or agreements relating to the Property.

**Section 5.4    <u>Purchaser Representations and Warranties</u>.**    Purchaser represents and warrants to Seller, to the best of Purchaser's knowledge, as follows (which representations and warranties shall be true and correct as of the Effective Date):

(a)    As of the Closing, Purchaser will be a limited liability company duly organized and legally existing under the laws of the State of its formation, will be duly qualified to do business in the State of North Carolina, has duly and validly authorized and executed this Agreement, and has full authority to enter into this Agreement and to carry out all of its terms, none of which will result in any breach or constitute default under any agreement or other instrument to which Purchaser is a party;

(b)    Purchaser is not a "foreign person" within the meaning of Sections 1445 and 7701 of the Code;

(c)    Purchaser has not filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by its creditors, suffered the appointment of a receiver to take possession of substantially all of its assets, or suffered the attachment or other judicial seizure of substantially all of its assets; and

(d)    Purchaser and each person or entity owning a direct interest in Purchaser, is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("<u>OFAC</u>") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order, or regulation (collectively, the "List"), (ii) not a person or entity with whom a citizen of the United

States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of the United States law, regulation, or Executive Order of the President of the United States, and (iii) not an Embargoed Person (as hereinafter defined). None of the funds or assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly). The term "Embargoed Person" means any person, entity or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder.

Section 5.5    **Defaults and Remedies.**  Without limiting or expanding the remedies provided in Section 3.1, the following shall apply to any other default:

(a)    No party shall declare the other party in default under this Agreement without first giving the defaulting party written notice specifying the alleged default and a period of five (5) days after receipt of such written notice to cure the same.

(b)    If the purchase and sale of the Property is not consummated in accordance with the terms and provisions of this Agreement due to a breach or default by Seller under this Agreement, Purchaser, as its sole and exclusive remedy, shall have the right to either (i) enforce specific performance of Seller's obligations hereunder and if specific performance is unavailable because Seller has conveyed or encumbered the Property such that specific performance is practically unavailable to Purchaser, Purchaser shall have all rights available at law or in equity, and, if Purchaser prevails in any such suit, to recover all costs incidental to such suit, including attorneys' fees and expenses, (ii) terminate this Agreement and receive a refund of the Deposit and Seller shall deliver a Default Payment to Purchaser, whereupon neither Party shall have any further obligation to the other Party hereunder, or (iii) expressly waive said default in writing and proceed to Closing without any reduction in the Purchase Price. For purposes of this Section 5.5, a "Default Payment" shall be the amount equal to the lesser of (A) the out-of-pocket, third party costs expended by Purchaser for due diligence, analysis and financing related to the purchase and sale of the Property under this Agreement, including without limitation costs and expenses related to the Title Commitment, inspections made by Purchaser, any fees or other costs incurred by Purchaser related to financing the purchase of the Property, and attorney fees and expenses, or (B) Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00); provided however that if Seller has wrongly conveyed or encumbered the Property such that specific performance is practically unavailable to Purchaser, then the Default Payment shall be the amount set forth in (A) above without limitation by (B) above. Notwithstanding anything herein to the contrary, Purchaser shall be deemed to have elected clause (ii) above (including, without limitation, to terminate this Agreement) if Purchaser fails to deliver to Seller written notice of its intent to file a claim or assert a cause of action for specific performance against Seller on or before thirty (30) days following the scheduled Closing Date (as such date may have been adjourned) or, having given such notice, fails to file a lawsuit asserting such claim or cause of action in the county in which the Property is located within sixty (60) days following the scheduled Closing Date (as such date may have been adjourned). Purchaser hereby waives any other rights or remedies with respect to default including the right to seek money damages not set forth in this Section, other than as set forth in Section 5.1. If Closing is consummated, Purchaser shall have all remedies available at law or in equity with

16

respect to the enforcement of any obligation of Seller that survives Closing under the express terms of this Agreement.

(c)     If the purchase and sale of the Property is not consummated in accordance with the terms and provisions of this Agreement due to a breach or default by Purchaser under this Agreement, then Seller, as its sole and exclusive remedy, may terminate this Agreement by notifying Purchaser thereof and receive and retain the Deposit as liquidated damages, provided that this provision shall not limit Seller's rights to pursue and recover on a claim with respect to any indemnity obligations of Purchaser pursuant to Sections 4.1, 4.3, or 10.1.  THE PARTIES HAVE AGREED THAT SELLER'S ACTUAL DAMAGES, IN THE EVENT PURCHASER DEFAULTS HEREUNDER DUE TO NO BREACH OF SELLER, WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.   AFTER NEGOTIATION, THE PARTIES HAVE AGREED THAT, CONSIDERING ALL THE CIRCUMSTANCES EXISTING ON THE EFFECTIVE DATE, THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE OF THE COSTS, EXPENSES AND DAMAGES THAT SELLER WOULD INCUR IN SUCH EVENT.  If Closing is consummated, Seller shall have all remedies available at law or in equity with respect to the enforcement of any obligation of Purchaser that survives Closing under the express terms of this Agreement.

(d)     In the event legal action is instituted to interpret or enforce the provisions of this Agreement, the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and attorney's fees, including all costs and fees that are incurred in any trial, on any appeal and/or in any bankruptcy proceeding.  For purposes of this Agreement, "prevailing party" shall include a party obtaining substantially the relief sought, whether by compromise, settlement or otherwise.

## ARTICLE VI
## CONDITIONS

**Section 6.1    Purchaser's Closing Conditions.**    The obligations of Purchaser to consummate the transaction contemplated hereby are subject to the following conditions which, if not fulfilled by Closing or as otherwise provided herein, shall be a default of Seller subject to applicable notice and cure periods, as provided herein; provided, however, that if notwithstanding the failure of such conditions, Purchaser proceeds to Closing, then Purchaser shall be deemed to have elected to waive such conditions and proceed to Closing with no adjustment to the Purchase Price:

(a)     The transactions contemplated under this Agreement to be effected on the Closing Date shall not be restrained or prohibited by any injunction or order or judgement rendered by any court or other governmental agency of competent jurisdiction and no proceeding shall have been instituted and be pending in which any creditor of Seller or any other person seeks to restrain such transaction or otherwise attach any of the Property, provided that such proceeding or action contemplated by this Section 6.1(a) shall not be brought by, through or under Purchaser;

(b)     All warranties and representations made by Seller herein are and remain truthful in all material respects; provided that a failure of this condition shall not be a default of Seller, but shall give Purchaser the remedies set forth in Section 5.1 of this Agreement; and

17

[The Astoria – Hope Mills]

(c)     Seller shall have performed all material covenants, agreements and obligations under this Agreement.

**Section 6.2     Seller's Closing Conditions.**  The obligations of Seller to consummate the transaction contemplated hereby are subject to the following conditions which, if not fulfilled by Closing or as otherwise provided herein, shall be a default of Purchaser subject to applicable notice and cure periods, as provided herein; provided, however, that if notwithstanding the failure of such conditions, Seller proceeds to Closing, then Seller shall be deemed to have elected to waive such conditions and proceed to Closing:

(a)     All warranties and representations made by Purchaser herein are and remain truthful in all material respects.

Nothing set forth in this Article 6 shall be construed, nor is anything herein intended, to limit the rights and remedies of any Party otherwise set forth in this Agreement in connection with the default of any Party.

**ARTICLE VII**
**CLOSING**

**Section 7.1     Closing Date.**  Closing shall occur sixty (60) days following the Effective Date (such ultimate date, the "Closing Date").  Notwithstanding anything contained in this Agreement to the contrary but without limiting any other Purchaser adjournment rights set forth in this Agreement, Purchaser, in its sole discretion, shall have the one time right to adjourn the scheduled Closing Date, for a period not to exceed thirty (30) days, provided that to exercise each such adjournment option, not later than five (5) days before the then scheduled Closing Date, Purchaser delivers written notice of such exercise to Escrow Agent and Seller and Purchaser delivers to Escrow Agent an additional earnest money deposit in the sum of One Million Dollars ($1,000,000), which additional deposit shall become nonrefundable to Purchaser except as otherwise expressly provided in this Agreement.  At the Closing, the Deposit and all additional earnest money deposits shall be applied toward the Purchase Price.  At Closing, the following shall occur:

(a)     The Title Company shall perform the services of Title Company pursuant to the terms and conditions of this Agreement, and Seller and Purchaser agree to indemnify and hold the Title Company harmless for any liability, costs and expenses, including reasonable attorneys' fees, it may incur as a result of its services as escrow agent, other than such liability, costs and expenses arising directly or indirectly from the Title Company's own gross negligence or willful misconduct.

(b)     At Closing, Seller shall deliver to Purchaser and/or the Title Company, as applicable, the items specified herein and the following documents and instruments, duly executed and acknowledged:

(i)     A Special Warranty Deed dated as of the Closing Date, in the form of **EXHIBIT E** attached hereto, conveying fee simple title to the Land and the Improvements to Purchaser or its permitted assignee, subject only to the Permitted Exceptions;

18

(ii)     The Bill of Sale and Assignment attached as **EXHIBIT F** hereto (the "Bill of Sale") for the Personal Property, the Intangible Property, and the Permits;

(iii)    An executed Assignment and Assumption Agreement with respect to the Leases and those Service Contracts and Personalty Leases that Purchaser elects to assume or is a Must Assume Contract, in the form of **EXHIBIT G** attached hereto (the "Assignment Agreement");

(iv)    Tenant notice letters, dated as of the Closing Date, containing Seller's authorization to the tenants of the Property for payment or rental for periods beginning on and after the Closing Date directly to Purchaser or Purchaser's managing agent in the form of **EXHIBIT H** attached hereto, and notices to each of the vendors under Service Contracts that Purchaser elects to assume pursuant to the terms of this Agreement, advising of the sale of the Property to Purchaser;

(v)     a certificate of the Seller dated as of the Closing Date, certifying that all of Seller's representations and warranties set forth in this Agreement remain true and correct in all material respects, subject to any Disclosures, and attaching an updated Rent Roll for the Property that shall be certified by Seller to be true, complete and correct in all material respects as of no earlier than two (2) days before the Closing Date;

(vi)    Evidence acceptable to the Title Company, authorizing the consummation by Seller of the purchase and sale transaction contemplated hereby and the execution and delivery of the closing documents on behalf of Seller;

(vii)   An executed certificate with respect to Seller's non-foreign status sufficient to comply with the requirements of Section 1445 of the Code, and all regulations applicable thereto; and

(viii)  Such affidavit and indemnity as the Title Company shall reasonably require to issue its Owner's Policy of Title Insurance without exception for mechanic's or materialman's liens or rights of parties in possession except for apartment tenants, as tenants only, under the unrecorded Leases, and an affidavit of no change as to the Survey as the Title Company shall reasonably require.

(ix)    a settlement statement approved by the parties with respect to the Closing duly executed by Seller;

(x)     a broker lien waiver executed by Seller's Broker (as defined in Section 10.1) in form satisfactory to the Title Company; and

(xi)    Such other instruments and documents as may reasonably be necessary in order to complete the Closing of the transactions contemplated hereunder, the form and content of which shall be acceptable to Seller and Purchaser.

(c)     At the Closing, Purchaser, or its permitted assignee, shall do the following:

(i)     Pay to the Title Company the Purchase Price as set forth in Article 3;

[The Astoria – Hope Mills]

(ii)     Deliver to Seller and/or the Title Company the Assignment Agreement executed by Purchaser or its permitted assignee;

(iii)    a settlement statement approved by the parties with respect to the Closing duly executed by Purchaser;

(iv)    Provide evidence, acceptable to the Title Company, authorizing consummation by Purchaser of the purchase and sale transaction contemplated hereby and execution and delivery of the closing documents on behalf of Purchaser; and

(v)     Such other instruments and documents as may reasonably be necessary in order to complete the Closing of the transactions contemplated hereunder, the form and content of which shall be acceptable to Seller and Purchaser.

(d)     The following which are in possession of the Seller shall be left at the Property or delivered to Purchaser at Closing (which obligation shall survive Closing): the original Leases, Lease files, Service Contracts and Personalty Leases assumed by Purchaser (or true and correct copies thereof), all then-effective and tangible permits, guaranties, warranties and licenses with respect to the Property, the keys and key-codes to the Property, the books and records of the Property in Seller's possession or control (excluding any attorney-client privileged materials) and copies of the plans and specifications for the Improvements.  Seller shall transfer to Purchaser each of the following accounts used in connection with the Property:   Google My Business, telecommunication providers, all utilities accounts (e.g., electric, gas, water), domain name, website, and phone numbers, in order to change the ownership information associated with such accounts and effectuate a transfer of such accounts and Intangible Property effective no later than the Closing.  Seller's obligations under this Section 7.1(d) shall survive the Closing.

**Section 7.2    Apportionments**.  All Property-related items of income and expense, including but not limited to the following, shall be apportioned between Seller and Purchaser as of 11:59 p.m. on the day prior to the Closing Date (the "Proration Date") as follows:Taxes.  All real estate taxes, personal property taxes and assessments affecting the Property (on the basis of the most recent ascertainable tax bill if the bill for the current tax year is not then available) shall be prorated on a per diem basis as of the Proration Date based on the tax bills for the year of the Closing.  Seller shall pay Taxes for all years prior to the current tax year.  In the event the Taxes are not determinable at the time of Closing, the Taxes shall be prorated on the basis of the best available information and such items shall be reprorated as soon as practicable after the Closing Date.  In the event any of the Taxes are delinquent at the time of Closing, the same shall be paid by Seller at Closing.

(b)     Rents.  Rents and other recurring income relating to the Property and collected by Seller for the month in which Closing occurs shall be deemed earned ratably on a per diem basis and shall be prorated as of the Proration Date.  Amounts collected by Seller prior to the date of Closing as rent for each day occurring after the Proration Date and all other prepaid amounts shall be credited to the Purchaser at Closing.  All such amounts collected by Seller or Purchaser from tenants or other payors after Closing shall be paid over and applied in the following order of priority:  (i) first, on account of current rents and other sums currently due to Purchaser after Closing, (ii) then, on account of rents and other sums due to Seller and Purchaser (and

pro-rated between them as of the Proration Date) for the month in which Closing occurs, and (iii) thereafter, on account of rents and other sums due to Seller for any month prior to the month of Closing.

(c)     Other.  All normal and customarily proratable items including without limitation operating expenses, payments due under the Service Contracts and Personalty Leases which are assumed by Purchaser, shall be apportioned pro rata between Seller and Purchaser on a per diem basis based upon a calendar year.

(d)     Security/Pet Deposits.  The total sum of all refundable tenant security deposits required to be held by or on behalf of Seller under the Leases shall be transferred to Purchaser at Closing by operation of a credit against the Purchase Price. Any security deposits in the form of a letter of credit shall be assigned to Purchaser by the issuer at Closing without cost to Purchaser. All nonrefundable security deposits and nonrefundable upfront fees paid by tenants and all pet deposits shall belong to Seller.

(e)     Utility Meter Readings.  All water, electric, gas and other utilities servicing the Property shall be prorated on a per diem basis as of the Proration Date (on the basis of the most recent utility bill for each such utility).  If the Property calculates tenant obligations using the RUBS system, then upon obtaining readings of the meters measuring exclusively utility consumption which is to be paid in full by tenants under Leases, Seller shall pay the charges incurred prior to the Closing Date as reasonably determined by both Purchaser and Seller based upon such readings, and at Closing, Purchaser shall receive a RUBS credit in an amount reasonably estimated to represent the anticipated obligation of tenants after Closing.

(f)     Door Fees.  Any bonuses, one-time inducement payments, "door fees" or other lump sum payments, if any, received by Seller on or after the date that is one (1) year prior to the Effective Date shall be prorated as of the Closing Date.

(g)     True-up.  If at any time during the one hundred eighty (180) day period following Closing the actual amount of any pro-rated items that were based upon estimations at Closing, including without limitation, utilities and other operating expenses with respect to the Property for the month in which the Closing occurs, are determined, the Parties agree to adjust the proration of utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.  This provision shall survive Closing and recordation of the Special Warranty Deed for one hundred eighty (180) days.

(h)     Closing Costs.  Seller shall pay (1) all of Seller's legal costs and expenses; (2) any excise, transfer, deed or stamp tax, and the recording and filing fees, incurred in connection with the recording of the deed; (3) all Liens affecting the Property, including all release fees; (4) 100% of the brokerage fees payable to Seller's Broker in accordance with Section 10.1; and (5) 50% of the escrow fees charged by the Title Company.  Purchaser shall pay (i) 50% of the escrow fees charged by the Title Company, (ii) all of Title Company's title search and exam fees, (iii) the premium for the owner's policy of title insurance and any endorsements thereto, (iv) the cost of any survey or other inspections of the Property ordered by Purchaser, (v) the cost of any lender's policy of title insurance and any endorsements thereto, and (vi) all Purchaser's legal costs and expenses.  All other costs and expenses incurred in connection with the transaction contemplated

hereby and not specifically allocated herein shall be paid by the Party incurring the same (in addition to any other cost or expense allocated thereto hereunder).

Any credit due to Purchaser pursuant to Section 7.2 shall be applied as a credit against the Purchase Price, and any credit due to Seller pursuant to Section 7.2 shall be paid by Purchaser to Seller at Closing as an addition to the Purchase Price.

**Section 7.3    Settlement Statement**.  At Closing and/or at any time and from time to time after Closing, Purchaser and Seller agree to execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered such settlement statements reflecting the transaction and prorations to be made at Closing and such other additional instruments or documents and to take or cause to be taken such further action as the other party may reasonably request to evidence and effectuate the transactions contemplated under this Agreement.  This provisions of this Section shall survive Closing.

<div align="center">

**ARTICLE VIII**
**POSSESSION**

</div>

Purchaser shall be entitled to exclusive possession of the Property at Closing, subject only to the Permitted Exceptions, including without limitation, tenants' rights under the Leases.

<div align="center">

**ARTICLE IX**
**SURVIVAL**

</div>

Except those obligations of Seller or Purchaser that expressly survive the Closing or termination of this Agreement (which obligations shall survive without limitation unless otherwise set forth in this Agreement), all other warranties, representations, covenants, obligations and agreements contained in this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period of one hundred eighty (180) days after the Closing Date (the "Survival Period").

<div align="center">

**ARTICLE X**
**COMMISSIONS**

</div>

**Section 10.1    Brokers**.  Seller and Purchaser each warrant and represent to each other that no realtor, broker, finder, or other intermediary has been involved with or employed by such Party in connection with the transaction contemplated by this Agreement, other than MMG Real Estate Advisors ("Seller's Broker"), which shall be paid by Seller in accordance with the terms of a separate agreement between Seller and Seller's Broker.  Except as to Seller's Broker (whose brokerage fee shall be the sole responsibility of Seller), Seller and Purchaser agree to indemnify, hold harmless and defend the other from and against claims, loss, liability, cost and expense (including reasonable attorneys' fees at or before the trial level and any appellate proceedings) arising out of any claim made by any realtor, broker, finder or any other intermediary who claims to have been engaged, contracted or utilized by the indemnifying party in connection with the transaction which is the subject matter of this Agreement.  This indemnification shall survive Closing or any termination of this Agreement.

<div align="center">22</div>

# ARTICLE XI
# RISK OF LOSS

**Section 11.1    Casualty**.  If any time prior to the Closing any portion of the Property is destroyed or damaged by fire or other casualty whatsoever, Seller shall give notice thereof to Purchaser within five (5) business days after Seller becomes aware of such casualty, but in any event prior to Closing.  The rights and obligations of the parties by reason of such destruction or damage shall be as follows:

(a)    If the "cost of repair and restoration" (as such term is defined in Section 11.2) of such destruction of damage shall be One Million Two Hundred Fifty Thousand and No/100 United States Dollars ($1,250,000.00) or less, Seller shall, at its option, either (a) repair the damage before the Closing in a manner reasonably satisfactory to Purchaser (and if necessary, Seller may extend the Closing Date up to thirty (30) days to complete such repairs), or (b) assign to Purchaser at Closing, by means of a valid and enforceable assignment acceptable to Seller's insurer carrier, any insurance proceeds, including, without limitation, the proceeds from rent loss insurance for the period of construction, if any (and any claim for such insurance proceeds) available to Seller on the Closing Date on account of such damage (less any amounts expended by Seller in connection with the collection of such proceeds or any restoration), and pay to Purchaser the amount of any deductible. The payment will be in current funds or by credit in favor of Purchaser on the closing statements to be delivered at Closing.

(b)    If the "cost of repair and restoration" of such destruction or damage shall exceed One Million Two Hundred Fifty Thousand and No/100 United States Dollars ($1,250,000.00) or if there is any uninsured loss, Purchaser may elect to terminate this Agreement in which event the Deposit shall be refunded to Purchaser immediately upon request, all rights and obligations of the parties under this Agreement shall expire and this Agreement shall become null and void; and if Purchaser does not elect to terminate this Agreement, the Closing shall occur as scheduled in accordance with the terms of this Agreement, whereupon Seller shall assign to Purchaser at Closing, by means of a valid and enforceable assignment acceptable to Seller's insurer carrier, any insurance proceeds including, without limitation, the proceeds from rent loss insurance for the period of construction, if any (and any claim for such insurance proceeds) available to Seller on the Closing Date on account of such damage (less any reasonable out of pocket amounts expended by Seller in connection with the collection of such proceeds or any restoration), and pay to Purchaser the amount of any deductible, and the sale shall be closed without Seller's repairing such damage.  In the event Purchaser elects to terminate this Agreement in accordance with the terms of this Section 11.1(b), the Deposit shall be refunded to Purchaser immediately and this Agreement shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder other than any obligations that expressly survive termination of this Agreement.

**Section 11.2    Cost of Repair and Restoration**.  For purposes of this Agreement, the term "cost of repair and restoration" shall mean an estimate of the actual cost of repair and restoration obtained by Seller from a reputable third-party contractor, reasonably acceptable to both Purchaser and Seller, regularly doing business in the Hope Mills, North Carolina area.

23

**Section 11.3    Condemnation**.  If (i) the whole or any part of the Property or any interest in the Property is taken by condemnation or right of eminent domain prior to Closing, and (ii) such taking by condemnation or right of eminent domain results in (A) the taking of all or any part of the Improvements, (B) the loss of any parking spaces or other areas which causes the Property not to comply with then applicable zoning ordinances or other applicable laws, rules or regulations, or (C) a loss of any means of vehicular access to the Property, at Purchaser's option this Agreement shall terminate.  If Purchaser elects not to terminate this Agreement or does not have the right to do so under this Section 11.3, the transactions contemplated by this Agreement shall be closed in accordance with the terms of this Agreement notwithstanding any such taking, but at Closing Seller shall assign to Purchaser all of Seller's rights to collect any awards which may be payable as a result of, or recoverable against others for, such taking.

**Section 11.4    Settlement**.  Seller shall not settle any insurance claim with respect to casualty or condemnation or similar proceeding affecting the Property during the pendency of this Agreement without Purchaser's consent, which shall not be unreasonably withheld, conditioned or delayed.

**Section 11.5    Precedence**.  The provisions of this Article 11 shall control the rights and duties of the Parties, in lieu of any contrary provisions of law.

<div align="center">

**ARTICLE XII**
**NOTICES**

</div>

**Section 12.1**    Any notice, request, demand, instruction or other communication to be given to either party hereunder except those required to be delivered at Closing, shall be in writing, and shall be deemed to be delivered (a) upon receipt, if hand delivered, (b) on the first business day after having been delivered to a national or overnight air courier service, (c) three (3) business days after deposit in registered or certified mail, return receipt requests, or (d) upon having been sent by the notifying party by electronic mail, in all cases, as applicable, addressed as follows:

If to Purchaser:

c/o Valor Residential Group LLC
3 Alpine Court, Suite 200
Chestnut Ridge, NY 10977
Attention: Max Weingarten
Email: max@valorresidential.com
Telephone: (845) 480-0825
With a copy to:

Lubin Law Group LLC
9 Belvedere Lane, Suite 101
Lakewood, NJ 08701
Attention: Michael E. Lubin, Esq.
Email:  mlubin@mlubinlaw.com
Telephone: (917) 885-7363

If to Seller:

c/o Maxus Properties
Attn: Adam Fletcher, Vice President
104 Armour Road
North Kansas City, MO 64116
Phone: (816) 303-4500
Email: afletcher@maxusprop.com

With a copy to:

Stinson LLP
Attn: Karl Phares, Christopher Frantze
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Phone: (816) 842-8600
Email: karl.phares@stinson.com; chris.frantze@stinson.com

## ARTICLE XIII
## MISCELLANEOUS

**Section 13.1    Counterparts**.  This Agreement may be executed in any number of counterparts which together shall constitute the agreement of the Parties.  The Parties further agree that the delivery of a Party's signature by facsimile or other electronic transmittal (including electronic mail and .PDF) shall have the same legal effect as the delivery of such Party's original signature, and the Parties may rely upon the binding and enforceable effect of such delivery.

**Section 13.2    Confidentiality**.  Purchaser shall not disclose any Confidential Information (defined herein) to any party other than (a) persons within Purchaser's organization, Purchaser's affiliates, persons who may invest in, or co-purchase with Purchaser, or person with which Purchaser has contracted, including attorneys, accountants, appraisers, engineers, environmental consultants and other professionals engaged for this contemplated transaction who are advised of the confidential nature of the Confidential Information, (b) potential lenders and agents of potential lenders who are advised of the terms of this Agreement related to the Confidentiality Information, (c) as necessary to consummate or enforce the terms of this Agreement or any financing relating thereto, and (d) subject to the last sentence of this Section, as required by law or court order.  For purposes of this Agreement, "Confidential Information" means the terms of this Agreement and all due diligence information (including the Seller's Documents) provided to Purchaser by Seller other than information of public record or generally known to the public.  Purchaser will destroy any electronic or paper documents constituting the Confidential Information, or return it to Seller if appropriate, if the Closing does not occur or this Agreement is terminated by Purchaser or Seller before Closing.  The confidentiality provisions of this Section 13.2 shall not apply to any disclosures made by Purchaser as required by law, by court order, or in connection with any subpoena served upon Purchaser; provided that to the extent permitted by applicable law, Purchaser shall provide Seller with written notice before making any such disclosure.  The foregoing confidentiality obligations shall not apply to the extent that such (a) information is a matter of public record or is provided in other sources available to the real estate industry or the

general public other than as a result of disclosure by Purchaser, or (b) disclosure is compelled by law or by regulatory or judicial process, (c) to the extent any information becomes available to Purchaser from any third party and such third party was not prohibited, at the time of disclosure, from disclosing such information to Purchaser by any contractual obligation, or (d) was independently developed by Purchaser or its representatives without the use of information in breach of this Agreement.    Purchaser's obligations under this Section 13.2 shall survive termination of this Agreement for a period of one year, but shall terminate as of Closing.

**Section 13.3    No Other Representations**.  Purchaser acknowledges that neither Seller nor anyone acting, or purporting to act, on behalf of Seller, has, except as expressly set forth in this Agreement or in the Closing Documents, made any representation or warranty with respect to the Property.

**Section 13.4    Additional Escrow Provisions**Dispute.  In the event of a dispute between any of the parties hereto sufficient in the sole discretion of the Title Company to justify its doing so, the Title Company shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

(b)    <u>Title Company as Escrow Holder</u>.  Seller and Purchaser covenant and agree that in performing any of its duties under this Agreement, the Title Company shall not be liable for any loss, costs or damage which it may incur as a result of serving as escrow holder hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. Accordingly, the Title Company shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which the Title Company shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

(c)    <u>Indemnity</u>.  Seller and Purchaser hereby agree to indemnify and hold harmless the Title Company against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by the Title Company in connection with its serving its role as the Title Company hereunder, except for any loss, costs or damage arising out of its willful default, gross negligence or failure to adhere to the terms or conditions of this Agreement.  The provisions of this Section shall survive termination of this Agreement.

**Section 13.5    No Personal Liability**. Notwithstanding anything to the contrary contained herein, Seller's shareholders, partners, members, the partners or members of such partners or members, the shareholders of such partners or members, and the trustees, officers, directors, employees, agents and security holders of Seller and the partners or members of Seller assume no personal liability for any obligations entered into on behalf of Seller and its individual assets shall not be subject to any claims of any person relating to such obligations.  Notwithstanding anything to the contrary contained herein, Purchaser's shareholders, partners, members, the partners or

members of such partners or members, the shareholders of such partners or members, and the trustees, officers, directors, employees, agents and security holders of Purchaser and the partners or members of Purchaser assume no personal liability for any obligations entered into on behalf of Purchaser and its individual assets shall not be subject to any claims of any person relating to such obligations. The foregoing shall govern any direct and indirect obligations of Seller and/or Purchaser under this Agreement.  This provision shall expressly survive Closing and recordation of the Special Warranty Deed or termination of this Agreement.

**Section 13.6**   **Assignment by Purchaser**.  This Agreement, and rights and obligations hereunder, may not be assigned by Purchaser without the express written consent of Seller, which may be granted or withheld in Seller's sole discretion.  Notwithstanding the foregoing, Purchaser may, upon prior written notice to Seller given not later than three (3) business days prior to the Closing, assign all its interest under this Agreement to one or more Affiliates of Purchaser (e.g., tenants-in-common) provided any such assignment shall not release Purchaser from its obligations under this Agreement.  As referred to herein the term "Affiliate" shall mean, with respect to Purchaser, any persons or entities that own or control, are owned or controlled by, or are under common ownership or control with, Purchaser.

**Section 13.7**   **Successors and Assigns**.  This Agreement and terms and provisions hereof shall inure to the benefit of and be binding upon the Parties and their respective heirs, executors, personal representatives, successors and assigns whenever the context so requires or admits.  This Agreement may not be amended, altered or modified unless the party against whom enforcement of any waiver, modification or discharge is sought does so in writing.

**Section 13.8**   **Exhibits**.  The following Exhibits have been attached to this Agreement and incorporated herein by reference:

> **EXHIBIT A** –   Legal Description
>
> **EXHIBIT B** –   List of Service Contracts and Personalty Leases
>
> **EXHIBIT C** –   Rent Roll
>
> **EXHIBIT D** –   Form of Lease
>
> **EXHIBIT E** –   Form of Special Warranty Deed
>
> **EXHIBIT F** –   Bill of Sale
>
> **EXHIBIT G** –   Assignment Agreement
>
> **EXHIBIT H** –   Form of Tenant Notice Letter

**Section 13.9**   **Governing Law**.  This Agreement and the transactions contemplated hereby shall be construed in accordance with the laws of the State of North Carolina.

**Section 13.10**   **Severability**.  If a court of competent jurisdiction determines that any clause or provisions of this Agreement is void, illegal or unenforceable, the other clauses and provisions

of this Agreement shall remain in full force and effect and the clauses and provisions which are determined to be void, illegal or unenforceable shall be limited so that they shall remain in effect to the extent permissible by law.

      **Section 13.11  Time is of the Essence**.  Time is of the essence of each and every term, provision and covenant of this Agreement.  The expiration of any period of time prescribed in this Agreement shall occur at 6:00 p.m. eastern time of the last day of the period.  Should any period of time specified herein end on a Saturday, Sunday or legal holiday, the period of time shall automatically be extended to 6:00 P.M. eastern of the next full business day (defined as a day that is not a Saturday, Sunday or legally recognized federal or state holiday in the state in which the Property is located).  Whenever this Agreement makes reference to a time period which begins on or lasts for a time "from", "following" or "after" a certain date, it is expressly understood and agreed that the words "from", "following" and "after" do not imply or impute the word "including" so that no such time frames shall include such date.

      **Section 13.12  Signatory Authority**.  Seller and Purchaser represent to each other that each has full power and authority to enter into and perform this Agreement, all related instruments and the documentation contemplated hereby and thereby in accordance with their respective terms and that the delivery and performance of this Agreement, all related instruments and the documentation contemplated hereby and thereby has been duly authorized by all necessary action.

      **Section 13.13  1031 Exchange.**  In the event Seller or Purchaser wishes to consummate the transactions contemplated herein in a manner that qualifies for a deferral of recognition of gain related to the conveyance or sale of the Property pursuant to Section 1031 of the Code, and the Treasury Regulations thereunder ("Like-Kind Exchange"), Purchaser and Seller agree and covenant to fully cooperate with such Like-Kind Exchange, at no cost to Purchaser (in the case of a Seller Like Kind Exchange) or Seller (in the case of a Purchaser Link Kind Exchange).  Purchaser and Seller agree and covenant to timely execute any and all documents, and perform any and all tasks, deemed necessary by Seller or Purchaser to facility the Like-Kind Exchange.  Seller or Purchaser may assign its rights under this Agreement on or before Closing to any person without the consent of Purchaser or Seller, including to a qualified intermediary as provided in Treasury Regulation 1.1031(k)-1(g)(4).  Notwithstanding the foregoing, neither party makes any promises, agreements, covenants, or representations to the other of any kind or nature that the transaction contemplated hereby can qualify for treatment under Section 1031 of the Code.

      **Section 13.14  Reporting Person**.  Each of Seller and Purchaser hereby designate the Title Company as the "Reporting Person" as such term is utilized in Section 6045 of the Code, and the Treasury Regulations thereunder.  Seller agrees to provide the Title Company with such information as may be required for the Title Company to file a Form 1099 or other required form relative to the Closing with the Internal Revenue Service.  A copy of the filed Form 1099 or other filed form shall be provided to Seller and Purchaser simultaneously with its being provided to the Internal Revenue Service.

      **Section 13.15  Entire Agreement**.  This Agreement and the Exhibits attached hereto contain the entire agreement between the Parties.  No modification or amendment of this Agreement shall be of any force or effect unless made in writing and executed by Purchaser and

28

Seller.  Further, the prevailing party in litigation between the parties shall be entitled to recover, as part of its judgment, reasonable attorneys' fees, costs and expenses.

      **Section 13.16  Waiver.**  The waiver of any breach of any provision hereunder by Purchaser or Seller shall not be deemed to be a waiver of any preceding or subsequent breach hereunder.  No failure or delay of any party in the exercise of any right given hereunder shall constitute a waiver thereof nor shall any partial exercise of any right preclude further exercise thereof.

<center>[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]</center>

[The Astoria – Hope Mills]

IN WITNESS WHEREOF, this Agreement has been executed by Seller and Purchaser effective as of the Effective Date.

**SELLER**:

CAPE FEAR MULTIFAMILY, LLC,
a North Carolina limited liability company

By: _____
Name: _____
Title: _____


**PURCHASER**:

ASTORIA OWNER LLC,
a Delaware limited liability company


By:_____
Name: Moshe Weingarten
Title:  Authorized Signatory

30

[The Astoria – Hope Mills]

IN WITNESS WHEREOF, this Agreement has been executed by Seller and Purchaser effective as of the Effective Date.

**SELLER**:

CAPE FEAR MULTIFAMILY, LLC,
a North Carolina limited liability company

By:_____
Name: _____
Title: _____

**PURCHASER:**

ASTORIA OWNER LLC,
a Delaware limited liability company

By:_____
Name: Moshe Weingarten
Title:  Authorized Signatory

30

[The Astoria – Hope Mills]

The undersigned hereby joins in this Agreement, as primary obligor for the purpose of guarantying the payment and performance (and not of collection) of all of the obligations of Seller set forth in Section 5.1 of the Agreement, including, without limitation, all obligations of Seller set forth in Section 5.1 of the Agreement that survive the Closing, subject to any limitations on Seller's obligations set forth in Section 5.1 of the Agreement.  The obligations of each of the undersigned and of the Seller under this Agreement shall be joint and several.   The undersigned hereby covenants (which covenant shall survive the Closing) to maintain a liquid net worth of not less than $1,000,000 for six (6) months following Closing (except to the extent that a claim against Seller is asserted by Purchaser prior to the six (6) months following Closing, in which case such covenant shall survive until such claim is finally resolved).

MAXUS OPERATING LIMITED PARTNERSHIP,
a Delaware limited partnership

By: _____
Name: _Adam Fletcher_____
Title: _Vice president_____

31

## Exhibit A

### Legal Description

THE FOLLOWING DESCRIBED TRACT OF LAND LIES ON THE NORTH SIDE OF BLACK & DECKER ROAD, CITY OF FAYETTEVILLE. THE TRACT IS PART OF THE PROPERTY DULY RECORDED IN DEED BOOK 8527 PAGE 134 AND KNOWN AS A PORTION OF LOT 2 AS RECORDED IN PLAT BOOK 127 PAGE 87 ALL OF THE CUMBERLAND COUNTY, NORTH CAROLINA REGISTRY, AND IS MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN EXISTING 5/8" REBAR IN THE NORTHERN RIGHT-OF-WAY MARGIN OF BLACK & DECKER ROAD, SAID REBAR ALSO BEING THE SOUTHWESTERN CORNER OF LOT 1 AS SHOWN ON PLAT BOOK 127, PG 87, CUMBERLAND COUNTY REGISTRY, AND RUNNING THENCE WITH SAID RIGHT-OF-WAY N78°43'43"W 102.14 FEET TO AN EXISTING 3/8" REBAR, THENCE LEAVING SAID RIGHT-OF-WAY N00°28'49"W 1,269.86 FEET TO AN EXISTING 1/2" REBAR, THENCE S78°39'40"E 1,335.86 FEET TO AN EXISTING 1/2" REBAR, AN EXISTING 1/2" REBAR, AN EXISTING 1/2" REBAR, THENCE S00°28'50"E 457.05 FEET TO AN EXISTING 5/8" REBAR, THENCE S36°29'21"W 136.55 FEET TO AN EXISTING 5/8" REBAR, THENCE S13°10'35"W 85.03 FEET TO AN EXISTING 5/8" REBAR, THENCE N76°49'25"W 44.61 FEET TO AN EXISTING CONCRETE MONUMENT, THENCE N78°19'03"W 365.21 FEET TO AN EXISTING CONCRETE MONUMENT, THENCE N78°42'39"W 400.03 FEET TO AN EXISTING 3/8" REBAR, THENCE N11°18'44"E 124.05 FEET TO AN EXISTING 5/8" REBAR, THENCE N78°39'49"W 346.05 FEET TO AN EXISTING 5/8" REBAR, TO AN EXISTING 5/8" REBAR, THENCE S00°28'49"E 729.64 FEET TO THE POINT OF BEGINNING, CONTAINING 20.16 ACRES.

## EXHIBIT B

### SERVICE CONTRACTS AND PERSONALTY LEASES

There are NO Service Contracts or Personalty Leases that are "Must Assume Contracts"

- Outdoor Environments
- Prosource Fitness
- Bug Out
- ProChem Pest Management
- Waste Industries
- Zillow
- Apartments.com
- Rentvision
- Protection One/ADT
- Lincoln's Home Improvements
- Carrillo Cleaning
- Checkpoint ID
- ScentAir
- Zumper
- HappyCo
- J Turner
- Modern Message
- Multifamily Ventures
- Rentlinx
- Realpage
- Ops Technology
- LeaseStar
- CBI Fire/Security Central
- Appliance Warehouse
- Greater Fayetteville Apartment Association
- City of Fayetteville
- Carolina Fire Protection
- NAA Services
- Cumberland County Department of Health
- Time Warner/Spectrum Cable
- Coinmach

33

## Exhibit C

## Rent Roll

There are NO evictions of residential tenants in the ordinary course of Seller's business

[SEE ATTACHED]

34

OneSite Rents v3.0

06/14/2022 11:12:22AM

Maxus Properties LLC - Astoria

**RENT ROLL DETAIL**

As of 06/14/2022

Page 1 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 0111 | 3X2 | N/A | 1308 | Occupied-NTVL | Asher, Nathan | 07/25/2020 06/20/2022 | 07/21/2021 | 06/20/2022 | 1,254.00 | RENT | 1,401.00 | 0.00 | 1,451.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| | | N/A | | Applicant | DuPont, Summer | 06/28/2022 | 06/28/2022 | 11/27/2022 | | PETRENT | 0.00 * | 20.00 * | 1,850.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,830.00 * | 0.00 * | | | |
| 0112 | 3X2 | N/A | 1308 | Occupied | Gairy, Tonya | 01/14/2020 | 01/09/2021 | 01/09/2023 | 1,254.00 | RENT | 1,241.00 | 0.00 | 1,291.00 | 843.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0113 | 2X2 | N/A | 1176 | Occupied | Perez, Julio | 05/10/2022 | 05/10/2022 | 03/09/2023 | 1,212.00 | GARAGE | 0.00 | 75.00 | 1,742.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,647.00 | 0.00 | | | |
| 0114 | 2X2 | N/A | 1176 | Occupied | Slivinski, Bruno | 04/15/2022 | 04/15/2022 | 07/14/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,670.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,575.00 | 0.00 | | | |
| 0115 | 2X2 | N/A | 1176 | Occupied | Grey, Morris | 12/21/2021 | 12/21/2021 | 12/20/2022 | 1,157.00 | RENT | 991.00 | 0.00 | 991.00 | 691.00 | (1.12) |
| 0116 | 2X2 | N/A | 1176 | Occupied | Brown, Elizabeth | 07/03/2021 | 07/03/2021 | 10/03/2022 | 1,182.00 | PETRENT | 0.00 | 30.00 | 1,684.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,654.00 | 0.00 | | | |
| 0117 | 3X2 | N/A | 1308 | Occupied | Salley, Wendy | 05/20/2022 | 05/20/2022 | 08/19/2023 | 1,254.00 | RENT | 1,689.00 | 0.00 | 1,689.00 | 1,389.00 | 0.00 |
| 0118 | 3X2 | N/A | 1308 | Occupied | Smith, Alison | 10/08/2020 | 10/08/2021 | 10/07/2022 | 1,254.00 | RENT | 1,331.00 | 0.00 | 1,331.00 | 962.00 | 1,523.01 |
| 0121 | 3X2 | N/A | 1308 | Occupied | Richards, Jessica | 10/16/2020 | 10/16/2021 | 10/15/2022 | 1,254.00 | GARAGE | 0.00 | 75.00 | 1,520.00 | 1,056.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| 0122 | 3X2 | N/A | 1308 | Occupied | Prengler, Lisa | 11/05/2021 | 11/05/2021 | 12/04/2022 | 1,254.00 | RENT | 1,794.00 | 0.00 | 1,819.00 | 1,494.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0123 | 2X2 | N/A | 1176 | Occupied | WELBORN, REBEKAH | 04/22/2022 | 04/22/2022 | 10/21/2022 | 1,182.00 | PETRENT | 0.00 | 20.00 | 1,610.00 | 1,290.00 | 0.00 |
| | | | | | | | | | | RENT | 1,590.00 | 0.00 | | | |
| 0124 | 2X2 | N/A | 1176 | Occupied | Elhilaly, Dalia | 07/24/2021 | 07/24/2021 | 07/23/2022 | 1,182.00 | RENT | 1,734.00 | 0.00 | 1,734.00 | 0.00 | 0.00 |
| 0125 | 2X2 | N/A | 1176 | Occupied | Jenkins, Harry | 02/23/2022 | 02/23/2022 | 04/22/2023 | 1,182.00 | RENT | 1,411.00 | 0.00 | 1,411.00 | 0.00 | (39.16) |
| 0126 | 2X2 | N/A | 1176 | Occupied | Jackson, TINA | 01/04/2022 | 01/04/2022 | 01/03/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,255.00 | 0.00 | (5,715.52) |
| | | | | | | | | | | PETRENT | 0.00 | 30.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

Maxus Properties LLC - Astoria

**RENT ROLL DETAIL**

As of 06/14/2022

Page 2 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,125.00 | | | | |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0127 | 3X2 | N/A | 1308 | Occupied-NTV | Hayes, Camela | 04/01/2022 06/18/2022 | 04/01/2022 | 03/31/2023 | 1,254.00 | RENT | 1,671.00 | 0.00 | 1,671.00 | 0.00 | (4,196.65) |
| 0128 | 3X2 | N/A | 1308 | Occupied | Roberson, Timikial | 01/30/2022 | 01/30/2022 | 01/29/2023 | 1,254.00 | PETRENT | 0.00 | 20.00 | 1,801.00 | 1,481.00 | 0.00 |
| | | | | | | | | | | RENT | 1,781.00 | 0.00 | | | |
| 0133 | 2X2 | N/A | 1176 | Occupied | Clarke, Laura | 02/20/2021 | 03/20/2022 | 01/19/2023 | 1,182.00 | RENT | 1,423.00 | 0.00 | 1,473.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0134 | 2X2 | N/A | 1176 | Occupied | Steel, Joshua | 04/08/2022 | 04/08/2022 | 04/07/2023 | 1,182.00 | RENT | 1,489.00 | 0.00 | 1,539.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0135 | 2X2 | N/A | 1176 | Occupied | Watson, Deontae | 04/10/2021 | 04/10/2022 | 04/10/2023 | 1,182.00 | RENT | 1,479.00 | 0.00 | 1,479.00 | 0.00 | 0.00 |
| 0136 | 2X2 | N/A | 1176 | Occupied | Wolgamott, Andrew | 02/08/2021 | 04/07/2022 | 04/06/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,375.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,300.00 | 0.00 | | | |
| 0211 | 2X2 | N/A | 1176 | Occupied | FREDERICKS, RUTH | 04/17/2021 | 02/04/2022 | 01/31/2023 | 1,202.00 | RENT | 1,634.00 | 0.00 | 1,659.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0212 | 2X2 | N/A | 1176 | Occupied | BARTO, ALEXANDER | 12/18/2021 | 12/18/2021 | 12/17/2022 | 1,277.00 | RENT | 1,314.00 | 0.00 | 1,314.00 | 0.00 | 0.00 |
| 0213 | 1X1 | N/A | 815 | Occupied | Legge, William | 03/31/2022 | 03/31/2022 | 09/29/2022 | 1,069.00 | RENT | 1,410.00 | 0.00 | 1,460.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0214 | 1X1 | N/A | 815 | Occupied | Abeln, Clayton | 06/26/2021 | 06/26/2021 | 06/25/2022 | 1,069.00 | RENT | 1,331.00 | 0.00 | 1,381.00 | 0.00 | (59.34) |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| | | N/A | | Pending renewal | Abeln, Clayton | 06/26/2021 | 06/26/2022 | 06/26/2023 | | RENT | 1,358.00 * | 0.00 * | 1,408.00 * | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 * | 50.00 * | | | |
| 0215 | 1X1 | N/A | 815 | Occupied | Revels, Jacob | 03/19/2022 | 03/19/2022 | 06/17/2023 | 1,069.00 | PETRENT | 0.00 | 20.00 | 1,276.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,256.00 | 0.00 | | | |
| 0216 | 1X1 | N/A | 815 | Occupied | Kandinata, Natalie | 07/08/2016 | 12/21/2021 | 12/20/2022 | 1,069.00 | PETRENT | 0.00 | 15.00 | 793.00 | 0.00 | 75.00 |
| | | | | | | | | | | RENT | 778.00 | 0.00 | | | |
| 0217 | 2X2 | N/A | 1176 | Occupied | Jones, Demetria | 12/06/2019 | 12/04/2021 | 07/05/2022 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,735.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,660.00 | 0.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 3 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | N/A | | Pending renewal | Jones, Demetria | 12/06/2019 | 07/06/2022 | 10/05/2022 | | GARAGE | 0.00 * | 75.00 * | 1,906.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,831.00 * | 0.00 * | | | |
| 0218 | 2X2 | N/A | 1176 | Occupied | Currie, Somphasouk | 08/03/2019 | 09/20/2021 | 09/14/2022 | 1,202.00 | RENT | 1,111.00 | 0.00 | 1,161.00 | 0.00 | 2,555.51 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0221 | 2X2 | N/A | 1176 | Occupied | Bullard, Jamie | 09/13/2021 | 09/13/2021 | 09/12/2022 | 1,182.00 | RENT | 1,763.00 | 0.00 | 1,763.00 | 0.00 | (1,777.93) |
| 0222 | 2X2 | N/A | 1176 | Occupied | Kamer, Joseph | 01/22/2016 | 03/31/2022 | 03/30/2023 | 1,182.00 | GARAGE | 0.00 | 100.00 | 1,036.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 936.00 | 0.00 | | | |
| 0223 | 1X1 | N/A | 815 | Occupied | Correa Feliciano, Antonio | 03/04/2022 | 03/04/2022 | 09/03/2022 | 1,049.00 | RENT | 1,369.00 | 0.00 | 1,419.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0224 | 1X1 | N/A | 815 | Occupied | James, Justin | 01/30/2017 | 06/11/2021 | 08/10/2022 | 1,049.00 | CONCR | 0.00 | (103.20) | 584.80 | 200.00 | 0.00 |
| | | | | | | | | | | RENT | 688.00 | 0.00 | | | |
| 0225 | 1X1 | N/A | 815 | Occupied | Lopez, Sara | 01/18/2021 | 01/18/2022 | 02/17/2023 | 1,049.00 | PETRENT | 0.00 | 15.00 | 1,149.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,084.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0226 | 1X1 | N/A | 815 | Occupied | Rodriguez, Jessica | 01/15/2022 | 01/15/2022 | 04/14/2023 | 1,049.00 | RENT | 1,079.00 | 0.00 | 1,079.00 | 779.00 | 0.00 |
| 0227 | 2X2 | N/A | 1176 | Occupied-NTVL | Mathias, Audrey | 06/19/2021 06/18/2022 | 06/19/2021 | 06/18/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,586.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,571.00 | 0.00 | | | |
| | | N/A | | Applicant | Dunning, Michael | 06/25/2022 | 06/25/2022 | 06/24/2023 | | RENT | 1,566.00 * | 0.00 * | 1,566.00 * | 783.00 | 0.00 |
| 0228 | 2X2 | N/A | 1176 | Occupied | Lowry, Ginger | 12/14/2017 | 10/01/2021 | 11/30/2022 | 1,182.00 | RENT | 850.00 | 0.00 | 875.00 | 200.00 | 941.62 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0231 | 2X2 | N/A | 1176 | Occupied | Jones, Belinda | 05/27/2022 | 05/27/2022 | 11/28/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,770.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,695.00 | 0.00 | | | |
| 0232 | 2X2 | N/A | 1176 | Occupied | McLaurin, Mark | 10/03/2016 | 09/16/2021 | 10/15/2022 | 1,182.00 | CONC/SPECL | 0.00 | (119.10) | 764.90 | 200.00 | 0.00 |
| | | | | | | | | | | GARAGE | 0.00 | 75.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 794.00 | 0.00 | | | |
| 0233 | 1X1 | N/A | 815 | Occupied | Borom, Marielle | 06/01/2019 | 06/22/2021 | 07/21/2022 | 1,049.00 | RENT | 924.00 | 0.00 | 974.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 4 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;
details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0234 | 1X1 | N/A | 815 | Occupied | Williams, Deandre | 11/12/2021 | 11/12/2021 | 11/11/2022 | 1,049.00 | RENT | 1,316.00 | 0.00 | 1,366.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0235 | 1X1 | N/A | 815 | Occupied | Tong, Karen | 08/08/2020 | 03/08/2022 | 06/07/2023 | 1,049.00 | PETRENT | 0.00 | 20.00 | 1,199.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,179.00 | 0.00 | | | |
| 0236 | 1X1 | N/A | 815 | Occupied | Denny, Jacob | 06/29/2021 | 06/29/2021 | 07/28/2022 | 1,049.00 | RENT | 1,150.00 | 0.00 | 1,150.00 | 0.00 | 0.28 |
| | | N/A | | Pending renewal | Denny, Jacob | 06/29/2021 | 07/29/2022 | 07/28/2023 | | RENT | 1,207.00 * | 0.00 * | 1,207.00 * | 0.00 | 0.00 |
| 0237 | 2X2 | N/A | 1176 | Occupied | Harris, Donte | 11/16/2021 | 11/16/2021 | 11/14/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,636.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,571.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0238 | 2X2 | N/A | 1176 | Occupied | Abdelfatah, Samar | 10/09/2018 | 07/04/2022 | 07/05/2022 | 1,182.00 | RENT | 999.00 | 0.00 | 999.00 | 200.00 | 0.00 |
| | | N/A | | Pending renewal | Abdelfatah, Samar | 10/09/2018 | 07/06/2022 | 07/05/2023 | | RENT | 1,048.00 * | 0.00 * | 1,048.00 * | 0.00 | 0.00 |
| 0311 | 3X2 | N/A | 1308 | Occupied | Lewis, Carol | 10/31/2022 | 02/23/2022 | 02/22/2023 | 1,254.00 | GARAGE | 0.00 | 150.00 | 1,564.00 | 1,060.00 | (0.20) |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,399.00 | 0.00 | | | |
| 0312 | 3X2 | | 1308 | Occupied | Levack, Nancy | 06/01/2015 | 03/19/2021 | 06/18/2022 | 1,254.00 | GARAGE | 0.00 | 75.00 | 1,283.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,193.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Levack, Nancy | 06/01/2015 | 06/19/2022 | 09/18/2023 | | GARAGE | 0.00 * | 75.00 * | 1,347.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 * | 20.00 * | | | |
| | | | | | | | | | | RENT | 1,252.00 * | 0.00 * | | | |
| 0313 | 2X2 | N/A | 1176 | Occupied | FARQUHARSON ANDERSON, JANICE | 11/24/2021 | 11/24/2021 | 02/22/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,611.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,536.00 | 0.00 | | | |
| 0314 | 2X2 | N/A | 1176 | Occupied | Knight, Donna | 10/16/2018 | 04/06/2022 | 07/05/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,167.00 | 200.00 | 0.00 |
| | | | | | | | | | | RENT | 1,092.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Knight, Donna | 10/16/2018 | 07/06/2022 | 10/05/2023 | | GARAGE | 0.00 * | 75.00 * | 1,221.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,146.00 * | 0.00 * | | | |
| 0315 | 2X2 | N/A | 1176 | Occupied | McCarty, April | 01/27/2022 | 01/27/2022 | 10/26/2022 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,325.00 | 0.00 | 0.00 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 5 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | PETRENT | 0.00 | 30.00 | | | |
| | | | | | | | | | | RENT | 1,170.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0316 | 2X2 | N/A | 1176 | Occupied | Dangelo, Paul | 08/01/2020 | 10/26/2021 | 01/25/2023 | 1,202.00 | PETRENT | 0.00 | 15.00 | 1,028.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,013.00 | 0.00 | | | |
| 0317 | 3X2 | N/A | 1308 | Occupied | Lan, Shu | 05/18/2021 | 11/18/2021 | 07/18/2022 | 1,279.00 | RENT | 1,873.00 | 0.00 | 1,923.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0318 | 3X2 | N/A | 1308 | Occupied | FREEMAN, SHALIA | 11/01/2021 | 11/01/2021 | 01/31/2023 | 1,379.00 | RENT | 1,982.00 | 0.00 | 1,982.00 | 0.00 | 0.00 |
| 0321 | 3X2 | N/A | 1308 | Occupied | Wilks, Summer | 08/13/2019 | 05/08/2022 | 09/07/2022 | 1,254.00 | GARAGE | 0.00 | 50.00 | 1,683.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,633.00 | | | | |
| 0322 | 3X2 | N/A | 1308 | Occupied | Miller, Denise | 06/08/2022 | 06/08/2022 | 06/07/2023 | 1,254.00 | PETRENT | 0.00 | 40.00 | 1,747.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,657.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0323 | 2X2 | N/A | 1176 | Occupied | Reinink, Avery | 12/18/2020 | 12/18/2020 | 12/17/2022 | 1,182.00 | RENT | 1,337.00 | 0.00 | 1,337.00 | 0.00 | 0.00 |
| 0324 | 2X2 | N/A | 1176 | Occupied | Brown, Mike | 10/26/2019 | 12/25/2021 | 12/24/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,040.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 950.00 | 0.00 | | | |
| 0325 | 2X2 | N/A | 1176 | Occupied | WILLLIAMSON, MONTEL | 01/21/2022 | 01/21/2022 | 04/20/2023 | 1,182.00 | CONC/SPECL | 0.00 | (174.90) | 1,116.10 | 0.00 | 0.00 |
| | | | | | | | | | | GARAGE | 0.00 | 75.00 | | | |
| | | | | | | | | | | RENT | 1,166.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0326 | 2X2 | N/A | 1176 | Occupied | Gorrell, Stephen | 07/05/2017 | 01/26/2022 | 01/25/2023 | 1,182.00 | RENT | 1,119.00 | 0.00 | 1,119.00 | 911.00 | 0.00 |
| 0327 | 3X2 | N/A | 1308 | Occupied | Koch, Rudy | 01/23/2019 | 10/15/2021 | 10/14/2022 | 1,254.00 | GARAGE | 0.00 | 50.00 | 1,234.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,184.00 | 0.00 | | | |
| 0328 | 3X2 | N/A | 1308 | Occupied | Gasque, William | 12/06/2017 | 08/21/2021 | 06/20/2022 | 1,254.00 | GARAGE | 0.00 | 75.00 | 1,189.00 | 300.00 | 0.00 |
| | | | | | | | | | | RENT | 1,114.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Gasque, William | 12/06/2017 | 06/21/2022 | 06/20/2023 | | GARAGE | 0.00 * | 75.00 * | 1,244.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,169.00 * | 0.00 * | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

06/14/2022 11:12:22AM

Page 6 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 0333 | 2X2 | N/A | 1176 | Occupied | FELKER, ANAYANSI | 01/04/2022 | 01/04/2022 | 01/03/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,141.00 | 715.00 | 1,299.96 |
| | | | | | | | | | | RENT | 1,016.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0334 | 2X2 | N/A | 1176 | Occupied-NTV | Zahodnick, Arielle | 07/16/2021 07/15/2022 | 07/16/2021 | 07/15/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,807.00 | 1,442.00 | 0.00 |
| | | | | | | | | | | RENT | 1,742.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0335 | 2X2 | N/A | 1176 | Occupied | Sargeant, William | 04/23/2022 | 04/23/2022 | 07/22/2023 | 1,182.00 | PETRENT | 0.00 | 40.00 | 1,567.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,527.00 | 0.00 | | | |
| 0336 | 2X2 | N/A | 1176 | Occupied | McNeill, Devon | 03/03/2018 | 05/19/2022 | 07/18/2022 | 1,182.00 | PETRENT | 0.00 | 20.00 | 924.00 | 801.00 | 0.00 |
| | | | | | | | | | | RENT | 904.00 | 0.00 | | | |
| 0411 | 3X2 | N/A | 1308 | Occupied | Caswell, Kimberly | 04/25/2022 | 04/25/2022 | 07/24/2023 | 1,209.00 | RENT | 1,535.00 | 0.00 | 1,535.00 | 0.00 | 0.00 |
| 0412 | 3X2 | N/A | 1308 | Occupied | McLean, Tommy | 07/03/2021 | 07/03/2021 | 10/03/2022 | 1,254.00 | RENT | 1,681.00 | 0.00 | 1,706.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0413 | 2X2 | N/A | 1176 | Vacant-Leased | VACANT | | | | 1,352.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | | Applicant | Wang, Paul | 06/21/2022 | 06/21/2022 | 06/20/2023 | | RENT | 1,752.00 * | 0.00 * | 1,752.00 * | 0.00 | 50.00 |
| 0414 | 2X2 | N/A | 1176 | Occupied | Day, Denise | 08/13/2012 | 05/03/2022 | 08/02/2022 | 1,202.00 | PARKING | 0.00 | 35.00 | 1,107.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,072.00 | 0.00 | | | |
| 0415 | 2X2 | N/A | 1176 | Occupied | Lawson, Sonia | 09/19/2012 | 11/02/2021 | 02/01/2023 | 1,202.00 | RENT | 1,019.00 | 0.00 | 1,044.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0416 | 2X2 | N/A | 1176 | Occupied | COLON AYALA, STEVEN | 11/30/2021 | 11/30/2021 | 11/29/2022 | 1,202.00 | RENT | 1,499.00 | 0.00 | 1,499.00 | 0.00 | 0.00 |
| 0417 | 3X2 | N/A | 1308 | Occupied | Moore, Arthur | 04/30/2016 | 04/17/2022 | 07/16/2022 | 1,209.00 | GARAGE | 0.00 | 75.00 | 1,180.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,105.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Moore, Arthur | 04/30/2016 | 07/17/2022 | 10/16/2023 | | GARAGE | 0.00 * | 75.00 * | 1,235.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,160.00 * | 0.00 * | | | |
| 0418 | 3X2 | N/A | 1308 | Occupied | Barrett, Stacie | 05/18/2022 | 05/18/2022 | 06/17/2022 | 1,254.00 | RENT | 1,656.00 | 0.00 | 1,656.00 | 0.00 | 0.00 |
| | | N/A | | Pending renewal | Barrett, Stacie | 05/18/2022 | 06/18/2022 | 06/17/2023 | | RENT | 1,731.00 * | 0.00 * | 1,731.00 * | 0.00 | 0.00 |
| 0421 | 3X2 | N/A | 1308 | Occupied | JR, Roy | 03/03/2018 | 09/16/2021 | 10/15/2022 | 1,254.00 | GARAGE | 0.00 | 75.00 | 1,196.00 | 1,024.00 | |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |

\* indicates amounts not included in detail totals

OneSite Rents v3.0

Maxus Properties LLC - Astoria

Page 7 of 23

06/14/2022 11:12:22AM

**RENT ROLL DETAIL**

As of 06/14/2022

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,086.00 | 0.00 | | | |
| 0422 | 3X2 | N/A | 1308 | Vacant-Leased | VACANT | | | | 1,254.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Rivera Cruz, Ana | 06/15/2022 | 06/15/2022 | 09/14/2023 | | RENT | 1,745.00 * | 0.00 * | 1,745.00 * | 0.00 | 0.00 |
| 0423 | 2X2 | N/A | 1176 | Occupied | Fiala, Otto | 12/21/2019 | 02/16/2022 | 08/15/2022 | 1,182.00 | GARAGE | 0.00 | 125.00 | 1,455.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,330.00 | 0.00 | | | |
| 0424 | 2X2 | N/A | 1176 | Occupied | Lewis, Jemal | 03/23/2016 | 04/01/2022 | 09/30/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,065.00 | 346.00 | 0.00 |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |
| | | | | | | | | | | RENT | 955.00 | 0.00 | | | |
| 0425 | 2X2 | N/A | 1176 | Occupied | Lilienthal, Louis | 04/07/2022 | 04/07/2022 | 07/05/2023 | 1,182.00 | RENT | 1,423.00 | 0.00 | 1,423.00 | 0.00 | 0.00 |
| 0426 | 2X2 | N/A | 1176 | Occupied-NTV | Aswad, Stephen | 08/30/2019 07/30/2022 | 07/21/2022 | 07/20/2022 | 1,182.00 | RENT | 1,154.00 | 0.00 | 1,204.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0427 | 3X2 | N/A | 1308 | Occupied | Hutchins, Latasha | 05/22/2021 | 05/22/2021 | 08/21/2022 | 1,254.00 | GARAGE | 0.00 | 75.00 | 1,676.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,601.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Hutchins, Latasha | 05/22/2021 | 08/22/2022 | 11/21/2023 | | GARAGE | 0.00 * | 75.00 * | 1,775.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,700.00 * | 0.00 * | | | |
| 0428 | 3X2 | N/A | 1308 | Occupied | Sharpe, Joshua | 08/21/2021 | 08/21/2021 | 09/20/2022 | 1,254.00 | PETRENT | 0.00 | 15.00 | 1,734.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,719.00 | 0.00 | | | |
| 0433 | 2X2 | N/A | 1176 | Occupied | Perkins, Rachel | 02/27/2021 | 02/27/2022 | 02/27/2023 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,609.00 | 1,211.00 | 0.00 |
| | | | | | | | | | | RENT | 1,594.00 | 0.00 | | | |
| 0434 | 2X2 | N/A | 1176 | Vacant | VACANT | | | | 1,182.00 | | 0.00 * | 0.00 * | | | |
| 0435 | 2X2 | N/A | 1176 | Occupied | Jones, Josefina | 04/14/2022 | 04/14/2022 | 07/13/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,657.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,532.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0436 | 2X2 | N/A | 1176 | Occupied | Ketchens, Xavier | 04/23/2020 | 07/18/2022 | 08/17/2022 | 1,207.00 | RENT | 1,008.00 | 0.00 | 1,058.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0511 | 3X2 | N/A | 1308 | Occupied-NTV | Romero, Carlos | 09/13/2019 06/27/2022 | 12/07/2021 | 12/06/2022 | 1,209.00 | GARAGE | 0.00 | 75.00 | 1,303.00 | 818.00 | 0.00 |
| | | | | | | | | | | RENT | 1,228.00 | 0.00 | | | |
| 0512 | 3X2 | N/A | 1308 | Occupied-NTVL | Rucker, John | 07/08/2021 07/06/2022 | 07/08/2021 | 07/06/2022 | 1,254.00 | GARAGE | 0.00 | 75.00 | 1,806.00 | 0.00 | 0.00 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 8 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,681.00 | | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| | | N/A | | Applicant | Leisie, Ronald | 07/14/2022 | 07/14/2022 | 07/13/2023 | | RENT | 1,674.00 * | 0.00 * | 1,674.00 * | 0.00 | 0.00 |
| 0513 | 2X2 | N/A | 1176 | Occupied | BREWER, ROBERT | 06/04/2021 | 06/04/2022 | 10/03/2022 | 1,202.00 | RENT | 1,739.00 | 0.00 | 1,789.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0514 | 2X2 | N/A | 1176 | Occupied | Lewis, Josephus | 12/23/2017 | 02/08/2022 | 02/07/2023 | 1,202.00 | RENT | 837.00 | 0.00 | 862.00 | 735.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0515 | 2X2 | N/A | 1176 | Occupied | Blake, Matthew | 05/07/2022 | 05/07/2022 | 08/06/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,673.00 | 1,278.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,578.00 | | | | |
| 0516 | 2X2 | N/A | 1176 | Occupied | Beard, Tericka | 06/17/2016 | 04/02/2022 | 07/01/2022 | 1,202.00 | RENT | 938.00 | 0.00 | 938.00 | 0.00 | 0.00 |
| 0517 | 3X2 | N/A | 1308 | Occupied | Perreira, Raoul | 11/18/2021 | 11/18/2021 | 02/17/2022 | 1,209.00 | RENT | 1,737.00 | 0.00 | 1,762.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0518 | 3X2 | N/A | 1308 | Vacant-Leased | VACANT | | | | 1,254.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Scott, Meghan | 06/18/2022 | 06/18/2022 | 06/17/2023 | | PETRENT | 0.00 * | 20.00 * | 1,732.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,712.00 * | 0.00 * | | | |
| 0521 | 3X2 | N/A | 1308 | Occupied | NIbbs, Michael | 09/27/2018 | 03/16/2022 | 05/15/2023 | 1,254.00 | RENT | 1,271.00 | 0.00 | 1,271.00 | 1,129.00 | (0.38) |
| 0522 | 3X2 | N/A | 1308 | Occupied | Michel, Monique | 06/02/2020 | 06/29/2021 | 09/28/2022 | 1,254.00 | GARAGE | 0.00 | 50.00 | 1,264.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,149.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0523 | 2X2 | N/A | 1176 | Occupied | Bozeman, Maryissa | 07/05/2019 | 10/02/2021 | 10/01/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,326.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,186.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0524 | 2X2 | N/A | 1176 | Occupied | Bicksler, Constance | 05/02/2022 | 05/02/2022 | 07/31/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,642.00 | 1,197.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,497.00 | 0.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 9 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0525 | 2X2 | N/A | 1176 | Occupied | Ix, Timothy | 10/24/2020 | 08/24/2021 | 08/23/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,371.00 | 1,032.00 | 0.00 |
| | | | | | | | | | | RENT | 1,356.00 | 0.00 | | | |
| 0526 | 2X2 | N/A | 1176 | Occupied | McWhite, Brianna | 04/09/2020 | 04/09/2020 | 06/03/2021 | 1,182.00 | RENT | 1,120.00 | 0.00 | 1,120.00 | 621.00 | 1,239.78 |
| 0527 | 3X2 | N/A | 1308 | Occupied | Bost, Chelsea | 10/03/2020 | 01/01/2022 | 03/31/2023 | 1,254.00 | PARKING | 0.00 | 35.00 | 1,483.00 | 0.00 | 25.67 |
| | | | | | | | | | | RENT | 1,448.00 | 0.00 | | | |
| 0528 | 3X2 | N/A | 1308 | Occupied-NTV | Miller, Nicole | 08/13/2021 08/12/2022 | 08/13/2021 | 08/12/2022 | 1,254.00 | RENT | 1,701.00 | 0.00 | 1,776.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0533 | 2X2 | N/A | 1176 | Occupied | White, Larissa | 12/20/2021 | 12/20/2021 | 03/18/2023 | 1,182.00 | RENT | 1,483.00 | 0.00 | 1,483.00 | 0.00 | 0.00 |
| 0534 | 2X2 | N/A | 1176 | Occupied | Turck, Ryan | 04/23/2022 | 04/23/2022 | 04/22/2023 | 1,182.00 | RENT | 1,478.00 | 0.00 | 1,478.00 | 0.00 | 0.00 |
| 0535 | 2X2 | N/A | 1176 | Occupied | Rivera, Emanuel | 09/29/2013 | 02/10/2022 | 02/09/2023 | 1,182.00 | RENT | 1,059.00 | 0.00 | 1,109.00 | 475.00 | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0536 | 2X2 | N/A | 1176 | Occupied | Krepek, Bruno | 11/02/2018 | 02/24/2022 | 02/23/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,194.00 | 945.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,054.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0611 | 2X2 | N/A | 1176 | Occupied | Bowers, Nicholas | 03/12/2021 | 03/11/2022 | 03/10/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,650.00 | 1,146.00 | 0.00 |
| | | | | | | | | | | RENT | 1,525.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0612 | 2X2 | N/A | 1176 | Occupied | Owens, James | 09/01/2004 | 02/15/2022 | 05/15/2023 | 1,202.00 | RENT | 1,134.00 | 0.00 | 1,134.00 | 1,022.00 | 0.00 |
| 0613 | 1X1 | N/A | 815 | Occupied | Hector, Channel | 12/14/2020 | 01/14/2022 | 04/13/2023 | 1,099.00 | RENT | 1,095.00 | 0.00 | 1,095.00 | 0.00 | 0.00 |
| 0614 | 1X1 | N/A | 815 | Occupied | Moran, Kyle | 06/07/2021 | 06/07/2021 | 06/06/2023 | 1,219.00 | RENT | 1,437.00 | 0.00 | 1,437.00 | 0.00 | 0.00 |
| 0615 | 1X1 | N/A | 815 | Occupied | Caspary, Daniel | 12/28/2021 | 12/28/2021 | 12/26/2022 | 1,024.00 | GARAGE | 0.00 | 50.00 | 1,243.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,143.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0616 | 1X1 | N/A | 815 | Occupied | Clute, Brent | 09/30/2021 | 09/30/2021 | 10/29/2022 | 1,144.00 | GARAGE | 0.00 | 50.00 | 1,459.00 | 0.00 | 1,547.68 |
| | | | | | | | | | | RENT | 1,409.00 | 0.00 | | | |
| 0617 | 2X2 | N/A | 1176 | Occupied | Dobbins, Kenneth | 05/28/2020 | 05/27/2022 | 05/26/2023 | 1,277.00 | RENT | 1,431.00 | 0.00 | 1,431.00 | 0.00 | 0.00 |

* indicates amounts not included in detail totals

OneSite Rents v3.0          **Maxus Properties LLC - Astoria**         Page 10 of 23

06/14/2022 11:12:22AM         **RENT ROLL DETAIL**         mgt-521-003

As of 06/14/2022

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0618 | 2X2 | N/A | 1176 | Occupied | WILSON, MINYVONNE | 12/22/2021 | 12/22/2021 | 03/21/2023 | 1,352.00 | RENT | 1,228.00 | 0.00 | 1,228.00 | 0.00 | 0.00 |
| 0621 | 2X2 | N/A | 1176 | Occupied-NTV | Fennell, Brittany | 06/12/2021 07/16/2022 | 06/12/2021 | 07/11/2022 | 1,182.00 | RENT | 1,609.00 | 0.00 | 1,609.00 | 1,309.00 | (1.49) |
| 0622 | 2X2 | N/A | 1176 | Occupied | Engstrom, Daniel | 05/03/2019 | 03/24/2022 | 03/23/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,289.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | PETRENT | 0.00 | 20.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,194.00 | 0.00 |  |  |  |
| 0623 | 1X1 | N/A | 815 | Occupied | Aekins, Derek | 12/31/2016 | 01/13/2022 | 01/12/2023 | 1,049.00 | RENT | 887.00 | 0.00 | 887.00 | 200.00 | 960.20 |
| 0624 | 1X1 | N/A | 815 | Occupied | Mowrer, Zachary | 02/14/2022 | 02/14/2022 | 05/13/2023 | 1,049.00 | GARAGE | 0.00 | 75.00 | 1,367.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | PETRENT | 0.00 | 20.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,272.00 | 0.00 |  |  |  |
| 0625 | 1X1 | N/A | 815 | Occupied-NTV | Sathiraju, Kishore | 11/21/2020 06/19/2022 | 02/21/2021 | 05/20/2022 | 1,049.00 | RENT | 1,487.00 | 0.00 | 1,487.00 | 0.00 | 0.00 |
| 0626 | 1X1 | N/A | 815 | Occupied-NTV | Bailey, Quentlin | 01/14/2022 07/12/2022 | 01/14/2022 | 07/12/2022 | 1,049.00 | RENT | 1,368.00 | 0.00 | 1,368.00 | 0.00 | 0.00 |
| 0627 | 2X2 | N/A | 1176 | Occupied | Walker, Mark | 07/26/2019 | 10/20/2021 | 08/19/2022 | 1,182.00 | GARAGE | 0.00 | 50.00 | 1,291.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,241.00 | 0.00 |  |  |  |
| 0628 | 2X2 | N/A | 1176 | Occupied | Krawczuk, Alexandra | 05/14/2020 | 06/09/2022 | 07/08/2023 | 1,182.00 | PETRENT | 0.00 | 20.00 | 1,198.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,178.00 | 0.00 |  |  |  |
| 0631 | 2X2 | N/A | 1176 | Occupied | Robinson, Michael | 09/15/2021 | 09/15/2021 | 09/13/2022 | 1,182.00 | RENT | 1,773.00 | 0.00 | 1,773.00 | 1,473.00 | 1,908.17 |
| 0632 | 2X2 | N/A | 1176 | Occupied | DAlessio, Lucio | 05/18/2019 | 06/08/2022 | 06/07/2023 | 1,182.00 | RENT | 1,106.00 | 0.00 | 1,156.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | WASH/DRY | 0.00 | 50.00 |  |  |  |
| 0633 | 1X1 | N/A | 815 | Vacant-Leased | VACANT |  |  |  | 1,049.00 |  | 0.00 * | 0.00 * |  |  |  |
|  |  | N/A |  | Applicant | Crow, Hannah | 06/18/2022 | 06/18/2022 | 12/17/2022 |  | PETRENT | 0.00 * | 20.00 * | 1,431.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,411.00 * | 0.00 * |  |  |  |
| 0634 | 1X1 | N/A | 815 | Occupied | Willard, Jasmen | 01/05/2018 | 06/29/2021 | 08/29/2022 | 1,049.00 | RENT | 681.00 | 0.00 | 681.00 | 200.00 | 0.00 |
| 0635 | 1X1 | N/A | 815 | Occupied | Bogale, Henok | 12/19/2020 | 12/19/2021 | 06/18/2022 | 1,049.00 | RENT | 1,077.00 | 0.00 | 1,077.00 | 0.00 | (96.40) |
|  |  | N/A |  | Pending renewal | Bogale, Henok | 12/19/2020 | 06/19/2022 | 12/19/2022 |  | RENT | 1,187.00 * | 0.00 * | 1,187.00 * | 0.00 | 0.00 |
| 0636 | 1X1 | N/A | 815 | Occupied | Brown, Malcolm | 01/27/2022 | 01/27/2022 | 01/26/2023 | 1,049.00 | GARAGE | 0.00 | 75.00 | 1,231.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,156.00 |  |  |  |  |
| 0637 | 2X2 | N/A | 1176 | Occupied | Whitaker, Maxine | 09/15/2017 | 06/18/2021 | 09/17/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,131.00 | 200.00 | 0.37 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 11 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,056.00 | 0.00 | | | |
| 0638 | 2X2 | N/A | 1176 | Occupied | Cervera, Rikardo | 12/29/2021 | 12/29/2021 | 03/28/2023 | 1,182.00 | RENT | 1,130.00 | 0.00 | 1,130.00 | 0.00 | 0.00 |
| 0711 | 2X2 | N/A | 1176 | Occupied | Preston, Mary-Louise | 04/01/2014 | 05/11/2022 | 08/10/2023 | 1,202.00 | GARAGE | 0.00 | 50.00 | 1,078.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,028.00 | 0.00 | | | |
| 0712 | 2X2 | N/A | 1176 | Occupied | Davis, Christopher | 05/30/2020 | 08/24/2021 | 10/24/2022 | 1,277.00 | RENT | 1,175.00 | 0.00 | 1,175.00 | 0.00 | 0.00 |
| 0713 | 1X1 | N/A | 815 | Occupied | Lowe, Kathleen | 10/28/2019 | 04/19/2022 | 07/18/2023 | 1,069.00 | RENT | 838.00 | 0.00 | 838.00 | 0.00 | 0.00 |
| 0714 | 1X1 | N/A | 815 | Occupied | Miller, Robert | 10/19/2019 | 08/10/2021 | 10/10/2022 | 1,069.00 | RENT | 852.00 | 0.00 | 877.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0715 | 1X1 | N/A | 815 | Occupied | Youngs, Anthony | 05/23/2022 | 05/23/2022 | 06/21/2023 | 1,024.00 | RENT | 1,278.00 | 0.00 | 1,278.00 | 0.00 | 0.00 |
| 0716 | 1X1 | N/A | 815 | Occupied | Boyd, Latasha | 10/13/2021 | 04/07/2021 | 07/06/2022 | 1,069.00 | GARAGE | 0.00 | 50.00 | 780.00 | 689.00 | 0.00 |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Boyd, Latasha | 10/13/2018 | 07/07/2022 | 10/06/2023 | | GARAGE | 0.00 * | 50.00 * | 816.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 766.00 * | 0.00 * | | | |
| 0717 | 2X2 | N/A | 1176 | Occupied | Alford, Donnie | 04/17/2019 | 06/14/2022 | 06/13/2023 | 1,202.00 | RENT | 1,063.00 | 0.00 | 1,063.00 | 733.00 | (56.54) |
| 0718 | 2X2 | N/A | 1176 | Occupied | Gibbs, Melanie | 12/15/2015 | 04/22/2022 | 07/21/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,144.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| 0721 | 2X2 | N/A | 1176 | Occupied | Hicks, Angelica | 09/29/2018 | 02/25/2022 | 02/24/2023 | 1,182.00 | RENT | 950.00 | 0.00 | 950.00 | 200.00 | 0.00 |
| 0722 | 2X2 | N/A | 1176 | Occupied | JONES, SHEA | 02/01/2022 | 02/01/2022 | 01/31/2023 | 1,182.00 | RENT | 1,341.00 | 0.00 | 1,391.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0723 | 1X1 | N/A | 815 | Occupied | MEHTA, POOJA | 06/26/2021 | 06/26/2021 | 06/25/2022 | 1,049.00 | RENT | 1,173.00 | 0.00 | 1,173.00 | 873.00 | 0.00 |
| | | N/A | | Pending renewal | MEHTA, POOJA | 06/26/2021 | 06/26/2022 | 06/26/2023 | | RENT | 1,237.00 * | 0.00 * | 1,237.00 * | 0.00 | 0.00 |
| 0724 | 1X1 | N/A | 815 | Occupied | Maynor, Tamela | 07/28/2021 | 07/28/2021 | 08/27/2023 | 1,049.00 | RENT | 1,387.00 | 0.00 | 1,437.00 | 1,087.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0725 | 1X1 | N/A | 815 | Occupied | Ramos, Diego | 11/07/2019 | 01/30/2022 | 01/30/2022 | 1,049.00 | RENT | 736.00 | 0.00 | 761.00 | 0.00 | 0.00 |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0726 | 1X1 | N/A | 815 | Occupied | Smith, Haley | 07/01/2015 | 10/17/2021 | 01/16/2023 | 1,049.00 | RENT | 928.00 | 0.00 | 928.00 | 0.00 | 0.00 |
| 0727 | 2X2 | N/A | 1176 | Occupied | Bates, Dennis | 05/08/2018 | 10/08/2021 | 10/07/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,214.00 | 200.00 | 0.00 |
| | | | | | | | | | | RENT | 1,199.00 | 0.00 | | | |
| 0728 | 2X2 | N/A | 1176 | Occupied | Neuens, Denise | 10/01/2016 | 04/30/2021 | 06/29/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,093.00 | 0.00 | 0.00 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,003.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Neuens, Denise | 10/01/2016 | 06/30/2022 | 06/29/2023 | | GARAGE | 0.00 * | 75.00 * | 1,143.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 * | 20.00 * | | | |
| | | | | | | | | | | RENT | 1,048.00 * | 0.00 * | | | |
| 0731 | 2X2 | N/A | 1176 | Occupied | Ginyard, Jeremiah | 08/20/2020 | 08/20/2021 | 08/19/2022 | 1,182.00 | RENT | 1,271.00 | 0.00 | 1,321.00 | 934.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0732 | 2X2 | N/A | 1176 | Occupied | Mostello, Lakeshia | 02/16/2022 | 02/16/2022 | 05/15/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,392.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,317.00 | | | | |
| 0733 | 1X1 | N/A | 815 | Occupied | Gordon, Lamora | 01/14/2022 | 01/14/2022 | 04/12/2023 | 1,049.00 | RENT | 1,099.00 | 0.00 | 1,149.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0734 | 1X1 | N/A | 815 | Occupied | Jones, Deante | 02/05/2022 | 02/05/2022 | 02/04/2023 | 1,049.00 | PETRENT | 0.00 | 20.00 | 1,201.00 | 881.00 | 0.00 |
| | | | | | | | | | | RENT | 1,181.00 | 0.00 | | | |
| 0735 | 1X1 | N/A | 815 | Occupied | Dougherty, Thomas | 03/18/2022 | 03/18/2022 | 06/17/2022 | 1,049.00 | RENT | 1,295.00 | 0.00 | 1,345.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0736 | 1X1 | N/A | 815 | Occupied | Eastwood, Lesa | 04/16/2022 | 04/16/2022 | 09/15/2022 | 1,049.00 | RENT | 1,391.00 | 0.00 | 1,391.00 | 0.00 | 0.00 |
| 0737 | 2X2 | N/A | 1176 | Occupied | Davidson, Tyler | 03/19/2021 | 03/19/2022 | 03/18/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,563.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,473.00 | 0.00 | | | |
| 0738 | 2X2 | N/A | 1176 | Occupied | Kugler, Patricia | 07/19/2019 | 08/19/2021 | 06/18/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,276.00 | | |
| | | | | | | | | | | RENT | 1,236.00 | 0.00 | | | |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| | | N/A | | Pending renewal | Kugler, Patricia | 07/19/2019 | 06/19/2022 | 06/19/2023 | | PETRENT | 0.00 * | 20.00 * | 1,342.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,297.00 * | 0.00 * | | | |
| | | | | | | | | | | STORAGE | 0.00 * | 25.00 * | | | |
| 0811 | 2X2 | N/A | 1176 | Occupied | Chamberlin, Caitlin | 11/30/2019 | 02/23/2022 | 02/22/2023 | 1,202.00 | PETRENT | 0.00 | 15.00 | 1,076.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,061.00 | 0.00 | | | |
| 0812 | 2X2 | N/A | 1176 | Occupied | Hughes, Kim | 04/22/2020 | 07/16/2021 | 07/15/2022 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,093.00 | 0.00 | 1,168.43 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 13 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,003.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Hughes, Kim | 04/22/2020 | 07/16/2022 | 10/16/2023 | | GARAGE | 0.00 * | 75.00 * | 1,148.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 * | 20.00 * | | | |
| | | | | | | | | | | RENT | 1,053.00 * | 0.00 * | | | |
| 0813 | 1X1 | N/A | 815 | Occupied | BALLARD, SHARONDA | 09/23/2016 | 07/04/2021 | 07/05/2022 | 1,069.00 | GARAGE | 0.00 | 50.00 | 986.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 936.00 | 0.00 | | | |
| 0814 | 1X1 | N/A | 815 | Occupied | Roberts, AShley | 06/29/2016 | 06/08/2022 | 07/07/2023 | 1,069.00 | PETRENT | 0.00 | 20.00 | 902.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 882.00 | 0.00 | | | |
| 0815 | 1X1 | N/A | 815 | Occupied | Jean, Laura | 05/16/2016 | 05/01/2021 | 07/25/2022 | 1,024.00 | RENT | 702.00 | 0.00 | 702.00 | 0.00 | 0.00 |
| | | N/A | | Pending renewal | Jean, Laura | 05/16/2016 | 07/26/2022 | 10/25/2023 | | RENT | 737.00 * | 0.00 * | 737.00 * | | |
| 0816 | 1X1 | N/A | 815 | Occupied | King, Derrick | 05/19/2016 | 08/06/2021 | 10/05/2022 | 1,069.00 | RENT | 695.00 | 0.00 | 695.00 | 629.00 | 0.00 |
| 0817 | 2X2 | N/A | 1176 | Occupied | Martin, Gaitrice | 12/29/2017 | 06/15/2021 | 06/14/2022 | 1,202.00 | RENT | 873.00 | 0.00 | 873.00 | 828.00 | 0.00 |
| | | N/A | | Pending renewal | Martin, Gaitrice | 12/29/2017 | 06/15/2022 | 06/14/2023 | | RENT | 916.00 * | 0.00 * | 916.00 * | 0.00 | 0.00 |
| 0818 | 2X2 | N/A | 1176 | Occupied-NTV | RABELOS, ANGELA | 04/28/2021 07/29/2022 | 04/28/2021 | 07/27/2022 | 1,202.00 | RENT | 1,520.00 | 0.00 | 1,570.00 | 1,220.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0821 | 2X2 | N/A | 1176 | Occupied-NTV | Sutton, Sheldon | 05/29/2021 06/28/2022 | 05/29/2021 | 06/28/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,652.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,562.00 | 0.00 | | | |
| 0822 | 2X2 | N/A | 1176 | Occupied | Douglas, Jimayia | 12/28/2021 | 12/28/2021 | 12/27/2022 | 1,182.00 | RENT | 1,166.00 | 0.00 | 1,216.00 | 866.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0823 | 1X1 | N/A | 815 | Occupied | Nguyen, Thomas | 11/08/2021 | 11/08/2021 | 11/05/2022 | 1,049.00 | RENT | 1,286.00 | 0.00 | 1,286.00 | 986.00 | 0.00 |
| 0824 | 1X1 | N/A | 815 | Occupied | Young, Torrey | 07/30/2016 | 07/10/2021 | 07/09/2022 | 1,049.00 | RENT | 803.00 | 0.00 | 853.00 | 0.00 | (911.68) |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| | | N/A | | Pending renewal | Young, Torrey | 07/30/2016 | 07/10/2022 | 07/10/2023 | | RENT | 843.00 * | 0.00 * | 893.00 * | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 * | 50.00 * | | | |
| 0825 | 1X1 | N/A | 815 | Occupied | Crockett, Aryanna | 02/01/2022 | 02/01/2022 | 02/28/2023 | 1,049.00 | RENT | 1,166.00 | 0.00 | 1,166.00 | 0.00 | 0.00 |
| 0826 | 1X1 | N/A | 815 | Occupied | Campbell, Cynthia | 06/07/2019 | 08/31/2021 | 10/31/2022 | 1,049.00 | RENT | 1,019.00 | 0.00 | 1,019.00 | 981.00 | 0.00 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

Maxus Properties LLC - Astoria

**RENT ROLL DETAIL**

As of 06/14/2022

06/14/2022 11:12:22AM

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 0827 | 2X2 | N/A | 1176 | Occupied | Poston, Dezarai | 05/08/2019 | 07/28/2021 | 10/27/2022 | 1,182.00 | RENT | 1,084.00 | 0.00 | 1,084.00 | 0.00 | 0.00 |
| 0828 | 2X2 | N/A | 1176 | Occupied | Weber, Lauren | 05/05/2022 | 05/05/2022 | 08/03/2023 | 1,182.00 | PETRENT | 0.00 | 40.00 | 1,564.00 | 0.00 | 0.00 |
|      |     |     |      |          |               |            |            |            |          | RENT | 1,524.00 | 0.00 |          |      |      |
| 0831 | 2X2 | N/A | 1176 | Occupied | Shanks, Kenneth | 08/01/2020 | 06/01/2021 | 08/31/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,270.00 | 0.00 | 0.00 |
|      |     |     |      |          |               |            |            |            |          | RENT | 1,255.00 | 0.00 |          |      |      |
| 0832 | 2X2 | N/A | 1176 | Occupied | Wright, Christopher | 05/23/2022 | 05/23/2022 | 05/22/2023 | 1,182.00 | PETRENT | 0.00 | 20.00 | 1,625.00 | 1,305.00 | (5,998.22) |
|      |     |     |      |          |               |            |            |            |          | RENT | 1,605.00 | 0.00 |          |      |      |
| 0833 | 1X1 | N/A | 815 | Occupied | Ham, Thomas | 02/23/2022 | 02/23/2022 | 02/22/2023 | 1,049.00 | PETRENT | 0.00 | 20.00 | 1,202.00 | 0.00 | 0.00 |
|      |     |     |     |          |             |            |            |            |          | RENT | 1,182.00 | 0.00 |          |      |      |
| 0834 | 1X1 | N/A | 815 | Occupied | Powers, Cristian | 03/10/2022 | 03/10/2022 | 03/09/2023 | 1,049.00 | RENT | 1,191.00 | 0.00 | 1,241.00 | 0.00 | 0.00 |
|      |     |     |     |          |                  |            |            |            |          | WASH/DRY | 0.00 | 50.00 |          |      |      |
| 0835 | 1X1 | N/A | 815 | Occupied-NTV | Smith, Aaron | 01/12/2018 08/05/2022 | 12/30/2021 | 06/29/2022 | 1,049.00 | RENT | 768.00 | 0.00 | 768.00 | 646.00 |      |
| 0836 | 1X1 | N/A | 815 | Occupied | Sarchet, Desiree | 10/24/2019 | 04/23/2022 | 04/22/2023 | 1,049.00 | PETRENT | 0.00 | 20.00 | 966.00 | 0.00 | 0.00 |
|      |     |     |     |          |                  |            |            |            |          | RENT | 946.00 | 0.00 |          |      |      |
| 0837 | 2X2 | N/A | 1176 | Occupied | Allen, Libby | 11/23/2019 | 05/07/2022 | 08/07/2023 | 1,182.00 | RENT | 1,024.00 | 0.00 | 1,024.00 | 0.00 | 0.00 |
| 0838 | 2X2 | N/A | 1176 | Occupied | Williams, Jacinta | 08/01/2018 | 05/18/2022 | 05/17/2023 | 1,182.00 | RENT | 1,089.00 | 0.00 | 1,139.00 | 200.00 | 0.00 |
|      |     |     |      |          |                   |            |            |            |          | WASH/DRY | 0.00 | 50.00 |          |      |      |
| 0911 | 2X2 | N/A | 1176 | Occupied | Martin, Ronnie | 12/19/2014 | 04/03/2021 | 07/02/2022 | 1,202.00 | GARAGE | 0.00 | 225.00 | 1,257.00 | 415.00 | 1,332.91 |
|      |     |     |      |          |                |            |            |            |          | RENT | 1,032.00 | 0.00 |          |      |      |
| 0912 | 2X2 | N/A | 1176 | Occupied-NTV | Carlson, Josh | 08/03/2018 08/27/2022 | 08/28/2021 | 08/27/2022 | 1,202.00 | GARAGE | 0.00 | 50.00 | 1,077.00 | 200.00 | 0.00 |
|      |     |     |      |          |               |            |            |            |          | PETRENT | 0.00 | 15.00 |          |      |      |
|      |     |     |      |          |               |            |            |            |          | RENT | 1,012.00 | 0.00 |          |      |      |
| 0913 | 1X1 | N/A | 815 | Occupied | Michael, Kibrom | 10/21/2020 | 10/21/2020 | 11/20/2021 | 1,069.00 | RENT | 1,090.00 | 0.00 | 1,140.00 | 0.00 | 0.00 |
|      |     |     |     |          |                 |            |            |            |          | WASH/DRY | 0.00 | 50.00 |          |      |      |
| 0914 | 1X1 | N/A | 815 | Occupied | Williams, Tayler | 05/16/2020 | 08/10/2021 | 11/09/2022 | 1,219.00 | PETRENT | 0.00 | 15.00 | 1,159.00 | 0.00 | 0.00 |
|      |     |     |     |          |                  |            |            |            |          | RENT | 1,144.00 | 0.00 |          |      |      |
| 0915 | 1X1 | N/A | 815 | Occupied | Smith, Aaron | 04/19/2021 | 04/19/2021 | 07/18/2022 | 1,069.00 | PETRENT | 0.00 | 15.00 | 1,202.00 | 0.00 | 0.00 |
|      |     |     |     |          |              |            |            |            |          | RENT | 1,187.00 | 0.00 |          |      |      |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;
details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0916 | 1X1 | N/A | 815 | Occupied | Huffman, Rufus | 11/12/2021 | 05/12/2022 | 11/11/2022 | 1,069.00 | RENT | 1,352.00 | 0.00 | 1,352.00 | 0.00 | 0.00 |
| 0917 | 2X2 | N/A | 1176 | Occupied | Harris, Sabina | 06/18/2021 | 06/18/2021 | 06/17/2022 | 1,202.00 | EMPC | 0.00 | (231.72) | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | EMPL | 0.00 | (926.87) | | | |
| | | | | | | | | | | RENT | 1,158.59 | 0.00 | | | |
| | | N/A | | Pending renewal | Harris, Sabina | 06/18/2021 | 06/18/2022 | 06/17/2023 | | EMPC | 0.00 * | (238.68)* | 0.19 * | 0.00 | 0.00 |
| | | | | | | | | | | EMPL | 0.00 * | (954.68)* | | | |
| | | | | | | | | | | RENT | 1,193.55 * | 0.00 * | | | |
| 0918 | 2X2 | N/A | 1176 | Occupied-NTVL | Rehard, Annie | 06/17/2017 06/15/2022 | 06/01/2021 | 05/31/2022 | 1,202.00 | GARAGE | 0.00 | 150.00 | 1,439.00 | 823.00 | 0.00 |
| | | | | | | | | | | RENT | 1,289.00 | 0.00 | | | |
| | | N/A | | Applicant | Guduru, Manogna | 06/23/2022 | 06/23/2022 | 06/22/2023 | | RENT | 1,574.00 * | 0.00 * | 1,624.00 * | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 * | 50.00 * | | | |
| 0921 | 2X2 | N/A | 1176 | Occupied | Eubanks, Andrea | 10/15/2018 | 01/07/2022 | 01/06/2023 | 1,182.00 | RENT | 1,248.00 | 0.00 | 1,248.00 | 200.00 | 0.00 |
| 0922 | 2X2 | N/A | 1176 | Occupied | Patel, Purna | 12/15/2021 | 05/15/2022 | 12/14/2022 | 1,182.00 | RENT | 1,436.00 | 0.00 | 1,436.00 | 0.00 | 0.00 |
| 0923 | 1X1 | N/A | 815 | Occupied-NTVL | Fortier, Kevin | 06/30/2021 06/29/2022 | 06/30/2021 | 06/29/2022 | 1,049.00 | RENT | 1,239.00 | 0.00 | 1,239.00 | 0.00 | 0.00 |
| | | N/A | | Applicant | Kirkland, Maurice | 07/07/2022 | 07/07/2022 | 10/06/2023 | | GARAGE | 0.00 * | 75.00 * | 1,384.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,309.00 * | 0.00 * | | | |
| 0924 | 1X1 | N/A | 815 | Occupied | Chanelli, Christopher | 01/10/2014 | 04/24/2022 | 04/24/2023 | 1,049.00 | RENT | 875.00 | 0.00 | 875.00 | 425.00 | 0.00 |
| 0925 | 1X1 | N/A | 815 | Occupied | Blount, Garrion | 08/01/2020 | 10/31/2021 | 10/31/2022 | 1,049.00 | RENT | 1,024.00 | 0.00 | 1,074.00 | 684.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0926 | 1X1 | N/A | 815 | Occupied | Lloyd, Deshon | 06/04/2022 | 06/04/2022 | 09/04/2023 | 1,049.00 | RENT | 1,280.00 | 0.00 | 1,280.00 | 980.00 | (3.00) |
| 0927 | 2X2 | N/A | 1176 | Occupied | Weiderer, Jacob | 03/06/2020 | 03/06/2022 | 03/06/2023 | 1,182.00 | PETRENT | 0.00 | 20.00 | 1,250.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,180.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0928 | 2X2 | N/A | 1176 | Occupied | Martin, Gene | 01/08/2021 | 07/08/2021 | 07/07/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,473.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,348.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| | | N/A | | Pending renewal | Martin, Gene | 01/08/2021 | 07/08/2022 | 07/07/2023 | | GARAGE | 0.00 * | 75.00 * | 1,540.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,415.00 * | 0.00 * | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 16 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | WASH/DRY | 0.00 * | 50.00 * | | | |
| 0931 | 2X2 | N/A | 1176 | Vacant | VACANT | | | | 1,182.00 | | 0.00 * | 0.00 * | | | |
| 0932 | 2X2 | N/A | 1176 | Occupied | Santiago, Tracy | 09/26/2018 | 08/20/2021 | 08/19/2022 | 1,182.00 | RENT | 979.00 | 0.00 | 1,029.00 | 200.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 0933 | 1X1 | N/A | 815 | Occupied | Parker, Johnathan | 01/18/2019 | 04/13/2022 | 06/12/2023 | 1,049.00 | RENT | 865.00 | 0.00 | 890.00 | 0.00 | |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 0934 | 1X1 | N/A | 815 | Occupied | Clark, Gerald | 01/07/2022 | 01/07/2022 | 04/06/2023 | 1,049.00 | RENT | 1,178.00 | 0.00 | 1,178.00 | 0.00 | 0.00 |
| 0935 | 1X1 | N/A | 815 | Occupied | Mansour, Monica | 06/08/2020 | 09/01/2021 | 08/31/2022 | 1,049.00 | RENT | 945.00 | 0.00 | 945.00 | 0.00 | 0.00 |
| | | N/A | | Pending renewal | Mansour, Monica | 06/08/2020 | 09/01/2022 | 07/31/2023 | | RENT | 995.00 * | 0.00 * | 995.00 * | 0.00 | 0.00 |
| 0936 | 1X1 | N/A | 815 | Occupied | Wieckowski, Richard | 08/06/2014 | 10/24/2021 | 10/24/2022 | 1,049.00 | PETRENT | 0.00 | 15.00 | 933.00 | 425.00 | (957.12) |
| | | | | | | | | | | RENT | 918.00 | 0.00 | | | |
| 0937 | 2X2 | N/A | 1176 | Occupied | Ragin, Kelexus | 02/05/2022 | 02/05/2022 | 02/04/2023 | 1,182.00 | PETRENT | 0.00 | 20.00 | 1,291.00 | 0.00 | (19.93) |
| | | | | | | | | | | RENT | 1,271.00 | 0.00 | | | |
| 0938 | 2X2 | N/A | 1176 | Occupied | LopezMontoya, Aiyana | 12/30/2021 | 12/30/2021 | 12/29/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,180.00 | 0.00 | |
| | | | | | | | | | | RENT | 1,165.00 | 0.00 | | | |
| 1011 | 2X2 | N/A | 1176 | Occupied | Richardson, Jeff | 01/10/2015 | 06/15/2021 | 01/14/2022 | 1,202.00 | RENT | 1,245.00 | 0.00 | 1,295.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1012 | 2X2 | N/A | 1176 | Occupied | Hale, Grace | 03/19/2022 | 03/19/2022 | 06/18/2023 | 1,202.00 | CONCR | 0.00 | (224.70) | 1,323.30 | 1,198.00 | 0.00 |
| | | | | | | | | | | RENT | 1,498.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1013 | 2X2 | N/A | 1176 | Occupied-NTV | Boeckel, Kevin | 05/15/2014 10/31/2022 | 02/03/2022 | 05/02/2022 | 1,157.00 | RENT | 1,397.00 | 0.00 | 1,397.00 | 0.00 | 0.00 |
| 1014 | 2X2 | N/A | 1176 | Occupied | Badillo, Shelley | 07/15/2017 | 04/15/2021 | 07/14/2022 | 1,202.00 | PETRENT | 0.00 | 15.00 | 954.00 | 1,012.00 | |
| | | | | | | | | | | RENT | 939.00 | 0.00 | | | |
| 1015 | 2X2 | N/A | 1176 | Occupied | Rodriguez, Alfredo | 04/22/2022 | 04/22/2022 | 04/21/2023 | 1,157.00 | RENT | 1,439.00 | 0.00 | 1,489.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1016 | 2X2 | N/A | 1176 | Occupied | Roop, Kimberly | 03/02/2019 | 03/29/2022 | 03/28/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,163.00 | 687.00 | 0.00 |
| | | | | | | | | | | RENT | 1,088.00 | 0.00 | | | |
| 1017 | 2X2 | N/A | 1176 | Occupied | Veal, Mara | 03/08/2022 | 03/08/2022 | 06/07/2023 | 1,202.00 | RENT | 1,431.00 | 0.00 | 1,481.00 | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1018 | 2X2 | N/A | 1176 | Occupied | Shea, Michael | 08/09/2019 | 11/02/2022 | 10/01/2022 | 1,202.00 | PETRENT | 0.00 | 15.00 | 1,242.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,227.00 | 0.00 | | | |
| 1021 | 2X2 | N/A | 1176 | Occupied | Arumilli, Radhika | 05/29/2021 | 05/29/2021 | 08/28/2022 | 1,182.00 | RENT | 1,480.00 | 0.00 | 1,480.00 | 0.00 | 0.00 |
| 1022 | 2X2 | N/A | 1176 | Occupied | Bailey, Sonya | 10/06/2018 | 04/06/2022 | 02/06/2023 | 1,182.00 | RENT | 1,185.00 | 0.00 | 1,185.00 | 200.00 | 0.00 |
| 1023 | 2X2 | N/A | 1176 | Occupied | The Church ofLatter Day Saints, * | 10/31/2020 | 01/31/2022 | 08/30/2022 | 1,182.00 | RENT | 1,436.00 | 0.00 | 1,436.00 | 0.00 | 0.00 |
| | | N/A | | Pending renewal | The Church ofLatter Day Saints, * | 10/31/2020 | 08/31/2022 | 10/30/2023 | | RENT | 1,507.00 * | 0.00 * | 1,507.00 * | 0.00 | 0.00 |
| 1024 | 2X2 | N/A | 1176 | Occupied | Shinault, Brandon | 06/22/2017 | 06/16/2021 | 09/15/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,085.00 | 200.00 | 0.00 |
| | | | | | | | | | | RENT | 995.00 | 0.00 | | | |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1025 | 2X2 | N/A | 1176 | Occupied | Eason, Ruth | 06/03/2022 | 06/03/2022 | 09/02/2023 | 1,182.00 | RENT | 1,457.00 | 0.00 | 1,457.00 | 0.00 | 0.00 |
| 1026 | 2X2 | N/A | 1176 | Occupied | Ortiz, Arlicia | 07/31/2020 | 09/30/2021 | 09/29/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,253.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,238.00 | 0.00 | | | |
| 1027 | 2X2 | N/A | 1176 | Occupied | Castellano, Franco | 02/24/2017 | 03/10/2022 | 03/09/2023 | 1,182.00 | RENT | 944.00 | 0.00 | 944.00 | 200.00 | 0.00 |
| 1028 | 2X2 | N/A | 1176 | Occupied | Buckner, Darryl | 10/23/2014 | 02/08/2022 | 02/07/2023 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,033.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,018.00 | 0.00 | | | |
| 1031 | 2X2 | N/A | 1176 | Occupied | PETTIS, SEAN | 12/30/2021 | 12/30/2021 | 03/29/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,121.00 | 746.00 | 0.00 |
| | | | | | | | | | | RENT | 1,046.00 | 0.00 | | | |
| 1032 | 2X2 | N/A | 1176 | Occupied-NTV | Burton, Jaylen | 09/08/2017 07/21/2022 | 04/22/2021 | 07/21/2022 | 1,182.00 | PETRENT | 0.00 | 15.00 | 1,043.00 | 200.00 | 0.00 |
| | | | | | | | | | | RENT | 1,028.00 | 0.00 | | | |
| 1033 | 2X2 | N/A | 1176 | Occupied | Goodman, Breanna | 04/29/2022 | 04/29/2022 | 04/27/2023 | 1,182.00 | RENT | 1,517.00 | 0.00 | 1,567.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1034 | 2X2 | N/A | 1176 | Occupied | Kersten, Courtney | 01/11/2020 | 08/05/2021 | 08/04/2022 | 1,182.00 | GARAGE | 0.00 | 50.00 | 1,219.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,154.00 | 0.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | Pending renewal | Kersten, Courtney | 01/11/2020 | 08/05/2022 | 06/05/2023 | | GARAGE | 0.00 * | 50.00 * | 1,291.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 * | 20.00 * | | | |
| | | | | | | | | | | RENT | 1,221.00 * | 0.00 * | | | |
| 1035 | 2X2 | N/A | 1176 | Occupied | Johnson, Jamiqua | 03/08/2021 | 03/08/2022 | 03/07/2023 | 1,182.00 | RENT | 1,504.00 | 0.00 | 1,554.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1036 | 2X2 | N/A | 1176 | Occupied | Gunter, Alex | 12/16/2021 | 12/16/2021 | 03/15/2023 | 1,182.00 | RENT | 1,166.00 | 0.00 | 1,166.00 | 0.00 | 0.00 |
| 1037 | 2X2 | N/A | 1176 | Vacant | VACANT | | | | 1,182.00 | | 0.00 * | 0.00 * | | | |
| 1038 | 2X2 | N/A | 1176 | Occupied | Salazar, Juan | 01/15/2022 | 01/15/2022 | 01/14/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,183.00 | 808.00 | 0.00 |
| | | | | | | | | | | RENT | 1,108.00 | 0.00 | | | |
| 1111 | 2X2 | N/A | 1176 | Occupied-NTVL | Laurent, Kyturah | 05/15/2021 06/30/2022 | 01/15/2022 | 07/14/2022 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,867.00 | 0.00 | (35.55) |
| | | | | | | | | | | RENT | 1,792.00 | 0.00 | | | |
| | | N/A | | Applicant | Rodriguez, Victoria | 07/08/2022 | 07/08/2022 | 07/07/2023 | | RENT | 1,580.00 * | 0.00 * | 1,630.00 * | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 * | 50.00 * | | | |
| 1112 | 2X2 | N/A | 1176 | Occupied | Holden, Ronda | 03/19/2018 | 10/06/2022 | 01/05/2023 | 1,202.00 | RENT | 1,110.00 | 0.00 | 1,110.00 | 982.00 | 0.00 |
| 1113 | 1X1 | N/A | 815 | Occupied | Gray, Wayne | 05/02/2022 | 05/02/2022 | 05/01/2023 | 1,069.00 | RENT | 1,392.00 | 0.00 | 1,392.00 | 0.00 | 0.00 |
| 1114 | 1X1 | N/A | 815 | Occupied | Jaskolski, Kristin | 05/27/2022 | 05/27/2022 | 05/29/2023 | 1,069.00 | PETRENT | 0.00 | 20.00 | 1,327.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,307.00 | 0.00 | | | |
| 1115 | 1X1 | N/A | 815 | Occupied | Flanagan, Cynthia | 04/20/2018 | 07/06/2021 | 07/05/2022 | 1,069.00 | PETRENT | 0.00 | 15.00 | 943.00 | 881.00 | 0.00 |
| | | | | | | | | | | RENT | 928.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Flanagan, Cynthia | 04/20/2018 | 07/06/2021 | 10/05/2023 | | PETRENT | 0.00 * | 15.00 * | 989.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 974.00 * | 0.00 * | | | |
| 1116 | 1X1 | N/A | 815 | Occupied | Hillard, Genesis | 03/23/2021 | 03/23/2021 | 06/22/2022 | 1,069.00 | GARAGE | 0.00 | 75.00 | 1,245.00 | 870.00 | 0.00 |
| | | | | | | | | | | RENT | 1,170.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Hillard, Genesis | 03/23/2021 | 06/23/2022 | 09/22/2022 | | GARAGE | 0.00 * | 75.00 * | 1,456.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,381.00 * | 0.00 * | | | |
| 1117 | 2X2 | N/A | 1176 | Occupied | Quinn, Paul | 08/07/2021 | 08/07/2021 | 08/06/2022 | 1,157.00 | PETRENT | 0.00 | 30.00 | 1,715.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,685.00 | 0.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0      Page 19 of 23

**Maxus Properties LLC - Astoria**

06/14/2022 11:12:22AM      **RENT ROLL DETAIL**      mgt-521-003

As of 06/14/2022

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1118 | 2X2 | N/A | 1176 | Occupied | Gaines, Donald | 02/20/2018 | 08/18/2021 | 08/17/2022 | 1,202.00 | PETRENT | 0.00 | 15.00 | 995.00 | 200.00 | 0.00 |
| | | | | | | | | | | RENT | 980.00 | 0.00 | | | |
| 1121 | 2X2 | N/A | 1176 | Occupied | Franklin, Vincent | 07/23/2013 | 04/21/2021 | 07/20/2022 | 1,182.00 | GARAGE | 0.00 | 50.00 | 1,087.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,037.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Franklin, Vincent | 07/23/2013 | 07/21/2022 | 10/20/2023 | | GARAGE | 0.00 * | 50.00 * | 1,138.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,088.00 * | 0.00 * | | | |
| 1122 | 2X2 | N/A | 1176 | Occupied | NABORS, JORDAN | 01/09/2022 | 01/09/2022 | 01/08/2023 | 1,182.00 | RENT | 1,106.00 | 0.00 | 1,106.00 | 0.00 | 0.00 |
| 1123 | 1X1 | N/A | 815 | Occupied-NTVL | Sloop, Gavin | 05/02/2020 06/24/2022 | 07/27/2021 | 07/26/2022 | 1,049.00 | PETRENT | 0.00 | 15.00 | 856.00 | 0.00 | 800.00 |
| | | | | | | | | | | RENT | 841.00 | 0.00 | | | |
| | | N/A | | Applicant | Ramos, Daniel | 07/02/2022 | 07/02/2022 | 09/30/2023 | | PETRENT | 0.00 * | 20.00 * | 1,354.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,309.00 * | 0.00 * | | | |
| | | | | | | | | | | STORAGE | 0.00 * | 25.00 * | | | |
| 1124 | 1X1 | N/A | 815 | Occupied | Adams, Tenesha | 05/02/2020 | 04/28/2021 | 04/27/2022 | 1,049.00 | RENT | 922.00 | 0.00 | 922.00 | 0.00 | 0.00 |
| 1125 | 1X1 | N/A | 815 | Occupied | Archey, Marilynn | 09/12/2018 | 02/06/2022 | 04/05/2023 | 1,049.00 | GARAGE | 0.00 | 125.00 | 1,108.00 | 862.00 | 0.00 |
| | | | | | | | | | | RENT | 933.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1126 | 1X1 | N/A | 815 | Occupied | Summers, Jane | 11/04/2019 | 11/04/2021 | 11/03/2022 | 1,049.00 | RENT | 839.00 | 0.00 | 889.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1127 | 2X2 | N/A | 1176 | Occupied | Sims, David | 10/18/2019 | 04/12/2022 | 04/11/2023 | 1,182.00 | PETRENT | 0.00 | 15.00 | 995.00 | 602.00 | 0.00 |
| | | | | | | | | | | RENT | 980.00 | 0.00 | | | |
| 1128 | 2X2 | N/A | 1176 | Occupied | Torres, Asbel | 07/06/2019 | 09/29/2021 | 09/28/2022 | 1,182.00 | CONCR | 0.00 | (127.80) | 724.20 | 785.00 | 0.00 |
| | | | | | | | | | | RENT | 852.00 | 0.00 | | | |
| 1131 | 2X2 | N/A | 1176 | Occupied | Wall, Samantha | 12/04/2020 | 02/04/2022 | 05/03/2023 | 1,182.00 | RENT | 1,378.00 | 0.00 | 1,378.00 | 0.00 | 0.00 |
| 1132 | 2X2 | N/A | 1176 | Occupied | Miller, Annmarie | 04/06/2022 | 04/06/2022 | 04/05/2023 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,495.00 | 0.00 | 228.67 |
| | | | | | | | | | | PETRENT | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 1,380.00 | 0.00 | | | |
| 1133 | 1X1 | N/A | 815 | Occupied-NTV | Losievsky, Noah | 07/08/2021 07/07/2022 | 07/08/2021 | 07/07/2022 | 1,049.00 | GARAGE | 0.00 | 75.00 | 1,433.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,358.00 | 0.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0 | **Maxus Properties LLC - Astoria** | Page 20 of 23
06/14/2022 11:12:22AM | **RENT ROLL DETAIL** | mgt-521-003
| As of 06/14/2022 |

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;
details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1134 | 1X1 | N/A | 815 | Occupied | Ray, Lauren | 12/12/2019 | 02/05/2022 | 02/04/2023 | 1,049.00 | GARAGE | 0.00 | 50.00 | 876.00 | 715.00 | 0.00 |
| | | | | | | | | | | RENT | 776.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1135 | 1X1 | N/A | 815 | Occupied-NTV | Conti, Joseph | 06/26/2020 07/27/2022 | 07/28/2021 | 07/27/2022 | 1,049.00 | RENT | 972.00 | 0.00 | 972.00 | 0.00 | 0.00 |
| 1136 | 1X1 | N/A | 815 | Occupied | Page, Kyle | 03/07/2022 | 03/07/2022 | 03/04/2023 | 1,049.00 | RENT | 1,244.00 | 0.00 | 1,244.00 | 944.00 | 0.00 |
| 1137 | 2X2 | N/A | 1176 | Occupied-NTV | Simpson, Tynisha | 09/23/2022 07/15/2022 | 12/23/2021 | 06/22/2022 | 1,182.00 | RENT | 1,481.00 | 0.00 | 1,531.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1138 | 2X2 | N/A | 1176 | Occupied-NTV | Pena, Christian | 07/17/2021 07/25/2022 | 07/17/2021 | 07/15/2022 | 1,182.00 | RENT | 1,739.00 | 0.00 | 1,739.00 | 0.00 | 1,840.69 |
| 1211 | 2X2 | N/A | 1176 | Occupied | Porter, Dwayne | 09/29/2014 | 05/12/2022 | 04/11/2023 | 1,202.00 | RENT | 1,143.00 | 0.00 | 1,318.00 | 475.00 | 0.00 |
| | | | | | | | | | | UTILITY | 0.00 | 175.00 | | | |
| 1212 | 2X2 | N/A | 1176 | Occupied | Jackson, Treyveon | 12/28/2021 | 12/28/2021 | 03/27/2022 | 1,277.00 | GARAGE | 0.00 | 75.00 | 1,271.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,196.00 | 0.00 | | | |
| 1213 | 2X2 | N/A | 1176 | Occupied | Pastore, Sharon | 07/03/2015 | 02/15/2022 | 02/14/2023 | 1,157.00 | PETRENT | 0.00 | 15.00 | 1,134.00 | 475.00 | (36.69) |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1214 | 2X2 | N/A | 1176 | Occupied | Brown, Pandora | 09/09/2019 | 01/25/2022 | 04/24/2023 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,348.00 | 840.00 | 1,440.90 |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |
| | | | | | | | | | | RENT | 1,238.00 | 0.00 | | | |
| 1215 | 2X2 | N/A | 1176 | Occupied | Jackson, Randal | 02/23/2022 | 02/23/2022 | 02/21/2023 | 1,202.00 | GARAGE | 0.00 | 150.00 | 1,340.00 | 890.00 | 0.00 |
| | | | | | | | | | | RENT | 1,190.00 | 0.00 | | | |
| 1216 | 2X2 | N/A | 1176 | Occupied | Baez, Yeicon | 10/15/2019 | 12/08/2021 | 10/07/2022 | 1,277.00 | PETRENT | 0.00 | 15.00 | 1,223.00 | 760.00 | 0.00 |
| | | | | | | | | | | RENT | 1,158.00 | 0.00 | | | |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1217 | 2X2 | N/A | 1176 | Occupied | West, Russell | 08/25/2020 | 08/25/2021 | 08/24/2022 | 1,202.00 | GARAGE | 0.00 | 75.00 | 1,406.00 | 984.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 1,291.00 | 0.00 | | | |
| 1218 | 2X2 | N/A | 1176 | Occupied | Hill, Robert | 01/29/2022 | 01/29/2022 | 04/28/2023 | 1,202.00 | RENT | 1,354.00 | 0.00 | 1,404.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

details

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1221 | 2X2 | N/A | 1176 | Occupied | Fultz, Datrion | 10/05/2019 | 03/29/2022 | 03/28/2023 | 1,182.00 | RENT | 948.00 | 0.00 | 948.00 | 573.00 | 0.00 |
| 1222 | 2X2 | N/A | 1176 | Vacant | VACANT | | | | 1,257.00 | | 0.00 * | 0.00 * | | | |
| 1223 | 2X2 | N/A | 1176 | Occupied | Denning, Brittany | 06/09/2014 | 09/28/2021 | 09/27/2022 | 1,182.00 | PARKING | 0.00 | 35.00 | 1,058.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,023.00 | 0.00 | | | |
| 1224 | 2X2 | N/A | 1176 | Occupied | Robinson, Kathy | 12/29/2017 | 04/21/2021 | 07/20/2022 | 1,182.00 | RENT | 827.00 | 0.00 | 827.00 | 200.00 | 0.00 |
| | | N/A | | Pending renewal | Robinson, Kathy | 12/29/2017 | 07/21/2022 | 10/20/2023 | | RENT | 868.00 * | 0.00 * | 868.00 * | 0.00 | 0.00 |
| 1225 | 2X2 | N/A | 1176 | Occupied | Chanza, Ashley | 04/25/2022 | 04/25/2022 | 07/24/2023 | 1,182.00 | PETRENT | 0.00 | 40.00 | 1,649.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,584.00 | 0.00 | | | |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 1226 | 2X2 | N/A | 1176 | Occupied | Lynch, Delquan | 01/24/2022 | 01/24/2022 | 01/23/2023 | 1,182.00 | RENT | 1,319.00 | 0.00 | 1,319.00 | 0.00 | 0.00 |
| 1227 | 2X2 | N/A | 1176 | Occupied | Sutton, CASSANDRA | 08/07/2021 | 08/07/2021 | 08/06/2022 | 1,182.00 | GARAGE | 0.00 | 75.00 | 1,824.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,724.00 | 0.00 | | | |
| | | | | | | | | | | STORAGE | 0.00 | 25.00 | | | |
| 1228 | 2X2 | N/A | 1176 | Occupied | Green, Tamara | 12/29/2021 | 12/29/2021 | 03/28/2023 | 1,182.00 | RENT | 1,108.00 | 0.00 | 1,158.00 | 0.00 | (1.23) |
| | | | | | | | | | | WASH/DRY | 0.00 | 50.00 | | | |
| 1231 | 2X2 | N/A | 1176 | Admin/Down | VACANT | | | | 1,182.00 | | 0.00 * | 0.00 * | | | |
| 1232 | 2X2 | N/A | 1176 | Vacant | VACANT | | | | 1,182.00 | | 0.00 * | 0.00 * | | | |
| 1233 | 2X2 | N/A | 1176 | Occupied | Clemens, Trevor | 01/22/2022 | 01/22/2022 | 01/21/2023 | 1,182.00 | RENT | 1,114.00 | 0.00 | 1,114.00 | 0.00 | 0.00 |
| 1234 | 2X2 | N/A | 1176 | Occupied | McElligott, James | 09/30/2021 | 09/30/2021 | 10/29/2022 | 1,182.00 | GARAGE | 0.00 | 50.00 | 1,805.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 15.00 | | | |
| | | | | | | | | | | RENT | 1,740.00 | 0.00 | | | |
| 1235 | 2X2 | N/A | 1176 | Occupied | Allen, Jaquan | 12/21/2021 | 12/21/2021 | 12/20/2022 | 1,182.00 | RENT | 1,053.00 | 0.00 | 1,053.00 | 753.00 | 0.00 |
| 1236 | 2X2 | N/A | 1176 | Occupied | Brandt, Conner | 06/01/2020 | 05/27/2022 | 08/26/2022 | 1,182.00 | RENT | 1,268.00 | 0.00 | 1,293.00 | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 | 25.00 | | | |
| | | N/A | | Pending renewal | Brandt, Conner | 06/01/2020 | 08/27/2022 | 10/26/2023 | | RENT | 1,331.00 * | 0.00 * | 1,356.00 * | 0.00 | 0.00 |
| | | | | | | | | | | WASH/DRY | 0.00 * | 25.00 * | | | |
| 1237 | 2X2 | N/A | 1176 | Occupied | Ingram, Byron | 06/06/2015 | 06/16/2021 | 06/15/2022 | 1,182.00 | GARAGE | 0.00 | 125.00 | 1,130.00 | 0.00 | (1,222.34) |
| | | | | | | | | | | RENT | 1,005.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Ingram, Byron | 06/06/2015 | 06/16/2022 | 09/15/2023 | | GARAGE | 0.00 * | 125.00 * | 1,185.00 * | 0.00 | 0.00 |

* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|------|-----------|------------------|------|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,060.00 * | 0.00 * | | | |
| 1238 | 2X2 | N/A | 1176 | Occupied | FLEMING, ALYSSA | 05/20/2022 | 05/20/2022 | 08/19/2023 | 1,182.00 | RENT | 1,484.00 | 0.00 | 1,484.00 | 0.00 | 0.00 |
| **totals:** | | | | | | | | | **316,592.00** | | **325,099.59** | **9,021.71** | **334,121.30** | **69,010.00** | |

\* indicates amounts not included in detail totals

OneSite Rents v3.0

06/14/2022 11:12:22AM

**Maxus Properties LLC - Astoria**

**RENT ROLL DETAIL**

As of 06/14/2022

Page 23 of 23

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

Amt / SQFT: Market = 298,104 SQFT;  Leased =  286,441 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market + Addl. | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|-----------|---------|--------------|------------------------|----------------|----------------|-------------------|----------------|-------------|-----------------|
| 1X1 | 72 | 815 | 1,059.42 | 1.30 | 1,081.96 | 1.33 | 71 | 98.61 | 5 |
| 2X2 | 168 | 1,176 | 1,191.76 | 1.01 | 1,262.79 | 1.07 | 161 | 95.83 | 15 |
| 3X2 | 32 | 1,308 | 1,253.06 | 0.96 | 1,499.03 | 1.15 | 30 | 93.75 | 3 |
| **totals / averages:** | **272** | **1,096** | **1,163.94** | **1.06** | **1,240.84** | **1.13** | **262** | **96.32** | **23** |

### occupancy and rents summary for current date

| unit status | Market + Addl. | # units | potential rent |
|-------------|----------------|---------|----------------|
| Occupied, no NTV | 275,527.00 | 237 | 290,488.59 |
| Occupied, NTV | 20,797.00 | 18 | 24,797.00 |
| Occupied NTV Leased | 8,192.00 | 7 | 9,814.00 |
| Vacant Leased | 4,909.00 | 4 | 4,909.00 |
| Admin/Down | 1,182.00 | 1 | 1,182.00 |
| Vacant Not Leased | 5,985.00 | 5 | 5,985.00 |
| **totals:** | **316,592.00** | **272** | **337,175.59** |

### summary billing by transaction code for current date

| code | amount |
|------|--------|
| CONC/SPECL | (294.00) |
| CONCR | (455.70) |
| EMPC | (231.72) |
| EMPL | (926.87) |
| GARAGE | 5,600.00 |
| PARKING | 210.00 |
| PETRENT | 1,420.00 |
| RENT | 325,099.59 |
| STORAGE | 400.00 |
| UTILITY | 175.00 |
| WASH/DRY | 3,125.00 |
| **total:** | **334,121.30** |

**Exhibit D**

**Form of Lease**

[SEE ATTACHED]

# APARTMENT LEASE CONTRACT



Date of Lease Contract: **April 12, 2022**
*(when the Lease Contract is filled out)*

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between *you* the resident(s) *(list all people signing the Lease Contract):*

_____
_____
_____
_____
_____
_____
_____
_____

and *us,* the owner: **Cape Fear Multifamily, LLC.**

_____
_____

*(name of apartment community or title holder).* You've agreed to rent Apartment No. _____, at **405 Grand Wailea Drive**

_____ *(street address)*

in _____**Hope Mills**_____ *(city),* North Carolina, **28348** *(zip code)* (the "apartment" or the "premises") for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written or electronic notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants not signing the Lease Contract):*

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

As permitted by law, you understand and agree that we may provide access to any occupant listed under paragraph 2 (Occupants) in the absence of any written document that withdraws such authorization.

No one else may occupy the apartment without our express written permission.

**3. LEASE TERM.** The initial term of the Lease Contract begins on the _____ day of _____, and ends at 11:59 P.M. the _____ day of _____. This Lease Contract will automatically renew month-to-month unless either party gives at least _____ days written notice of termination or intent to move-out as required by paragraph 43 (Move-Out Notice). In the event this Lease Contract has renewed on a month-to-month basis, it shall continuously renew each month thereafter until either party provides the other with a written notice of termination at least 30 days before the end of any such renewal term in accordance with the requirements set forth in paragraph 43 (Move-Out Notice).

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ _____, due on or before the date this Lease Contract is signed, to be administered in accordance with the North Carolina Tenant Security Deposit Act, N.C.G.S. § 42-50 et seq.

In holding your security deposit, we will *[check one]:*
☒ Deposit the security deposit in a trust account with (name of bank or savings institution) **Bank of America**

located at (address) **4747 Cumberland Road, Fayetteville, NC 28306**

or
☐ Furnish a bond from (name of bonding company) _____
_____ located at
(address) _____

**The security deposit may, in our discretion, be deposited in an interest-bearing account with the bank or savings institution named above.** We may retain any interest earned upon the security deposit and may withdraw such interest, if any, from such account as it accrues as often as is permitted by the terms of the account.

Your security deposit will be held and, upon termination of your tenancy, be applied in the manner and for the purposes set forth in paragraphs 47 (Security Deposit Deductions and Other Charges) and 48 (Deposit Return, Surrender, and Abandonment) of this Lease Contract.

**5. KEYS.** You will be provided _____ apartment key(s), _____ mailbox key(s), _____ FOB(s), and/or _____ other access device(s) for access to the building and amenities at no additional cost at move-in. If the key, FOB, or other access device is lost or becomes damaged during your tenancy or is not returned or is returned damaged when you move out, you will be responsible for the costs for the replacement and/or repair of the same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ _____ per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☒ at **www.theastoriaapts.com**

_____
_____

Prorated rent of $ _____ is due for the remainder of *[check one]:* ☒ 1st month or ☐ 2nd month, on

_____.

*Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period.* Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless expressly authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. At our discretion, we may convert any and all checks via the Automated Clearing House (ACH) system for the purposes of collecting payment. Rent is not considered accepted, if the payment/ACH is rejected, does not clear, or is stopped for any reason. If you don't pay all rent on or before the **5th** day of the month (late fee cannot be charged before the 6th day of the month), you'll pay a late charge of 5% of the rental payment or $15.00, whichever is greater—or, where your rent is subsidized in any way, the late fee shall not exceed $15.00 or an amount equal to 5% of your share of the rental payment. The late fee shall be considered additional rent and you will owe such late fee without us having to demand it from you. You'll also pay a charge of $ **25.00** or the maximum amount allowed by law at the date the check is tendered to us (whichever is greater) for each returned check or rejected electronic payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation.

**7. UTILITIES.** We'll pay for the following items, if checked and if permitted by law:
☐ water  ☐ gas  ☐ electricity  ☐ master antenna
☐ wastewater  ☐ trash  ☐ cable TV
☐ other _____

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities. You are responsible for having all utilities for which You are paying the provider directly, set up in Your name prior to taking possession of the Premises. You must not

allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends as such failure constitutes a default of the Lease. Cable channels that are provided may be changed during the lease term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If any utilities are submetered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

In addition, we urge all Residents, and particularly those residing in coastal areas, areas near rivers, and areas prone to flooding, to obtain flood insurance. Renter's insurance may not cover damage to your property due to flooding. A flood insurance resource which may be available includes the National Flood Insurance Program managed by the Federal Emergency Management Agency (FEMA).

We ❏ require ❏ do not require you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

If renter's insurance is required, you shall maintain at all times during the Term of this Lease, at your sole expense, a renter's insurance policy, or its equivalent, issued by a licensed insurance company in a minimum policy coverage amount of $_____, and you shall provide us with proof of such insurance to our satisfaction. If you allow your renter's insurance coverage to lapse, we may retain a policy for you and assess the premium to the you as additional rent which is due and payable with the monthly rent.

If no box is checked, renter's insurance is not required.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance, and you shall provide us with proof of such insurance to our satisfaction ❏ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability

insurance throughout your tenancy, including any renewal periods and/or lease extensions, may be an incurable breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. You understand and agree that should you allow your liability coverage to lapse, expire or otherwise be terminated, we may, at our sole option (in lieu of declaring an incurable breach), elect to purchase a liability policy on your behalf and assess the premium to you as additional rent which is due and payable with the monthly rent.

You acknowledge that no portion of the rent paid by you under this agreement will be specifically allocated for the purchase of the owner's structural fire insurance, though the owner may use a portion of gross rental proceeds obtained from all rental units in the community to purchase such structural fire insurance, and in such an event, that you are in no way a co-insured under any such policy.

**9. LOCKS AND LATCHES.** Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done before you move into your apartment. You agree not to install additional or different locks or latches on any doors or windows of the premises, unless we have consented in writing to such installation.

You may at any time ask us to change or rekey locks or latches during the Lease Term. We must comply with those requests, but you must pay for them, unless otherwise provided by law. You agree that any resident may request, either orally or in writing, that we install new or different locks for the premises. You further understand and agree that once we install new or different locks we shall provide keys to the replacement locks to any other residents and/or authorized occupants in the absence of a lawful reason to deny them such keys.

**Payment for Rekeying, Repairs, Etc.** You must pay for all repairs or replacements arising from misuse or damage to devices by you or your occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair or change or rekey the same device during the 30 days preceding your request and we have complied with your request. Otherwise, you must pay immediately after the work is completed.

---

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.** The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed lease form.

```
Co-Signer, if applicable, does not have a
right to possession of leased premises.
_____
_____
_____
```

See any additional special provisions.

**11. REIMBURSEMENT.** You must promptly reimburse us for lost rent, loss, damage, government fines, or cost of repairs or service in the apartment community resulting, directly or indirectly, from You, your occupants, guests or visitors. The parties expressly agree that NCGS 42-10 shall not apply to your tenancy and, as such, resident shall be strictly liable for any damage incurred by us, including but not limited to lost rent, even where the premises is not habitable. **Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following that result from your or your invitees, guests, or occupants' negligence or intentional acts: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver. Whether or not you pay for the damage, we may still declare a default of the Lease Contract and terminate your right to possession of the premises pursuant to paragraph 33 (Default by Resident) herein.

**12. (A) EVICTION OR SUMMARY EJECTMENT AND PROPERTY LEFT IN THE APARTMENT.**

In the event you violate any terms or conditions of this Lease Contract or Addenda or fail to perform any promise, duty or obligation you have agreed to or imposed upon you by law, then we, in addition to all other rights and remedies provided by law, may, at our option and with or without notice to you, either (1) terminate this Lease Contract or (2) terminate your right to possession of the premises without terminating this Lease Contract.

Regardless of whether we terminate this Lease Contract or only terminate your right of possession without terminating this Lease Contract, we shall be immediately entitled to possession of the premises and you shall peacefully surrender possession of the premises to us immediately upon our demand. In the event that you fail to surrender possession, we shall re-enter and re-take possession through a summary ejectment proceeding or expedited eviction proceeding as provided by North Carolina law. In the event that we terminate this Lease Contract, all of our duties under this agreement shall terminate and we shall be entitled to collect from you all accrued and unpaid rents, and damages arising under this Lease Contract.

If we bring a suit against you for summary ejectment, the County sheriff may remove your personal property from the apartment within 7 days from the time the sheriff executes the Writ of Possession. You must retake possession of your property if it is removed by the sheriff. If you do not do so, the sheriff may arrange for the storage of your property, and you will be liable for the costs of the proceedings and the storage of your property.

If the sheriff does not store your personal property removed from the apartment, we may take possession of it and move it for storage purposes. In the event of an execution of a Writ of Possession against you, you agree that this sentence hereby constitutes our offer to release your personal property to you during our regular business hours for the seven calendar-day period following the execution of a Writ of Possession. Seven days after being placed in lawful

possession of your personal property by execution of the Writ of Possession, we may throw away, dispose of, or sell your property. If you request that we release your property to you during the seven day period, we must do so during our regular business hours. If we elect to sell your property, we must give you at least seven days notice prior to the sale, and we must release your property to you if you so request before the sale. If you do not request the release of your property within seven days, all costs of summary ejectment, execution and storage proceedings shall be charged to you as court costs and shall constitute a lien against the stored property.

In the event we terminate your right of possession without terminating this Lease Contract, you shall remain liable for the full performance of all the covenants, and we shall use reasonable efforts to re-rent the premises on your behalf and you shall remain liable for any resulting costs, deficiencies or damages. Any such rentals reserved from re-renting shall be applied first to the cost of re-renting the premises and then to the rentals due under this Lease Contract. Re-entry shall not bar the right of recovery of rent or damages for breach of covenants, nor shall the partial receipt of rent after conditions broken be deemed a waiver of forfeiture, as provided by N.C.G.S. In order to entitle us to re-enter and/or terminate this Lease Contract for default, it shall not be deemed necessary to give notice of rent being due and unpaid or of other conditions broken or to make demands for rent, the execution of this Lease signed by you and us being sufficient notice of all terms of this Lease Contract including of the rent being due and demand for the same. We shall have all rights granted pursuant to N.C.G.S. §42-25.9 and §42-25.6.

**(B) ABANDONED PROPERTY**

If you abandon personal property with a value of $750 or less from apartment or fail to remove such property at the time of execution of a Writ of Possession, we may, as an alternative to the procedures described above, deliver the property to a non-profit organization regularly providing free or inexpensive clothing or household furnishings to people in need, provided that such organization agrees to store the property separately for a thirty-day period, and to release it to you without charge during this thirty-day period. We will deem personal property to be abandoned if we find evidence clearly showing the apartment has been voluntarily vacated after the rental period has expired and we have no notice of a disability that caused the vacancy.

If the total value of the property left in the apartment at the time of execution of a Writ of Possession is less than $500, we may deem the property abandoned after five days and may throw away or dispose of the property.

**13. FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, we may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. This paragraph does not apply to termination of this Lease Contract 14 or more days before occupancy by military personnel.

**14. RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10 (Special Provisions), by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 19 (Community Policies or Rules). If, at least 5 days before the advance notice deadline referred to in paragraph 3 (Lease Term), we give you written notice

of rent increases or lease changes effective when the lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 43 (Move-Out Notice).

**15. DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. You hereby acknowledge and agree that we shall not be responsible for any other damages that may result from our failure to deliver possession of the premises, including but not limited to, moving expenses, lodging, storage, or any other cost, expense or damage whatsoever. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in paragraph 3 (Lease Term)—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in paragraph 3 (Lease Term) and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in paragraph 3 (Lease Term) for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**16. RENTAL APPLICATION.** You understand and agree that we have relied upon the Rental Application ("application") submitted by you as an inducement for entering into this Lease Contract, and you warrant that the facts contained in such application are true. If we determine or learn that any fact or representation in the application is false or deceptive or omits material facts, you shall be in default of this Lease Contract, and in such an event, we shall have all of the rights and remedies set forth in this Lease Contract.

You understand and agree that we reserve the right to check the criminal records of you and your occupants at any time during the original term or any renewal terms of this Lease Contract, though you also agree that we have no affirmative duty to anyone to research or monitor the criminal records or sex offender records of any person.

**17. DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it.

## While You're Living in the Apartment

**18. COMMON AREAS.** As used in this Agreement, the terms "Common Area" or "Common Areas" shall refer to all land and fixtures and spaces (other than Our business and management offices) outside the premises that are owned and maintained by us and comprise the single piece of real property that form the single community in which the premises is located. You understand and agree that the use of the Common Areas (including any amenity, swimming pool, exercise room, basketball court, parking areas, laundry facilities, hallways, breezeways, roadways, and so forth) is subject to any Rules and Regulations set by us and that such Rules and Regulations may be changed at any time without notice. You understand and agree that your payment of rent to us only entitles you to the rental and use of the premises and your ingress and egress to and from the premises while you remain in legal possession of the premises; you also understand and agree that your use of any Common Area facility is not included as part of the rent but instead is a privilege granted to you by us. We may revoke your privilege to use any facility upon your default of this Agreement, or if we deem, in our sole discretion, that you or an occupant or guest has misused the facility in any way or has disturbed the rights or comfort of other people.

In the event we revoke your privilege to use a facility, you agree that we have the right to trespass you and your occupant(s) criminally from the facility. You also further agree that: (a) We may close or eliminate any facility at any time; (b) that we may bar you or any occupant or guest from entering or using any facility based on your, or their, misuse of same or based upon your default of this Agreement, including but not limited to your failure to pay rent or any other debt when due under this Agreement; (c) You would not be entitled to any rent reduction or abatement or rescission or damages of any kind whatsoever relating in any way to your inability to access or use any facility. You also agree that we may remove, or we may request that any law enforcement officer remove or otherwise trespass, any person from the Common Areas where such person cannot or will not establish that they are a resident, occupant or guest.

**19. COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written apartment rules, any restrictive covenants that might be in place and community policies, including instructions for care of our property. Our rules are

considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if they are distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**Amenities.** We reserve the right to set the days and hours of use for all Amenities and to change the character of, or close, any Amenity based upon our needs and in our sole and absolute discretion, without notice, obligation or recompense of any nature to you.

**20. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean and free of trash, garbage, and other debris. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You agree to keep all passageways and common areas free of obstructions such as trash, storage items, and all forms of personal property. No person shall ride or allow bikes, skateboards, or other similar objects in the passageways. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in all common areas. You, your occupants, or guests may not anywhere in the apartment community: use candles or use kerosene lamps or kerosene heaters without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us if you or any occupant registers as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**21. PROHIBITED CONDUCT.** You, your occupants or guests, or the guests of any occupants, may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; criminal activity of any kind, including but not limited to, manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; allowing or inviting any previously trespassed and/or banned guest or visitor into the community.

**22. PARKING.** We may regulate the time, manner, and place of parking cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license plate or no current registration and/or inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or

(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a resident and is parked in a visitor or retail parking space.

**23. RELEASE OF RESIDENT.** Unless you're entitled to terminate your tenancy under paragraphs 10 (Special Provisions), 15 (Delay of Occupancy), 43 (Move-Out Notice), or any other applicable laws, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**24. MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**25. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke detectors and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and access control devices.

**Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish smoke detectors and carbon monoxide detectors as required by statute, and we'll test them and provide working batteries, if applicable, when you first take possession. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must periodically inspect the smoke detectors and carbon monoxide detectors to ensure their operability and immediately report smoke detector and carbon monoxide detector malfunctions to us. Neither you nor others may disable smoke detectors and carbon monoxide detectors. If you disable or damage the smoke detector and carbon monoxide detectors, or fail to replace a dead battery or report malfunctions to us, you may be liable to us and others for any loss, damage, or fines from fire, smoke, or water.

**Casualty Loss.** You shall immediately notify us of any damage to the premises by fire, flooding, or other casualty not caused by us, including any type of catastrophic damage which renders the premises or a substantial portion of the premises, uninhabitable. We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. Furthermore, where such damage is not caused by us, we shall have no obligation to provide alternative housing for you or to pay relocation expenses associated with vacating the premises. During freezing weather, you must ensure that the temperature in the apartment is sufficient to make sure that the pipes do not freeze (the appropriate temperature will depend upon weather conditions and the size and layout of your unit). If the pipes freeze or any other damage is caused by your failure to properly maintain the heat in your apartment, you'll be liable for damage to our and other's property. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for those services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity or other emergency involving imminent harm. You should then contact our representative. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security. If we provide any access control devices or security measures upon the property, they are not a guarantee to prevent crime or to reduce the risk of crime on the property. You agree that no access control or security measures can eliminate all crime and that you will not rely upon any provided access control or security measures as a warranty or guarantee of any kind. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

**26. CONDITION OF THE PREMISES AND ALTERATIONS.** You'll be given an Inventory and Condition form on or before move-in. You must note on the form all defects or damage within 7 days of being put in possession of the premises and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and access control devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. When you move in, we'll supply the initial batteries for any battery-operated smoke detectors and carbon monoxide detectors; after that, you'll be responsible for testing such batteries and replacing the same for the duration of the tenancy and any renewal thereof. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**27. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SUBMITTED THROUGH EITHER THE ONLINE RESIDENT/MAINTENANCE PORTAL, OR SIGNED AND IN WRITING AND DELIVERED TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or imminently dangerous conditions as specifically defined by law). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are rarely emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections.

We may, in our sole discretion, elect to repair substantial damage to the premises within a reasonable time under the circumstances, and in such an event, your obligations under the Lease Contract shall continue. Any obligation to pay rent during such period of repair shall be abated so long as the substantial damage was not caused by you, your occupants, guests or visitors. If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate your tenancy within a reasonable time by giving you written notice. If your tenancy is so terminated, we'll refund prorated rent (dating back to the date of the casualty) and all deposits, less lawful deductions. Should you fail to vacate the premises following our notice of termination herein you shall be considered a hold over tenant and we may exercise any and all remedies available to us under this Lease Contract.

**28. ANIMALS.** Unless otherwise provided under federal, state, or local law, no animals (including mammals, reptiles, birds, fish, rodents, and insects) are allowed, even temporarily, anywhere in the apartment or apartment Community unless we've so authorized in writing. You must remove an illegal or unauthorized animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. If we allow an animal as a pet, you must execute a separate animal addendum which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. We will authorize an assistance animal for a disabled person. When allowed by applicable laws, before we authorize an assistance animal, if the disability is not readily apparent, we may require a written statement from a qualified professional verifying the disability-related need for the assistance animal. If we authorize an assistance animal, we may require you to execute a separate animal and/or assistance animal addendum. Animal deposits, additional rents, fees or other charges will not be required for an assistance animal needed due to disability, including an emotional support or service animal, as authorized under federal, state, or local law. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. You shall remove any pet previously permitted under this Lease Contract and the Animal Addendum within 48 hours of written notification from us that the pet, in our sole judgment, creates a nuisance or disturbance or is, in our opinion, undesirable. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules.

**29. WHEN WE MAY ENTER.** If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary in emergencies) if:

(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; *and*

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector and/or carbon monoxide detector batteries; retrieving unreturned tools, equipment, or appliances; preventing waste of utilities; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or access control devices; removing or rekeying unauthorized access control devices; stopping excessive noise; cutting off electricity according to statute; retrieving property owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with search or arrest warrant or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance by us and to lenders, appraisers, contractors, prospective buyers, or insurance agents. Should you fail or refuse to allow us access to the premises pursuant to the terms of this paragraph, you shall be in default of this Lease Contract.

**30. JOINT AND SEVERAL RESPONSIBILITY.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of tenancy termination, repair requests, and entry permissions) constitute notice from all residents. Security-deposit refunds and deduction itemizations of multiple residents will comply with paragraph 48 (Deposit Return, Surrender, and Abandonment).

© 2021, National Apartment Association, Inc. - 1/2021, North Carolina

## Replacements

**31. REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, assignment, or granting a right or license to occupy is allowed only when we expressly consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent, in writing, to the replacement, subletting, assignment, or granting a right or any license to occupy then:

(1) a reletting charge *will not* be due;

(2) a reasonable administrative (paperwork) and/or transfer fee *will* be due, and a rekeying fee will be due if rekeying is requested or required; and

(3) the departing and remaining residents *will* remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right of occupancy or security-deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

## Responsibilities of Owner and Resident

**32. RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) comply with the applicable building and housing codes;

(2) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition;

(3) keep all common areas of the premises in safe condition;

(4) maintain in good and safe working order and promptly repair all facilities and appliances supplied or required to be supplied by us; and

(5) provide operable smoke detectors and/or carbon monoxide detectors and replace or repair the smoke and/or carbon monoxide detectors within 15 days of receipt of your written notification to us.

**33. DEFAULT BY RESIDENT.   You'll be in default if you or any guest or occupant violates any terms of this Lease Contract or Addenda including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia under state statute; (6) any illegal drugs or paraphernalia are found in your apartment; (7) you or any guest or occupant engages in any of the prohibited conduct in paragraph 21 (Prohibited Conduct); or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government.**

**Eviction.**   If you default, we may re-enter and re-take possession of the premises as provided in paragraph 12 (Eviction or Summary Ejectment and Property Left in the Apartment) and may immediately institute proceedings for summary ejectment as provided by law without notice or demand. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other lease obligations. After filing a summary ejectment suit, we may still accept a partial payment of rent or a partial housing subsidy payment; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting a partial payment of rent or a partial housing subsidy payment at any time doesn't waive your default of this Lease Contract; our right to damages; past or future rent or other sums; or to file an eviction or to continue with filed eviction proceedings; nor does our exercise of any of our rights in this Paragraph violate Chapter 75 of the N.C. General Statutes. Pursuant to NCGS 42-73, we may accept a full payment of rent due with full and complete knowledge of any criminal acts that violate this Lease Contract without such acceptance of rent constituting any waiver of your default or our rights to enforce the same.

**Release of Property Following Writ.**   If we obtain a judgment for possession against you and the Sheriff has executed a Writ of Possession delivering possession of the premises to us, this paragraph constitutes our offer to release your personal property to you, during our normal business hours, for a period of no more than 7 calendar days after the date of the Sheriff's execution of the Writ of Possession. Should you fail to retrieve your personal property during the lockout period we have the right to throw away or dispose of your personal property without any liability to you for the disposal or destruction of your personal property.

**Holdover.**   You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) you'll be liable to us for actual damages arising out of full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term—for up to one month from the date of notice of lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**Other Remedies.**   We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us all sums due and owing. Upon your default, we have all other legal remedies, including lease termination and summary ejectment under state statute. We may recover from you attorney's fees and all litigation costs to the extent permitted by law. In the event we file a summary ejectment lawsuit against you, we may also recover from you the highest one of the following fees (which shall be in addition to late fees, attorney's fees, and any applicable court costs):

**(1) Complaint Filing Fee.**   If you are in default of this Lease Contract and if we file and serve a summary ejectment complaint or a complaint for money owed against you, and if we elect to dismiss the complaint after you cure the default, you shall owe Us a Complaint Filing Fee equal to $15.00 or five percent (5%) of the monthly rent, whichever is higher. If the rent is subsidized by a government entity, the Complaint Filing Fee will be $15.00 or 5% of your share of the monthly rent, whichever is higher.

**(2) Court Appearance Fee.**   In the event that (i) we file, serve, and prosecute successfully a summary ejectment complaint or complaint for money owed against you and (ii) a judgment is entered against you, you shall owe us—in lieu of the Complaint Filing Fee—a Court Appearance Fee equal to ten percent (10%) of the monthly rent. If the rent is subsidized by a government entity, the Court Appearance Fee will be 10% of your share of the monthly rent.

**(3) Second Trial Fee.**   In the event that (i) you appeal a judgment of a magistrate and (ii) we prove that you are in default of the lease at the new trial and (iii) we obtain a judgment against you at the new trial, you shall owe us—in lieu of the Complaint Filing Fee and Court Appearance Fee—a Second Trial Fee equal to twelve percent (12%) of the monthly rent. If the monthly rent is subsidized by a government entity, the Second Trial Fee will be 12% of your share of monthly rent.

**Mitigation of Damages.**   If you move out early, you'll be subject to all remedies under North Carolina law. We'll exercise customary diligence to relet and mitigate damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

**Lease Renewal When A Breach or Default Has Occurred.** In the event that you enter into a subsequent Lease prior to the expiration of this Lease and you breach or otherwise commit a default under this Lease, We may, at our sole and absolute discretion, terminate the subsequent Lease, even if the subsequent Lease term has yet to commence. We may terminate said subsequent Lease by sending you written notice of our desire to terminate said subsequent Lease.

**Remedies Cumulative.**   Any remedies set forth herein shall be cumulative, in addition to, and not in limitation of, any other remedies available to Landlord under any applicable law.

## General Clauses

**34. NO AUTHORITY TO AMEND UNLESS IN WRITING.** *Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing.*

**35. NO WAIVER.** No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, liens, or other rights isn't a waiver under any circumstances.

**36. NOTICE.** Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax or electronic signatures are binding. All notices must be signed. For purposes of establishing notice the parties may use electronic mail, text message or written notice sent to the addresses and/or mobile number set forth at the end of this Lease Contract.

**37. MISCELLANEOUS.**
A. Exercising one remedy won't constitute an election or waiver of other remedies.
B. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties.
C. All remedies are cumulative.
D. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf.
E. This Lease Contract binds subsequent owners.
F. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.
G. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies.
H. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option.
I. All Lease Contract obligations must be performed in the county where the apartment is located.
J. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.
K. If the premises or any portion of the community shall be taken by eminent domain pursuant to governmental authority, this Lease Contract shall terminate at our option and you shall have no claim against us or as to any portion of the award granted to us as a result of such taking.

**38. CONTACTING YOU.** By signing this lease, you are agreeing that we, or our representative(s) or agent(s) may contact you. You agree that we may contact you using any contact information relating to your lease including, any number or email address (i) you have provided to us (ii) from which you called us, or (iii) which we obtained and through which we reasonably believe we can reach you. You agree we may use any means to contact you. This may include calls made to your cellular telephone using an automatic telephone dialing system, artificial or prerecorded voice messages, text messages, mail, e-mail, and calls to your phone or Voice over Internet Protocol (VoIP) service, or any other data or voice transmission technology. You agree to promptly notify us if you change any contact information you provide to us. You are responsible for any service provider charges as a result of us contacting you.

**39. OBLIGATION TO VACATE.** If we provide you with a notice to vacate, or if you provide us with a written notice to vacate or intent to move-out in accordance with paragraph 3 (Lease Term), and we accept such written notice, then you are required to vacate the Apartment and remove all of your personal property therefrom at the expiration of the Lease term, or by the date set forth in the notice to vacate, whichever date is earlier, without further notice or demand from us.

**40. FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**41. PAYMENTS.** At our option and without notice, we may apply money received first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. This excludes any previously charged late fees and/or unpaid utility payments which are submetered by us. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

**42. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or;(2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

## When Moving Out

**43. MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire Lease Contract term if you move out early (paragraph 23 - Release of Resident) except under any other applicable laws. YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3 (Lease Term). Oral move-out notice will not be accepted and will not terminate your Lease Contract.

- Your move-out notice must not terminate your tenancy sooner than the end of the Lease Contract term or renewal period.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. Please use our written move-out form. You must obtain from our representative written acknowledgment that we received your move-out notice. If we terminate your tenancy, we must give you the same advance notice—unless you are in default. Where there is more than one resident to this Lease Contract, a notice of termination submitted by one resident shall be considered a notice of termination submitted by all residents. Should there be conflicting notices, the notice of termination shall control.

**44. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in reletting charges. You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address. You shall pay any and all utility bills due for any utility services to the premises for which you are responsible. At or before the time of move-out and surrender of possession, you will provide us with written authorization allowing us to dispose of any personal property left in the premises by you upon surrendering the keys. You understand and acknowledge that your failure to provide such written authorization and/or to remove all personal property from the premises shall constitute your continued possession of the premises requiring us to file an action for summary ejectment to regain possession of the premises. Should we be required to file such action you will be responsible for any rental obligation that comes due until such time as we are placed in lawful possession of the premises.

**45. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**46. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**47. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** We may deduct sums from your security deposit for charges related to the following: your possible non-payment of rent, costs of water and sewer services provided, damage to the premises, damage or destruction of smoke detectors or carbon monoxide detectors, nonfulfillment of the rental period, any unpaid bills that become a lien against the demised property due to your occupancy, costs of re-renting the premises after breach by you, including but not limited to any reasonable fees or commissions paid by the landlord to a licensed real estate broker to re-rent the premises, costs of removal and storage of your property after a summary ejectment proceeding, court costs, or any fee authorized by N.C. GEN. STAT. § 42-46.

**48. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.**
**Deposit Return and Forwarding Address.** You are required to provide us written notice of your forwarding address, on or before termination of this Lease Contract. If we can determine the full extent of our deductions from your security deposit, we'll mail you, to the forwarding address you provide, your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 30 days after termination of your tenancy under this Lease Contract and delivery of possession by you, unless statutes provide otherwise. If we cannot determine the full extent of our deductions from your security deposit within the aforementioned 30 day period, we'll mail you an interim itemized accounting of our deductions from the deposit within 30 days after termination of your tenancy under this Lease Contract and delivery of possession by you, and we'll also mail your security deposit refund (less lawful deductions) and a final itemized accounting of any deductions no later than 60 days after termination of your tenancy under this Lease Contract and delivery of possession by you. If you fail to provide us with your forwarding address in writing, as required above, we will process the unclaimed security deposit in accordance with state law. To the extent there are multiple residents under the Lease Contract, you hereby acknowledge that we may issue any Deposit refund to one or all of the residents and it shall be up to the residents to divide accordingly.

**Surrender.** You have surrendered the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 (Keys) have been turned in where rent is paid—whichever date occurs first.

**Abandonment.** You have abandoned the apartment when all of the following have occurred: (1) everyone appears to have moved out in our reasonable judgment; (2) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; (3) you've been in default for non-payment of rent for 5 consecutive days or water, gas, or electric service for the apartment not connected in our name has been terminated; and (4) you've not responded for 2 days to our notice left on the inside of the main entry door, stating that we consider the apartment abandoned. An apartment is also "abandoned" 10 days after the death of a sole resident.

Surrender, abandonment, and judicial eviction end your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment, and determine any security deposit deductions. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 12 - Eviction or Summary Ejectment and Property Left in the Apartment), but do not affect our mitigation obligations (paragraph 33 - Default by Resident).

---

## Severability, Originals and Attachments, and Signatures

**49. SEVERABILITY.** If any provision of this Lease Contract or Addenda are invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Lease Contract. The court shall interpret the lease and provisions herein in a manner such as to uphold the valid portions of this Lease Contract while preserving the intent of the parties.

**50. ORIGINALS AND ATTACHMENTS.** This Lease Contract and Addenda has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract and Addenda. Your copy of the Lease Contract and Addenda may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and Addenda and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract and Addenda are binding and hereby incorporated into and made part of the Lease Contract and Addenda between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.

> You are legally bound by this document.
> Read it carefully before signing.

**Resident or Residents** *(all sign below)*

_____

_____

_____

_____

_____

**Address, phone number and email address of resident for notice purposes**

_____

_____

_____

**Owner or Owner's Representative** *(signing on behalf of owner)*

_____

**Broker's license (if applicable):**

_____

**Address and phone number of owner's representative for notice purposes**

_____

_____

_____

**Name and address of locator service** *(if applicable)*

_____

_____

_____

**Date form is filled out** *(same as on top of page 1)*

_____**04/12/2022**_____

---

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2) _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

## LEASE CONTRACT BUY-OUT AGREEMENT

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____, 405 Grand
**Wailea Drive**
_____ *(street address)* in
_____ **Hope Mills** _____
*(city)*, North Carolina, _____ 28348 _____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **April 12, 2022**
Owner's name: **Cape Fear Multifamily, LLC.**
_____
_____
_____

Residents *(list all residents)*:
_____
_____
_____
_____
_____
_____
_____
_____
_____

**3.** The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

**4. BUY-OUT PROCEDURES.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term if all of the following occur:

(a) you give us written notice of buy-out at least ___30___ days prior to the new termination date (i.e., your new move-out date), which *(check one)* ❏ must be the last day of a month or ☒ may be during a month;

(b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

(c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

(d) you are not in default under the Lease Contract on the new termination date (move-out date);

(e) you move out on or before the new termination date and do not hold over;

(f) you pay us a buy-out fee (consideration) of $ _____;

(g) you pay us the amount of any concessions you received when signing the Lease Contract; and

(h) you comply with any special provisions in paragraph 9 below.

**5. WHEN PAYABLE.** The buy-out fee in paragraph 4(f) is due and payable no later than ___30___ days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ _____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

**6. SHOWING UNIT TO PROSPECTIVE RESIDENTS.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

**7. COMPLIANCE ESSENTIAL.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit up to the maximum statutorily allowed amount (i.e. not to exceed 2 months' rent), and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term. To the extent any monies paid cause your security deposit to exceed 2 months' rent, such excess balance shall be refunded to you without relieving you of further liability under the Lease.

**8. MISCELLANEOUS.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

**9. SPECIAL PROVISIONS.** Your right of buy-out *(check one)* ❏ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents** *(All residents must sign)*

_____
_____
_____
_____
_____

**Owner or Owner's Representative** *(signs below)*

_____

**Date of Lease Contract**

**April 12, 2022**

© 2018, National Apartment Association, Inc. - 9/2018, North Carolina

## LEASE CONTRACT ADDENDUM
## FOR SATELLITE DISH OR ANTENNA



*Under a Federal Communications Commission (FCC) order, you as our resident have a right to install a transmitting or receiving satellite dish or antenna on the leased dwelling, subject to FCC limitations. We as a rental housing owner are allowed to impose reasonable restrictions relating to such installation. You are required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions that you and we agree to follow.*

**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____, **405 Grand**
**Wailea Drive**
_____ *(street address)* in
_____ **Hope Mills** _____
*(city)*, North Carolina, _____ **28348** _____ *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **April 12, 2022**
Owner's name: **Cape Fear Multifamily, LLC.**
_____
_____
_____

Residents *(list all residents)*:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract . Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. NUMBER AND SIZE.** You may install ____**1**____ satellite dish(es) or antenna(s) on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. Antennas that only transmit signals or that are not covered by 47 CFR § 1.4000 are prohibited.

**4. LOCATION.** Your satellite dish or antenna must be located: (1) inside your dwelling; or (2) in an area outside your dwelling such as a balcony, patio, yard, etc. of which you have exclusive use under your lease. Installation is not permitted on any parking area, roof, exterior wall, window, window sill, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for your exclusive use.

**5. SAFETY AND NON-INTERFERENCE.** Your installation: (1) must comply with all applicable ordinances and laws and all reasonable safety standards; (2) may not interfere with our cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to our telecommunication systems; and (4) may not be connected to our electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; (2) clamping it to a part of the building's exterior that lies within your leased premises (such as a balcony or patio railing); or (3) any other method approved by us in writing. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

**6. SIGNAL TRANSMISSION FROM EXTERIOR DISH OR ANTENNA TO INTERIOR OF DWELLING.** You may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If your satellite dish or antenna is installed outside your dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of your dwelling only by the following methods: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a window pane," similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window—without drilling a hole through the window; (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us in writing.

**7. SAFETY IN INSTALLATION.** In order to assure safety, the strength and type of materials used for installation must be approved by us. Installation must be done by a qualified person or company approved by us. Our approval will not be unreasonably withheld. An installer provided by the seller of the satellite dish or antenna is presumed to be qualified.

**8. MAINTENANCE.** You will have the sole responsibility for maintaining your satellite dish, antenna and all related equipment.

**9. REMOVAL AND DAMAGES.** You must remove the satellite dish or antenna and all related equipment when you move out of the dwelling. In accordance with the Lease Contract, you must pay for any damages and for the cost of repairs or repainting caused by negligence, carelessness, accident or abuse which may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment. You will not be responsible for normal wear.

**10. LIABILITY INSURANCE. You must take full responsibility for the satellite dish, antenna and related equipment. If the dish or antenna is installed at a height that could result in injury to others if it becomes unattached and falls, you must provide us with evidence of liability insurance (if available) to protect us against claims of personal injury and property damage to others, related to your satellite dish, antenna and related equipment.** The insurance coverage must be $ **100000.00**, which is an amount reasonably determined by us to accomplish that purpose. Factors affecting the amount of insurance include height of installation above ground level, potential wind velocities, risk of the dish/antenna becoming unattached and falling on someone, etc.

**11. SECURITY DEPOSIT.** An additional security deposit of $ **300.00** will be charged. We *(check one)* ❑ will consider or ☒ will not consider this additional security deposit a general security deposit for all purposes. The security deposit amount in the Security Deposit paragraph of the Lease Contract *(check one)* ☒ does or ❑ does not include this additional deposit amount. Refund of the additional security deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

This additional security deposit is required to help protect us against possible repair costs, damages, or failure to remove the satellite dish, antenna and related equipment at time of move-out. Factors affecting any security deposit may vary, depending on: (1) how the dish or antenna is attached (nails,screws, lag bolts drilled into walls); (2) whether holes were permitted to be drilled through walls for the cable between the satellite dish and the TV; and (3) the difficulty and cost repair or restoration after removal, etc.

12. **WHEN YOU MAY BEGIN INSTALLATION.** You may start installation of your satellite dish, antenna or related equipment only after you have: (1) signed this addendum; (2) provided us with written evidence of the liability insurance referred to in paragraph 10 of this addendum; (3) paid us the additional security deposit, if applicable, in paragraph 11; and (4) received our written approval of the installation materials and the person or company that will do the installation, which approval may not be unreasonably withheld.

13. **MISCELLANEOUS.** If additional satellite dishes or antennas are desired, an additional lease addendum must be executed.

14. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(signs here)*

**Date of Lease Contract**

April 12, 2022

North Carolina/National Apartment Association Official Form, September 2018
© 2018, National Apartment Association, Inc.

# LEASE CONTRACT ADDENDUM FOR ENCLOSED GARAGE, CARPORT, OR STORAGE UNIT

NAA NATIONAL APARTMENT ASSOCIATION

**1. DWELLING UNIT DESCRIPTION.**
Unit No. ____________, 405 Grand Wailea Drive
______________ *(street address)* in Hope Mills
*(city)*, North Carolina, 28348 *(zip code)*.

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: April 12, 2022
Owner's name: Cape Fear Multifamily, LLC.

Residents *(list all residents)*:

The term of this Addendum is as follows:
Begins on ____________, ________ and
ending on ____________, ________.

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract. Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. GARAGE, CARPORT, OR STORAGE UNIT.** You are entitled to exclusive possession of: *(check as applicable)*

- ❑ garage or carport attached to the dwelling;
- ❑ garage space number(s) ____________;
- ❑ carport space number(s) ____________;
  and/or
- ❑ storage unit number(s) ____________.

All terms and conditions of the Lease Contract apply to the above areas unless modified by this addendum.

**4. SECURITY DEPOSIT.** An additional security deposit of $ ________ will be charged for the checked areas above. We *(check one)* ❑ will consider or ❑ will not consider this additional security deposit a general security deposit for all purposes. The security deposit amount in Provision 4 of the Lease Contract *(check one)* ❑ does or ❑ does not include this additional deposit amount. Refund of the additional security deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

**5. ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ ________. The monthly rent amount in Provision 6 of the Lease Contract *(check one)* ❑ includes ❑ does not include this additional rent.

**6. USE RESTRICTIONS.** Garage or carport may be used only for storage of operable motor vehicles unless otherwise stated in our rules or community policies. The garage or carport may not be used for the charging of any electric vehicle or other device, without regard to whether the community has designated charging stations for such vehicles. Storage units may be used only for storage of personal property. No one may sleep, cook, barbeque, or live in a garage, carport, or storage unit. Persons not listed as a resident or occupant in the Lease Contract may not use the areas covered by this addendum. No plants may be grown in such areas.

**7. NO DANGEROUS ITEMS.** Items that pose an environmental hazard or a risk to the safety or health of other residents, occupants, or neighbors in our sole judgment or that violate any government regulation may not be stored. Prohibited items include fuel (other than in a properly capped fuel tank of a vehicle or a closed briquette lighter fluid container), fireworks, rags, piles of paper, or other material that may create a fire or environmental hazard. We may remove from such areas, without prior notice, items that we believe might constitute a fire or environmental hazard. Because of carbon monoxide risks, you may not run the motor of a vehicle inside a garage unless the garage door is open to allow fumes to escape.

**8. NO SMOKE, FIRE, OR CARBON MONOXIDE DETECTORS.** No smoke, fire, or carbon monoxide detectors will be furnished by us unless required by law.

**9. GARAGE DOOR OPENER.** If an enclosed garage is furnished, you ❑ will ❑ will not be provided with a ❑ garage door opener and/or ❑ garage key. You will be responsible for maintenance of any garage door opener, including battery replacement. Transmitter frequency settings may not be changed on the garage door or opener without our prior written consent.

**10. SECURITY.** Always remember to lock any door of a garage or storage unit and any door between a garage and the dwelling. When leaving, be sure to lock all keyed deadbolt locks.

**11. INSURANCE AND LOSS/DAMAGE TO YOUR PROPERTY.** You will maintain liability and comprehensive insurance coverage for any vehicle parked or stored. We are not responsible for pest control in such areas.

**12. COMPLIANCE.** We may periodically open and enter garages and storerooms to ensure compliance with this addendum. In the event we enter the garage or storerooms, we will comply with the notice provisions set forth in the Lease Contract.

**13. NO LOCK CHANGES, ALTERATIONS, OR IMPROVEMENTS.** Without our prior written consent, locks on doors of garages and storage units may not be rekeyed, added, or changed, and improvements, alterations, or electrical extensions or changes to the interior or exterior of such areas are not allowed. You may not place nails, screws, bolts, or hooks into walls, ceilings, floors, or doors. Any damage not caused by us or our representatives to areas covered by this addendum will be paid for by you.

**14. MOVE-OUT AND REMEDIES.** Any items remaining after you have vacated the dwelling will be removed, sold, or otherwise disposed of according to the Lease Contract, which addresses disposition or sale of property left in an abandoned or surrendered dwelling. All remedies in the Lease Contract apply to areas covered by this addendum. Termination of the Lease Contract shall terminate any rental under this addendum.

© 2022, National Apartment Association, Inc. - 3/2022, North Carolina

**15. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
_(All residents must sign here)_

**Owner or Owner's Representative**
_(signs here)_

_____
_____
_____
_____
_____

**Date of Lease Contract**

April 12, 2022

# LEASE ADDENDUM
## FOR REMOTE CONTROL, CARD, OR CODE ACCESS GATE



**1. DWELLING UNIT DESCRIPTION.**
Unit No. _____ **405 Grand**
**Wailea Drive**
_____ *(street address)* in
_____ **Hope Mills**
*(city),* North Carolina, _____ **28348** _____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract Date: **April 12, 2022**
Owner's name: **Cape Fear Multifamily, LLC.**
_____
_____
_____

Residents *(list all residents):*
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

This Addendum constitutes an Addendum to the above described Lease Contract for the above described premises, and is hereby incorporated into and made a part of such Lease Contract . Where the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control.

**3. REMOTE CONTROL/CARDS/CODE FOR GATE ACCESS.**

❑ Remote control for gate access. Each person who is listed as a resident on the lease will be given a remote control at no cost to use during his or her residency. Each additional remote control for you or other occupants will require a $ _____ non-refundable fee.

❑ Cards for gate access. Each person who is listed as a resident on the lease will be given a card at no cost to use during his or her residency. Each additional card for you or other occupants will require a $ _____ non-refundable fee.

❑ Code for gate access. Each resident will be given, at no cost, an access code (keypad number) for the pedestrian or vehicular access gates. It is to be used only during your residency. We may change the access code at any time and will notify you of any such changes.

**4. DAMAGED, LOST OR UNRETURNED REMOTE CONTROLS, CARDS OR CODE CHANGES.**

❑ If a remote control is lost, stolen or damaged, a $ _____ fee will be charged for a replacement. If a remote control is not returned or is returned damaged when you move out, there will be a $ _____ deduction from the security deposit.

☒ If a card is lost, stolen or damaged, a $ _____ **25.00** _____ fee will be charged for a replacement. If a card is not returned or is returned damaged when you move out, there will be a $ _____ deduction from the security deposit.

❑ We may change the code(s) at any time and notify you accordingly.

**5. REPORT DAMAGE OR MALFUNCTIONS.** Please immediately report to the office any malfunction or damage to gates, fencing, locks or related equipment.

**6. FOLLOW WRITTEN INSTRUCTIONS.** We ask that you and all other occupants read the written instructions that have been furnished to you regarding the access gates. This is important because if the gates are damaged by you or other occupants, guests or invitees through negligence or misuse, you are liable for the damages under your lease, and collection of damage amounts will be pursued.

**PERSONAL INJURY AND/OR PERSONAL PROPERTY DAMAGE.** Except as specifically required by law, we have no duty to maintain the gates and cannot guaranty against gate malfunctions. We make no representations or guarantees to you concerning security of the community. Any measures, devices,or activities taken by us are solely for the benefit of us and for the protection of our property and interests, and any benefit to you of the same is purely incidental. Anything mechanical or electronic is subject to malfunction. Fencing, gates or other devices will not prevent all crime. No security system or device is foolproof or 100 percent successful in deterring crime. Crime can still occur. Protecting residents, their families, occupants, guests and invitees from crime is the sole responsibility of residents, occupants and law enforcement agencies. You should first call 911 or other appropriate emergency police numbers if a crime occurs or is suspected.We are not liable to any resident, family member, guest, occupant or invitee for personal injury, death or damage/loss of personal property from incidents related to perimeter fencing, automobile access gates and/or pedestrian access gates unless it arises from our misconduct. We reserve the right to modify or eliminate security systems other than those statutorily required. You will be held responsible for the actions of any persons to whom you provide access to the community.

**7. RULES IN USING VEHICLE GATES.**

- Always approach entry and exit gates with caution and at a very slow rate of speed.

- Never stop your car where the gate can hit your vehicle as the gate opens or closes.

- Never follow another vehicle into an open gate. Always use your card to gain entry.

- Report to management the vehicle license plate number of any vehicle that piggybacks through the gate.

- Never force the gate open with your car.

- Never get out of your vehicle while the gates are opening or closing.

- If you are using the gates with a boat or trailer, please contact management for assistance. The length and width of the trailer may cause recognition problems with the safety loop detector and could cause damage.

- Do not operate the gate if there are small children nearby who might get caught in it as it opens or closes.

- If you lose your card, please contact the management office immediately.

- Do not give your card or code to anyone else.

- Do not tamper with gate or allow your occupants to tamper or play with gates.

**8. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(signs here)*

_____          _____

_____

_____          **Date of Lease Contract**

_____          **April 12, 2022**

_____          _____

North Carolina/National Apartment Association Official Form, September 2018
© 2018, National Apartment Association, Inc.

# LEASE ADDENDUM FOR DRUG-FREE HOUSING

In consideration of the execution or renewal of a lease of the dwelling unit identified in the lease, Owner and Tenant agree as follows:

1) Tenant, or any member of tenant's household, or a guest or other person under the tenant's control shall not engage in criminal activity, including drug-related criminal activity, on or near project premises. "Drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use, of a controlled substance (as defined in section 102 of the Controlled Substance Act 21 U.S.C. 802).

2) Tenant, any member of the tenant's household or guest or other person under the tenants control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on or near project premises.

3) Tenant or members of the household will not permit the dwelling unit to be used for, or to facilitate criminal activity including drug-related activity, regardless of whether the individual engaging in such activity is a member of the house or a guest.

4) Tenant or member of the household will not engage in the manufacture, sale, or distribution of illegal drugs at any location, whether on or near project premises or otherwise.

5) Tenant, any member of the tenant's household, or a guest or other person under the tenants control shall not engage in any acts of violence or threats of violence, including, **but not limited to,** the unlawful discharge of firearms on or near project premises.

6) **VIOLATION OF THE ABOVE PROVISION SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF TENANCY.** A single violation of any of the provisions of this addendum shall be deemed a serious violation and a material noncompliance with the lease. It is understood and agreed that a **single** violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be by a preponderance of the evidence.

7) In case of conflict between the provisions of this addendum and any other provisions of the lease, the provisions of the **addendum** shall govern.

8) This Lease Addendum is incorporated into the lease executed renewed this day between Owner and Tenant.

Tenant _____          Landlord _____

Date _____

# The Astoria Washer/Dryer Rental Agreement

1. Residents who choose to rent a washer / dryer set agree to a monthly fee of **$50.00**
2. Resident is responsible for keeping good maintenance while leasing the washer / dryer.
3. Resident is responsible to pay the monthly rental fee on the first of each month; if the rental balance is delinquent, the washer / dryer will be removed from the apartment.
4. Resident agrees to call The Astoria leasing office, (910) 779-0788, for any service calls that are needed to repair the washer / dryer as needed. The Astoria will then schedule a service repair with Appliance Warehouse.
5. Resident agrees that any service calls that are scheduled with Appliance Warehouse will require access to the washer / dryer during business hours.
6. Resident agrees that the office has permission to check out apartment keys to Appliance Warehouse, allowing them to make repairs regardless of if occupants are home.

**Resident(s)**                                    **Landlord**

**Date**
**«currentsystemdate»**

## GENERAL RENTAL PROVISIONS ADDENDUM
## (FORMING PART OF THE RENTAL AGREEMENT)

1. **DAMAGE**. Resident has carefully inspected the Apartment and finds it to be in a clean, rentable, undamaged condition except as noted on Resident's check-in report attached to this agreement. Resident agrees to maintain the apartment in the same condition, free from unsightly debris and equipment. Resident agrees upon termination of the lease to return the Apartment to original, move-in condition, with the exception of ordinary wear & tear. Resident agrees to pay for damages to the apartment caused by the negligence of Resident or his invitees. Resident is cautioned to be careful with smoking materials. In the event of rain, all windows must be sufficiently closed to prevent any rain from entering. Resident will be held responsible for all drapery and carpet stains.

2. **PARKING**. Resident agrees that Landlord has the right to control the method and manner of parking in the parking spaces and on and around the premises, to designate what portion of the premises may be used by Resident, and Resident's invitees for parking and to tow away and store at Resident's expense any vehicle parked by Resident or Resident's invitees in unauthorized spaces. It is the responsibility of Resident to advise invitees of parking restrictions and to provide current information to the Landlord of vehicles that will be parked on the property according to the above rules.  The Landlord is not liable for any loss or damage in such case.

    **A. FIRELANES.** ALL RED CURBS on the property indicate fire lanes. Parking along these curbs is prohibited. Vehicles parked next to red curbs will be towed from the property at the vehicle owner's expense in accordance with fire codes and city ordinances.

    **B. COVERED PARKING**. (If provided) A resident has one assigned covered space. Second vehicles and guests must park in uncovered areas.  Violations of this rule could result in the vehicle being towed from the property at the vehicle operator's expense.

    **C. R.V. AND BOAT PARKING**. R.V. and boat parking is not allowed on the premises without prior written approval front the Landlord.

    **D. MOTORCYCLES / BICYCLES**. Due to fire and safety regulations, motorcycles and bicycles must be parked in the parking lot.  Parking Violations should be reported to the office during business hours.  No riding of bicycles or motor bikes is permitted on the walks or lawns.

3. **VEHICLE REPAIRS / INOPERABLE VEHICLES**. Repairs to vehicles are not permitted anywhere on the premises. Vehicles not in good operating condition (disabled, unlicensed or wrecked), vehicles not in condition to legally operate on this state's streets and highways, or vehicles left unused for a period of two (2) weeks, will be towed at the vehicle owner's expense.

4. **NOISE**. Radios, televisions or any other sound equipment should be operated in a way that does not disturb others. Vocal or instrumental music, typing, pounding or other unusual noises are prohibited if the sound penetrates into other apartments. Loud noise, boisterous play, running on stairs, and slamming of doors are prohibited. The hours from 10:00 p.m. to 9:00 a.m. are sleeping hours when any noise may be disturbing to other residents. If two substantiated noise complaints are received within a 30 day period, the Landlord has the right to terminate the Lease by providing a thirty day lease termination notice.

5. **WATER BEDS**. Water beds are allowed providing arrangements are made in advance with the Landlord and a copy of insurance satisfactory to Landlord is furnished.

6. **HOUSEKEEPING**. Housecleaning that might disturb others should be done during normal waking hours. Do not throw sanitary napkins, rags, matches, cigarettes, coarse paper or kitchen refuse in the toilet bowl.  Place grease drippings in container and deposit in trash bin. All plumbing stoppage is the financial responsibility of the Resident, if caused by negligent use.

7. **FIXTURES, WALLPAPER AND PAINTING**. All wallpaper or fixtures to be installed to woodwork or walls should be done only after consultation with Landlord. The Landlord will assist you with information in order to avoid damage to the premises. Painting or wallpapering of any portion of the premises is not permitted without written consent from the Landlord.

8. **WINDOW, PATIO OR BALCONY SHADES**. No metal foil of any type may be used and drapes or blinds may be changed only after permission from the Landlord. Any other types of window coverings must be approved by the Landlord. Any window covering must show white against the window. Resident agrees to keep balconies in a neat and orderly fashion, clear of unsightly articles, clothes, or clothesline, and gives Landlord the right to require the removal or any item deemed inappropriate.

9. **CLUBHOUSE RULES**. The Clubhouse is open to adults during those hours as posted by Landlord. Shirts and shoes must be worn in the Clubhouse at all times. Pets are not permitted in the Clubhouse. Only persons 18 years of age or older are permitted in the Clubhouse. Hours are subject to change at the discretion of the Landlord.

10. **POOL RULES.** If Applicable. Swimming pool hours and rules are posted in the immediate pool area and must be observed at all times, Supervision of children and guests is the responsibility of the Resident, and Landlord is not responsible for the safety or supervision of pool users.

11. **SUPERVISION**. Resident agrees to supervise guests and occupants at all times when in the apartment community common areas (i.e., breezeways, sidewalks, swimming pools, grass areas, etc.). Items of personal property may not be left in driveways, breezeways or on sidewalks.

12. **GUESTS**. Resident is responsible for his/her guests' behavior in the apartment and on the premises. Landlord requests that Residents not entertain more than two (2) guests when using the common facilities and that Resident accompany them at all times. Resident will be legally and financially responsible for any damage caused by their guests.

13. **GUARDED GATE / SECURITY**. Regardless of whether or not the complex has a guarded entrance, Resident acknowledges and agrees that Landlord does not provide any type of security for the deterrence or prevention of crime and that Resident is responsible for his/her own safety. Resident may install additional security protection of Resident's Apartment subject to the prior approval of the Landlord.

14. **PROMOTIONS.** Occasionally the Company offers Rental Promotions. Persons currently renting from Maxus Properties, Inc. are not eligible for the promotions. Only persons selecting apartments and paying deposits on the days the promotion is in effect are eligible.

15. **REFERENCES AND JOINT LIABILITY.** The use of this agreement of the masculine singular pronoun in reference to Resident shall nevertheless be deemed the appropriate reference if Resident is of female gender or is comprised of more than one person or entity. All parties under this agreement shall be jointly and severally liable for all rental payments and for the performance of all other obligations of Landlord under this agreement; and each party's community property and separate property shall be so liable.

16. **SMOKE DETECTOR / FIRE EXTINGUISHER.** The Resident agrees to check the smoke detector and fire extinguisher (if an extinguisher is furnished) upon move-in and agrees that it is in working order. If the smoke detector becomes inoperable or the fire extinguisher becomes uncharged or inoperable, the Resident agrees to inform the Landlord in writing.

17. **RESIDENT PERSONAL PROPERTY / RENTERS INSURANCE.** Please be advised that the Landlord is not responsible for loss of personal property by theft, fire, and any other casualty. We advise Resident to carry individual insurance coverage on their personal property in the event of theft, fire, or any other casualty. We also recommend that interior telephone wiring insurance be purchased, since the Landlord is not responsible for the

repair of such.

18. **DELIVERIES**. Supplies, goods, packages, furniture and furnishings of every kind are to be delivered and/or removed at the service entrances or as directed by the Landlord. Landlord is not responsible for deliveries left for Resident in the office or with the staff of Landlord.

19. **TRASH**. All garbage or refuse shall be prepared for collection in a manner required by the Landlord and deposited in containers designated for same and not left on the ground outside container. Trash may never be left outside the Resident's door, including diaper service containers.

20. **LAUNDRY.** No laundry, washing, or clothing is permitted to be dried or aired except in the places designated by Landlord. No washing machine or other apparatus shall be used and operated on the premises except those provided or approved by the Landlord. No window boxes, flower boxes or other articles are permitted on the sill of any window.  No clothing, wash, laundry, rugs, carpets or other articles are permitted to be placed on or hung from any part of the building.

21. **RADIO / TELEVISION.** No radio or television or similar device shall be installed which requires a defacing, drilling or alteration in any manner of the leased premises, without the Landlord's consent in writing. No radio or television aerial, or sending or receiving device shall be erected on the roof or exterior walls of the dwelling or the building of which it forms a part, or the ground, without the written consent of the Landlord. Citizens band or amateur radios which interfere with radio or television reception of other residents or neighbors are prohibited.

22. **SCREENS.** Window screens shall not be removed except for cleaning and must be replaced immediately. Resident is financially responsible for any damage caused by removal.

23. **GRILLS.** Use or storage of any coal, fossil fuel (propane) or natural gas grills is prohibited on patios, balconies, walkways, inside dwelling or anywhere on the community grounds. Only electrical grills are allowed and must be stored on patios or balconies.

24. **LOCKS / SIGNS.** No additional locks, bolts, knockers, signs or other attachments shall be placed upon any door or other part of the building without written consent of the Landlord. Posting of any notices at the mailboxes is prohibited.

25. **REDECORATING.** No decorating shall be done by Resident except with the approval of Landlord. Failure to obtain such approval shall, at Landlord's option, be cause for charging Resident the cost of restoring unit to its original condition.

26. **STORAGE AREAS.** Resident agrees to assume all risk of damage or loss of property stored in any locker or storage area.  Landlord does not carry insurance on Resident's personal property and suggests that Resident carry renter's insurance for his own protection. Storage should be on racks, pallets or shelves off the floor to prevent accidental water damage. Valuable or spoilable articles should not be kept in storage areas.

27. **MAXUS PROPERTIES, INC. EMPLOYEES**. Employees of the Landlord are dispatched through Landlord's office only.  Request for service shall be directed to the Landlord. Employees may not render services to Residents outside their normal duties without the approval of Landlord or if it would interfere with the performance of their normal duties.

28. **LOCKS / LOCK-OUT POLICY**. Resident agrees to pay key replacement fee of $10.00 per key or the actual cost to the Landlord to replace the locks. After hour lock out services are not provided. Arrangements with a locksmith must be made should you be locked out of your apartment.

29. **SPECIAL SERVICE CALLS**. The Landlord will be happy to admit servicemen or other repair personnel to your

apartment if we are notified in writing in advance and authorize same. Landlord or service personnel are not permitted to stay in your apartment while repairs by outside contractors are being made, so please arrange to be home or have someone present for that purpose, if desired. Landlord is not responsible for any loss or damage resulting from this Service.

30. **MIRRORS & PICTURES**. Residents are permitted to hang mirrors, pictures or other decorations on the walls provided that same are hung with small nails designed for that purpose.

31. **WEIGHT ROOM / EXERCISE AREA**. In consideration of the right to use the Weight Room, the undersigned acknowledges and agrees that neither Maxus Properties, Inc., or the Landlord, or their affiliates, agents, employees, partners, successors or assigns shall be liable for claims, demands, costs or expenses arising out of any personal injury, property damage or loss which may be sustained whether or not caused in whole or part by the active or passive actions of Maxus Properties. Inc., or the Landlord, or their affiliates, agents, employees, partners, successors, or assigns. In this regard, the undersigned hereby agrees to assume all risk of such occurrences and to hold Maxus Properties Inc., or the Landlord, their affiliates, agents, employees, partners, successors or assigns harmless and indemnify and defend same against any and all claims, liability, damages, liens and expenses (including, without limitation, reasonable attorney's fees) arising directly or indirectly from any such occurrences.

32. **KEYS.** Resident acknowledges that a key was received before taking possession of the Apartment and that this key and all duplicates must be returned upon move-out.

**Resident(s)**                                    **Landlord**

_____   _____

_____

_____

_____

_____

**Date**
**«currentsystemdate»**

**Mold Information and Prevention Addendum**

1. **Unit Description** - **Unit #«unitnumber»: «unitaddressline1» «unitaddressline2», «unitaddresscity», «unitaddressstate» «unitaddresszipcode»**

                                Street Address                             City       State       Zip

2. **Leasing Contract Description** - **Lease Contract Date: «leasestartdateleaseorselectedrenewaloffe»**
   **Property Name: «sitename»**

   | Residents (list all residents): |
   |---|
   | «occupantname» |

   *(This Addendum will apply to all renewals of the Leasing Contract between Owner and the Resident.)*

3. **Background of Mold** - Molds are naturally occurring microscopic organisms that are in our environment, both indoors and outdoors, and exist in both new and old structures. Basically, mold spores are everywhere all of the time and are needed to break down organic matter as a natural process of our environment. It is important to remember that mold spores cannot ever be fully or permanently eliminated from the indoor and outdoor environment, however, when excess moisture is present inside a dwelling, mold growth can and will occur. While there is no scientific evidence that the accumulation of mold causes any significant health risks for persons with a normally functioning immune system, the appropriate steps to prevent mold and moisture problems must still be taken.

4. **Tips to aid in the prevention of Mold Growth** - *It is important to prevent excessive buildup of household dust, dirt and debris that may harbor moisture, mold or food for mold within your dwelling. Failure to pay attention to leaks and moisture that accumulates on surfaces or that might penetrate wall or ceiling cavities can encourage mold growth. Follow the steps below to minimize the potential for mold growth in your dwelling:*

   · Keep your dwelling clean; especially the kitchen, the bathroom(s), carpets and floors.

   · Eliminate visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as possible. Check for leaks in washing machine hoses and lines, especially if the leak is large enough for water to saturate nearby walls. Utilize any exhaust fans in the bathroom and kitchen before you begin activities that will create moisture and/or steam. Wipe moisture off walls, doors, the bathtub and the floor. After shower or tub use, leave the bathroom door open and hang up your towels and bath mats so they will dry out completely.

   · **Notify management immediately and submit a maintenance service request regarding any Heating, Ventilation and Air Conditioning (HVAC) problems as soon as you discover them.** Follow any rules/guidelines regarding air filter replacement. Window and doors should be opened on days when the outdoor weather is dry (i.e., humidity < 50%) to help lower humidity levels and dry out the dwelling.

   · **Notify management immediately and submit a maintenance service request regarding any signs of water leaks/intrusions, and/or mold growth as soon as they are identified. Never attempt to address**: **(1)** Visible mold on *porous surfaces* (i.e., Sheetrock walls or ceilings), or **(2)** Large areas of visible mold on *non-porous* surfaces. **Management will repair or remedy the situation, as necessary, in accordance with the Leasing Contract and state law.**

   · In the event temperatures rise to or above 80 degrees Fahrenheit, keep the thermostat set to automatically circulate air to reduce humidity.

   **4.1 Excessive moisture can be caused by:**

   · Exterior issues such as rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters.

   · Overflows from showers, bathtubs, toilets, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines. Leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks. Washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking. Leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and Insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

5. **If small areas of mold are discovered on Non-Porous surfaces** (such as vinyl flooring, Formica, ceramic tile, metal, wood or plastic), the Federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within twenty-four (24) hours apply a household cleaning solution, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover® or Clorox Cleanup®, (note: Only a few of the common household cleaners will actually kill Mold) and Tilex® and Clorox® contain bleach which can discolor or stain. **Strictly follow the manufacturer's directions on use. Never mix bleach and ammonia!! It will cause toxic fumes that can cause severe illness or death.**

6. **Compliance** - Complying with this addendum will assist you in preventing moisture and/or mold growth in your dwelling. If you fail to comply with this addendum, you can be held liable for any property damage and responsible for any associated health problems that may result from your inaction. If you have any questions regarding this addendum, please visit or contact the management office at the phone number shown in your Leasing Contract.

7. **Special Provisions** - The following special provisions will take precedence over conflicting provisions of this addendum:

   _____

   _____

                 **Resident or Residents**                           **Owner or Owner's Representative**
                 (All resident must sign here)                                (Sign Here)

   _____           _____

   _____                  **Date of Leasing Contract**
   _____                    _____/_____/_____

# Maxus Bedbug Addendum

This community has a comprehensive plan of action to follow when we encounter bedbugs in our community. Bedbugs are now a pandemic, not just here in the United States, but around the world. Following a systematic plan will ensure that issue is mitigated quickly and will protect other residents, family members, and guests in the community. Every effort is made to protect residents from the social embarrassment associated with having a bedbug infestation. Because self-treatment poses extreme dangers to residents and family, we require that a licensed pest management professional be engaged to help respond and treat infested apartments. Without full cooperation of the resident, this treatment program will not be successful. Because involving a pest management professional in the eradication plan is very difficult and costly, we require residents to cooperate fully in the treatment solution and policies relating to controlling bedbug infestations. Integrated pest management requires that the resident, landlord and pest management professional work together. Lack of cooperation will result in termination of tenancy.

This Bedbug Addendum (this "Addendum") is made and entered into as of **«systemdate»,** by and between **«custom_entityname»**, dba **«sitename»** (the "Landlord") and **«leasesigners»** (the "Resident). This Addendum will acknowledge that all parties are aware of bedbug issues and will cooperate throughout the tenancy to deal with potential issues.

Landlord and Resident have inspected the unit and are aware of no bedbug infestation upon move-in or lease renewal on **«leasestartdateleaseorselectedrenewaloffe»**.

Resident(s) claims that all furnishings and personal properties to be moved into the premises are free of bedbugs. Resident(s) hereby agree to prevent and control possible infestation by adhering to the below list of responsibilities for the duration of the tenancy:

1. Inspection.   Check for hitch-hiking bedbugs. If you stay in a hotel or another home, inspect your clothing, luggage, shoes and personal belongings for signs of bedbugs before re-entering your apartment. Check backpacks, shoes and clothing after using public transportation or visiting theaters. After guests visit, inspect beds, bedding and upholstered furniture for sings of bedbug infestation.

2. Duty to Report.   Residents shall report any problems immediately to Owner/ Agent. Even a few bedbugs can rapidly multiply to create a major infestation that can spread to other units. Manager will then be given access to rental unit for inspection within 24 hours of Resident being given written notice.

3. Mandatory Cooperation.   Resident shall cooperate with pest control efforts. If your unit or a neighbor's unit is infested, a pest management professional will be called in to inspect and eradicate the problem.

4. Bed Bug Treatment.   In the event of a bedbug issue, Resident agrees to execute the "Bed Bug Treatment Agreement" attached as Exhibit A. In addition, Resident must comply with recommendations and requests from the pest control specialist prior to professional treatment including but not limited to:

    a.  Place all bedding, drapes, curtains and small rugs in plastic bags for transport to laundry or dry cleaners.

b.  Heavily infested mattresses are not salvageable and must be sealed in plastic and disposed of properly. Call Management for removal and disposal of mattress(s). Empty dressers, night stands, and closets. Remove all items from floors and bag all clothing, shoes, boxes, toys, etc. Bag and tightly seal washable separately from non-washable items. Used plastic bags must be disposed of properly.

c.  Wash all machine-washable bedding, drapes, and clothing, etc. on the hottest water temperature and dry on the highest heat setting. Items that cannot be washed must be taken to a dry cleaner who MUST be informed of the issue. You must safely discard ALL items that cannot be decontaminated.

d.  Vacuum all floors, including the inside of closets. Vacuum all furniture including inside drawers and nightstands, mattresses and box springs. Carefully remove vacuum bags, sealing them tightly in plastic and discarding of properly. Use a brush attachment to dislodge eggs.

e.  Move furniture toward the center of the room so that technicians can easily treat carpet edges where bedbugs congregate, as well as walls and furniture surfaces. Items must be removed from the closets to allow for treatment.

5.  Indemnification.    Resident agrees to indemnify and hold the Landlord harmless from any actions, claims, losses, damages and expenses that Landlord may incur as a result of the negligence of the Resident(s) or any guest occupying or using the premises.

6.  Property Insurance.    It is acknowledged that the Landlord shall not be liable for any loss of personal property to the Resident as a result of an infestation of bedbugs.

7.  Default.    Any Default of this Addendum or of the Lease by Resident shall entitle Landlord to pursue all rights and remedies available under this Addendum, the Lease, or applicable law including, but not limited to, terminating the Resident's right to possession of the premises for material non-compliance. The following will be considered material non-compliance of the Lease and Addendum:

a.  Any misrepresentation by the Resident in this Addendum.

b.  Refusal to execute the Bed Bug Treatment Agreement.

c.  Failure to promptly notify the Landlord of the presence of bedbugs.

d.  Failure to adequately prepare for treatment in the sole discretion of the pest control professional.

e.  Refusal to allow the Landlord to inspect the premises.

f.  Any action that prevents treatment of the Unit or potentially exacerbates or increases the bedbug issue.

8. <u>Conflicts.</u>   To the extent that the terms of this Addendum are inconsistent with the terms of the Lease, the terms of this Addendum shall control.

By signing below, the undersigned Resident(s) agree and acknowledge having read and understood this addendum.

**Resident(s)**                                              **Landlord**

_____       _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

**Maxus Properties**

**Carpet Addendum**

The purpose of this addendum is to ensure that you understand your responsibility for keeping the carpet in good condition. Please review the following helpful hints:

1) Vacuum your carpet regularly to prevent dirt from becoming ground into the fibers.
2) Soak up any spills or accidents immediately.
3) Do not use carpet cleaners or spot cleaner that is not specifically designed for carpet.
4) If your carpet becomes loose around the edges or at the doorway, or if you notice wrinkles or buckling, contact the office immediately so that we can make arrangements to correct the problem before it damages the carpet.

By signing the below, you are confirming you understand that upon move-out, any damage to the carpet beyond normal wear and tear will be solely your responsibility.

The age of the carpet at move out will determine the cost of damage that will be charged:

**0 to 12 months: 100% of replacement cost**
**13 to 24 months: 85% of replacement cost**
**25 to 36 months: 70% of replacement cost**
**37 to 48 months: 55% of replacement cost**
**49 to 60 months: 40% of replacement cost**
**60 months or longer: 25% of replacement cost**

Stains, pet damage, smoke smell, or any offensive odors, tears, burns, wax, etc. are not considered normal wear and tear and will result in replacement charges.

**Resident(s)**                                     **Landlord**

_____     _____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**
_____     _____

# Rent Concession Addendum

Unit Number: «unitnumber»
Unit Street Address: «unitaddressline1» «unitaddressline2»
               «unitaddresscity», «unitaddressstate» «unitaddresszipcode»

Date: «currentsystemdate»
Owners Name: «sitename»
Lease Signers: «leasesigners»


Concession / Discount Agreement:   You will receive the following rent Concession or Discount:


☐ **One-Time Concession.**  You will receive a One-Time Concession off the rent amount shown in the Lease Contract. This One-Time Concession will be credited to your rent at the beginning of your lease term.

☐ **Monthly Discount / Concession.**  The rent amount indicated in the Lease Contract will be modified by a monthly Discount. The monthly discount will be applied toward the indicated rental rate for your unit.


Your Concession amount will be:            **$«concessiondetailamount»**


Concession Cancellation and Charge-Back:   The concession and discounts shown above are provided to you with the understanding that you will fulfill your lease requirements through the entire term of your lease. If you decide to end your lease early or your lease is terminated for reasons such as: non-payment of rent, eviction or abandonment of unit, then this Rent Concession Addendum is no longer valid.  You will be required to repay the Owner the total amount of all Concessions or Discounts received.

Special Provisions:   The following special provisions shall rule over any conflicting provisions of this Addendum or the Lease Contract: If the lease is terminated early, resident will be charged back all concessions given during the lease term while the unit was occupied.

**Resident(s)**                                **Landlord**

_____          _____

_____

_____

_____

_____          _____

**Date**

«currentsystemdate»

# MAXUS PROPERTIES EMPLOYEE LEASE AGREEMENT

1. By this agreement entered into as of «systemdate» between **«custom_entityname»**, d/b/a **«sitename» / «propertyowner»** (Employer) and **«leasesigners»** (Employee), agree to the following:

2. The performance of duties by Employee for Employer under an Employee-Employer relationship, is the major consideration for Employer's agreement to allow Employee to occupy the Premise at **«unitaddressline1» #«unitnumber» «unitaddresscity», «unitaddressstate» «unitaddresszipcode»,** for the initial 12 month lease term beginning **«leasestartdateleaseorselectedrenewaloffe»** and ending **«leaseenddateleaseorselectedrenewaloffer».**

3. The Employee agrees to pay rent in the amount of **$«renewalcustom10»** per month, which is broken down as follows:

| | | |
|---|---|---|
| Base Rent: | $«baserentleaseorselectedrenewaloffer» | |
| Employee Concession: | $«renewalcustom19» | «concessiondesc» |
| Pet Rent: | $«petrentforleaseorrenewaloffer» | |
| Trash: | $«renewalcustom3» | |
| Pest Control: | $«renewalcustom2» | |
| Parking: | $«renewalcustom6» | «renewrentitemcustomlisttype1» «renewrentitemcustomlistdescription1» |
| Rentable Item: | $«renewalcustom7» | «renewrentitemcustomlistdescription2» |
| Payroll Deducted Amount: | $«renewalcustom20» | |

All scheduled billing charges, excluding Rent, shall be payable on the first day of each month, during the entire term of the lease. All charges, excluding Rent, must be paid in full prior to the **«residentinitiallateday»** day of each month, at which time Employee agrees that any outstanding balance may be subject to a late charge of **$«residentinitiallateamt»**, plus **$«residentnextdaylateamt»** per day, beginning on the second late day, continuing thereafter, until paid in full. A payment, which is returned for any reason is deemed nonpayment of rent, and is subject to late charges and an additional administrative charge of **$«leansffee».**

Employees are expected to stay current on any charges. If an Employee has an outstanding balance over 30 days, the Employee will be subject to a one-time payroll deduction for the balance. If an outstanding balance accrues consistently, Maxus will evaluate the Employees residency at **«sitename».**

4. Only the designated Employee and the following person(s) shall occupy the premises: **«residentoccupantnames»**

5. Employee is responsible to pay and furnish all utilities (including sewer service charges, trash services and related deposits) during tenancy. All Utilities must be in the Employees name. Any Utility billed through Resident Utility Management (RUM) must be paid directly to the community. These charges will NOT be payroll deducted and no discount will be offered.

6. In the event of termination, the Employee must vacate **«sitename»**, the **«propertyowner»** community apartment, within ten (10) days or re-apply for residency as a new prospective resident to the community and must qualify similar to any outside applicant.

Employee Lease Agreement 08/19

7.  Employee is responsible for family members, guests and invitees. Employee agrees that any violation of this agreement by any Family member, guest or invitee shall be considered a violation. Employee accepts responsibility for all such lease violations as though such violation were that of the Employee.

8.  Employee, at Employee's expense, shall repair any damage to the Premises caused by Employee's acts or neglect.

9.  Employer and its agent's at all reasonable times, may enter and inspect the Premises to ensure that Employee is complying with this Agreement.

10. Maxus Properties will re-evaluate the Employees rental rates annually, on the anniversary of the Employees move in date. Employee will re-sign a new 12 month Employee Lease Agreement upon re-evaluation.

11. Employees are required to give a **30** day notice to vacate for reasons other than termination of employment. Failure to provide proper notice to vacate or any damage made to the unit could result in additional fees, per the standard state lease policies.

12. Employee agrees that the Rules and Regulations and such other rules and regulations as may be adopted from time to time by Employer, are part of this agreement; that Employee shall be bound by such rules and regulations; and that failure to comply with such rules and regulations shall be a violation of the conditions of this Agreement.

13. Employee agrees that verbal representations are not binding. No representation other than those contained in this Lease shall be binding upon Employer.

14. Employee acknowledges that this Agreement, together with any addenda, rules and regulations or attachments, constitutes the entire agreement between parties. All prior understandings are merged into this Lease Agreement. The terms of this Lease shall not be modified except in writing, and signed by the parties to bound. Only the designated agent of Agent of Employer or Maxus Executive shall have authority to execute any such writing.

15. Employee authorizes Employer to deduct from Employee's wages any amount which Employee must pay to Employer under this Agreement. Only Rent amounts can be deducted from Employee Payroll; additional scheduled billing items, such as Trash, Pest Control, Utilities and / or Pet Rent, cannot be payroll deducted.

16. ALL PAYMENTS BY THE EMPLOYEE TO THE EMPLOYER SHALL FIRST BE CREDITED TO THE OUTSTANDING BALANCE, IF ANY, FOR REPAIRS OR FOR DELINQUENT RENT, THEN TO LATE FEES AND ADMINISTRATIVE CHARGES, AND LASTLY TO THE CURRENT MONTH'S RENT.

17. Maxus Properties may allow for unit transfers if it is relevant to a property assignment change at no cost to the employee. The request process will be followed as outlined in the Employee Apartment Allowance Authorization Policy and subject to approval by a Maxus Executive. Any other on-site transfer based on a personal request is subject to the approval requirements listed in the Employee Apartment Allowance Authorization Policy. The employee is subject to a $500 transfer fee if they lived in their current apartment less than two (2) years. The transfer fee can be payroll deducted over a two month period (four (4) payroll checks). All transfers require rescreening.

**Resident(s)**                                   **Landlord**

_____        _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

_____        _____

## MAXUS PARKING AND REMOTE ACCESS ADDENDUM

1. Parking is to be used for parking of Resident(s) vehicle only.  Resident(s) must promptly report any changes to his/her vehicle information.
2. Resident agrees to abide by the parking regulations established by Landlord in the property's Rules and Regulations.  Boats, trailers, campers, and RVs may not be parked on the property.
3. Vehicles must be in operable condition and maintained with current state registration, insurance, and license.
4. No automobile repairs may be made on the premises.  Automobiles must be removed from property for service including oil changes.
5. Resident understands and agrees that Landlord will not assume responsibility for loss of or damage to any parked vehicle or items in any parked vehicle, including damage caused by parking gate on properties which offer such.
6. Parking illegally or in assigned spaces may result in a fine per incident, enforced by Landlord on Resident's account.
7. Resident agrees any vehicle parked illegally or improperly in assigned spaces may be towed without notice at the owner's expense.
8. Resident agrees that any damage done to the vehicle as a result of towing, any towing charges, and any storage charge incurred as a result of the towing of any vehicle from the property, shall be bourn solely by the owner or operator of the vehicle, and Resident(s) waives any cause of action, if any exist, against Landlord.
9. Resident agrees to contact the office regarding parking permits and/or gate/garage remotes or building access remotes/keycards, if any such are used by Landlord. Resident further agrees that potential fees may result if permits or remotes are lost, damaged, or stolen.

Assigned Parking Type(s): **«renewrentitemcustomlisttype1»**

Assigned Parking Item(s): **«renewrentitemcustomlistdescription1»**

Monthly parking rent amount: **$«renewalcustom6»**

**Parking rent amount is considered a part of total monthly rent.  Monthly rent is considered late if parking rent amount is not included, and late fees will result in accordance with the lease agreement.**

| Make | Model | Year | Color | LP # |
|---|---|---|---|---|
| «tablestart:vehicle»«vehiclemake» | «vehiclemodel» | «vehicleyear» | «vehiclecolor» | «vehiclelicenseplate»«tableend:vehicle» |

**Resident(s)**                                        **Landlord**

_____        _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

# MAXUS ANIMAL ADDENDUM

1.  Resident agrees that only the pet(s) described and named below will occupy premises. No additional or different pet(s) are authorized under this agreement. If an additional pet is added during the current lease agreement, Resident will execute a new Maxus Animal Addendum with the consent of the Landlord.
2.  If Resident does NOT have a pet at time of move-in and Resident elects to bring an animal onto the premises during the current lease term, Resident will execute a new Maxus Pet Addendum with the consent of the Landlord.
3.  Additional pets found in the apartment during the current lease agreement or at the time of move-out will subject Resident to any and all pet fees that date back to move-in.
4.  Resident agrees to contact Landlord regarding number of pets allowed per apartment. If more than two pets are allowed, an additional Maxus Pet Addendum will be executed with consent of the Landlord.
5.  Landlord reserves the right to refuse any breed or type of animal. All municipal breed restrictions are enforced per city or local Ordinance.
6.  The pet must be kept, maintained and licensed in accordance with regulations of the local Health Department and all other governmental agencies. Landlord has the right to request any documentation that would be required by city or local Ordinance.
7.  Landlord reserves the right to request animal health records including vaccination and veterinary history. Resident acknowledges that the animal has received all required inoculations per city or local Ordinance.
8.  The Resident shall properly supervise the behavior of the pet. In the event the pet engages in behavior that in the Landlord's sole opinion creates a nuisance, disturbs other residents, guests or invitees, or interferes with the residents right to quiet enjoyment, then the Resident agrees to promptly put the pet out for board or otherwise permanently remove the pet from the premises, upon notification from Landlord.
9.  Resident shall be liable for all damages caused by the pet and all cleaning, exterminating, and deodorizing required. If cleaning cannot be accomplished in a satisfactory manner, Resident shall pay for the replacement property damaged by pet. Damages can include as a direct result of the animal, or from any equipment required (i.e. heat lamps, water fountain, etc.) If pet damage is not covered within your current insurance policy (if applicable), the Resident will be financially responsible for any damages that occur within the unit.
10. Pet must be on a leash and accompanied by owner at all times when outside of the apartment.
11. Resident shall immediately remove any and all pet waste. If resident does not remove pet waste they will be assessed a **cleanup fee** per occurrence. Failure to pay fine may result in termination of the lease agreement.
12. Resident acknowledges that dogs will be entered into the PooPrints program at participating properties. This will keep the DNA profile of each dog on file. Further detail is included in Maxus PooPrints Addendum.
13. Resident agrees to pay Landlord a refundable Pet Deposit of **$«residentpetdeposit»** and / or a non-refundable Pet Fee of **$«residentpetfee»**.
14. Resident shall pay to Landlord as additional pet rent the sum of **«petrentforleaseorrenewaloffer»**, per month for each month or portion thereof that the Resident has a pet on the premises.
15. In the event that the Resident, in the Landlord's sole and absolute discretion, fails to comply with all of their obligations stated herein, then the Landlord may, at its option, exercise any remedy available to it under the law including but not limited to the termination of the Resident's tenancy.
16. As owner of the animal(s), you're strictly liable for the entire amount of any injury that the animal causes to a person or a person's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

Total Number of Animals at time of signing: «householdpetcount»

| Type of Pet(s) | Breed(s) | Name(s) | Age(s) | Color(s) | Weight(s) |
|---|---|---|---|---|---|
| «tablestart:pet»«householdpettype» | «householdpetsbreed» | «householdpetsname» | «householdpetsage» | «householdpetscolor» | «householdpetweight»«tableend:pet» |

**Resident(s)**                                    **Landlord**

_____                    _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

# MAXUS POOL ADDENDUM

1. No lifeguard on duty. All persons using the pool area do so at their own risk.
2. Leaseholder must accompany all guests. Maximum of **2** guests per apartment.
3. Residents are responsible for the supervision and conduct of their guests. We may exclude any person who refuses to identify him/herself as a resident, occupant, or guest of a specific resident.
4. All minors must be accompanied by an adult resident over the age of **18**.
5. No glass containers allowed in pool area.
6. No pets, bikes, skateboards or rafts allowed in the pool area.
7. No running, diving, pushing, or rough play allowed.
8. The use of profanity or offensive language will not be tolerated.
9. Appropriate swimwear is required; no cut-offs, street clothing or revealing bathing suits.
10. Please remove all hair accessories before entering the pool.
11. Children that are not potty-trained must wear swim diapers; regular diapers are not allowed in the pool area.
12. For the protection of all residents, use of the pool is prohibited to anyone with open or infected cuts, sores, or infectious diseases.
13. Receptacles have been provided for trash; please keep the pool area clean and free of litter.
14. Ropes and rings may be provided for the safety of the people using the pool. If so, please do not hang on or sit on the ropes.
15. From time to time, Landlord will hold pool parties for the residents and their guests. No other parties are to be held at the pool.
16. Music must be played at a low volume that is not disruptive of others, according to Landlord's sole discretion. Offensive or inappropriate music will not be accepted.
17. Pool entry is to remain secure at all times.
18. Pool furniture is not to be removed from the pool area. Additional furniture is not allowed in the pool area.
19. Resident agrees to contact Landlord regarding Pool Hours at **«sitename»**. Persons found in the pool area after hours will risk losing privileges for the duration of the season.
20. Pool Pass or Code may be required according to site policy. Resident agrees to contact the office for further details.
21. Landlord is not responsible for loss or damage of any personal property left in the pool area.
22. Landlord reserves the right to refuse access to the pool if in Landlord's sole discretion the safety or enjoyment of residents of the community may be at risk.
23. Resident agrees to obey any additional rules posted inside the clubhouse or pool area.
24. Resident acknowledges that the pool is a smoke free environment; smoking is NOT permitted inside the pool area.

**Resident(s)**                                    **Landlord**

_____        _____

_____

_____

_____

_____

_____

**Date**

«currentsystemdate»

# Requirement of Renter's Insurance

*By applying your electronic signature, you are agreeing to all areas that require initials*

1.   **Addendum.** This addendum is entered into on the date below between the parties signed below. It is intended to be a part of the lease agreement between the parties for leasing a residential rental unit.

Resident(s):«leasesigners»                                    Premises: # «unitnumber» at «custom_entityname» dba «sitename»

2.   **Acknowledgement concerning insurance or damage waiver.** You understand that our property and liability insurance may not protect you, your guests or any occupants against loss or damage to personal property or belongings, or cover your liability for loss or damage caused by your actions or those of any occupant of the dwelling or any guest. You understand that by not maintaining a renter's insurance policy, you may be liable to us and others for loss or damage caused by your actions or those of any occupant or guest in the dwelling. **You understand that you are required to maintain a renter's insurance policy, which provides limits of liability to third par ties in an amount not less than $100,000 per occurrence.** You agree to maintain, at your own expense, during the Term of the Lease and any subsequent renewal periods, a renter's insurance policy satisfying these requirements.   **Liability Insurance DOES NOT protect you against loss or damage to your personal property or belongings – only a renter's insurance policy does this.**

3.   **Election of insurance coverage**. You agree to the following with respect to your renter's insurance **(Check One):**

☐ You agree to purchase renter's insurance through LeasingDesk Insurance Services ("eRenterPlan"). If you have questions regarding eRenterPlan please call **1-888-205-8118** or visit **www.eRenterPlan.com;** Leasing Office Employees are not licensed agents. **Note that LeasingDesk Insurance Services, LLC is not owned or operated by us, and we make no guarantees, representations, or promises concerning the insurance or services it provides. You are under no obligation to purchase renter's insurance through eRenterPlan.**

☐ You may purchase renter's insurance from an insurance company of your choice. If you elect to purchase the required insurance form another company, you will provide us with written proof of compliance with this Lease Addendum on or prior to the lease commencement date, and any time we request it. Your insurance company will be required to provide notice to us within 30 days or any cancellation, non-renewal, or other material change in your insurance policy. You agree to obtain renters insurance with a minimum amount of $100,000 covering property damage and liability, to notify us within 30 days of cancellation, and to include us in insurance certificate as **"Additional Interested Party" or "Additional Certificate Holder" «custom_entityname» / DBA «sitename», Maxus Properties, PO Box 115009, Carrollton, TX 75011-5009.** Under no circumstances should the community be listed as "Additional Insured."

Initials:

4.   **Non-Compliance Fee:** You also acknowledge and agree by initialing that you will accept a charge of $75 Non-Compliance Fee, in any month during which you fail to purchase the required insurance coverage, fail to provide written proof of coverage, or allow the required insurance coverage in Section 3 of this addendum to lapse or expire. THIS CHARGE WILL OCCUR EACH MONTH THAT YOU DO NOT HAVE THE REQUIRED RENTERS INSURANCE, AND IT IS NOT REFUNDABLE, NOR PRORATEABLE. This Non-Compliance Fee is for the purpose of reimbursing the Landlord for multiple expenses associated with the risk of an uninsured resident. You agree to pay Landlord this amount in addition to all other obligations in the Lease Agreement. You also agree that the cost of this Fee will be considered additional rent for purposes of the Lease Agreement."

Initials:

5.   **Personal Premises Insurance and Liability.** All personal property kept in the Apartment, Apartment building and/or common areas by you (or anyone else whom you permit to use or occupy the Apartment) shall be kept at your own risk. You agree that, as the law permits, you and your insurance carrier will not hold us liable for claims for damage or injury normally covered by Renter's insurance, even if we are negligent, and you will look solely to your insurance to compensate for any such damage or injury.

6.      **Subrogation allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes the language contained in the lease agreement.

**Resident(s)**                                                **Landlord**

_____        _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

# MAXUS SMOKE DETECTOR ADDENDUM

This addendum dated «currentsystemdate», will become part of the original lease agreement between «sitename» (Landlord) and «leasesigners» (Tenant), for the residence located at «unitaddressline1» «unitaddresscity» «unitaddressstate» «unitaddresszipcode».

1. Tenant acknowledges that as of the date of this addendum, the unit is equipped with a smoke detector; that Tenant has inspected the smoke detector; and that the Tenant finds it to be in proper working condition.

2. Tenant agrees that it is Tenant's duty to test and clean the smoke detector on a monthly basis and Tenant agrees to notify the Landlord immediately, in writing, of any problem, defect, malfunction or failure of smoke detector.

3. Tenant understands that the smoke detector is battery operated and it shall be Tenant's responsibility to ensure that the battery is in operating condition at all times. If after replacing the battery, the smoke detector still will not operate properly, Tenant must inform Landlord immediately in writing.

4. Tenant agrees that they hold Landlord harmless from any loss, cost, damage or injuries to persons or property caused by (1) Tenant's failure to test the smoke detector; (2) Tenant's failure to notify the Landlord of any issues, malfunctions, or failure of the smoke detector; (3) Theft of the smoke detector or removal of its batteries; (4) Tenant's failure to comply with the terms of this addendum.

**Resident(s)**                                    **Landlord**

_____        _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

**MAXUS UTILITY ADDENDUM**

The utility addendum shall be incorporated into the Apartment Lease Contract hereafter referred to as "Lease" and is entered into as of _ «currentsystemdate»

by and between «custom entityname» dba «sitename» ("Owner or we") and **«Leasesigners»** ("Resident or you") located at **«unitaddressline1» «unitaddressline2» «unitaddresscity», «unitaddressstate» «unitaddresszipcode»** and is in addition to all terms and conditions in the Lease. To the extent that the terms of this Utility Addendum conflict with those of the Lease, this Utility Addendum shall control.

1. Resident shall be responsible for payment of utilities, and the method of metering or otherwise measuring the cost of the utility shall be as indicated herein.

a.) Water service to your apartment will be paid by you either:
   «c  Directly to the utility service provider; or
   «c  Water bills will be billed by the service provider to us and then allocated to you based on formula:   «custom
   Note: If a flat rate is selected, the flat rate for water service is $            per month.

b.) Sewer service to your apartment will be paid by you either:
   «c  Directly to the utility service provider; or
   «c  Sewer bills will be billed by the service provider to us and then allocated to you based on formula:   «custom_s
   Note: If a flat rate is selected, the flat rate for sewer service is $        per month.

c.) Gas service to your apartment will be paid by you either:
   «c  Directly to the utility service provider; or
   «c  Gas bills will be billed by the service provider to us and then allocated to you based on formula:   «custom
   Note: If a flat rate is selected, the flat rate for gas service is $            per month.

d.) Electric service to your apartment will be paid by you either:
   «c  Directly to the utility service provider; or
   «c  Electric bills will be billed by the service provider to us and then allocated to you based on formula:  «custom
   Note: If a flat rate is selected, the flat rate for electric service is $            per month.

e.) Trash service to your apartment will be paid by you either:
   «c  Directly to the utility service provider; or
   «c  Trash bills will be billed by the service provider to us and then allocated to you based on formula:   «custom_t
   Note: If a flat rate is selected, the flat rate for trash service is $«renewalcustom3» per month.

f.) Pest Control service to your apartment will be paid by you either:
   «c  Directly to the utility service provider; or
   «c  Pest Control bills will be billed by the service provider to us and then allocated to you based on formula:   «custom_p

   Note: If a flat rate is selected, the flat rate for pest control service is $«renewalcustom2» per month.

**METERING/ALLOCATION METHOD**
   1) Allocation based on the number of persons residing in your apartment unit
   2) Allocation based on the number of persons residing in your apartment unit using a ratio occupancy formula
   3) Allocation based on square footage of your apartment unit
   4) Allocation based on a combination of square footage of your apartment unit and the number of persons residing in your apartment unit
   5) Allocation based on the number of bedrooms in your apartment unit
   6) Flat rate per month
   7) Sub-metering of all of your water/sewer, gas and electric use
   8) Calculation of your total water use based on sub-metering of hot water
   9) Calculation of your total water use based on sub-metering of cold water
   10) Allocation based on a lawful formula not listed here

Note: if method 10) is selected, a separate sheet will be attached describing the formula used.

2. If an allocation formula above is used we, or our billing company will calculate your allocated share of the utility services in accordance with state and local laws. If allowed by state law, we at our sole discretion may change the above methods of determining your allocated share of the utility services, by written notice to you.

3. When billed by us directly or through our billing company you must pay utility bills along with your rent at the place indicated on your bill or the payment shall be considered late.   The late payment of a bill or failure to pay any utility bill is a breach of the Lease and we shall exercise all remedies available under the Lease up to and including eviction for nonpayment.

4. To the extent there is a billing fee for the production of any utility bill or a set-up charges or initial fee by our billing company, you shall pay such fees in the amount of a monthly service fee of $«custom_utilityaddendumservicefee» and a onetime activation fee at time of move-in the amount of $«custom_utilityaddendumactivationfee».

5. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the apartment. If you breach the Lease, you will be responsible for utility charges for the time period you were obligated to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your apartment and may charge an additional penalty fee in amount of $«custom_utilityaddendumpenaltyfee» per occurrence.

6. When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

7. You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease and this Utility Addendum. Where lawful, all utilities charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

**Resident(s)**                                    **Landlord**

_____    _____

_____

_____

_____

_____

_____

_____

**Date**

**«currentsystemdate»**

[The Astoria – Hope Mills]

**EXHIBIT E**

**FORM OF SPECIAL WARRANTY DEED**

**Prepared by and return to**:
Stinson LLP
1201 Walnut St., Ste. 2900
Kansas City, Missouri 64106
Attention: Karl Phares
Tax Map No: _____
Assessed Value: _____
Excise Tax:     _____

**SPECIAL WARRANTY DEED**

THIS DEED is made as of the ____ day of _____, 2022, by and between CAPE FEAR MULTIFAMILY, LLC, a North Carolina limited liability company ("Grantor"), whose address is _____, and _____ ("Grantee"), whose address is _____.

W I T N E S E T H:

That for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt of which is hereby acknowledged, Grantor does hereby give, grant, bargain, sell and convey, with special warranty of title, unto Grantee, the property located in the City of Hope Mills, Cumberland County, North Carolina as more particularly described in Exhibit A attached hereto and made a part hereof, subject only to the Permitted Encumbrances listed on Exhibit B attached hereto and incorporated herein by this reference.

And Grantor hereby warrants that Grantor has done nothing to impair the title as received by Grantor and that Grantor will forever warrant and defend the title against the lawful claims of all persons claiming by, through or under Grantor.

All or a portion of the property herein conveyed does not include the primary residence of Grantor.

36

[The Astoria – Hope Mills]

**IN WITNESS WHEREOF**, Grantor has caused this instrument to be executed as of the day and year first above written.

GRANTOR:

CAPE FEAR MULTIFAMILY, LLC,
a North Carolina limited liability company

By: _____
Name: _____
Title: _____

## ACKNOWLEDGMENT

STATE OF _____    )
                         ) ss.
COUNTY OF _____   )

I, _____, a Notary Public of _____ County and State of North Carolina, certify that _____ personally came before me this day and acknowledged that s/he is the _____ of Cape Fear Multifamily, LLC, a North Carolina limited liability company, and that by authority duly given and as the act of the limited liability company, the foregoing instrument was signed in its name by its _____, and attested by her/him as its _____.

Witness my hand and official seal this _____ ___, 2022.

(SEAL)

_____
Printed Name: _____
Notary Public in and for said State
Commissioned in _____ County

My Commission Expires:


_____

37

EXHIBIT "A" TO SPECIAL WARRANTY DEED

LEGAL DESCRIPTION

[INSERT]

[The Astoria – Hope Mills]

## EXHIBIT "B" TO SPECIAL WARRANTY DEED

## PERMITTED ENCUMBRANCES

[INSERT PERMITTED EXCEPTIONS OF RECORD]

39

<u>**Exhibit F**</u>

**Bill of Sale**

## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT (the "<u>Assignment</u>") is made as of _____, 2022, by and between CAPE FEAR MULTIFAMILY, LLC, a North Carolina limited liability company ("<u>Seller</u>") in favor of _____, a _____ ("<u>Buyer</u>").

## RECITALS

A.    Pursuant to a certain Purchase and Sale Agreement, dated as of _____, 2022 (the "<u>Agreement of Sale</u>"), Seller has agreed to sell to Buyer, upon the terms, provisions and conditions set forth therein in that certain apartment complex located in Hope Mills, North Carolina, containing an aggregate of 272-units and related improvements, and commonly known as "The Astoria Apartment Homes" having a principal address of 405 Grand Wailea Dr., Hope Mills, North Carolina 28348, all as more particularly described in the Agreement of Sale (the "<u>Property</u>").

B.    In connection with the sale and purchase of the Property, Seller desires to sell, assign and transfer to Buyer all of Seller's right, title and interest in and to the Personal Property, the Intangible Property and the Permits as each such term is defined in the Agreement of Sale, all upon the terms, covenants and conditions set forth in this instrument.

NOW THEREFORE, for an in consideration of Ten Dollars ($10.00), the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Seller hereby agrees as follows:

1.    <u>Definitions</u>.  Capitalized terms used herein and not otherwise defined herein shall have the respective meanings given such terms in the Agreement of Sale.

2.    <u>Transfer and Assignment</u>.  Seller hereby sells, transfers, assigns, delivers and conveys to Buyer, its successors and assigns, all of Seller's right, title and interest in, to and under the Personal Property, the Intangible Property and the Permits.

3.    <u>Representations and Warranties of Seller</u>.  Seller hereby represents and warrants to Buyer as follows:

(i)    Seller is the sole owner and holder of the Personal Property; and

(ii)    Seller has the power, authority and right to execute and deliver this Assignment and to sell, transfer, assign, deliver and convey the Personal Property.

4.    <u>AS IS, WHERE IS</u>.  EXCEPT AS SET FORTH IN THE AGREEMENT OF SALE OR THE CLOSING DOCUMENTS, THE PERSONAL PROPERTY IS BEING CONVEYED "AS IS", "WHERE IS", AND "WITH ALL FAULTS" AS OF THE DATE OF THIS

ASSIGNMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED.  EXCEPT AS SET FORTH IN THE AGREEMENT OF SALE OR THE CLOSING DOCUMENTS, SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, THERETO.   EXCEPT AS SET FORTH IN THE AGREEMENT OF SALE OR THE CLOSING DOCUMENTS, BUYER IS HEREBY THUS ACQUIRING THE PERSONAL PROPERTY BASED SOLELY UPON BUYER'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTION OF THAT PROPERTY AND NOT IN RELIANCE UPON ANY INFORMATION PROVIDED BY SELLER OR SELLER'S AGENTS OR CONTRACTORS.

       5.    <u>Absolute Transfer</u>.  It is the intention of Seller to transfer absolute title of the Personal Property to Buyer, its successors and assigns, free of any equity of redemption by Seller or its successors and assigns

       6.    <u>Binding Effect</u>.  This Assignment shall be binding upon and inure to the benefit of Seller and Buyer and their respective heirs, personal representatives, successors and assigns.

       IN WITNESS WHEREOF, intending to be legally bound, Seller has caused this Bill of Sale and Assignment to be executed by its duly authorized officer on the day and year first above written.

<div align="center"><u>SELLER</u>:</div>

CAPE FEAR MULTIFAMILY, LLC,
a North Carolina limited liability company


By:_____
Name: _____
Title: _____

**EXHIBIT G**

ASSIGNMENT AGREEMENT

**ASSIGNMENT AND ASSUMPTION OF AGREEMENTS**

THIS ASSIGNMENT AND ASSUMPTION OF AGREEMENTS (this "Assignment") is made and entered into as of _____ \_\_\_\_, 2022, by and between CAPE FEAR MULTIFAMILY, LLC, a North Carolina limited liability company ("Assignor"), and _____, a _____ ("Assignee").

RECITALS

A.      Pursuant to a certain Purchase and Sale Agreement, dated as of _____, 2022 (the "Agreement of Sale"), Assignor has agreed to sell to Assignee, upon the terms, provisions and conditions set forth therein in that certain apartment complex located in Hope Mills, North Carolina, and commonly known as "The Astoria Apartment Homes" having a principal address of 405 Grand Wailea Dr., Hope Mills, North Carolina 28348, all as more particularly described in the Agreement of Sale (the "Property").

B.      In connection with the sale and purchase of the Property, Assignor desires to assign to Assignee all tenant leases encumbering the Property and certain other contracts and agreements pertaining to the Property and Assignee desires to accept said assignment and assume the obligations of Assignor under said leases, all upon the terms, covenants and conditions set forth in this instrument.

NOW, THEREFORE, in consideration of the purchase price paid by Assignee to Assignor for the Property, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee covenant and agree as follows:

1.      Assignment.  Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's right, title and interest (collectively, the "Assigned Interests") in and to  (a) the leases set forth on the rent roll attached hereto as Exhibit A and made a part of this Assignment together with all amendments, extensions, and other modifications thereto (the "Leases"), (b) any and all rights of Assignor and the lessor under the Leases to collect rents, additional rents, escrow or security deposits, fees, income, charges, and profits now or hereafter arising thereunder, (c) any guarantees of any Leases, to have and to hold the same unto Assignee, its successors and assigns, and (d) the contracts and agreements together will all amendments, extensions and modifications thereto, in each case, set forth on the attached Exhibit B hereto and made a part of this Assignment (the "Contracts").

2.      Assumption.  Assignee accepts said assignment and assumes all obligations of Assignor on the part of the lessor/landlord under the Leases first arising on or after the date of this Assignment and all obligations on the part of Assignor under the Contracts first arising on or after the date of this Assignment.

3.      Indemnification by Assignor.  Assignor agrees to indemnify, defend and hold Assignee harmless from and against any claim, demand, cause of action, charge, judgment,

42

damage, liability, cost or expense (including, without limitation, reasonable attorney's fees and legal costs) (a) arising out of the Assigned Interests in connection with events occurring at any time during Assignor's ownership of the Property, or (b) arising out of any claim by any tenant arising prior to the date of this Assignment with respect to any security deposit but only to the extent of the amount of such security deposit and interest thereon not transferred by Assignor to Assignee.

        4.    <u>Indemnification by Assignee</u>.  Assignee agrees to indemnify, defend and hold Assignor harmless from and against any claim, demand, cause of action, charge, judgment, damage, liability, cost or expense (including, without limitation, reasonable attorneys' fees and legal costs) arising out of the Assigned Interests in connection with events occurring on or after the date of this Assignment or arising out of any claim by any tenant arising on or after the date of this Assignment with respect to its security deposit but only to the extent of the amount of such security deposit and interest thereon transferred by Assignor to Assignee and not returned to such tenant by Assignee.

        5.    <u>Counterparts</u>.  This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.  For purposes of this Assignment, any signature transmitted by e-mail (in pdf format) shall be considered to have the same legal and binding effect as any original signature.

        6.    <u>Binding Effect</u>.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, personal representatives, successors and assigns.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[The Astoria – Hope Mills]

IN WITNESS WHEREOF, intending to be legally bound, the parties have caused this Assignment and Assumption of Agreements to be executed by their duly authorized officers on the day and year first above written.

ASSIGNOR:

CAPE FEAR MULTIFAMILY, LLC,
a North Carolina limited liability company

By: _____
Name: _____
Title: _____

ASSIGNEE:

_____,
a _____

By:     _____
Name: _____
Title**:** _____

44

[The Astoria – Hope Mills]

## EXHIBIT A TO ASSIGNMENT AND ASSUMPTION OF AGREEMENTS

### RENT ROLL

[SEE ATTACHED]

45

[The Astoria – Hope Mills]

## EXHIBIT B TO ASSIGNMENT AND ASSUMPTION OF AGREEMENTS

### CONTRACTS

[SEE ATTACHED]

**EXHIBIT H**

**FORM OF TENANT NOTICE LETTER**

[SEE ATTACHED]

**NOTICE TO TENANTS**

The Astoria Apartment Homes

[●] _____, 202[●]

*All Residents at*
*The Astoria Apartment Homes*

     RE:     *Notice to Tenants of "The Astoria Apartment Homes" having a principal address of 405 Grand Wailea Dr., Hope Mills, North Carolina 28348 (the "Property")*

Dear Tenant:

     This letter is to inform you that on **[●]** ___, 202**[●]**, CAPE FEAR MULTIFAMILY, LLC, a North Carolina limited liability company ("<u>Landlord</u>"), transferred all ownership interests in the Property to **[●]**, a **[●]** ("<u>Purchaser</u>"). All rights of the Landlord under your lease have been assigned to Purchaser.

The Property will be owned by the Purchaser and will be managed by **[●]**.  You should make your rent checks  payable  to <u>**[●]**</u> and the new address for your payment of rent under your Lease is **[●]** [<u>c/o</u> **[●]**], effective immediately.

For any questions concerning this letter or the transfer, please call **[●]**, the new property manager, at **[●]**.

[SIGNATURE PAGE FOLLOWS]

47

[The Astoria – Hope Mills]

Very truly yours,

CAPE FEAR MULTIFAMILY, LLC,
a North Carolina limited liability company


By: _____

Name: _____

Title: _____

## SCHEDULE 4.1

## REQUESTED DUE DILIGENCE MATERIALS

To the extent in Seller's possession or control:

1.   Copies of current tenant leases, licenses, occupancy, rental agreements and copies of tenant files, which will be made available at the Property.
2.   Income & Expense Statements year-to-date and audited financial statements for the previous three (3) full calendar years for the Property.
3.   Current balance sheet for the Property.
4.   Current year budget for the Property.
5.   List of personnel, wages, benefits and concessions for all employees.
6.   Occupancy report for the past full year.
7.   List of any pending litigation involving the Property.
8.   Copy of current property insurance policy, certificates of insurance and insurance bill(s) for the property plus a three (3) year loss run.
9.   The utility bills for the Property for the past three (3) calendar months.
10.  List of capital expenses for the Property and capital repairs, replacements, and improvements performed on the Property for the previous three (3) years.
11.  Copies of all Floor Plans.
12.  Copies of all current advertising copy including brochures.
13.  Licenses, certificates and permits, governmental and otherwise, including certificates of substantial completion.
14.  Site Plan of the Property.
15.  Copy of property management contract.
16.  Warranties and guaranties for all or any portion of the Property.
17.  Copy of laundry leases.
18.  Copy of current construction contracts and any applicable warranties for construction completed during the previous year.
19.  Copy of any rental assistance agreements affecting the Property.
20.  Next year's budget, if completed.
21.  Copy of existing owner's title policy, survey, zoning reports and environmental reports.