AMERICAN ARBITRATION ASSOCIATION

-------------------------------x

MaxMez NC, LLC,

Case No. 012400064870

Claimant,

- vs -

VIDEO-RECORDED DEPOSITION OF:

ELI MEISELS

Hawks PVO Holding LLC,
Merchant's Holding 1 LLC,
PVO Holding LLC,
Merchant's Holding 2 LLC,
PVO JV LLC,
Hawks PVO LLC,
Merchant's Walk Apartments LLC,
Eli Meisels,
Moshe Weingarten,

Respondents.

-------------------------------x

TRANSCRIPT of the stenographic notes of the proceedings in the above-captioned matter, as taken by and before BARBARA A. BRADEY, a Certified Court Reporter and Notary Public of the State of New Jersey, held at BRADY & KUNZ, 680 Hooper Avenue, Building C, 2nd Floor, Toms River, New Jersey 08753, on Tuesday, July 29, 2025, commencing at 10:11 a.m.

A P P E A R A N C E S:

STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
(816) 691-3128
BY: BRAD ANDERSON, ESQ.
brad.anderson@stinson.com
Attorneys for Claimant

GLANKLER BROWN
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 525-1322
BY: S. JOSHUA KAHANE, ESQ.
jkahane@glankler.com
Attorneys for Respondents

ALSO PRESENT:

Logan Fancher, Esq. - Stinson LLP
Greg Wolf - MaxMez NC, LLC
Daniel DeLuca, Legal Videographer - Veritext

INDEX


| | | PAGE |
|---|---|---|
| WITNESS: ELI MEISELS | | |
| EXAMINATION BY MR. ANDERSON | | 8 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Purchase and Sale Agreement, dated June 16, 2022 | 14 |
| Exhibit 2 | Limited Liability Company Agreement of Merchant's Holding 1 LLC as of June 16, 2022 | 14 |
| Exhibit 3 | First Amendment to Purchase and Sale Agreement, dated July 19, 2022 | 31 |
| Exhibit 4 | Landmark Abstract Agency, LLC deposit letter, dated July 19, 2022 | 34 |
| Exhibit 5 | Email to Mr. Kahane from Mr. Lubin, dated July 23, 2025, and Certificates of Cancellation for Merchant's Holding 1 LLC and Hawks PVO Holding LLC | 54 |
| Exhibit 6 | Email thread, Bates stamped MaxMez00007708 - 7711 | 55 |
| Exhibit 7 | Letter from MaxMez NC, LLC Re: Drag to Market Notice, dated June 17, 2024 | 61 |
| Exhibit 8 | Letter from CBRE to Mr. Meisels, attaching opinion of value | 64 |
| Exhibit 9 | Timesheet details | 73 |

EXHIBITS (cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 10 | Letter of Intent, dated May 25, 2022 | 77 |
| Exhibit 11 | Email thread, Bates stamped SUPP_DOC_PROD 001711 - 1731 | 78 |
| Exhibit 12 | Park at Village Oaks Best and Final Offer Summary | 83 |
| Exhibit 13 | Email thread, Bates stamped SUPP_DOC_PROD 000894 - 898 | 85 |
| Exhibit 14 | Email to Mr. Phares from Mr. Kahane, dated August 30, 2024 | 90 |
| Exhibit 15 | Email thread, Bates stamped SUPP_DOC_PROD 001662 - 1664 | 92 |
| Exhibit 16 | Contract of Purchase and Sale among URS Capital Partners I LLC and Dover Sub 2 LLC, RRAIT Sub 2 LLC, Merchant's Sub 2 LLC, and Village Oaks Owner LLC, dated September 9, 2024 | 95 |
| Exhibit 17 | Settlement Statement, dated October 1, 2024, Bates stamped 004851 - 4854 | 100 |
| Exhibit 18 | Letter from MaxMez NC, LLC to various parties, dated March 6, 2024 | 109 |
| Exhibit 19 | Letter from MaxMez NC, LLC to various parties, dated May 3, 2024 | 111 |
| Exhibit 20 | Letter from MaxMez NC, LLC to various parties, dated June 18, 2024 | 117 |
| Exhibit 21 | Letter from MaxMez NC, LLC to various parties, dated August 7, 2024 | 126 |

EXHIBITS (cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | Letter from Regions Bank, dated March 18, 2024 | 128 |
| Exhibit 23 | Email thread, Bates stamped SUPP_DOC_PROD 001927 - 1951 | 131 |
| Exhibit 24 | Email thread, Bates stamped SUPP_DOC_PROD 001910 - 1919 | 151 |
| Exhibit 25 | Email to Mr. Weingarten from Mr. Koromilas, dated June 11, 2024 | 167 |
| Exhibit 26 | Email thread between Mr. Snyder and Mr. Koromilas, dated June 13, 2024 | 171 |
| Exhibit 27 | Email thread, Bates stamped SUPP_DOC_PROD 001877 - 1893 | 178 |
| Exhibit 28 | Email thread, Bates stamped SUPP_DOC_PROD 001840 - 1845 | 183 |
| Exhibit 29 | Letter from Regions Bank to Village Oaks Owner LLC, dated September 24, 2024 | 187 |
| Exhibit 30 | Email thread, Bates stamped 002793 - 2801 | 192 |
| Exhibit 31 | Email to Mr. Koromilas from Mr. Snyder, dated October 24, 2024 | 199 |
| Exhibit 32 | Email thread, Bates stamped SUPP_DOC_PROD 001778 - 1787 | 201 |
| Exhibit 33 | Email thread with attachments, Bates stamped MaxMez00007862 - 7871 | 207 |
| Exhibit 34 | Email to Mr. Wolfson from Mr. Kahane, dated February 3, 2025, Bates stamped 005202 - 5203 | 209 |


(Exhibits attached)

SPECIAL REQUESTS

PAGE LINE

(None)

THE VIDEOGRAPHER: We are going on the record at 10:11 a.m. on July 29, 2025. Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference. Please turn off all cell phones or place them away from the microphone, as they can interfere with the deposition audio. Audio and video recording will continue to take place unless all parties agree to get off the record.

This begins the Media Unit 1 of video-recording of Eli Meisels, taken in the matter of MaxMez NC LLC v. Hawks PVO. This deposition is being held at Brady & Kunz, located at 680 Hooper Avenue in Toms River, New Jersey.

My name is Daniel DeLuca, from the firm Veritext. I am the videographer. The court reporter is Barbara Bradey, from the firm Veritext. I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome.

All appearances are noted on the stenographic record. Will the court reporter please swear in the witness.

E L I M E I S E L S, c/o Hawks PVO Holding LLC, 3 Alpine Court, Chestnut Ridge, New York 10977, having been duly sworn by the Notary, testified as follows:

EXAMINATION BY MR. ANDERSON:

Q All right. Good morning, Mr. Meisels. It's good to see you again. Brad Anderson, representing MaxMez NC in this arbitration, and was going to just having a personal deposition as well as finish up the corporate deposition today, kind of picking up from where we left off.

If you have any questions or if you don't understand one of my questions, will you please let me know?

A Okay.

Q And then the yes and the nos, if that's possible.

A I'll do what I can.

Q Okay. And then the other thing is, I know from past experience that as much as you can speak up, the better so that everyone can pick everything up. Okay?

A Okay.

Q You know, one thing that I had wanted to ask about was --

MR. KAHANE: I'm sorry, Brad, to interrupt. I just want to make sure we have on the record, so you're beginning now with Mr. Meisels' personal deposition? This is not the 30(b)6; is that correct?

MR. ANDERSON: Yes.

MR. KAHANE: And so he should be answering questions in his personal capacity. And at such time that you decide to revert back to completing the 30(b)6, you'll make that known to Mr. Meisels; is that correct?

MR. ANDERSON: That works. Yes.

MR. KAHANE: Okay.

Q So I was going to talk briefly about the Astoria property.

MR. ANDERSON: Could you hand me Tab 66, please?

Q Can you tell me generally your understanding of the Astoria property?

A I'm not a party to it.

Q And your role again with Respondents is what?

A You're asking me personally?

Q Yes.
A Which respondents?
Q Any of the above: Hawks PVO Holding LLC; Merchant's Holding 1 LLC; PVO Holding LLC, Merchant's Holding 2 LLC; PVO JV LLC; Hawks PVO LLC; Merchant's Walk Apartments LLC.
MR. KAHANE: Objection as to form.
A I'm an investor.
Q Okay. And how is Valor Residential Group related to those entities?
A Don't know. You would have to ask them.
Q You are -- what is your role with Valor Residential?
A I'm a member.
Q Okay. And what is your title with Valor Residential?
A I've had a couple. Currently, I am the CEO.
Q Okay. So as the CEO of Valor, I assume you're going to have some personal knowledge of its businesses, correct?
A Yes.
Q So what is your understanding then with that background as to the role that Valor

plays for those entities that we talked about?
A It's a management company.
MR. ANDERSON: 66. Okay.
Q And does Valor do the management for those entities' properties?
A It does not do the management for those entities, no.
Q Okay. Does Valor handle management for PVO property and Hawks property?
A Yes.
Q It did in the past, but no longer, I presume?
A Correct.
Q And in regard to those properties --
MR. ANDERSON: Thank you. I appreciate it.
Q I'm handing you what we're going to mark as Exhibit No. 1. And if you can take a look at that, please.
A Okay.
Q So in here, there's some identifiers up top; Astoria Owner LLC and Cape Fear Multi-Family LLC.
Are either of those names familiar

to you?
A I've heard of them.
Q Okay. Can you tell me how you've heard of Astoria Owner LLC?
A I believe it was the entity that was going to purchase this Astoria property.
Q Okay. And did you have an interest in Astoria Owner LLC?
A I don't believe so.
Q Did Valor have an interest in Astoria LLC?
A No.
Q Do you know who actually had interest in Astoria Owner LLC?
A No.
Q Was the purchase of this Astoria property in any way related to the Hawks property or the PVO property?
A The seller was Maxus.
Q Okay. On all three properties, or are you saying on the -- I'm sorry. Strike that.
Are you saying Maxus was the seller of Astoria Owner LLC?
A I believe -- no, Maxus was the seller of Cape Fear Multi-Family.

(Clarification by the court reporter.)

Q That's another poor question.

It was actually -- what you're saying is it was the seller of this Astoria property generally that's identified in this Exhibit 1, correct?

A Yes.

Q Okay. And was it -- how was that related to Hawks property or PVO property?

A The seller of this property was at the time going to be the preferred equity provider for Hawks and PVO.

Q Okay. Was there any interrelationship between those three deals?

A Yes.

Q Okay. Can you tell me how?

A Mr. Johnson conditioned the closing of the preferred equity in Hawks and PVO to the signing of the contract on Astoria.

Q And how did he condition those?

A He said we need to sign the -- he said that the Astoria Owner contract needs to be signed prior to him funding the money for Hawks and PVO.

Q Okay. And we see on this document here, this Exhibit 1, the date of June 16, 2022, correct?

A Yeah.

Q When we look at -- let's see if you recall this offhand.

When we look at the LLC agreements related to the Hawks property and the PVO property, would you agree with me that June 16, 2022 is also the closing date there?

A I can't say for certain.

Q Okay.

MR. ANDERSON: Can we pull those, please, Logan?

(Exhibit 1, Purchase and Sale Agreement, dated June 16, 2022, was marked for Identification.)

(Exhibit 2, Limited Liability Company Agreement of Merchant's Holding LLC as of June 16, 2022, was marked for Identification.)

Q I'm going to let you take a look at that for a second, please, Mr. Meisels. "That" being Exhibit 2.

And that is the Limited Liability Company Agreement for Merchant's Holding 1 LLC,

correct?
A Yes.
Q And that has a date of June 16, 2022, correct?
A Yes.
Q Do you recall which property this Merchant's Holding 1 applies to? Is it Hawks or PVO?
If you want to take a look at Page 6, it might help. Page 6 with the definition of "land."
A It says Hawks.
Q Okay. So would you agree with me, and we talked about this before in your corporate capacity, there were two LLC agreements applying to the Hawks property and two LLC agreements applying to the PVO property?
A Yes.
Q And those four agreements, outside of identifying maybe certain amounts or certain names of investors in both properties, were pretty much identical as far as their terms, correct?
MR. KAHANE: Objection; calls for a legal conclusion based on analysis of a legal document.

A You would you have to ask my attorney that.
Q Okay. As far as your personal knowledge goes, is there anything that was materially different in those under the terms?
MR. KAHANE: Objection; calls for a legal conclusion.
A I wasn't personally involved in these entities.
Q But you've reviewed these LLC agreements, correct?
A Not in my personal capacity, no.
Q And turning to the final page of this exhibit, did you take a look there at the -- the final few pages, I'm sorry, and just verify whose signatures are on there for Merchant's Walk Apartments?
A They look like -- there appears to be several signatures.
Q Okay. And does Mr. Weingarten's signature appear on there?
A Yes.
Q Okay. Mr. Weingarten is your partner, right?
A Not in my personal capacity, no.

Q How is he your partner then?
A We are partners in certain entities, but not in my personal capacity.
Q Right.
So what entities are you guys partners in?
A I don't know all of them offhand.
Q Is it a lot?
A Yes.
Q Does that include Valor?
A Yes.
Q And Valor Residential Group, is that the proper name?
A Yes.
Q And is that the name of the entity that also does property management?
A I believe so.
Q And is that the entity that managed the PVO property?
A Yes.
Q And the Hawks property?
A Yes.
Q So we're talking about Astoria. And my understanding is that you said the PVO property, the Hawks property, and the Astoria

property were conditioned together, correct?
A By Mr. Johnson, yes.
Q How were they conditioned together?
A In early 2022, we were looking at purchasing Hawks and PVO. We had spoken to an equity broker to arrange some preferred equity for us to purchase the properties.
Q And we're talking about the Hawks property and the PVO property?
A Correct.
Q Okay.
A He identified several groups that were interested. MaxMez was one of them. We went through conversations with each one and we ultimately chose MaxMez to be the preferred equity provider for these two properties, for Hawks and PVO.
At the same time, MaxMez was -- unrelated to what we were doing, they were going through a restructuring where they were selling off properties they had owned previously in order to -- I guess I shouldn't say why. I don't know why. But they were selling off their properties. They were a bit too late in selling them off. So

the market was really good in 2020 and 2021. They only started selling them off a little bit later, so they were probably six months late to executing on what they intended on, based on what we were told.

In around March or April of 2022, we entered into an agreement with Maxus for them to invest $14,000,000 as preferred equity in Hawks and PVO; $7,000,000 apiece. Closing date was set for June 1st. We were working together to get this done. Everybody knew the date was June 1st. Everybody understood that that's the date that the contracts for purchase expires, so we needed to close by June 1st.

At one point prior to June 1st, we got a commitment from Maxus that they're going to fund this amount of money but that they needed an additional two weeks to -- I forget if it was put the money together or for whatever reason they needed an additional two weeks, so they asked if we can extend the contracts by two weeks. At this point, the sellers were quite annoyed. The contracts -- June 1st was the latest date in the extension for the contracts for both properties. And June 1st was an absolute drop dead. There was

nothing beyond June 1st.

Q Okay.

A So when Maxus asked for June 15th or 16th, or a two-week extension, it was out of the ordinary. It was something that was unprofessional. They should have known that -- I mean, they did know that the target was June 1st. They knew back in March when we spoke to them that everybody knows the date is June 1st. And we were -- perhaps it was May 31st, but that's -- you know, approximately that's when it was. It was one of those two dates. And we had to close on June 1st.

So when they requested a two-week extension, it was -- they admitted to us that it was solely their fault, they had some internal issue, and they would not -- they asked us to go arrange an extension with both sellers of Hawks and PVO.

This wasn't something we were expecting. Was not something we were anticipating. They -- we already had our documents buttoned up. We had our agreements and everything we were thinking of doing. Property management, was getting ready to get set up for

June 1st. Everything was set for June 1st. And they had knowingly asked -- knowing that all of this was taking place and everything was ready to go, they asked for an extension beyond June 1st for about two weeks.

So we negotiated with the sellers an extension for a couple of weeks in exchange for us releasing several million dollars to the sellers of these properties as a show of good faith, whereas if we don't close by these dates the sellers can keep those millions of dollars and we would forfeit that amount of money.

At the same time -- or, rather, probably middle of May, we had started having conversations with Maxus independently about various properties that they had that they were looking to sell, one of which was Astoria. So we mentioned to them that we would be interested in buying the property. And I forget the exact price that we spoke about, but it was approximately $62,000,000, if memory serves.

Q Okay.

A We started negotiating the contracts at the end of May, approximately. And the contract was -- by the end of May, which

should have been the closing date for Hawks and PVO, the contract was not ready. The contract to purchase Astoria was not ready. There was still a fair amount of going back and forth, but nothing had been signed and we didn't have a timeline on that one just yet.

Q Okay.

A Versus Hawks and PVO, we were -- down the road, we obviously had signed a contract many months prior to that. We already had a lender lined up. We had negotiated loan documents. We had spent a fair amount of time doing due diligence, which was complete, setting up the property management company in place for Hawks and PVO which was done at the time. So this is all at the end of May.

And then when Maxus requested the extension. Again, they knew everything was all set up and ready to go at the end of May, but it was solely an internal thing that they needed an extra two weeks or so to get this done.

On or about June 1st, we released several million dollars to the sellers of Hawks and Park at Village Oaks as nonrefundable earnest money, which we were responsible for. And, like I

said, this was engineered by Maxus solely for the purpose of us to release millions of dollars to the sellers so we would be forced to close regardless of whatever happened. And, again, it was solely because of MaxMez, their internal needs to raise capital or put -- some internal needs that they had that weren't shared with us.

On June -- on or about June 9th or 10th, we heard from MaxMez that they're ready to close.

Q On which property?

A On Hawks and PVO.

Q Okay.

A However, they needed to reduce their commitment amount from $14,000,000 down to $11,000,000. It could have been June 12th, June 13th. I don't remember the exact date. Somewhere around there. A couple of days before closing. Which is very unusual. It's unheard of it. It's called a retrade. It's not something commonly done by stand-up people. It's something that's never done by anybody who's stand-up and professional.

Obviously, we were spending months negotiating documents. We had an understanding.

We had an agreement of how much they're going to be contributing. And to force us to extend the property -- to force us to extend the contract with Hawks and PVO by inducing us to release millions of dollars to the sellers and, therefore, putting us at risk for their own purposes with the plan that they were going to reduce the proceeds of their commitment amount so we would not be able to close unless we capitulate to their demands on Hawks and PVO. Because if we didn't capitulate to them, they would -- we would lose the millions of dollars that we had released to the sellers.

So several days prior to June 16, 2022, Maxus informed us that two things would be happening. (A), even though they had already committed to $14,000,000, they're reducing the -- their investment to $11,000,000, just arbitrarily without any sort of explanation or any sort of logic. There was no formula that they calculated this by. There was no underwriting that changed. There were no DSCR tests that were redone. Everything was firmed up. There were no new numbers that had come to light. It was a sole just -- it was a decision purely to spite us and to force us to do things that were uncomfortable

and capitulate to any demands MaxMez would have, because they knew we had released all these millions of dollars to the sellers and if we didn't close by June 16th we would lose all that money, which was our money and not Maxus' money. They had no downside in any of this. That was the first condition.

The second condition was that they would not fund anything whatsoever, not even the $11,000,000, unless we signed a contract on Astoria for approximately $62,000,000 and put up $2,000,000 in escrow nonrefundable.

At that point, we hadn't finished our due diligence on the Astoria property. We were not ready to buy it for $62,000,000 and we were not ready to sign the contract for $62,000,000. The contract was -- the way I understood, is that we needed to put up $2,000,000 as an earnest money for the benefit of Maxus. If the contract defaulted, that was completely nonrefundable with no due diligence period in the -- or no inspection period in the contract.

We were not ready to sign the contract. We didn't have our diligence completed. We hadn't reviewed this to the same extent as we

do any property that we purchase. So this was purely a blackmail in order to induce us to sign a contract that we were not ready to sign to buy a property that we were not ready to buy for a price that we not ready to pay, which Maxus knew full well and knew all about but did this for the sole purpose of if we put up $2,000,000 as a nonrefundable earnest deposit, they would be entitled to keep it if we didn't close on this property; which we at that point were not looking to close. We didn't know everything that we were trying to figure out about the property.

And so we got an email from Dave Johnson conditioning the closing of Hawks and PVO and funding the already committed $11,000,000, or now reduced $11,000,000, which should have been 14, that he would not fund it until we signed this contract. And he held it as an amount over our heads to force us to do something that we didn't want to do, knowingly -- knowing, rather, that we had released millions of dollars to the sellers of Hawks and PVO, which would put us under tremendous pressure to sign whatever he made us sign or whatever he asked us to sign because the alternative would be losing millions of dollars in

earnest money to the sellers of Hawks and PVO.

This is something, as I mentioned, that is very -- it is only practiced by, I'm gonna say, barbarian type of people. I never experienced it before. We hadn't been exposed to such behavior, so we weren't used to it. We didn't know how to deal with it. And we were told that he's -- that Maxus is just being a little forceful but they're ultimately nice people and they'll deal in good faith and, if we don't want to buy Astoria, they'll work with us and we shouldn't worry about it.

We foolishly believed that. So on June 16th, we both signed the contract for Astoria and closed on Hawks and Park at Village Oaks. MaxMez funded the $11,000,000 on June 16th. We had to go scramble to figure out an additional $3,000,000 that MaxMez shorted us from 14 down to 11. As I mentioned, we only had a couple days' notice to figure that out. And that's -- you know, so that's what happened on June 16th.

Q So who did you go to to come up with the additional $3,000,000 on Hawks and PVO?

A We went to our existing investors.

Q And you were able to raise those

funds?
A Yes.
Q And those properties closed on the 16th?
A Yes.
Q And then I showed you -- I think it was -- sorry. We're so close together, that I'm, like, leaning over on you. I apologize. I think I showed the purchase and sale agreement, this Exhibit 1, on Astoria.
The date on that is also June 16, 2022, correct?
A Yes.
Q And that's the same date as the PVO and the Hawks property deals, correct?
A Yes, which is not a coincidence. That never happens. The only way that would happen is if we were forced to do something, as evidenced by all the various emails from Mr. Johnson to us forcing us to sign the contract on June 16th to purchase Astoria in advance of him funding his $11,000,000 as he had promised several months back to fund the purchase of Hawks and Park at Village Oaks.
Q Okay. And you said that you

started looking at the Astoria property in approximately May of 2022; is that correct?
A Yes.
Q And do you recall what broker you worked with on that?
A No.
Q But there was a broker in between MaxMez and yourself in that time frame, right?
MR. KAHANE: Objection as to form.
A There was a broker who negotiated the preferred equity between us and MaxMez as it relates to Hawks and PVO.
Q Okay.
A Which was completely unrelated to Astoria. I don't remember if there was a broker involved in Astoria or not.
Q Okay. How would you have found Astoria then?
A I wouldn't.
Q How would Max have found Astoria?
A You would have to ask him.
Q Did you ever ask Max how he found Astoria?
A No.
Q Is it typical that there's a

listing for a property and you submit a bid?

A Could be.

Q Were you involved in any bids on the Astoria property?

A I don't remember.

Q And looking at this Exhibit 1 -- sorry -- well, I'll just ask: Have you seen this Exhibit 1 before? When you had a chance. I'm sorry. I'm grabbing it from you. Oh, my gosh.

MR. ANDERSON: Can you help me get back to Tab 66? I'm sorry, Logan.

A I can't say for certain that I have.

Q Okay. And on Page 30 -- well, there's two Page 30s on this exhibit -- it has a signature on one side that says Cape Fear Multi-Family LLC by Adam Fletcher, and then the signature on the other side is Astoria Owner LLC, and it says Moshe Weingarten.

Do you believe that's Moshe's signature?

A You would have to ask him.

Q Does that look like Moshe's signature to you?

A Don't know.

Q You don't recognize Moshe's signature?

MR. KAHANE: Objection; asked and answered.

A I don't know.

Q Do you recognize Moshe's signature when --

MR. KAHANE: Objection; asked and answered.

Q -- when you see it?

A No.

Q Okay. And then let's go to --

MR. ANDERSON: Could you do the tab for 67, please? This is going to be exhibit what?

MR. FANCHER: 3.

MR. ANDERSON: Thank you. Appreciate it.

(Exhibit 3, First Amendment to Purchase and Sale Agreement, dated July 19, 2022, was marked for Identification.)

Q And I'm handing you what's been marked as Exhibit No. 3.

And that's entitled First Amendment to Purchase and Sell Agreement, correct?

A Yes.
Q And it references the date July 19th of 2022?
A Okay.
Q Okay. And then we see on the back page signatures; Moshe Weingarten and, again, Adam Fletcher, correct?
A Appears to be.
Q Okay. And this is approximately five weeks after the initial purchase and sale agreement, correct?
A Yes.
Q Do you recall, how did MaxMez or Dave Johnson force you to offer -- make an initial offer on the Astoria property?
MR. KAHANE: Objection; asked and answered.
A I don't think he forced us to make an initial offer on the property.
Q Okay. How was that initial offer made then?
A Don't know. I didn't do it.
Q But we do see a purchase and sell contract for $62,500,000.
Does that sound like the correct

amount that was offered?
A I don't know.
Q And then we see this July 22nd, amendment, correct?
A Yes.
Q And what's the purchase price changed to?
A $60,500,000.
Q How did that happen; do you know?
A No.
Q Were you involved in that?
A No.
Q And you'd agree with me that this is five weeks after the initial contract appears to be signed, correct?
A Yes.
Q And this is some five weeks after the PVO property and the Hawks property had closed, correct?
A Yes.
Q Did you go ahead and buy the Astoria property? Did this close?
MR. KAHANE: Objection as to form.
A No.
Q Why did it not close; do you know?

A No.

MR. ANDERSON: Please hand me Tab 65.

(Exhibit 4, Landmark Abstract Agency, LLC deposit letter, dated July 19, 2022, was marked for Identification.)

Q I'll hand you what's been marked as exhibit 4, Mr. Meisels.

A Okay.

Q Who's Landmark Abstract Agency LLC?

A A title company.

Q What title company?

A Landmark Abstract Agency.

Q Is that one you work with regularly?

A Occasionally.

Q Who's Jacob Rekant?

A He works for them.

Q And do you know what his role is there?

A No.

Q And this letter's dated July 19th, correct?

A Yes.

Q Regarding the Astoria apartment homes, correct?

A Yes.

Q It says, "This letter shall confirm we are holding the sum of $2,000,000 for the purchase of the above-referenced transaction," correct?

A Yes.

Q And, again, the above-referenced transaction is the Astoria apartment homes, correct?

A Yes.

Q Did Landmark Abstract Agency, on July 19th, have $2,000,000 held?

MR. KAHANE: Objection as to form. Objection as to speculation.

A No.

Q Why not?

A I don't know.

Q Did you all send $2,000,000 at any point to Landmark Abstract Agency regarding the Astoria transaction?

A No.

Q Why?

A I don't know.

Q So Mr. Rekant says, "This letter shall confirm we are holding the sum of $2,000,000."

Is Mr. Rekant's letter a lie?

A You would have to ask him.

Q But you know it's not correct, right?

A Correct.

Q Did you ask Mr. Rekant to draft this letter?

A No.

Q Did Mr. Weingarten ask Mr. Rekant to draft this letter?

A I don't know.

Q So you said that there was blackmail. That Mr. Johnson had blackmailed you, correct?

A Yes.

Q Because he forced you to buy Astoria, correct?

MR. KAHANE: Objection as to form. Objection as to mischaracterization of the witness's testimony.

A He forced us to sign a contract we didn't want to sign at a price we didn't want to

sign to buy a property that we were not ready to buy solely for the purpose of forcing us to do so so he would -- and if we didn't, he would fund -- he would not fund his promised $14,000,000, which then got reduced to $11,000,000, on June 16th for the purchase of Hawks and PVO.

Q And so Hawks and PVO closes, correct?

A Yes.

Q And Astoria had a signed contract on the same date in June 2022, correct?

A Yes.

Q And there's another contract, an amendment, in July for $2,000,000 less, for approximately $60,000,000 at that point, correct, for Astoria?

MR. KAHANE: Objection; asked and answered.

A Don't know.

Q And I'm sorry. What question are you responding to at that point?

A You asked me the difference, I believe, between the price.

Q Okay. So we can look at the first amended -- we see -- in Exhibit 1, we see

$62,5000,000. And then in Exhibit 4, I think it's over here --

MR. ANDERSON: Mr. Kahane, is it okay I'm reaching over like this?

MR. KAHANE: Sure. Exhibit 4 is the Landmark letter.

MR. ANDERSON: I'm sorry. Exhibit 3. Thank you, Mr. Kahane.

Q And then we have the first amended there with Exhibit 3.

Do you see that?

A No.

Q Sorry. I'll let you look at Exhibit 3.

MR. KAHANE: Can you just state the question that you're asking him?

MR. ANDERSON: So Mr. Meisels is discussing the difference between the prices that were going to be paid on Astoria.

MR. KAHANE: What's your question?

MR. ANDERSON: I'd have to have it read back to be exact.

(The question was read back as follows:

"QUESTION: And there's another

contract, an amendment, in July for $2,000,000 less, for approximately $60,000,000 at that point, correct, for Astoria?")

Q I think Exhibit 3 -- Exhibit 1 and Exhibit 3 will be what you might want to look at.

So in Exhibit 1, the purchase price is on Page 3. On Exhibit 3, the amended purchase price is on Page 1.

A Okay.

Q And so would you agree with me that the price went down approximately $2,000,000 between those two items?

A Yes.

MR. KAHANE: Objection.

Q And the second price is $60,500,000 on July 19, 2022, correct?

A It would appear so.

Q And without Astoria, this first amendment didn't go to closing, correct?

A Correct.

Q Was another price negotiated off of the $60,500,000; do you know?

A I don't know.

Q Do you know why this property

didn't go to closing?
A No.
Q Who would know that?
A I don't know.
Q Would Mr. Weingarten know that?
A He might.
Q Was Mr. Weingarten negotiating this Astoria deal; do you know?
A Probably.
Q Can you explain to me how it's blackmail to condition one deal on another deal five weeks later?
A It's blackmail, as I mentioned, to condition the signing of a contract of a property that we were not ready to buy, we had no interest in buying, at that time we weren't ready to buy, we hadn't completed our due diligence. And on June 16th, we had to close on Hawks and Park at Village Oaks.
We were ready to close on June 1st on Hawks and Park at Village Oaks. The contracts with the sellers of those properties had expired on June 1st of 2022. We were expecting to close then. The lender, the senior lender, Regions Bank, was ready to close on June 1st. We were

ready with our equity on June 1st. The property management company was working to get set up on June 1st. The loan documents were completed by June 1st and everything was ready to go on June 1st. MaxMez engineered the release of several million dollars to the sellers of Hawks and PVO for the sole purpose of putting us in a position where we would be pressured to do whatever they asked, because if we didn't we would lose those deposit monies that were already released to the sellers unconditionally subject to us closing on -- other than us closing on June 15th or 16th or thereabouts.

So they had engineered this to put us in a precarious situation in the first place that we didn't want to be in, we weren't looking for, we didn't ask for. They were aware of well in advance, and they purposely put us in that position by exploiting our trust where they had told us there's nothing to worry about and everything will be fine on June 15th or thereabouts. And by inducing us to do this, we were placed in a very precarious position where we would be forced to do whatever in order to get Hawks and Park at Village Oaks closed.

And then without any mention of Astoria being connected, it was a separate conversation that, as I understand, Max was having. It had nothing to do with us and I wasn't party to those conversations or aware of it. That's not my job. I was focused Hawks and Park at Village Oaks.

So on June 1st, they were completely disconnected; you know, Astoria and Hawks and PVO. Maxus engineered to put us in a precarious situation on Hawks and PVO on June 1st. So we were not in a precarious situation prior to that. And they put us in that position by telling us to trust them in the beginning of June, on June 1st. And we relied on that trust and on that basis to release those millions of dollars to the sellers of Hawks and PVO.

And then on June -- several days prior to June 16th, they told us they were going to reduce the funding now from $14,000,000 down to $11,000,000, and they also told us that they would not fund anything whatsoever unless we signed the contract that we were not ready to sign on June 16th.

None of this was conveyed to us

prior to us releasing those deposits to the sellers respectively of Hawks and PVO, and none of this was communicated, it wasn't contemplated. It was a complete surprise to us where they said if you don't sign this contract that you're not ready to do this for a price that you're not willing to pay, we're going to make sure you lose millions of dollars with respect to Hawks and PVO via the deposits that you've already released to the sellers, as well as previous costs that we had spent, you know, with the senior lender; we had done all the due diligence, we had spent the time, energy, and money with negotiating loan documents, we had spent the time and money negotiating with Maxus the preferred equity documents, setting up the management company for the takeover for the transition of the management. And all of that would be at risk simply at the whim of one person deciding, of Dave Johnson deciding, that he was in control. He would not allow any of this to happen, would force us to lose all of this money, time, effort, not to mention our reputation with both the sellers and the senior lender, simply for the purpose of his benefit, which was to sign a -- that we were to sign a contract that's only

beneficial to Maxus and not beneficial to us, induce us to signing such a thing.

And that's the definition of blackmail, where one party is forcing the other one to do something they don't want to do with, you know, a threat of if you don't do what I'm demanding you do, you're going to have a loss. You're going to lose this money. All these various things that we were facing.

Q So a lot of harm comes if the Hawks property and the PVO property equity deals don't close in June; is that correct?

A Yes.

Q And you're saying contingent on that or -- strike that.

As I understand it, you're saying Mr. Johnson required you to forward a contract in June and sign it on the Astoria property, correct?

A Yes.

Q And we see a contract -- and this is where I'm struggling. We see a contract five weeks later for $2,000,000 less on the Astoria property, Exhibit 3, right?

A Yes.

Q All of your negatives have gone

away with the closing in June of 2022, right?
A No.
Q What negatives in regard to Hawks and the PVO property are going to happen in July of '22?
A The fact that we had already signed a contract that we were not ready to sign, we were not prepared to sign, and we were forced to sign such contract.
Q And that was signed, though, in June of 2022, alongside the Hawks and the PVO equity contracts, right?
A No.
Q Didn't we just see the date on Exhibit 1 is the same date as the Hawks and PVO contracts; June 16, 2022?
A Yes, the closing happened on June 16th of 2022.
Q On the Hawks and the --
A Hawks and PVO.
Q And you signed a contract -- there's a contract for Astoria on June 16th of 2022 also for $62,5000,000, right?
A Yes.
Q So those are the same days,

correct?

A Yes.

Q And there's a reference to $2,000,000 hard on Astoria also, correct?

A In the contract.

Q Is that right?

A Of Hawks and PVO. Oh, I'm sorry. In the contract of Astoria, where the buyers are supposed to put up $2,000,000 completely nonrefundable without any due diligence or inspection period.

Q Okay. And then we see in July, July 22nd, a new contract with a purchase price $2,000,000 less on Astoria, correct?

A Yes.

Q And that doesn't go to closing, correct?

A Correct.

Q This is five weeks after the equity deals are done, correct?

A Yes.

Q So what harm do the Hawks or PVO entities suffer if everything's being renegotiated on Astoria in July, five weeks later?

A There were several things. First

of all, we were forced to sign this first amendment to the Astoria contract. And the fact that we had already signed a contract that we didn't want to do.

Q Who at MaxMez came to you and demanded $2,000,000 less for the Astoria property in July 2022?

A I don't know.

Q Does that make sense to you, $2,000,000 less?

A Yes.

Q Is it normal for sellers to come to you and say, I want to reduce the price of what I'm selling to you?

A Yes.

Q When does that happen? Explain that to me.

A So in this instance, the property was only worth about $55,000,000, by our guess. 62.5 was grossly inflated. $60,500,000 was grossly inflated as well by only about $5,000,000 versus $7,000,000 previously, but they were still both grossly inflated values of more than what the property was worth.

Q Okay.

A So --

Q Go ahead.

A Basically, what they were saying was, we'd like to steal $7,000,000 from you. We were unsuccessful; however, we would now like to steal $5,000,000 from you and -- you know, by way of having a purchase price which is $5,000,000 more than the property's worth.

Q Who at MaxMez forced you in April or May to come forward with an initial off of $62,500,000 on Astoria?

A I didn't come forward with an initial offer of 62.5.

Q Where did the $62,500,000 come from then?

A Don't know.

Q You have no idea how that came in to being on the purchase and sale agreement?

MR. KAHANE: Objection; asked and answered.

Q Who would know that?

A I don't know.

Q Would Mr. Weingarten know that?

A He might.

Q So you recall the value of the

property, Astoria, being $55,000,000, correct?
A Approximately.
Q When did you know that?
A Just now. You just asked me, so I just told you.
Q No. You told me $55,000,000 in your prior answer.
Do you recall that?
A Yes.
Q Okay. Where did that number come from?
A That was what I thought the property was worth.
Q When?
A What's your question? When was the property worth $55,000,000?
Q In your opinion, yes.
A I don't know what it's worth now. But, you know, in June or July of '22, that's what I thought.
Q And your testimony is somebody or Dave Johnson at MaxMez forced you to forward an offer for $62,500,000 on that property, correct?
A No.
Q Okay. How did the offer of

$62,500,000 come in?
A I don't know.
Q But we agree that Astoria Owner LLC made that offer, correct?
A No.
Q Then is it your thought that Mr. Weingarten's signature is not on Exhibits 1 and 3?
A Mr. Weingarten was forced to sign a contract for a price that he didn't want to do on a property that he didn't want to buy.
Q And so my question is: Who forced the initial offer to come in?
A I'm not talking about the initial offer. I'm talking about this contract had a number, $62,500,000, which we were not willing to pay. So we didn't put that number in there. Maxus put it in there and forced us to sign it.
Q So MaxMez -- Maxus, I'm sorry, sent you a contract for $62,500,000 for the Astoria property?
A Yes.
Q How did that come in?
A I don't know.
Q Was it mailed or emailed?
A I don't remember.

Q Did it come to you or did it come to Mr. Weingarten?
A It did not come to me.
Q Mr. Weingarten shared it with you, I presume?
A It's possible. I don't remember.
Q I mean, you guys are partners and have regular business dealings, correct?
A Yes.
Q I assume this has got to be a discussion point, this Astoria and Hawks and PVO. This got to be an ongoing discussion point between you, correct?
MR. KAHANE: Objection as to form.
A Hawks and PVO are. But Max handles acquisitions and I don't.
Q But a $62,500,000 potential acquisition is something you all would discuss in the regular course of business, right?
MR. KAHANE: Objection as to form. Objection; asked and answered.
A Not necessarily.
THE WITNESS: I'm going to grab some water.
MR. ANDERSON: Do you want to do a

quick five-minute break?

THE VIDEOGRAPHER: All right. The time is 11:14 and we are off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is 11:29 and we are back on the record.

Q Mr. Meisels, do you have an ownership interest in Landmark Title?

A No.

Q Does Mr. Weingarten have an ownership interest in Landmark Title?

A I don't know.

Q Do you have a personal relationship with anyone that is employed by or owns a piece of Landmark Title?

A I don't know.

Q You don't know if you have a personal relationship with anyone in that capacity?

A I know who I have a personal relationship with, but I don't know if anybody that I do has a piece of Landmark.

Q Okay. Do you have family members that work there?

A Not that I know of.

Q So can you take a look at that Exhibit -- I believe it's Exhibit 2. And Section 10, please.

MR. ANDERSON: Sorry. Can you help me out with that? Or let's just see if I can't pull it up here.

MR. FANCHER: (Inaudible.)

MR. ANDERSON: Yeah.

Q So that section's entitled "Dissolution" correct?

A Yes.

Q Can you tell me if this was ever enacted or if this was ever used?

MR. KAHANE: Objection as to form. Objection; call for a legal conclusion.

A You would have to ask the -- somebody from this company.

Q Okay. And so you personally have no knowledge whatsoever as to whether dissolution occurred; is that correct?

A You would have to ask someone from the company.

Q And let the reflect that you are looking at Mr. Kahane before you're responding to that, correct?

MR. KAHANE: I think he was waiting on me on object.

MR. ANDERSON: Okay.

THE WITNESS: I was.

Q And take a look at Tab 74. I'll hand you what has been marked as Exhibit 5.

(Exhibit 5, Email to Mr. Kahane from Mr. Lubin, dated July 23, 2025, and Certificates of Cancellation for Merchant's Holding 1 LLC and Hawks PVO Holding LLC, was marked for Identification.)

Q Have you seen that email before?

A Not in my personal capacity.

Q Well, if you received the email, you received it in your personal capacity too, correct?

A No.

Q So you've never seen this?

A I haven't received it in my personal capacity.

Q But you received it in a corporate capacity; is that what you're saying?

A You would have to ask the corporate representative.

Q So the question is to you: Have

you received this email?

MR. KAHANE: Objection; asked and answered.

A You would have to ask the corporate representative.

Q Okay. Have you spoken with Mr. Lubin about the dissolution of this company? Actually, these two companies. I apologize.

A You would have to ask the corporate representative.

MR. ANDERSON: Can I get Tab No. 16A, please?

(Exhibit 6, Email thread, Bates stamped MaxMez00007708 - 7711, was marked for Identification.)

Q I'm going to show you what's been marked as Exhibit 6. Why don't you take a look at that, Mr. Meisels, please.

A Okay.

Q These are some emails around roughly December 12, 2023 in regards to the PVO property, correct?

A Yes.

Q And at the top, it says, "Hand you over the property?" On December 12, 2023, it

says, "Hand you over the property??? Why would I do that? We were having a conversation."
Do you see that?
A Yes.
Q What does that mean?
A Don't know.
Q You're on this email thread, correct?
A Yes.
Q And what did that mean to you at the time?
A I don't know.
Q So, obviously, as we look over this, this is talking about returning the PVO property or handing the PVO property over to MaxMez, correct?
A I wouldn't say it's obvious.
Q Looking at it, would you agree with me that that's the context here?
A No.
Q Ryan Snyder, on December 11th, says, "Max, as we discussed, we intend to cooperate to make this an orderly transition. I have reached out to Regions Bank, Ryan Myrick, to get the process started on the lender's side.

Cheryl Marshall is copied here. She is our COO and will be sending one of our regional managers to the site in the next couple of days. We would like to walk the property and walk at a minimum all of the vacant units. You can always reach out to me and I think it is critical that you and I stay in communication. Please let me know if there is someone else on your side we should communicate with."

And, in response, Mr. Weingarten writes, "Ryan" -- and I assume that would be Ryan Myrick, correct? -- "We are discussing with our attorneys how to go about this. Once all is clear from the legal perspective, we can work on a proper transfer."

You see both of those things, correct?

A Yes.

Q And you're saying it's not clear this is talking about returning the PVO property to Maxus; is that right?

A Correct.

Q What would be your interpretation of this?

A It could be many things, but it

could be taking over property management. I don't know.

Q At the PVO property?

A Yes.

Q Okay. So your thought is that it could be taking over property management of the PVO property, correct?

MR. KAHANE: Objection; asked and answered.

Q And Max's response: "Hand you over the property? Why would I do that? We were having a conversation. As I told you, we are always happy to talk."

What does that mean to you, Mr. Meisels?

A I'm not going to interpret what Max may have thought or said.

Q But I want to know what it meant to you, Mr. Meisels.

A I don't know.

Q What changes Max's mind?

A I have no idea.

Q Did you talk to Max about this?

A I don't know.

Q Isn't one of your defenses in this

matter that Maxus was, at times, contacting directly Regions Bank?

A I'm not a party to this litigation.

Q You actually are a party to this litigation here. You're named in it personally.

You know that, right?

A If you say so.

Q Would you like me to show you the petition so that you can see, or will you agree with me that you're a party to this litigation?

A Show it to me, please.

Q No problem.

MR. ANDERSON: I did not mark this as an exhibit today. Mr. Kahane, do you have any issue with me not marking this and just showing him on my laptop? Would you like to see it first?

MR. KAHANE: I'm not sure what you're showing him.

MR. ANDERSON: I'm going to show him the petition that shows him as being named personally.

MR. KAHANE: Why don't we just show him his Notice of Deposition?

MR. ANDERSON: Well, he asked for

the petition. But I'm happy to do that. I'm agreeable to that, Mr. Kahane.

THE WITNESS: Okay.

Q Okay. So you'd agree with me that you're a party here, correct?

A Yes.

Q And you understand -- would you agree with me that one of the defenses being leveled is that MaxMez reached out to Regions regarding the PVO property in approximately December of 2023?

MR. KAHANE: Objection as to form. Objection; that's a legal conclusion, and the defenses asserted in this case by the Respondents are legal defenses.

Subject to that objection, Mr. Meisels, if you know the answer and want to answer --

A That's a question for my attorney.

Q We see here in December 2023 that Mr. Snyder from MaxMez is saying that he's having conversations with Regions, correct?

A Yes.

Q Okay. Thank you.

MR. ANDERSON: I may have to

remove a few items.
I'm going to apologize to you both. We're having a little binder problem getting over to exhibits.
Thank you.
(Exhibit 7, Letter from MaxMez NC, LLC Re: Drag to Market Notice, dated June 17, 2024, was marked for Identification.)
Q Here's Exhibit No. 7, sir. Why don't you take a moment to look at that, please?
And that's dated June 17, 2024, correct?
A Yes.
Q And do you recall receiving this letter?
A Yes.
Q Approximately when?
A I don't remember.
Q Would it have been in June 2024?
A Yes.
Q And that is a drag to market notice, correct?
MR. KAHANE: Objection; calls for a legal conclusion.
A Don't know.

Q Are you familiar with the term "drag to market?"
A Yes.
Q We looked at that as an exhibit to the LLC agreement, Section 16, correct?
MR. KAHANE: Objection. He did not look at that. That mischaracterizes the deposition.
A No.
Q And do you mind looking at Section 16 in Exhibit 2, please.
A Okay.
Q And now I'll just let you take a second to be familiar with that and ask the question again.
Are you familiar with what "drag to market" means?
MR. KAHANE: Objection; calls for a legal conclusion.
A Yes.
Q Can you kind of distill it really quickly for me?
MR. KAHANE: Objection; request for distillation requires analysis of a legal document and drawing a legal conclusion. He's not

a lawyer.
A Repeat the question.
Q What's it mean to you?
A I don't know.
Q And you received this Exhibit 7, you testified.
And did you respond to it?
A I don't remember.
Q Do you know if Valor responded to it?
MR. KAHANE: Objection. He's not the representative of Valor.
A You would have to ask Valor.
Q They're on here. I'm asking you: Do you know if they responded to it?
A I don't know.
MR. KAHANE: Objection.
Q Do you know if Mr. Weingarten responded to it?
MR. ANDERSON: I'm sorry, Mr. Kahane. I just jumped right in.
MR. KAHANE: I object. Again, he is not the representative of Valor and does not speak for them.
Q Do you know if Mr. Weingarten

responded to it?

A I don't know.

MR. ANDERSON: Tab 35, please.

(Exhibit 8, Letter from CBRE to Mr. Meisels, attaching opinion of value, was marked for Identification.)

Q I'll hand you what's been marked as Exhibit No. 8, sir.

MR. ANDERSON: Mr. Kahane, can we break like noon or shortly after if nothing pending to grab a quick lunch?

MR. KAHANE: If that works for you, sure.

MR. ANDERSON: That's fine.

MR. KAHANE: I would note that on your deposition notice, you noticed the corporate representative for 10 a.m. to be concluded by 2 p.m., and Mr. Meisels at 2 p.m. So I'm not exactly sure how exactly you're handling that, but it looks like your designate times are a little bit different than the way you've chosen to operate this morning.

MR. ANDERSON: Okay.

Q So, sorry, I'm letting you take a look at that exhibit. I appreciate you looking at

it, sir.

Have you had a chance to look, Mr. Meisels, or do you want another second?

A A second.

Q I'm sorry?

A One second, please.

Q Yes, sir.

A Okay.

Q So this is a bit of correspondence from CBRE, it appears, to you; is that correct?

A Yes.

Q And what property is it in regard to?

A Park at Village Oaks.

Q And on that first page, it says, "Please let us know if you have any questions. We look forward to working with you."

Can you explain to me the dates that are listed down below there?

MR. KAHANE: To the extent that any of the questions being asked here are being asked of Mr. Meisels in his individual personal capacity, I would object to any questions asking him to analyze or interpret this corporate document.

Subject to that objection --
A These are dates that CBRE sent us in this email.
Q Okay. What is that first date?
A June 25th, coming soon launch with dock center.
(Clarification by the court reporter.)
Q And what does that mean?
A It means that on June 25th, CBRE is going to send out a blast email to prospective buyers about the coming soon.
Q Okay. And is that a list of prospective buyers provided by you?
A No.
Q Is it compiled by CBRE?
A Yes.
Q And July 9th, full OM launch.
What does that mean?
MR. KAHANE: Same objection as to any questions in Mr. Meisels's individual and personal capacity.
A I'm not sure.
Q Okay. Did you respond to them and ask what full OM launch means?

A No.
Q And July 23rd, initial offers. What does that mean?
A Initial offers.
Q From whom?
A Whoever wants to submit an offer.
Q On what?
A Park at Village Oaks.
Q And what happens with those initial offers when they come in?
A They are looked at and --
Q Are they passed along to Respondents in this instance?
MR. KAHANE: Same objection as to capacity.
A Yes.
Q Were they sent to you?
A Yes.
Q And were they written offers at that point?
A Some were written, some were verbal.
Q And so how were the verbal offers communicated to you on July 23rd?
A It wasn't necessarily on July

23rd, but there were various phone calls.

Q From your broker?

A Among others.

Q And during those phone calls, they said what?

A Purchase price, timing. And usually the way it works is they ask, hey, so and so wants to submit an offer in approximately -- with approximately these terms. Let me know if we should put it in writing or if it's something you guys would consider or not.

Q Why would they put it in writing?

A To keep track of them.

Q Otherwise, you just take an oral offer that's a good one to close?

A No, we would take it to contract.

Q You mean in writing?

A No, verbal.

Q A verbal contract, you would take it to close?

A No. We would take a verbal offer to a written contract.

Q Okay. So what was the best verbal offer?

A I don't remember.

MR. KAHANE: Objection.
Hold on.
Objection. If you're asking questions of Mr. Meisels in his personal capacity, I would object to any question that asks him to speak on behalf of the company.
Q Are there any verbal offers -- well, strike that.
Really quickly, the August 1st date, "Award," it says.
Do you know what that means, Mr. Meisels?
MR. KAHANE: Same objection. Would you like me to put a standing objection on?
MR. ANDERSON: That's fine.
MR. KAHANE: All right. I put a standing objection on. I would direct Mr. Meisels to only answer questions in his personal capacity that he has personal information and knowledge about. Any question that he has knowledge about in relation to his designation as a 30(b)6 representative should reserve for that deposition and should not be answered here.
But if Mr. Meisels has personal knowledge independent of his 30(b)6 designation,

then he's certainly free to answer any questions. I would object to all of these questions because all of them are 30(b)6-related questions.

And that would be as to all of the line of questioning. And I'll let you know otherwise if we get to a different line of questioning.

Q So the August 1st award date, can you tell me what that means?

A It's a tentative date that the broker would award the contract -- award the -- that they would inform whichever buyer was chosen that they would be the ones to, you know, have the opportunity to buy it.

Q Okay. Were there any offers pending at the time you received this; do you know?

A Yes.

Q Did you advise CBRE of the pending offers?

A Yes.

Q And how did they respond?

A They didn't.

Q Did you advise them that you were going to accept any of the pending offers?

A I don't remember.

Q Do you think they would have marketed the property if you were going to accept any offer?

A Yes.

Q Why would they do that?

A So we had discussions with CBRE well before this date. In order for them to prepare an email to go out on June 25th, we were having conversations with them in May and prior to that. We -- it's not realistic or possible to engage a broker and for them to send out a coming soon launch on the same day. So we were speaking to them in advance. We had had some offers prior to signing up with CBRE. And I had mentioned to them. And they weren't necessarily offers that we were willing to take, but they would be part of the mix once CBRE pushed it out to the rest of the world.

Q And so did CBRE contact these entities that had these pending offers?

A Don't know.

Q Did you pass the names of those entities on to CBRE?

A Don't remember.

Q Did you contact the entities that had the pending offers and tell them that you're CBRE market the property?

A Don't remember.

Q Would CBRE make a notation that this is subject to contract on their marketing pitch?

A I'm not understanding the question.

Q If there's a contract, wouldn't it make a notation that the property's subject to contract?

MR. KAHANE: Objection. In addition to all the other objections, that one calls for speculation.

A What contract are you talking about?

A If there's a contract in place on the property, wouldn't CBRE make a notation that this offering is subject to contract?

A If it was, then they probably would do so, yes.

Q Okay. But there wasn't a contract, correct?

A No.

Q Okay. So it wouldn't have included that notation in here, correct?
A I don't know.
Q Was it CBRE that ultimately helped you sell the PVO property; do you know?
A Yes.
MR. ANDERSON: Could you hand me Tab 36, please?
(Exhibit 9, Timesheet details, was marked for Identification.)
Q I'll show you what's been marked as Exhibit 9, Mr. Meisels.
MR. KAHANE: Mr. Anderson, the same objection that I had with regard to Exhibit 8 I have with regard to Exhibit 9 and all the questions associated with Exhibit 9.
MR. ANDERSON: Great.
Q So on here we see it's kind of a compilation of Mr. Lubin's timesheet entries. And I just wanted to draw your attention really quickly to the June 26th entry. It says, "Finish markup of CBRE listing agreement for PVO 2.10."
Do you see that?
A Yes.
Q Had you worked with Mr. Lubin on

the CBRE listing agreement?
A Not in my personal capacity.
Q But you have worked with him, it sounds like, or Mr. Weingarten?
MR. KAHANE: Objection; asked and answered.
Mr. Meisels, you don't have to answer the same question three times.
MR. ANDERSON: Actually, he hasn't answered, I don't think.
Q Do you mind repeating your answer, sir, if you've answered?
A What's the question?
Q I said: Did you work with Mr. Lubin on the CBRE listing agreement?
A Yes.
Q Was it a work in progress at this point? I know this is June 26, 2024, and it says, "Finish markup of CBRE."
So was it an ongoing edit process at that point, or was it just being worked on; do you know?
A I don't know.
Q Why do you get a listing agreement together for a property?

A The brokers request it.
Q And what do the brokers request it for?
A So they have an exclusive.
Q What's an exclusive?
A It means that they've been -- they are the only ones who can sell the property.
Q And, again, this is June 26, 2024.
So it's not complete at this point?
A I don't know.
Q Okay. And then I call your attention to July 3, 2024. It says, "Review CBRE revised agreement."
Do you think that's the same thing.
A I don't know.
Q "Call with Eli. Revised document."
You don't recall what you all discussed on July 3rd?
A No.
Q So once the broker gets an exclusive, help me understand this, then it issues a blast out to the public?

MR. KAHANE: Objection; calls for speculation.

A Possible.

Q And kind of proceeds with the marketing schedule that we looked at in a prior exhibit, correct?

A Yes.

MR. ANDERSON: So, guys, I don't know if this is super annoying, but would it make sense to break for the lunch really quickly? It's noon and I don't have a question pending. Thirty minutes?

MR. KAHANE: Can we go off the record?

THE VIDEOGRAPHER: The time is 11:57 and we are off the record.

(A lunch recess was taken from 11:57 a.m. to 1:27 p.m.)

AFTERNOON SESSION

THE VIDEOGRAPHER: The time is 1:27 and we are back on the record.

(Exhibit 10, Letter of Intent, dated May 25, 2022, was marked for Identification.)

Q Mr. Meisels, I'm going to show you what's been marked as Exhibit 10. It's a letter. I'll just give you a second to just take a look at that. It's a letter dated May 25, 2022.

A Yes.

Q It says Letter of Intent from Max Weingarten, correct?

A Yes.

Q And it's a Letter of Intent but a nonbinding Letter of Intent offering $62,000,000 regarding the Astoria property; is that correct?

A Yes.

Q Do you recall when this went out?

A No.

Q Did Mr. Weingarten let you know that this had been sent out?

A No.

Q Does this fit into the timeline

that we were talking about earlier with the Astoria property and an initial offer made?

A May 25th, yes.

Q Okay. So that would have been $62,000,000 offer made to MaxMez or Maxus, correct?

A Yes.

Q And why did this in out on May 25th; do you know?

A No.

Q Are you aware of anything Maxus or MaxMez did to make Mr. Weingarten send this on May 25th?

A They would have sent financials.

Q Okay. But that wouldn't have forced Mr. Weingarten to send this offer letter, correct?

A No.

MR. ANDERSON: Can I get Tab 37, please, Logan?

(Exhibit 11, Email thread, Bates stamped SUPP_DOC_PROD 001711 - 1731, was marked for Identification.)

Q I'm going to hand you Exhibit 11. Just take a quick look, Mr. Meisels. It's a

little email thread.

A Okay.

Q We talked earlier about the CBRE schedule regarding PVO. This is kind of a continuation on that front, if that makes sense.

Does that make sense?

A Okay.

Q Looking here, who is Joe Horowitz?

A Joe Horowitz?

Q Yeah. Do you know who Joe Horowitz is?

A I don't see him on here.

Q Okay. But do you know the name Joe Horowitz?

A Yes. He works for Josh.

Q Oh, Mr. Kahane?

A Yes.

Q Oh, okay. I'm sorry.

In what capacity is that? Is he another attorney?

MR. KAHANE: He's an associate of mine.

MR. ANDERSON: Okay. I'm sorry.

Q What about Kitty Gorn? I'm sorry. Gitty Korn. Apologies.

A She's an employee of Valor Residential Group.
Q Okay. And looking at around Page 14 of this exhibit, it looks like there's a clear engagement for CBRE on the PVO property in July of 2024, correct?
A What page?
Q It's Page 14. And I'll tell you what. It has the supplemental doc prod 001724, because it's --
A Okay. I'm looking at it.
Q Okay. And on there we see the date July 9, 2024, correct?
A Marketing launch date.
Q Yeah. And so it appears there's a revised marketing launch date for the PVO property of July 9, 2024, correct?
A Revised?
Q Yes. We looked at an exhibit earlier where there was an initial offer date for the PVO property?
A Yes.
Q Okay. And so I believe this is revised to be July 9th; is that correct? Do you know?

A Okay.
Q Again, marketing launch date would be -- is that synonymous with the blast email that would be out from CBRE?
A Don't know.
Q What do you think the marketing launch date would be then?
MR. KAHANE: Before you answer that, the objection I put on before lunch as to any questions asked of Mr. Meisels in his personal capacity that should be directed to him as a 30(b)6 representative, I would object to any of those both in terms of form and in terms of just being the proper party to answer these questions. Subject to that --
Q What was the question?
A I think I was asking what would -- marketing launch date, what would that entail; to your knowledge?
A I don't know.
Q So you didn't have any understanding at the time this email came down?
A I don't remember this.
Q Okay. And then looking over at Page 15 kind of on there, it says marketing report

in detail, July 16, 2024, do you see that?
A Yeah.
Q There's a line in there, and it goes for a couple of pages. And it looks like CA received 7/9/2024, and some others say 7/12 and some others in July there.
Do you see that?
A Yes.
Q What does CA mean?
A Confidentiality agreement.
Q And what's the import of a confidentiality agreement in a situation like this?
A It's a standard -- when brokers will market a property, they'll have buyers sign a CA.
Q Okay. And does that indicate those buyers from sharing offer prices? Or do you know what the purpose is?
MR. KAHANE: Objection; calls for speculation.
A I don't know.
Q And do confidentiality agreements typically have to be in place before a written offer is received or sent?

A No.

MR. ANDERSON: Moving into Tab 38, please.

You can just set these right up here. Is it getting too big of a pile?

THE WITNESS: No, that's fine.

MR. ANDERSON: Okay.

(Exhibit 12, Park at Village Oaks Best and Final Offer Summary, was marked for Identification.)

Q And we got Exhibit 12. Why don't you take a look at that for just one second. It's a pretty short one.

A Okay.

Q I was trying to make sure I understood this.

Best and Final Offer Summary is what it's entitled for the PVO property, correct?

A Yes.

Q And is that something that was sent over by CBRE, obviously?

A Yes.

Q Okay. And so what typically is a best and final offer summary? What's the purpose of that?

A It's to try to push a group up from whatever their initial offer was.

Q Okay. So this is actually 00 is this actually shared with potential buyers?

A No.

Q Okay. Okay. It's shared with the seller?

A Yes.

Q Okay. So how is it used? I'm curious. How is it used to push up the prices then?

A That would be something the broker would know.

Q Okay. So you don't use this for anything?

A No. It's the broker's job to do that.

Q And do you know does the broker then typically reach out and renegotiate with these potential buyers for a higher price?

A I don't know.

Q So this would have come in on approximately August 8, 2024; is that correct?

A Yes.

Q And you recall seeing this, I

presume?

A Yes.

Q And you would have shared this probably with Mr. Weingarten; is that also correct?

A No.

Q Who would you have shared it with?

A No one.

MR. ANDERSON: Tab 39, please.

(Exhibit 13, Email thread, Bates stamped SUPP_DOC_PROD 000894 - 898, was marked for Identification.)

Q I'll just show you Exhibit 13, sir.

A Okay.

Q And it's an email thread between yourself and Christian DiCroce and some others; is that correct?

A Yes.

Q Who's Christian DiCroce?

A He worked for CBRE.

Q Okay. So he was the broker's representative that was working with you?

A He was one of the brokers.

Q Okay. And in the gist of this

thread, they're discussing selling the PVO property to URS; is that correct?
A Among others.
Q On Page 3, there's an email from yourself to Mr. DiCroce. It says, "Chris, can you start DD immediately?"
I assume that means due diligence, correct?
A Yes.
Q And that's August 12, 2024, correct?
A Yes.
Q "We already shared almost all of it with you earlier today. The rest can be sent first thing Wednesday morning. Is there a reason why we can't have a signed access agreement by Wednesday? I need to drop dead closing date to be October 2nd. You can relay that if he closes by September 13th, I will sell it for $21,150,000," correct?
A Yes.
Q And so that's a price drop of about $100,000; is that also correct?
A A price drop from what?
Q That selling point, $21,150,0000,

is that a lower price than what was initially discussed with URS?

A No.

Q So on Page 4, there's an email from Christopher Urso who's at URS, correct?

A Yes.

Q And in that email, he has price $21,205,000.

Do you see that?

A Page 5, yes.

Q Yes, sir.

And then coming back to Page 3, we see you telling Mr. DiCroce, tell him we can sell it for $21,150,000

You see that, correct?

A Yes.

Q So that's a change of approximately $55,000, right?

A Yes.

Q Why are you offering a $55,000 discount if URS closes by September 13, 2024?

A That's what Regions had requested.

Q When did Regions request that of you?

A I don't remember.

Q Did Regions request that --

MR. ANDERSON: Is this your water?

THE WITNESS: No, that one is mine.

(Off-the-record discussion.)

Q So did Regions call you with a request that you sell to URS?

A No.

Q How did they let you know that they wanted the property -- the PVO property sold to URS?

A I didn't say that. That's not what I said.

Q Okay. So why did you lower the price or why did you offer to lower the price $55,000 if closing would occur in September as opposed to October 2nd?

A Regions requested that we close as soon as possible. And that 15 days or 18 days, whatever that was, made a very big difference to them.

Q Okay. And when did they make that request that you close as soon as possible?

A They made it several times.

Q Okay. And how?

A In one of our many phone conversations.
Q And who was that phone conversation with?
A Regions.
Q But whom at Regions?
A John. I'm not sure how to pronounce his last name.
Q Koromilas?
A Yes.
Q Was it ever in writing?
A I don't know.
Q So Regions was going to receive approximately 19 or $20,000,000 from the closing of the PVO property, correct?
A They would receive whatever their payoff amount was.
Q And do you recall if that was 19 or $20,000,000, in that vicinity?
A It was north of that.
Q Okay. What do you think it was?
A I don't remember.
MR. ANDERSON: What was this exhibit again? I'm sorry, Logan.
MR. FANCHER: That was Exhibit 13.

MR. ANDERSON: I apologize for that.

Q So would there be excess proceeds from the sale of the PVO property; do you recall?

A Would there be or are there?

Q Are there excess proceeds from the PVO sale; if you recall?

A Yes.

Q And how much?

A Approximately $30,000.

Q And did URS take this price drop offered of $55,000; do you know?

A No.

Q If they had, that would have reduced the proceeds approximately $55,000, correct?

A No.

Q What would it have reduced it?

A The Regions payoff would have been about $40,000 to $45,000 less. So the net difference would have been about $10,000 less.

Q Okay.

MR. ANDERSON: Could you mark this Tab 40, please?

(Exhibit 14, Email to Mr. Phares

from Mr. Kahane, dated August 30, 2024, was marked for Identification.)

Q Okay. We got Exhibit 14, Mr. Meisels.

MR. KAHANE: Brad, I meant to ask you yesterday, the exhibit slipcovers, just what are these from?

MR. FANCHER: I think I can answer that. Those are from -- I think you all attached these as exhibits to one of your earlier filings in the arbitration, so the exhibit slipcovers are from that.

MR. KAHANE: Okay. Thank you.

Q So we're looking at an August 30, 2024 correspondence from Mr. Kahane, correct?

A Yes.

Q And taking a look at it, it kind of lays out a rough proposal, is that correct, regarding the PVO property?

A I guess so.

Q Okay. Is this the offer that was made to MaxMez to consent to a sale of the PVO property?

A Don't know.

Q Are you aware of any other written

offers to MaxMez to consent to the sale of the PVO property?

A I don't remember. There might have been.

MR. ANDERSON: What exhibit did we mark this again? I'm sorry, Mr. Fancher.

MR. FANCHER: 14.

MR. ANDERSON: Can I have Tab 41, please?

(Exhibit 15, Email thread, Bates stamped SUPP_DOC_PROD 001662 - 1664, was marked for Identification.)

Q Exhibit 15, Mr. Meisels. And down here, we see on Page 2, it says, "Hey, Chris. Just to reiterate, I'm in full control of this deal and would like to sell to you, as we've discussed."

Do you see that?

A Yes.

Q That's September 6, 2024, correct?

A Yes.

Q Why do you say you're in full control of this deal?

A Because I was.

Q What does that mean?

A That means I'm in full control.
Q What's the context in which that statement is made?
A About who has control to sell the deal.
Q So you're saying that you have the ability to sell the PVO property; is that right?
A Yes.
Q And you're telling Chris, again, DiCroce, and that's a person at CBRE, the broker, correct?
A Yes.
Q So, actually, are you perhaps speaking with Christopher Urso, or do you think you're speaking with Christian DiCroce?
A They're both Chris, so I don't know.
Q Okay. But it was sent to both, correct?
A Yes.
Q And then up above, Mr. Urso says, "Thank you, Eli. Can you confirm there's no active litigation between Valor and any investors in this Park at Village Oaks," September 6, 2024.
Do you see that?

A Yes.
Q And above, you say, "Correct. There is no active litigation."
Again, on September 6, 2024, correct?
A Correct.
Q This arbitration was ongoing at that time, though, wasn't it?
A Yes.
Q Why didn't you let Mr. Urso know that this arbitration was ongoing?
A Because he's asking if there's active litigation between Valor and any investors.
Q And what would investors denote to you?
A Valor's not a party to this litigation.
Q So did you correct Mr. Urso and say, a-ha, Valor's not a party to this sale?
A I said, "Correct. There's no active litigation." I answered his question.
Q But isn't it pretty material? Obviously, he's asking you if there's active litigation between the entity selling the property and investors, correct?

MR. KAHANE: Objection. Objection as to form and objection to mischaracterizing the document.
A No.
Q He's not?
A No.
Q Why the heck would he be asking about litigation with Valor and investors?
MR. KAHANE: Objection; calls for speculation. Objection as to form.
A You can ask him.
Q Okay.
MR. ANDERSON: Tab 42, please.
(Exhibit 16, Contract of Purchase and Sale among URS Capital Partners I LLC and Dover Sub 2 LLC, RRAIT Sub 2 LLC, Merchant's Sub 2 LLC, and Village Oaks Owner LLC, dated September 9, 2024, was marked for Identification.)
Q Exhibit 16, sir.
And also I believe this is just a contract to sell the PVO property to URS, correct?
MR. KAHANE: To the extent that that calls for a legal analysis of this document, I would object.
A Yes.

Q And it's signed also by Mr. Weingarten, correct? As well as Mr. Urso for URS. And, I'm sorry, Mr. Meisels. It's unmarked pages, but it's after Page 32 on this exhibit.

A I see one signature.

Q Okay. And whose signature do you see?

A It's signed above where it says "Moshe Weingarten."

Q And then on the page on the right, do we see Chris Urso for URS?

A Yes.

Q Okay. Who closed the PVO property transaction; do you recall?

A What do you mean "closed?"

Q Who actually closed the sale to URS? What title company?

MR. KAHANE: Objection as to form.

Q Was it Advantage Title?

A Yes.

Q Why was Advantage Title chosen?

A I don't know.

Q Who chose Advantage Title?

A The buyer.

Q Did Advantage Title ask for the

LLC agreements that are in dispute here?
A Don't know.
Q Did they communicate with you at all? "They" being Advantage Title. I'm sorry.
A Yes.
Q What was their communications with you?
A I don't remember.
Q Do you remember generally what area they would have been speaking to you about?
A For the most part, they were in touch with Michael Lubin, so not really.
Q And Mr. Lubin is a transactional attorney, correct?
A Yes.
Q And who was Mr. Lubin working for?
A Dover Sub 2 LLC; RRAIT Sub 2 LLC; Merchant's Sub 2 LLC; and Village Oaks Owner LLC.
Q Who did Mr. Lubin report to?
A He didn't report to anybody.
Q Mr. Lubin didn't report to anybody?
A No.
Q You never spoke to Mr. Lubin about the sale of the PVO property?

A I did.
Q And in what capacity did you speak with Mr. Lubin about the sale?
A None in my personal capacity.
Q Well, but you spoke to him, so you have personal knowledge, correct?
A Yes.
Q That's all I'm getting at.
Do you recall what it was that you spoke about?
A We spoke about lots of things.
Q In regards to the PVO property?
A We spoke about many things.
Q So, for example, what closing company to use? Did you speak about that?
A There is no closing company.
Q Did you speak about using Advantage Title?
A No.
Q Did you speak about any messages Advantage Title sent to Mr. Lubin?
A I don't recall specifically, but we probably did.
Q And would Advantage Title have asked for the LLC agreements that are in dispute

here?
A Don't know.
Q Did it ask if you had MaxMez's approval for the sale of the property?
MR. KAHANE: I would object. Mr. Anderson, if you can just ask him did they ask whom. It's a little unclear, the question.
Q Okay. What I'm asking right now, if they asked Mr. Lubin, I guess would be the first question.
Q Did they ask Mr. Lubin about that?
A About what?
Q About whether MaxMez had given approval for the sale of the property?
A I don't know.
Q They didn't ask Mr. Lubin for any documentation regarding Valor, did they?
A You would have to ask Mr. Lubin.
Q But you don't recall hearing any messages in that regard, right?
A Don't know.
Q And Valor wouldn't have been a party to this transaction, so it would make no sense to ask about Valor, right?
A They can ask whatever they want.

Q Kind of like URS asked if there was ongoing litigation, and we said no because it was in regard to Valor, correct?
A Okay.
MR. ANDERSON: Tab 43, please.
(Exhibit 17, Settlement Statement, dated October 1, 2024, Bates stamped 004851 - 4854, was marked for Identification.)
Q This is 17. And here we have a settlement statement dated October 1, 2024, correct?
A Yes.
Q And is that your signature on the back page, or is that Mr. Weingarten?
A It's not mine.
Q Okay. Do you think that's Mr. Weingarten's?
A Don't know.
Q Do you recall seeing this settlement statement before?
A Yes.
Q In here, we see a -- in the first page, I'm sorry, we see a security deposits line, buyer credit $58,430, seller debit $58,430.
Do you see that?

A Yes.
Q So that reduced the money that was going to be received by seller, correct?
MR. KAHANE: Objection as to form.
A Yes.
MR. ANDERSON: Looking back very quickly, I believe our Exhibit 2 is the LLC agreement, Mr. Fancher?
MR. FANCHER: That's correct.
MR. ANDERSON: Thank you, sir.
Q Just at Section 10 on Page 37.
MR. ANDERSON: Mr. Kahane, I have my copy handy. Do you object to me showing Mr. Meisels?
MR. KAHANE: No, no. Sure. Exhibit 10, you said?
MR. ANDERSON: It's Exhibit 2, Josh. Sorry to interrupt you.
Q That's not a real long section, and I just want to give you a chance to scan it really quickly.
A What section?
Q It's Section 10. It says, "Dissolution, Liquidation, and Termination Generally."

A Okay.
Q So this talks about the dissolution of these LLCs, correct?
A Yes.
Q Okay. One of the items is sale or disposition of the assets of the company.
Do you see that?
MR. KAHANE: Object as to form and object because the analysis of this document is a legal document, requires a legal conclusion. I would also object because these are questions that are appropriately asked of the corporate representative, not of Mr. Meisels in his individual capacity. So on those three grounds, I object to this question and any line of questioning involving Section 10.
A Yes.
Q Okay. So do you see that in there?
A Yes.
Q Do you recall, after this settlement statement came to be on October 1st and was executed and the closing occurred, was a liquidating trustee appointed; do you recall?
MR. KAHANE: Same three

objections.
A What's a liquidating trustee? I don't know what that is.
Q Okay. So would you agree with me to your knowledge no liquidating trustee was appointed at that point?
MR. KAHANE: Same three objections. Plus I object to mischaracterization of the witness's testimony.
A I don't know what that is.
Q Did you appoint a trustee in any capacity for the PVO property following the closing of the PVO property to URS?
MR. KAHANE: Objection. Same three objections.
A I don't know what a trustee is.
Q Somebody who would wind up the LLC.
MR. KAHANE: Objection as to form.
A Okay. What's the question.
Q So did you appoint a liquidating trustee at any point? Do you recall that?
MR. KAHANE: Same three objections.
A I don't recall.

Q Do you recall having an accounting done of the PVO Holding LLC after the sale?
MR. KAHANE: Same three objections.
A An accounting of what?
Q An accounting of the LLC.
A For taxes? What's the question? For taxes?
Q An accounting made -- as contemplated here in this section.
MR. KAHANE: Objection; mischaracterizes the provision. Objection as to form.
A It doesn't say anything about accounting here.
Q Okay. And in here, in Section 10.2c, there appears to be some thought about payments being made; is that correct?
MR. KAHANE: Objection as to form. Objection as to calls for legal conclusion. Objection as to asking this witness questions that are designated for the representative of the corporation.
A I don't see anything about any payments here. 10.2c?

Q Yes. "In the event of dissolution, the company shall conduct only such activities as are necessary to wind up its affairs and the assets of the company shall be applied in the manner and in the order of priority set forth in Section 18-804b subject to modifications provided in Section 7.2 of this agreement."

Do you see that?

A Yes.

Q And Section 7.2 is on Page 32 in Distributions. It's entitled "Distribution Priority."

A Okay.

Q And so my question is: Were any payments or distributions made pursuant to this following the liquidation of the PVO property?

MR. KAHANE: Objection as to form. Objection; calls for a legal conclusion. Objection; inappropriate witness.

A Prior to the settlement statement or after the settlement statement?

Q Prior to the settlement statement.

A It followed whatever it said on the settlement statement.

Q Following the settlement

statement?

A I said the payments followed -- the payments were on the settlement statement.

Q Okay. So no other payments outside of what appears on the settlement statement; is that correct?

MR. KAHANE: Objection as to form.

A I'm not a hundred percent sure.

Q And turning back to Exhibit 17, we see it says -- excuse me -- on Page 2, Escrow holdback held by Stewart Title. And there's a line that says $30,838.82.

Do you see that?

A Yes.

Q Can you tell me about that?

A That was something that MaxMez had demanded.

Q And how did they demand that?

A I believe it was -- I don't remember exactly how they demanded that, but that's what they wanted.

Q Okay. They wanted an escrow; is that right?

A They wanted any proceeds above all the expenses that need to be paid at closing to be

held in escrow by Stewart?
Q So who else may be entitled to those proceeds?
A At the time, I thought that they should go to MaxMez. I didn't think there would be any reason for an escrow. They specifically wanted an escrow, so I didn't really care. But as we stand today, that money is going to be going to the borrower, these entities.
Q To the borrower, to these entities? I'm sorry. Help me out with that.
A It's going to go to the entities.
Q You mean the seller, or do you mean the buyer?
A The seller.
Q Okay. So it's going to go to Dover Sub 2, RRAIT Sub 2, Merchant's Sub 2, and Village Oaks Owner?
A It's going to go to reimburse legal fees.
Q So at the time of this escrow agreement being established, you thought it should have been paid to MaxMez; is that correct?
A No.
Q Who did you think it should have

been paid to then?
A Sans the litigation or the arbitration that's ongoing, it should go to MaxMez because we won in arbitration and there's a provision that says the prevailing party's entitled to its legal fees. So the legal fees of the prevailing party, which was not MaxMez, was in excess of $30,000; so, therefore, the money should go to them.
Q You know we have trial in this matter in September, correct?
A Yeah, but there's separate for emergency proceedings and for the actual trial.
Q Okay.
A There were many proceedings, all of which were an attempt by MaxMez to be purely obstructionist. There was tremendous amounts of time and energy and money and reputational damages caused by MaxMez with the sole intention of damaging. And in addition to legal fees, there's obviously various damages. The seller here prevailed on all these emergency procedures and hearings and motions that they filed, and that's why they're entitled to all of this money plus damages.

MR. ANDERSON: So can I get Tab Number 12?
Sorry to multitask you. Do you know what exhibit number this should have been? The May 25th, the LOI?
MR. KAHANE: The Valor LOI?
MR. ANDERSON: Yeah.
MR. KAHANE: Should be Exhibit No. 10.
(Off-the-record discussion.)
(Exhibit 18, Letter from MaxMez NC, LLC to various parties, dated March 6, 2024, was marked for Identification.)
Q So March 6, 2024 letter regarding PVO property, correct?
A Yes.
Q Do you recall receiving this one?
A Yes.
Q In Paragraph 1, generally speaking, says that Mez loans regarding the PVO property are in default; is that correct?
A I'm not sure.
Q "DH2 and RRAITH2, each as borrower under its respective term loan agreement with MaxMez dated June 16, 2022, collectively the PVO

loans, failed to pay when due the principal and interest due to MaxMez by March 1, 2024 under said term loan agreements, which failure constitutes an event of default under Section 11(a)," and it goes on a little bit.

Do you recall -- do you recognize those references as being the Mez loans associated with the PVO property?

MR. KAHANE: Objection as to form. Objection; it calls for a legal conclusion as to what constitutes a default under the operating agreement.

A You're asking me if I recognize the names of those entities?

Q Yeah. Do you agree that that refers to the Mez loans on the PVO property?

A Don't know.

Q And so it says there's a default under certain loans as of March 1st.

Do you have any opinion on whether that's correct?

A No idea.

Q And then in the second paragraph, there's a reference to PVO Holding LLC and Merchant's Holding 2 LLC and an allegation that

they failed to pay MaxMez.
Do you see that?
A Yes.
Q And that's in regard to -- or that would generally be referring to the Mez loans that are the subject of this arbitration, correct?
MR. KAHANE: Objection as to form. Objection as to mischaracterizes the document.
Q And I meant to say equity loans instead of Mez loans that are the subject of this arbitration, correct?
MR. KAHANE: Objection only as to form.
A Yes.
Q And in here, there's an allegation that they're due and payable on March 1, 2024.
Do you believe that's correct?
MR. KAHANE: Objection; calls for a legal conclusion based on the documents.
A I don't know.
MR. ANDERSON: That was Exhibit 18; is that right?
MR. FANCHER: Correct.
MR. ANDERSON: Tab 14, please.
(Exhibit 19, Letter from MaxMez

NC, LLC to various parties, dated May 3, 2024, was marked for Identification.)

Q There's Exhibit 19, Mr. Meisels.
And there we have another piece of correspondence on the PVO property, correct?
A Yes.
Q And this is dated May 3rd of 2024?
A Yeah.
Q And do you recall receiving this one?
A No.
Q Do you see your name on the last page, Schedule I?
A Yes.
Q But you don't recall receiving this?
A No.
Q Have you seen this letter before today?
A Yes.
Q Okay. And when did you -- well, do you recall when that was?
A No.
Q Paragraph 1 talks about a default under the Regions loan and the timely payment of

real estate taxes for the PVO property.
Do you see that?
A Yes.
Q Was that correct at the time?
MR. KAHANE: Objection; calls for a legal conclusion based on both the operating agreement and the terms of the Regions senior mortgage loan. Also object as to form.
A Don't know.
Q Do you know if the taxes were paid on the PVO property at the time of this letter?
MR. KAHANE: Objection; calls for a legal conclusion about what constitutes the payment of taxes under the senior loan and operating agreement. And also objection as to form.
A Don't know.
Q And Section 2 there, or Paragraph 2, I'm not sure how they denote it, includes a request for reimbursement of attorney's fees.
Do you see that?
A Yes.
Q How did you respond to that?
A I don't remember.
Q You were you guarantor under the

Regions loan, correct, personally?
A Yes.
Q And you are a sponsor under the LLC agreements personally, correct?
A A guarantor, yes.
Q And it recites to a guaranty in this paragraph, correct?
A Yes.
Q And you don't know if you responded to the request for reasonable attorney's fees?
A It sure wasn't reasonable, but I don't remember if I responded to it.
Q You didn't cut a check for $34,798.80, correct?
A I don't remember.
Q You don't remember if you personally cut a check for $34,798.80?
MR. KAHANE: Objection; asked and answered.
Q Is that correct?
A I don't remember.
Q And Paragraph 3 there makes a request for financial statements.
Do you see that?

A Yes.
Q And, in particular, it says each guarantor is liable for 100% of the obligations as defined in each guaranty, et cetera.
Did you respond to this request?
MR. KAHANE: Objection. To the extent that you're suggesting that what is said in here and true and asking a question based on that, I would object. If you're objecting [sic] for just his impressions of the allegation in the letter, I don't have an objection.
Q Can you answer the question?
A Are you supposed to clarify? I'm confused.
Q No. Only if you ask me to.
A Okay. I'm sorry. Go ahead, please.
Q Do you want me to clarify the question?
A You can just repeat it. That's fine.
MR. ANDERSON: Okay. Do you mind reading it back, ma'am?
(The question could not be read back verbatim.)

MR. ANDERSON: Okay. So we don't need to pick up from there. No worries.
Q On Paragraph 3 -- or in Paragraph 3, there's a request to you as guarantor for financials.
Do you see that?
A No.
Q So we'll read it together. "Without limiting any of the foregoing, each guarantor is liable for 100% of the allegations defined in each guaranty pursuant to Section 3.2 of each guaranty as a result of the fraud by each guarantor, each as defined in each guaranty, in agreeing in each guaranty to deliver to MaxMez true, accurate, and complete financial statements of such guarantor, from time to time, upon reasonable request from MaxMez, while never intending to deliver such statements to MaxMez and refusing to deliver such statements to MaxMez. MaxMez hereby demands payment from each guarantor of 100% of the obligations."
So it references financials.
Do you see that in that sentence?
A Yes.
Q Did you respond with any sort of

financial statements?
A They didn't ask for financials.
Q Did you provide them with complete financial statements?
A I don't recall them asking.
Q Did you contact them after you received this letter to clarify what financial statements they're requesting?
A They weren't requesting financial statements.
Q Did you contact them to ask them what this paragraph meant?
A No.
MR. ANDERSON: Tab 15, please.
(Exhibit 20, Letter from MaxMez NC, LLC to various parties, dated June 18, 2024, was marked for Identification.)
Q Exhibit 20, Mr. Meisels.
And that's a letter dated June 18, 2024.
Do you see that?
A Yes.
Q And this letter is in regard to the PVO property, correct?
A Yes.

Q Do you recall receiving this letter?
A Not specifically.
Q But it's addressed to you also, correct?
A Yes.
Q And do you recall seeing this letter before today?
A Yes.
Q Looking at Paragraph 1 for a moment, it says, "As a result of the failure to extend senior mortgage loan or pay the full balance of the senior mortgage loan on or before the maturity date," and then it goes on.
Do you see that?
A Yes.
Q And the senior mortgage was held by Regions Bank; is that correct?
MR. KAHANE: Objection as to form.
A Yes.
Q The senior mortgage was a deed of trust on the PVO property, correct?
MR. KAHANE: Objection as to form. Objection; that mischaracterizes the loan documents.

A Yes.
Q And, again, dated June 18th. And it's discussing whether there's been an extension or a payoff of that senior mortgage loan, correct?
A I don't know.
Q Do you know if Regions had been paid off on the PVO property as of that date?
A They hadn't.
Q I'm sorry?
A They had not.
Q And did you respond to this letter; do you recall?
A Josh would have responded. We sent it to Josh.
Q Okay. And do you recall was the Regions loan ever extended on the PVO property?
MR. KAHANE: Objection; calls for a legal conclusion. Objection as to form.
A We had several conversations with Regions about PVO. They understood that Maxus would not consent to an extension or forbearance, and they had agreed to let the property -- you know, let the loan ride out while we were selling it.
Q And I'm sorry. Who is "they" in

the "they had agreed to let the lone ride out?"
A Regions.
Q Okay. And help me out again.
What is it you said MaxMez had not agreed to?
A Any sort of forbearance.
Q And Regions notified you of that?
A We just found that out in discovery, actually. We were aware that they were being obstructionists prior to all this. And the sole intent was to try to trip up one of the recourse provisions, which they were unsuccessful. So they had tried -- they refused to allow a sale to go through. Then they sent the -- prior to the maturity, hoping that it would trigger some sort of recourse. They wouldn't consent to any sort of forbearance; again, with the intent that would trigger some sort of recourse. And they breached the operating agreement multiple times throughout this process, throughout this time frame prior to June 15th and after June 15th by having conversations with Regions, by taking action prior to giving us notice, by taking action prior to 30 days from when they gave us notice, and just in general making sure that the property -- the sale

of the property would be as difficult as possible. And that any potential buyer that they heard of, they would figure out some way to deter them, some way to tell them that the property isn't really for sale, or we can't really sell it, or it might not be for sale, or Regions doesn't want it to be sold, or they don't want it to be sold.

The first time they had actually agreed to have the property sold was after the arbitrator ordered them to do so. And they had no choice. But prior to that, they did their absolute best to make sure the loan didn't get extended, the property couldn't be sold, and they used their absolute best efforts to obstruct and cause as much damage as possible both to the guarantors personally as well to the company, the existing investors, and to the management company's reputation. You know, to anything that they could try to grab a bite of, they did their absolute best.

They ultimately were unsuccessful, unsurprisingly. But that was their -- that was the MO, was just to obstruct, try to withhold consent, to try to damage the company, damage the property, breach the operating agreement, and hope

that something sticks.
Q And then you said this documentation of all of this is in MaxMez's discovery responses; is that right?
MR. KAHANE: Objection as to form. Objection; mischaracterizes testimony.
A Incorrect.
Q Where is it all at?
A It's in the discovery.
Q In what discovery?
A That we requested from MaxMez.
Q So it's in MaxMez's discovery responses?
A Some of it is, yes.
Q Where else is it?
A Don't know. We've seen other places. We're putting it all together.
Q What benefit would MaxMez get from delaying the sale of the PVO property?
A With the sole intention -- two things. First of all, the sole intention was to trip up one of these recourse professions; which, again, they were unsuccessful in doing. They realized pretty early on, probably about December or so, that the property had declined in value,

and they thought the best approach would be -- the best way to get their money back would be to come after the guarantors via recourse.

They refused to engage in any attempt to inject equity into the property and increase the value, extend the loan, get a new loan perhaps. They refused -- when we wanted to turn the management over to them and the property itself over to them and just have us walk away and they could do whatever they want, they refused to do that. The only intent is to trigger recourse, and everything else was irrelevant. Not to work with us, not to work with Regions, to, you know, damage us as guarantors, damage the reputation, any sort of damages that they wanted to do.

They have a pattern of causing damage. I mean, the first damage was we were talking about Astoria where they blackmailed us to sign a contract that we weren't ready for, that we had no interest in signing. And the damage was done right there where, first and foremost, we had to sign this contract. We had to spend the time, energy, and effort putting it together and speaking to people and doing everything we had to do. And they also caused us $3 million in damage

where they committed to put up $14,000,000 and they only funded 11. And that was all under the guise of, you know, you better do what we say or we're not going to do anything.

So that's just the pattern. They're not interested in working cooperatively, productively. It's just simply about how can we spend as much time and, kudos to you, legal dollars, you know, being obstructionists. Needless to say, it's not going too well, but here we are.

Q Okay. And so you referenced Astoria again, correct?

A Yes.

Q And that was -- you talked about $14,000,000 to $11,000,000.

And that was on the PVO property and the Hawks property; is that right?

A Yes.

Q Okay. I want to make sure we're talking about the same thing.

And those were the contracts, the LLC agreements, that are subject here, correct; PVO property and Hawks property?

A Yes.

Q And those closed on June 16, 2022?
A Yes.
Q At the same time, there was an Astoria contract signed same date, June 16, 2022, for $62,500,000, right?
MR. KAHANE: Objection as to form.
A Yes.
Q And then five weeks later, that price was reduced to $60,500,000, correct, for the Astoria property?
A So the damage was already done, because they had only funded 11 out of 14.
Q How were you damaged when you didn't pay the $60,500,000 [sic] for the Astoria property?
A Because they only funded 11 out of 14, so I had to come up with $3,000,000.
Q But you came up with $3,000,000, right?
A At a great expense.
Q But your investors came up with the additional money, correct?
A No. It was at a great expense.
Q What was the great expense?
A You're going to find out.

Q So it's been going for a long time. If there's a great expense, please share it with me.
A We're putting it all together and you're going to find out.
Q This has been requested months ago ad nauseam.
A Okay.
Q And you're not prepared to tell me today, correct?
A I don't have all the full amount of damages here today. It is more than $21.9 million, though.
Q Oh, good Lord. All right.
MR. ANDERSON: Tab 16, please. And I apologize. It's a little frustrating. That's all. But you don't need my commentary so --
THE WITNESS: I would be frustrated if I was you too. Actually, I wouldn't be. I'm making lots of money, so --
(Exhibit 21, Letter from MaxMez NC, LLC to various parties, dated August 7, 2024, was marked for Identification.)
Q Exhibit 21, Mr. Meisels.

A Yes.
Q This is an August 7, '24 letter.
And, again, you're on the distribution list here, correct?
A Yes.
Q And Paragraph 1 discusses the drag to market letter, correct?
A I don't see that.
Q So do you see where it references Article 16?
A No.
Q Paragraph 1, it says, "PVO JV LLC has willfully and intentionally failed to cooperate with capital member in connection with marketing the property pursuant to Article 16 of the PVO Holding LLC."
A Oh, yes.
Q Okay. And if you look at Exhibit 2, Section 16 is entitled "Drag to Market."
MR. ANDERSON: Mr. Kahane, is it okay if I lean over?
MR. KAHANE: Sure.
Objection; calls for a legal conclusion and interpretation of a legal document.
A Yes.

Q Okay. So it's referencing drag to market and it's referencing a failure there.
We see that, correct?
MR. KAHANE: Objection as to form. Objection as to drawing conclusions?
A Okay.
Q Did you respond to this August 7th letter from Mez?
A We sent it to Josh.
Q Okay. And do you know if Mr. Kahane responded to this letter?
A Don't know.
Q I'm sorry?
A I don't know.
MR. ANDERSON: So I had a request for a short break. Is it okay if we just do ten minutes, guys? Is that all right?
THE VIDEOGRAPHER: All right. The time is 2:35 and we are off the record.
(A short recess was taken.)
THE VIDEOGRAPHER: The time is 2:52 and we are back on the record.
MR. ANDERSON: And could you get me Tab 17, please?
(Exhibit 22, Letter from Regions

Bank, dated March 18, 2024, was marked for Identification.)
Q I am going to hand you Exhibit No. 22, Mr. Meisels. I'll give you a chance to take a look at that.
It's a letter dated March 18, 2024, and it's executed by a John Koromilas, correct?
A Yep.
Q And you're one of the addressees, correct?
A Yes.
Q And do you recall receiving this letter?
A Yes.
Q And it appears to be inquiring about outstanding insurance payments; is that correct?
A No.
Q Okay. Have you had a chance to look it all the way over yet?
A No.
Q Okay. I'll give you a second to do that.
So specifically on the second

page, the area that talks about Section 6.1, if I can call your attention to that real quick.
A Okay.
Q And it mentions 2023 real estate taxes, correct?
A Yes.
Q Not insurance proceeds; is that right?
A Correct. Nothing about insurance.
Q And how did you respond to that request about the 2023 real estate taxes?
A The taxes were paid.
Q And that's on the PVO property; is that correct?
A Yes.
Q And did you inform Regions of that?
A Yes.
Q Do you recall when the taxes were paid?
A I don't remember the date.
Q Do you know who paid the taxes?
A The entity did.
Q "The entity" meaning one of the Respondents?

A Well, the Respondents didn't have any money. But, yes, one of the Respondents did.
Q Okay. And that would have been money given over to one of the Respondents and then paid on their behalf, correct? Or its behalf?
A I guess so, sure.
Q Okay. Did you forward this to MaxMez at any point?
A I don't remember.
Q Did you -- when the taxes were paid, did you provide that information to MaxMez?
A We sent everything to Josh, and it's up to him to take it from there.
Q Okay. So any update would have come from Mr. Kahane; is that correct?
A Yes.
MR. ANDERSON: And Tab 18, please.
(Exhibit 23, Email thread, Bates stamped SUPP_DOC_PROD 001927 - 1951, was marked for Identification.)
Q Exhibit 23. And I'm sorry. It is a long email thread. Just take a quick look at it generally and try and get some flavor for what's going on.

A Okay.
Q I mean, generally speaking, it looks like it's a thread between John Koromilas at Regions Bank and yourself; is that right?
A It looks like it's between John Koromilas and Sam.
Q Okay. And who's Sam?
A He used do work for Valor Residential Group.
Q So Sam worked for you?
A He worked for Valor Residential Group.
Q And you're the what of Valor Residential Group?
A CEO.
Q What was Sam's title?
A Controller, I believe.
Q Did you work with Sam quite a bit?
A Yes.
Q Would Sam be sending emails to Regions Bank without your approval?
A Possible.
Q Do you know, did Sam run any of these emails by you before sending them?
A He didn't need to.

Q Why is that?
A I'm not his mother. He can do what he wants.
Q Going to Page 24 of this thread, so in there is -- well, let me give you a chance to get back there. I'm sorry, Mr. Meisels.
A Okay.
Q Email sent April 16th by yourself to Mr. Mendelovitz and Mr. Koromilas.
Do you see that?
A No. This is from Mr. Koromilas.
Q Well -- the one, I'm sorry. The one up above on Page 23 appears to be a forward to Mr. Mendelovitz. Aron. Is Aaron the -- is that the correct pronunciation of that name?
A Yes.
Q Okay. And so you have his contact info.
Do you see that, Page 23?
A Yes.
Q Okay. The forward is down below there. It's from John Koromilas to yourself, correct?
A Yes.
Q Okay. It says, "A brief topic

outline for tomorrow's call. Comments included to bring all parties up to date on earlier communications."

And, again, this would have been on April 15, 2024, right?

A Yes.

Q Okay. And item one, "Re: Taxes on Village Oaks. When is payment to be made?"

I view that as Mr. Koromilas asking when the PVO taxes will be paid; is that right?

A Okay.

MR. KAHANE: Hold on.

Q And we talked, and those ultimately were paid at some point, correct?

A Yes.

Q Item No. 2, "Open reporting items on Village Oaks." It says, "Please see February email from Siham below to you addressing your questions then on the two items. When are these item to be delivered?"

Do you see that?

A Yes.

Q And you respond, "Aron to provide shortly," right?

A No.
Q Okay. Who wrote, "Aron to provide shortly?"
A I'm pretty sure everything in red is written by John Koromilas, but I'm not sure.
Q Okay. Why would -- so who would have been writing in black then, out of curiosity?
A John.
Q You think Mr. Koromilas was writing in black and red?
A That's what it seems to be. I don't recall writing this.
Q Okay.
A Aron wouldn't have written his own name in third party.
Q Right. It would have made sense to me if it had been you that had written those items.
A No.
Q And why do you say that?
A Because, No. 5, I put my name. And I wouldn't put my own name and refer to myself as third party.
Q So you think somebody from -- you think it was perhaps Regions on both black and

then the red?

A I don't know.

Q Okay. So the third item says, "DSC covenant on Village Oaks."

Can you tell me, what is a DSC covenant?

A That's service coverage ratio. That's service coverage.

Q Okay. And what does "service coverage" mean generally?

A It's the ratio between the NOI at the property to the interest payment.

Q Okay. And it says, "Financials look to indicate a very large paydown required to cure. What is the borrower's paydown computation? Is the borrower requesting a modification to the built-in cure?"

Do you see that?

A Yes.

MR. ANDERSON: You know, I'm going to pause for just a second.

THE VIDEOGRAPHER: Do you want to go off the record?

MR. ANDERSON: No, I think the church bells will stop momentarily.

(Pause in the proceedings.)
Q If you get a chance -- can you take a look at the response there in red? I shouldn't say response. Can you take it the red portion on No. 3, Mr. Meisels?
A Yes.
Q Can you explain what those two sentences are connotating?
A I'm not quite sure.
Q Okay. I just want to make sure I understand this.
Do you believe this is Regions asking for a very large paydown on the PVO property loans?
A I don't think they asked for a large paydown. They were trying to figure out what the calculation would be to see if a paydown is required and, if so, how large would it be.
Q Okay. And it looks like Aron is going to work with them on that front, correct?
A Yes.
Q Okay. Do you know if that happened?
A I don't know.
Q Okay. And then Item No. 4, I'll

call your attention to that really quickly and let you take a look at the black portion.

A Okay.

Q So it's talking about the June maturity date events on both Village Oaks and Hawks Landings.

Those are the PVO and the Hawks properties, correct?

A Yes.

Q Okay. It says, "Based on the call with Max last month," that would be Mr. Weingarten, I presume?

A Yes.

Q "We had understood the then direction as refinancing of Hawks and sale of Village. Is that still the direction for both? If yes, has a refinance application been signed for Hawks and a listing agreement been signed for Village?"

Do you know at that point, April 15, 2024, had a refinance application been signed for Hawks by the Respondents or by Valor?

A We had several applications to refinance Hawks, but Maxus would not give us approval to do so.

Q Okay. So your position is that a refinance application had been signed for Hawks and presented to Regions; is that correct?
A No.
Q No?
On April 15, 2024?
A No.
Q Okay. So that's what I'm asking. It says, a refinance application at that point been signed for Hawks.
A So we had gotten refinance applications for Hawks. We had -- we need MaxMez's consent to do so. So we presented those to Regions. Regions obviously wanted us to do it. We wanted to do it. And MaxMez, as I mentioned earlier, with the sole strategy being to obstruct as much as possible, MaxMez wouldn't -- at first, they didn't respond. And then when John pushed them, they were not interested in any sort of refinance. They were intentionally doing the best that they could to make sure that the loans would go into maturity default and, obviously, that would get Regions upset and that would trigger recourses. And they were hoping to -- in Hawks, what they were probably hoping to do is take

control of the property in some way, shape, or form, which they did try to do continuously up until the eventual sale. And the idea was to just let's make life as difficult as possible, and then hopefully, you know, there will be some capitulation or they'll get what they want or they will, you know, be forced to do something they don't want to do.

Q So how did you send over the consent request to Maxus? Or MaxMez?

A It was all done through Josh.

Q Okay. And down below there, in red, it says, "Preferred lender would instead like to take over Village and the Valor team and Valor guarantors exiting the transaction."

Do you see that in red?

A Yes.

Q And the preferred lender there would be MaxMez, correct?

A Yes.

Q And so at that point, April 15, 2024, MaxMez had told you at some point that it would like to take over the PVO property; is that right?

A We were the ones that had offered

it.
Q Okay.
A Back in December, when it was taken.
Q Okay. And so it appears that the parties seem to be in some agreement at this point; is that right?
A No.
Q Okay. And then No. 5, it says, "Status or pendency of any project-related claims or litigation, including tenant litigation and any borrower indication." And then it says, "Eli indicated there are none."
Do you see that?
A Yes.
Q Do you know, April 15th, if that was correct at the time?
A I don't know who wrote this.
Q Okay. Turning over to Page 21 in here, it looks like a forward of an email from Mr. Koromilas.
Mr. KAHANE: Brad, can you give us a Bates stamp number on that?
MR. ANDERSON: SUP_DOC_PROD 001947.

MR. KAHANE: Thank you.
Q I'm just calling your attention really quickly to the first probably four or five lines there. It says, "It appears there are 32 unrenovated units and another 30 in some status of updates. Our 8/23 appraiser had indicated a then 75% occupancy. 25% of the units, approximately 32, are not renovated. Those renovations would be completed by 4/24. These assumptions then drove the future stabilized rents/value, et cetera. Given the assumptions made are no longer valid, the renovations will not be completed by 4/24" and it kind of goes on, "and unites are to leased/operated in their current state."
I'm just curious: Why had renovations not been completed by April 2024?
A Don't know.
Q And turning your attention over to Page 17 of this exhibit, Bates No. 001943 --
A Okay.
Q It says, "Eli, Village: After numerous repeat requests, I do not see where we ever received your DSC calculation or the compliance certificates for the financials."
Do you see that?

A Yes.
Q And it says, "You are leaving us no choice but to accelerate to the default rate on this loan."
A Yes.
Q And, "These were/are pretty easy to remedy. Sorry. John Koromilas."
A Yes.
Q Did Regions go ahead and accelerate that loan?
A No.
Q How did this come out, this request?
A Go to Page 16, please.
Q Okay. Perfect.
A You see I replied two minutes later. "We sent these to you previously. Happy to send again if you need us to."
Q Okay. So problem solved?
A Exactly.
Q Okay. And then on Page 14, Bates 001940 --
A Yep.
Q -- May 7, 2024, it says from Mr. Koromilas to you, "Eli, Overdrafts: Village

account ending 2079 is overdrawn today due to the loan payment auto charge. Hawks account ending 2117 is overdrawn today due to the loan payment auto charge. Please wire funds to cure by one Eastern or these will be returned."

Do you see that?

A Yes.

Q And then on Page 13, you respond with, "We'll take care of it," On May 8th, at 11:04.

Do you see that?

A Yep.

Q And I'm sorry. You know what? I skipped. He actually follows up first on May 8th at 11 and says, "Eli, You are bouncing checks on the Village account. You may wish to transfer funds to resolve."

And then you respond with, "Taking care of it," correct?

A No.

Q Okay. How is that wrong?

A His email's at 11 a.m. His previous -- his other email's at 11:01.

Q The 11:01 email is from May 7th.

A Oh, May 7th.

Q Yeah. And then he follows up again about 24 hours later on May 8th, saying, again, you're bouncing checks, correct?

A Yes.

Q And you respond with, "We'll take care of it," just minutes later, right?

A Yes.

Q And he responds -- "he" being Mr. Koromilas responds, "Looks like you need about 35k transferred in."

Do you see that?

A Yes.

Q Do you know where the 35k came from?

A No.

Q Do you know where I would be able to look in records to see that 35k?

A No.

Q Do you know who I would ask for that information?

A No.

Q And then kind of taking a quick look over at Page 6 of this exhibit, Bates 001932 --

A Okay.

Q -- it's Mr. Koromilas writing Sam. Sam T. at Valor, correct, your controller?
A Yes.
Q Or former controller, I should say, correct?
A Yes.
Q "Sam, questions for PVO." No. 1, "Valor BS shows $1,948M due to Valor."
Is BS balance sheet?
A Yes.
Q Okay. And I assume $1,948 is supposed to be 1.948 million?
A Correct.
Q Okay. And so Valor balance sheet shows 1.948 million due to Valor. And this is May 15, 2024.
And then the question is: "Is this supposed to be equity instead of debt?"
What's the answer to that question?
A It's equity.
Q Okay. "Loans of this size would usually require various consents," it says.
Do you agree with that?

A Yes.
Q Had anyone obtained those consents?
A This wasn't a loan.
Q Okay. What was it?
A Equity.
Q And equity in favor of whom?
A It's investors putting equity into property.
Q What investors?
A The investors of the property.
Q Who were the investors?
A There's about 60 of them.
Q Okay. And is MaxMez one of those investors?
A No.
Q Okay. So there's a balance sheet showing 1.948 million due to Valor on May 15, 2024, correct?
A No, incorrect.
Q Okay. So that's the date of this email, May 15, 2024, correct?
A Yes.
Q Okay. I'm just trying to understand who this equity is in favor of.

A So John Koromilas misread the balance sheet. He thought that this part of our equity was a loan, but it's not. It's our original equity that we put in; six or 7-somewhat million dollars.
Q Okay. The original equity that was done around June 2022, right?
A Yes.
Q Okay. Okay. So not new equity, correct?
A Some of it may have been new equity, but it was not a loan or anything like that. There was equity put in in the beginning, there was equity put in going forward.
Q Okay. Who put in the equity going forward after June 16, 2022?
A A bunch of investors from the group of the original 60-some-odd people.
Q Okay. So they put an initial amount in June of 2022, right?
A Yes.
Q And then I don't want to go too far here, so correct me if I'm wrong, please.
Intermittently, they gave more money as equity investments in that property?

A If money was needed. In the beginning, not really much. But later on, yes.
Q Okay. Do you have any idea how much additional equity was brought in?
A No.
Q Would it be anywhere near this figure that Mr. Koromilas recites, 1.948 million?
A No.
Q Would it be hundreds of thousands; do you think?
A I have no idea. A lot less than that.
Q A lot less than hundreds of thousands?
A A lot less than 1.9 million.
Q Okay. And what would that money have been used for?
A Anything that the property needed. It's fundable. It's not exact of where it's going.
Q Okay. Do you know, was MaxMez provided updates on those front of the additional equity?
A Don't know. I believe they were through Josh.

Q Okay. Another thing that jumped out to me on here was -- I know I'm losing sight of it. I'm sorry, guys. There's a reference to 89,000,000, I think, in here, and it just didn't make any sense to me whatsoever, and I thought you would be able to help me with that, Mr. Meisels.

A Lenders refer to thousands as M. And when there's two Ms, that's a million. So 89M is 89,000.

Q Oh, my gosh. Okay. I found it on Page 2, 001928. It says, "Questions for Hawks. BS shows 89m due to Valor. Why would Hawks be lending to Valor?"

So my first question is, what does 89m mean?

A 89,000.

Q Okay. Okay. So on the Hawks property, the balance sheet at the time was showing 89,000 due to Valor; is that right?

A That's John's apparent misinterpretation of it.

Q Okay. Because the question then posed from John is, "Why would Hawks be lending to Valor?" And the response appears to be, "Corrected."

What does that mean, "corrected?"
A That he read it wrong. John did.
Q Okay. So you don't think any change to the balance sheet occurred, you just think somebody corrected him?
A Correct.
MR. ANDERSON: Could you hand me Tab No. 19, please?
(Exhibit 24, Email thread, Bates stamped SUPP_DOC_PROD 001910 - 1919, was marked for Identification.)
Q I'm going to hand you Exhibit 24, Mr. Meisels and give you a little bit of time to just kind of take a quick look.
Is there any chance, can you just kind of give me the gist of this, like, five-six-page thread?
MR. KAHANE: Objection as to form.
A It's an email chain thread between Regions and Josh and sometimes us.
Q Okay. And you agree it's in regards to kind of negotiating a potential refinance?
A No.
Q What would you say it's in regard

to?

A It seems to be in regard to some sort of settlement or forbearance or maybe a refinance. It's not -- I'd have to read the whole thing. I can't tell you offhand.

Q Sure.

So going back, we see May 31st, we see correspondence to I believe it's Mr. Koromilas. It says, "We had a counsel's call yesterday to discuss the upcoming maturity dates of Hawks Landing and PVO."

Those are the Hawks property and the PVO properties, correct?

A Yes.

Q Okay. "At my client's direction, I provided the following proposals, which we then discussed. Hawks 60 day extension on Regions loan." And there's a little bit more there about what the purpose was. And then down below, it says, "PVO 6 month extension for full payoff of Regions loan."

In that context, I think those are, generally speaking, maybe forbearance agreements being discussed. Would that be fair to say?

MR. KAHANE: Objection as to form.
A I don't know.
Q Okay. But asking for additional time on both of those loans from Region, correct?
A Yes.
Q And, again, that's May 31st, right?
A Yes.
Q And we see the response there, May 31st, Mark Wolfson from Foley.
Mr. Wolfson represents Regions or represented Regions, correct?
A Yes.
Q It says, "Josh, I think John completely understood the proposal and it's simply totally unacceptable from the get-go, although he can respond himself or more formally from me later."
Do you see that?
A Yes.
Q And then you actually jump in, correct, and say, "You'll have to tell us what you think is acceptable?"
A Yes.
Q You also say, "We're happy to

continue to keep the property performing."

Do you know what property you're referring to there?

A No.

Q On Page 9.

A Yeah, I see it. I don't know.

Q Okay. "And get it to a position where it can easily be sold for well above the debt, but there's no way we can do a massive paydown here."

I assume if we're trying to sell for way above the debt at that point, we can agree that that's the Hawks property, correct?

A No.

Q Why not? On May 31, 2024, what could you have sold the PVO property for?

A Well, at that point, it was below the debt. But if I was referring to the PVO property, I was -- I would be saying that if we invested some -- if there's some agreement that everybody agrees to and money gets invested in the property, it could be sold for a lot more.

Q Was anyone talking about putting a bunch of money into the PVO property on May 31, 2024?

A Yes.
Q Who was that?
A We were having conversations between Regions and us, and I think Maxus even at some point.
Q Okay. So you were talking with Regions, you think, about potentially lending more money on the PVO property?
A I never lent any money on PVO. This wasn't lending money.
Q You were talking to Regions about them lending or it lending more money on PVO?
A No. They were not interested in lending any more money whatsoever. That was definitely not the case.
Q Okay.
A There was a conversation about some more equity being injected to do cap X which would improve the value of the property above -- at the time, it was probably worth, I'm throwing a number out there, I don't know, 20 million bucks, give or take.
Q Okay.
A Maybe 19, maybe 20.5. But somewhere around there is probably what it was

worth.

Q Okay. So you may have very well been talking about the PVO property here; is that what you're telling me?

A I'm saying I don't know.

Q Okay. But it's at least possible?

A Maybe.

Q Okay. And then up above, there's another email. It looks like it's from yourself to Mr. Wolfson. And it says, "The other alternative is that you work with us to convince Maxus to take the property."

Do you see that?

A Yep.

Q And that's May 31st, at 7:50, right?

A Yeah.

Q Do you know what property you're talking about here?

A I would imagine PVO.

Q Okay. "We tried to give it to them, but we need your help. They have the ability to do a massive paydown. They would be incentivized to do that if you agree to let them take over and help me convince them to take the

property and keep the upside for themselves;" is that right?

A Yes.

Q What does that mean?

A It means at the time the property was worth, let's just say for arguments sake, roughly the senior loan, give or take, which meant Maxus was under water. Obviously, I was under water, and certainly Maxus. I mean, Max was under water and certainly I was under water. But to me it was pretty obvious that if somebody, whether it's Maxus, Regions, me, a third party, URS, it doesn't matter, if somebody could come in here and put a relatively nominal amount of money in and pretty easily improve the value to, you know, pretty darn close to $30 million.

So we offered Maxus to go do that, and then they can keep all of it, which is well above the money that was owed to them. I think their last dollar was, like, $25 million. So we were very happy to give them the property, give up our rights. They take the property, put whatever it is, a million bucks into it, keep it for a year, improve the value, sell it for 30, make a bunch of money. They refused to do that.

This was all in the same vein of -- you see this is May 31st, and we were having initial discussions with Maxus in January of '24 and even December of '23 where we told them there's plenty of money to be made here.  You need to put a little bit, a relatively little bit of money into it, and you could improve the value drastically.  You can not only get all of your money back, but you can actually make money.

And this all is just showing the obstructionist, you know, mentality that they had; that they don't care about protecting the property, they're willfully destroying the value of the property by not consenting to anything and not working with us and not allowing the sale, not allowing the refinance, not allowing an extension from Regions.  They offered no solutions.  They only offered problems.

And they simply said we're not going to allow anything to happen at the property. We're not going to put money into it.  We're not going to allow you to put money into it.  We're not going to do anything whatsoever.  We're going to do our absolute best to cause harm to the property, to the loan, to the lender, to the

guarantors, to the company simply to try to enrich themselves to try to cause some sort of recourse so that the guarantors would have recourse liability. That was the sole purpose. They were not interested in doing anything else whatsoever.
Q Okay. And didn't we see earlier an email from Mr. Weingarten in which he discusses, quote, unquote, turning over the PVO property?
Do you recall that?
A No.
Q Not in December of 2023?
A Which exhibit is that?
Q Bear with me.
MR. FANCHER: 6.
Q Exhibit 6.
MR. ANDERSON: What tab number is that?
MR. FANCHER: 69.
MR. ANDERSON: Of course, I got to go all the way back here.
Q And I'll just look at this one again. December 12, 2023. Subject matter, Parks at Village Oaks. Max Weingarten to Ryan Snyder says, "Hand you over the property?" And there's

triple exclamation points. "Why would I do that? We were having a conversation. As I told you, we are always happy to talk."

Is that the offer of turning PVO over that you're referring to, Mr. Meisels?

A No.

Q No?

A No.

Q What offer are you referring to?

A Josh had conversations with Maxus or Maxus' attorney, whoever it was, about us turning over the property and we walk away and we're completely done.

Q Okay. And -- sorry. I did not mean to interrupt you. I'm sorry.

A Maxus -- I don't remember the exact timeline of events, but Maxus was very happy to take over the property and take away our upside and take away our equity, but they still wanted us to remain on as guarantors on the loan. They wanted us to remain -- which we would potentially may be interested in entertaining. But they wanted us to remain on as full and sign full recourse to Maxus in the event that their own plan didn't work.

So we were happy to give them the keys and walk away, but we were never happy to give them the keys plus retain all the liability and give them all the upside, which the operating agreement specifically said that if they want to remove us, they need to sign on the Regions loan. There's a series of steps they have to take to effectuate I guess what would be a changeover, which they never did and they were never willing to do.

So we were not willing to let them do a changeover without them fulfilling their contractual obligations under the operating agreement to do those various things, and they were not willing to do anything whatsoever. So it just became moot.

Q When was that offer on PVO conveyed by Mr. Kahane; do you know?

A Either in December or January. December of '23 or January of '24.

Q And would that have been in writing by Mr. Kahane.

A Don't know.

Q So -- sorry. Turning back a little bit --

MR. ANDERSON: I never wrote down the exhibit number on the last one we were talking about.
MR. FANCHER: Exhibit 24, I believe.
Q Referring back to this 24, the dialogue continues to go. And I see on June 4, 2024, from Mr. Koromilas to yourself, "Eli, as to your questions on paydowns, Hawks, Regions, capital markets" --
A Which page are you talking about?
Q Page 7. Bates No. 001916.
A Okay.
Q "Regions captain markets will be assisting in review/viability of the CMBS term sheet upon its delivery. For color, if we conclude the UW will not repay the bank, we would, as you might expect, require the difference be pledged for the anticipated sizing/closing costs."
Do you see that?
A Yes.
Q "Is there any progress on Mez/Preferred being willing to stay in the deal? I had understood at one point they wanted to be paid versus extending, which I believe makes moot

project refinance as a solution; does it not?"
Do you see that?
A Yes.
Q What is that connotating to you?
A So we had term sheets to refinance Hawks in April, May, June, et cetera. Regions wanted to do their own refinancing of Hawks with their own CMBS capital markets team. And he's asking here if MaxMez is willing to be cooperative or they just want to be obstructionists.
Q Okay. And then on Page 8, it says, "As to Maxus taking over Village operationally, change in property management, and/or Maxus full ownership interest in Village, change in ownership, we are not intervening in partner disputes. If there is an actual request for either, Regions will respond timely."
Do you see that?
A Yes.
Q Do you know if Maxus ever made a request?
A To do what?
Q For a change of property management.
A I don't know. They might have.

Q On June 6, 2024, we see an email from Mr. Koromilas. Page 4, Bates No. 001913. It says, "We had communicated for maybe six months now that paydowns would be need on both loans to consider extensions. And, specifically focused on Village. Notwithstanding all our communications, borrowers finally provided extension requests with zero paydowns on either loan last week."
Do you see that?
A Yes.
Q Do you recall sending over extension requests sometime around June 6, 2024 with zero paydowns?
A No.
Q Do you think that's incorrect?
A I don't know.
Q "Nevertheless, we responded that zero paydown may be viable on Hawks with the proposed signed takeout acceptable to all the parties and partners, but still needed at least 3 million to consider extending Village."
Do you see that?
A Yes.
Q Okay. What response did you give to the offer on Hawks?

A Which offer on Hawks?
Q It says they responded with a zero paydown may be viable on Hawks with the proposed signed takeout acceptable to all parties and partners.
So did you put together a signed takeout and send that over to Regions?
A This was Josh communicating with them, so I wouldn't have been the one to respond.
Q So I think it's actually addressed to Josh from John Koromilas, correct?
A Yes.
Q So it is Mr. Koromilas to Mr. Kahane?
A Yes.
Q Okay. So my question is: Was there a response to what Mr. Koromilas wrote?
A I don't know.
Q I'm sorry?
A I don't know.
Q Okay. Mr. Kahane would have handled that?
A Yes.
Q Okay. It goes on to say, "We find the strong arm comment below absolutely ludicrous

based on the history and the facts. The aforementioned early and often communications on paydowns needed to consider extensions; 2, the bank's patience on the Village unpaid RE: Tax matter; 3, the bank's patience on the Village DSC default that requires a very large paydown cure; and, 4, you well know that the bank has no obligation to extend either loan."

Do you see that?

A Yep.

Q There's no reference in here to MaxMez not agreeing to any sort of extension, is there?

A No.

Q Do you know if Regions ever requested that MaxMez consent to an extension?

A They did, yes.

Q Okay. When was that?

A I don't know offhand. It was in our discovery.

Q Sometime after June 6, 2024?

A Don't know.

Q Okay. The other part of that says, "But still needed at least 3 million to consider extending Village."

Do you see that?
A Yes.
Q And did you ever put together the 3 million to request the extension on Village?
A John ended up changing his mind on that and he had agreed to extend Village without the need for the $3,000,000.
Q Okay. And when does that happen?
A I don't recall the date.
Q Okay. So John goes from requiring 3 million on June 6, 2024 to something different for an extension?
A Yes.
Q Okay. Who was John interacting with on that front?
A Josh Kahane.
Q And so that would also be produced in discovery, correct?
A If it's in writing, yes.
Q And on to --
MR. ANDERSON: Sorry. Tab 20, please.
(Exhibit 25, Email to Mr. Weingarten from Mr. Koromilas, dated June 11, 2024, was marked for Identification.)

A This one, Exhibit 25?
Q Yes, sir.
A Okay.
Q Okay. And would you agree generally with me that this is Regions stating terms for extensions of loans?
A It's a conversation. I'm not sure what he was intending with this.
Q Okay. So as to Hawks, your request has now changed to a 90-day extension to overt maturity default.
Do you see that?
A Yes.
Q And then in the hyphen down below, it says --
(Clarification by the court reporter.)
MR. ANDERSON: Do I need to slow down?
THE COURT REPORTER: Yeah, a lot.
Q "As to Village, the owners and guarantors are still unwilling to provide cash collateral as part of an extension request."
So those are in regards to extensions, correct?

A Yes.
Q And down below, it says, "As any extensions and probably any decision to actually list and sell the properties likely require Maxus' consent. Your counsel will immediately determine if they directionally intend to consent to the borrower's request."
Do you see that?
A Yes.
Q How did you guys respond to Regions in that regard?
A Josh would have spoken to John Koromilas about it.
Q And then ultimately you would have asked Maxus for consent?
A We did many times in the six months or so prior to this email.
Q So you think it would have been a requested to consent to a 90-day extension to overt maturity on the Hawks loan with Regions?
A No, it was a request to consent to anything whatsoever. We requested from Maxus -- there was a whole plethora of options we can discuss how to solve both of these properties' issues in their each own respective way. And

we're pretty much willing to do whatever it takes to get it done. And as long as there's some sort of constructive cooperative conversation between us and Maxus, then this would have been worked out then your legal bill would have been zero. But that's not what happened, so here we are.

Q Okay. So you don't know if a 90-day extension request was made to Maxus?

A Every type of extension request was made to Maxus.

Q And they all would have come from Mr. Kahane?

A Yes.

Q Okay. And down there on the Village portion, we see, "To address Regions collateral concerns, you will immediately engage Alex McDearmon of Cushman and Wakefield for a BOV under a sale immediately scenario."

And, obviously, that's in regard to the PVO property, correct?

A Yes.

Q And so I read this to be Regions instructing you to put the property, the PVO property, up for sale immediately by way of Cushman and Wakefield; is that right?

A Yes.
Q Did you guys do that, or did you use a different broker?
A Maxus wouldn't consent, so we weren't able to do this. We had to use a different broker.
Q Okay. We saw ultimately that the PVO property was put up for sale, correct?
A Yes.
Q And I believe we saw CBRE; is that right?
A Yes.
Q And we saw the emails from CBRE over to you that talked about initial blast dates at the end of June 2024, right?
A Possible. I don't remember.
Q And then into July, there was another email that came subsequent that moved the initial marketing date to July 9, 2024, right?
A I don't remember.
MR. ANDERSON: Tab 21, please.
(Exhibit 26, Email thread between Mr. Snyder and Mr. Koromilas, dated June 13, 2024, was marked for Identification.)
Q Exhibit 26, Mr. Meisels.

A Okay.
Q Unfortunately, it's another email thread. I apologize for these. I know they're hard to kind of follow.
And at the top, we see John Koromilas writing Mr. Snyder at Maxus on June 13, 2024.
You see that, correct?
A Yes.
Q It says, "Ryan, A further discussion did occur this week with the Valor team, but no extension solution has been reached for the two pending maturity events."
The two pending maturity events would be the loans, the Regions loans, on the Hawks property and the PVO property, right?
A I don't know.
Q What other extension solution would you have been copied on by John Koromilas at that point in time?
A I don't know.
Q Would you agree with me that the Regions deeds of trust were going to mature in approximately June of 2024?
A Yes.

Q It says, "It is probably a good idea to set a call to discuss. I am out tomorrow and Regions' counsel is traveling for some vacation, so we need to work out a time that fits for all."
Do you see that?
A Yes.
Q And do you have any idea why Regions is writing MaxMez on June 13th in this regard?
A MaxMex was in touch with Regions directly without us from well before June 13th of 2024.
Q Is there anything that prohibits MaxMez from contacting Regions?
A Yes, the operating agreement does.
Q Do you recall where in the operating agreement it makes that prohibition?
A We'll find it.
Q It's Exhibit 2.
A Yep.
Q Okay.
Would it make sense maybe we take a look when we do our next break and pick it up then and just kind of move forward with questions

right now? Do you want me to circle back to it, Mr. Meisels?

A Let me try and find it.

MR. ANDERSON: Mr. Kahane, what do you think about, like, a five-minute break and let Mr. Meisels do that? Or would you like me to circle back to it at the end?

MR. KAHANE: You asked him. He said he was looking for it. I mean --

MR. ANDERSON: I agree. But there's no reason for us to sit in silence, would me my thought. Do you want to take a quick five-minute break?

MR. KAHANE: Sure.

MR. ANDERSON: You can look, Mr. Meisels. I don't want to preclude you from doing that. Is that okay?

THE WITNESS: Sure.

THE VIDEOGRAPHER: All right. The time is 3:54 and we are off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is 4:06 and we are back on the record.

Q Okay. When we had left, I believe, Mr. Meisels, you were looking for a

provision you wanted to show me in Exhibit 2.
Did you have a chance to do that?
A Yes.
Q Okay. What provision were you going to show me?
A On Page 22.
Q Okay.
A I don't know what provision that is. 21. Hang on.
Q Okay.
A Hang on. Sorry. Go to Page 21, please.
Q Okay.
A 13: " Making any material change in the method of conducting the business of the company or making any modifications to any organizational documents of the company."
Q Okay.
A So that's one section where there is a material change in the way they're conducting business of the company, which neither member is allowed to do without consent of the other.
Q Okay.
A And there's another section. Let me read this. Page 22, E.

Q Okay.
A "Without prior" -- "without the prior consent of all members, neither the manager nor any member shall have any authority to do any of the following acts." And it lists a bunch.
Q Okay.
A So we're going to go to No. 7.
Q Okay.
A "The taking of any willful action by the company" --
(Clarification by the court reporter.)
A "The taking of any willful action by the company or SPE that has the purpose of creating a recourse event identified in any guaranty or indemnity, including without limitation the guaranty agreement and the environmental indemnity agreement issued in favor of lender or capital member which, as used herein, means any recourse event, including without limitation fraud or misappropriation by the company or SPE."
Q Okay.
A Those two sections.
Q All right. I appreciate that.

And looking back again at 26, we see a June 13, 2024 email from Mr. Snyder.

A One second. Hang on.

Q Yeah. No problem.

MR. KAHANE: I'm sorry. Where are we?

MR. ANDERSON: We're on Exhibit 26.

A Okay.

Q We see the email from Mr. Snyder to Mr. Koromilas, June 13, 2024. It says, "John, Has Valor made any progress or have there been any further discussion on extending the loans? We see nothing on our side."

Do you see that?

A Yes.

Q Had you been in contact with MaxMez on extending the loans?

A Josh had been, yes.

Q Okay. And then the email that we were talking about where Mr. Koromilas responds, that's the one that Maxus says, "Ryan, No further discussion did occur this week with the Valor team, but no extension has been reached for the two pending maturity events."

Do you see that?
A Yes.
MR. ANDERSON: Can you give me Tab 22, please?
(Exhibit 27, Email thread, Bates stamped SUPP_DOC_PROD 001877 - 1893, was marked for Identification.)
Q Exhibit 27, Mr. Meisels. I'll let you take a look at that. These are emails between Mr. Kahane or Respondents or Valor, whatever the case may be, with Regions. I'll just let you take a look.
A Okay.
Q Generally speaking, this is, again, talking about the forbearance agreements, right, in that vicinity, correct?
MR. KAHANE: Objection as to form.
A I don't know.
Q Okay. Let's go through this. Excuse me. Well, actually, this is an interesting one.
We see July 2, 2024, from yourself to Mr. Koromilas, it says.
A What page are we looking at?
Q Page 5.

MR. KAHANE: I'm sorry. Can you refer to the Bates stamp, please?
MR. ANDERSON: 001881.
A Okay.
Q Actually, let's turn back just a tiny bit further to -- it is the bottom of Page 5 and into Page 6. Excuse me.
We see an email there from Mr. Koromilas. It says to Josh, Max, and Eli, "Thanks for your request." Then we turn the page, and it says, "The information you provided looks to have now highlighted one of the primary concerns that thwarted your earlier loan extension requests. The Village project leverage is untenable for Regions. Based on your Village BOV, there is strong support for future sale at $19MM" -- million, correct?
A Yes.
Q Okay. "Using the gross sale of $19MM and the principal alone owed of $19.9MM, the indicated rough loan to value is 105%;" is that correct?
A That's what it says.
Q "As well, we are all aware that the actual sale proceeds would be less than $19MM,

and the actual amounts owed Regions would be more than $19.9MM."
You see that, correct?
A Yes.
Q And this is in regards to the PVO property expressly, right?
A Yes.
Q And down at the end of that paragraph, it says, "You will note that Regions has already conceptually proposed: (1) a cash collateral pledge on Village that is returned if not needed; and, (2), in the 6/24 email below, payment reserves coupled with a forbearance cross default with Village and Hawks."
Can you tell me what the forbearance cross default is?
A I don't know.
Q Would that be Regions trying to tie the Hawks property in with the Village property in some way?
A I guess so.
Q Okay. And then it says, "A joint call will Regions/Valor/Maxus appears to be in order. Can you please advice to some good times for early next week."

Do you see that?
A Yes.
Q And then you respond on July 2nd, saying that you had some conversations with Maxus today. Josh will be in touch with you tomorrow. Our goal remains the same, which is to get you paid in full as soon as possible, right?
A Yes.
Q And so then the subsequent emails here July 3rd, July 12th, are continuing to go back and forth about the possibility of some sort of workout; is that correct?
A Yes.
Q On Pages 7 and 8, there is an email from Mr. Kahane dated June 24th. Hawks and PVO -- I'm sorry. "Hawks and Village continued" is the subject.
Do you see that?
A Yes.
Q And it says there's confidential settlement communication. And we segue down, and it's addressed to John and Mark, who I presume are with Regions, correct?
A Yes.
Q And in there, we're listing -- or

Mr. Kahane is listing several objections or issues with items with Regions; is that right?
A I don't know.
Q So No. 5 on Page 8, "Borrower is not agreeable to establishing a payment reserve."
Do you see that?
A Yes.
Q "All other existing loan conditions to remain in effect," No. 10, "with no defaults occurring beyond the maturity date event, is another term."
So these are basically an offer to Regions as to terms of some sort of agreement, correct?
A Okay.
Q Okay. And this is in regard -- is this potentially in regard to the Hawks property; do you believe? Or do you believe this is in regard to the PVO property?
A Don't know. It's one or the other.
Q Okay. And then down below, we see the listing or we see a couple of items, CBRE, Park at Village Oaks, and providing detail to Regions of a plan to market the property. That

PVO property, right?
A Okay.
Q And the coming soon launch is listed as June 25th there?
A Yep.
Q Okay. And that was subsequent to the drag to market letter that you guys had received, right?
A The date of June 25th?
Q Yes.
A Yes.
Q And then on the Hawks Landing, we see June 25th, premarketing, correct?
A Yes.
Q And, again, that's subsequent to drag to market letters, correct?
A Yes.
MR. ANDERSON: Tab 23.
(Exhibit 28, email thread, Bates stamped SUPP_DOC_PROD 001840 - 1845, was marked for Identification.)
Q Exhibit 28, Mr. Meisels. I'm going to give you a chance to look that over.
A Okay.
Q Okay. So it looks -- kind of

picking up here, there's discussions back here about legal fees from July 16, 2024. It says, "Summary of Foley fees/costs incurred through yesterday for each matter."
A Where do you see that?
Q At the bottom of Page 5.
And then there's just three blanks. There's no numbers in here. But that's what the bottom of that says, correct?
A The bottom of Page 5?
Q Um-hum.
A I don't see that.
Q So at the bottom of Page 5, Mark Wolfson email.
A Yes. "Summary of Foley fees/costs incurred through yesterday."
Q Yes. And there's no specific numbers listed, but that's what it says, correct?
A Correct.
Q And then when we pick it up above, there's an mail from John Koromilas. It says, "Eli, Per your request on legal fees yesterday, see attached. Please note that I have not reviewed the documents, but there's a chance that Regions is also entitled to interest on legal fees

as it's paid its lawyers. If so, should the parties reach a mutually agreeable forbearance? And interest on legal would be forgiven provided there are no later defaults in the forbearance agreements."

Do you see that?

A Yes.

Q Okay. And then up above, we have correspondence from Mr. Kahane, July 16th, to Mr. Koromilas. It says, "I'm reading this correctly. Want to confirm legal fees of approximately $65,000," right?

A Yes.

Q And the response from Mr. Koromilas on the 16th, that says, "Yes. I get $66,000." And allocates it between Village and Hawks, correct?

A Yep.

Q And then above that, we see on July 18th a proposal from Mr. Kahane on forbearance terms, correct?

A Yes.

Q Okay. So as of July 18, 2024, we don't have forbearance terms worked out; is that correct?

MR. KAHANE: Objection as to form. Objection; requires a legal conclusion.
A Not in writing.
Q Okay. On Page 2, one of the items -- again, Mr. Kahane's email of July 18th -- "John, Borrowers propose the following FB terms."
And that's short for forbearance, correct?
A Yes.
Q No. 3, "Borrower will pledge Hawks' collateral for PVO in lieu of any further deposit. Up to 1.4ML in proceeds from the sale of Hawks can be escrowed by Regions until Regions' PVO loan is paid in full. No cross default rights. Just cross collateral."
So what does that mean; can you tell me?
A I believe the proposal was that once Hawks sells, so the order of how the money would flow, would be first to cover the costs and expenses of facilitating the sale, such as the broker and anything else that has to be paid. Then Regions would be paid off in full. Then Maxus would get its money. And we were proposing $1.4 million above that of our money we would give

to Regions until PVO is paid off in full.
Q Okay. And did you guys contact MaxMez in regards to this proposal at any point?
A I don't know.
Q And so you don't know if MaxMez had approved of this concept?
A Josh was in touch with them. I have no idea.
Q So any proposal along those lines would have come from Mr. Kahane?
A Yes.
Q I'm sorry?
A Yes.
Q Thank you, Mr. Meisels.
MR. ANDERSON: Tab 24, please.
(Exhibit 29, Letter from Regions Bank to Village Oaks Owner LLC, dated September 24, 2024, was marked for Identification.)
Q We'll be really quick here, actually. Exhibit 29, Mr. Meisels.
A Okay.
Q And this is correspondence from Regions, dated September 24, 2024, right?
A Yes.
Q And response is typically just a

response to providing -- sorry. Strike that.
Is this letter providing a payoff?
A This is a payoff, yeah.
Q Okay. And looking at this, on September 24, 2024, is there any chance that this payoff, the amount listed here, would allow for the payment of MaxMez if the sale occurred?
A Depends on the sale price.
Q Well, we see a total payoff of $20,563,000 as of September 30th, correct?
A Yes.
Q Okay. And do you know at that point what PVO was going to bring at sale?
A $21,000,000 and some change.
Q Okay. And so there would be roughly $500,000 left over in proceeds, correct?
A Well, left after closing costs, which we need to calculate.
Q Even lower than -- fewer proceeds in this circumstance, correct?
A Correct.
Q Okay. And so we knew then at that point that MaxMez was not going to recover the full money that they had put into the equity portion of the PVO property, right?

A They knew back in January of 2024.
Q Okay.
A According to Ryan, at least.
Q So just touching really quickly on the Hawks property, if we could, I was trying to get a flavor for the management of the Hawks property, kind of how it was set up.
That typically was handled by Valor, correct?
A Yes.
Q Okay. What was your role in that regard?
A In which regard?
Q In the management of the Hawks property.
A Management of the Hawks entity, or actual property management?
Q The actual property management.
A I'm not a -- you mean as in was it my role to physically sit at the property and collect the rents?
Q I assume that's not the case, correct?
A Correct. Yes.
Q Right. Valor would have had

somebody else to do that?
A An employee, but not an outside person. But yes.
Q Sure. Sure. But that was something that was generally handled by Valor, correct?
A Yes.
Q And, generally speaking, the structure of the Hawks property, Regions also had a loan on that property, correct?
A Yes.
Q Approximately do you recall how much approximately the principal amount was?
A I believe it was $19.7 million.
Q That's pretty exact. I appreciate that.
And then equity investors in the Hawks property, can you recall who those were?
A There was about 60 of them.
Q Okay. So MaxMez was one, correct?
A No.
Q No?
A No.
Q MaxMez didn't have an equity investment in the Hawks property?

A They had a preferred equity --
Q Okay.
A -- investment in the property.
Q Okay. And how would you differentiate preferred equity from equity?
A Preferred equity is a glorified loan. They're not the owners of the property.
Q Okay. So there was preferred equity.
And do you know approximately how much that was?
A A hair under $5,000,000.
Q Was there any other pref equity on the Hawks property?
A No.
Q And then conglomerated on the investors, how much did they put in?
A I don't remember exactly.
Q Was it similar to what MaxMez put in, or more?
A More.
Q And their equity -- I'm sorry. How did you characterize their interest? The equity interest.
A They would be investors.

Q And so they were the direct investors to the entities that owned the Hawks property; is that right?
A Without the org chart in front of me, that sounds right.
Q Okay.
MR. ANDERSON: And Tab 27, please.
(Exhibit 30, Email thread, Bates stamped 002793 - 2801, was marked for Identification.)
Q I'm going to hand you Exhibit 30, Mr. Meisels. This is a series of emails from approximately August through September of 2024 with Regions, correct?
A Yes.
Q Okay. And I note several emails August 30th of 2024.
A What page are you looking at?
Q Looking at Pages 6 and 7.
A Okay.
Q And can you tell me, what is Mr. Wolfson asking for there on August 30th?
A Don't know.
Q Okay. It says, "As the obligors have been advised before, the loans has matured

and default interest has been occurring and continues to be due and owing to the extent not paid. The bank has been willing to be patient on a limited basis with respect to enforcement of remedies on interim basis, without waiving any defaults, while the obligor were maintaining the post-maturity payments of interest at the default rate, pending their efforts to close proposed contracts by October of 2024 that would pay off all amounts owing to the lender under the terms of the application loan documents."

Do you see that?

A Yes.

Q So is there a promise to pay Regions off sometime in October 2024; is that correct?

A No.

Q No?

A How can Mark Wolfson make a promise on my behalf?

(Clarification by the court reporter.)

Q So is he saying, since Mark Wolfson would be sending it to you, the implication would be that you're promising to pay

Regions Bank off by October 2024, correct?
MR. KAHANE: Objection as to form.
A I don't know.
Q It says, "The 8/15 default interest payment on the loan should be made immediately without conditions."
It seems to indicate that payment to Regions on the 8/15 default interest payment was missed; is that correct?
MR. KAHANE: Objection as to form. Objection; calls for a legal conclusion.
A I don't know.
Q And then above, we see another August 30th email from Mr. Wolfson. It says, "As a follow up, if you have an executed PSA" -- and that's a purchase and sale agreement; is that correct?
A Yes.
Q -- "for either of the properties, the bank expects to receive those immediately. And in addition, to the extent those contracts require the approval of Maxus to close, we expect to receive those approvals as well upon their issuances. Similarly, if you have received a written objection from Maxus, we expect to receive

those as well."
Do you see that?
A Yes.
Q Did you forward or was the executed -- were the executed PSAs forwarded to Regions in response to this email?
A They were forwarded. I don't know if it was in response to this email.
Q Okay. And did you ask for MaxMez's approval to close?
A The arbitrator ordered MaxMez to provide approval.
Q Okay. And do you know --
A MaxMez refused.
Q Did you touch base with them? And this is August 30th of 2024. So did you advise that of Regions?
A I don't know.
Q And did you pass along any written objections from Maxus to any closings to Regions?
A I don't know.
Q I think the next substantive email is on Page 4, September 6, 2024. It's from Mr. Wolfson to Mr. Kahane.
Do you see that?

A Yes.
Q It says, "Josh, Once again, promises made and not kept. Where are the signed contracts for the properties that you said would be provided to us along with the letters you were sending to Maxus the first of the week, which has not been done, so that we can consider the request if the default interest payments were made with respect to request for continued forbearance. Unfortunately, I think the bank's patience is about done."
And that's September 2024, correct?
A September 6, 2024.
Q Okay. And at that point, purchase and sale agreements had not been forwarded to Regions; would you agree with me?
A I don't know.
Q Okay. Do you have any reason to doubt Mr. Wolfson?
A I have no idea.
Q And what about any forwarding of correspondence to Maxus? Did that happen around this time?
A That would have all gone through

Josh.

Q Okay. And so moving on into September 6th, Mr. Kahane responds with a list of items, correct?

A Yes.

Q And moving into September 12th, a Mr. Wolfson email that says, "Where's the Hawks contract you said below was executed?"

Do you see that?

A Yes.

Q And the response from Mr. Kahane is that it's the document entitled access agreement.

Do you see that?

A Yes.

Q And Mr. Wolfson responds on Page 1, "That just gives a potential buyer access to the property. I'm talking about a signed purchase and sale contract for Hawks Landing."

Do you see that?

A Yes.

Q Do you believe one existed at that time?

(Clarification by the court reporter.)

A I don't remember.
Q Do you recall the history of the attempts to sell the Hawks property?
A There were many attempts.
Q Can you walk me through those?
A For the most part, they were blocked or -- I don't know. A hundred percent of the time, they were blocked by Maxus in various underhanded sort of, you know, backhanded ways. They attempted to speak to different buyers and dissuade them from making offers or signing contracts or just in general trying to muddy the waters as much as possible in order to prevent the sale of Hawks.
Q Do you recall the first entity that you tried to sell the Hawks property to?
A Not offhand.
Q Were there -- do you recall if there were two separate purchase and sale agreements that were in writing at some point on the Hawks property?
A Yes.
Q And I believe the first entity was Magma.
Does that sound correct?

A I don't remember.
Q Okay. We'll pull the purchase and sale agreement and you'll be able to take a look. So I'm not trying to trick you into saying Magma and then surprise you with something later. I'm just trying to work through that so we can have an understanding of kind of the baseline facts.
Does that make sense?
A Yes.
Q Okay.
A My previous answer as far as how many contracts were signed, it could be there were more than two. I'm not a hundred percent sure.
Q Okay. Any written contracts would have been provided in written discovery responses, though, correct?
A Yes, presumably.
(Exhibit 31, Email to Mr. Koromilas from Mr. Snyder, dated October 24, 2024, was marked for Identification.)
Q I'm going to hand you Exhibit 31.
So down below, we see a Koromilas email of October 11, 2024, correct?
A Yes.
Q And that says, "Everyone."

Do you recall receiving that email?
MR. KAHANE: I'm sorry. I don't see a Bates stamp on this. Where is this from?
MR. ANDERSON: That, I do not know. I would assume it's probably from the request for inspection that you guys didn't Bates stamp. That's typically where un-Bates stamped items are coming from.
MR. KAHANE: And you think in request for inspection, we produced an email from your company to the Regions Bank?
MR. ANDERSON: I believe that's probably where it came from, yes. That would be my best guess as I sit here right now.
Q So do you recall seeing that email from Mr. Koromilas at any point before, Mr. Meisels?
A I don't remember.
Q Okay. Do you recall any sort of forbearance outline from Regions to both Maxus and Respondents around this time frame?
A It's possible. I don't remember.
Q Do you recall if you responded to this?

A I don't remember.
Q Okay. We see up above that Mr. Snyder responds from Maxus, correct?
A Yes.
Q There's an agreement to forbearance terms?
A I'm not sure what you're talking about.
Q So how would you connotate Mr. Snyder's response?
MR. KAHANE: Objection as to form.
A I have no idea what he's talking about.
Q Okay.
MR. ANDERSON: Tab 29, please.
(Exhibit 32, Email thread, Bates stamped SUPP_DOC_PROD 001778 - 1787, was marked for Identification.)
Q Why don't you take a look at that Exhibit 32?
And, again, it's kind of a compilation of emails with Regions in October of 2024, correct?
A Okay.
Q Would you agree with that?

A Yes.
Q Okay. And the general gist of this is forbearance agreements, is that correct, on the Hawks property?
MR. KAHANE: Objection as to form.
Mr. Meisels, please read the emails before answering that question.
A I don't know.
Q I'll let you have a chance to take at look at those emails.
And we can start back October 15th, Mark Wolfson to Mr. Kahane saying, "As Regions has received no response to its most recent email forbearance demand, I've been instructed to prepare default in demand notices to the borrower and guarantors."
Do you see that?
A No. Where do I see that?
Q Page 9. 001786.
MR. KAHANE: Which property did you say this was connected to?
MR. ANDERSON: Subject line appears to be Hawks Landing.
MR. KAHANE: Okay.
A This is Hawks Landing. PVO had

been paid off already.

Q And then October 15th, Mr. Kahane writes, "The borrower is not in a position to pay the upfront funds required to consummate the FB" --

And that's forbearance, correct? Mr. Meisels, is FB forbearance there?

A Yes.

Q Okay.

-- "as proposed by Regions. Borrower will pay all sums due to Regions at closing next month. Happy to discuss further if you would like."

So, again, still talking about forbearance agreements on the Hawks Landing property or the Hawks property on October 15, 2024, correct?

A Yes.

Q Okay. And as we kind of move up, there's an mail from Mr. Koromilas, October 16th, that again talks about the forbearance agreements and terms, correct?

A I don't know.

Q I'll give you a chance to take a look at that. Specifically, on Page 8, it says,

"All said, please discuss in detail with your client. We will give the borrower to the end of today to reconsider accepting the Regions forbearance offer."
A Okay.
Q And then the response from Mr. Kahane later that day saying, "I conferred with client."
And by, "client," I assume that means yourself and Mr. Weingarten?
MR. KAHANE: Objection as to form.
A Where do you see that?
Q Page 6.
A Okay.
Q It says, "I conferred with client."
Who would "client" be referring to?
A The borrowers.
Q "The borrower does not have sufficient funds to cover the default interest and the guarantors are not willing to contribute."
Do you see that?
A Yes.
Q So it's rejecting the forbearance

offer, correct?

MR. KAHANE: Objection as to form. Objection; calls for a legal conclusion.

A I don't know.

Q Who were the guarantors?

A Max and myself.

Q And as we kind of continue on into Page 5, we see additional correspondence between the parties in regard to the forbearance, right?

A I don't know.

Q On Page 4, we have an email from Mr. Koromilas at Regions that says, "Based on attorneys' conversations yesterday, I understand you indicated your client wishes to forestall enforcement/foreclosure action by Regions and that execution of a sale contract is imminent. As a final effort by Regions to avert enforcement efforts, please advise if the following forbearance terms are acceptable before 5 today."

Do you see that?

A Yes.

Q And there's a list that goes seven long down below there, correct?

A Yes.

Q And that's sent on October 17,

2024?
A Yeah.
Q Okay. And there's a response that comes in starting on Page 3 from Mr. Kahane to Mr. Koromilas, right?
A I don't see that.
Q It starts on Page 3, October 19, 2024, and actually the body is on Page 4, correct?
A Okay.
Q And it's essentially asking for additional time to respond?
A Don't know.
Q Okay. And up above that, Mr. Koromilas advises that Regions will extend the offer deadline for acceptance through Monday at 5 o'clock for the Hawks Landing on October 20th, correct?
A Yes.
Q And then the next writing is October 22nd from Mr. Koromilas saying no response had been received. Pages 2 and 3 of this exhibit. Right?
A Yes.
Q Okay. And bottom of Page 1, Mr. Koromilas writes, rather tersely, but essentially

the gist saying there's no forbearance agreement, correct?

A No idea.

Q Okay. And up above, Mr. Kahane says, "Moving forward, I look forward to speaking directly with litigation counsel," right?

A Yes.

Q So you knew at that point, October 23, 2024, that Regions was going to continue with foreclosure of the Hawks property, correct?

MR. KAHANE: Objection; mischaracterizes. Objection as to form.

A I had no idea what they were going to do.

MR. ANDERSON: And Tab 30, please.

(Exhibit 33, Email thread with attachments, Bates stamped MaxMez00007862 - 7871, was marked for Identification.)

Q Exhibit 33. Let me know when you've had a chance to look that over.

A Okay.

Q Okay. And at the very back of that is an action filing in Catawba County, correct?

A Yes.

Q And you've seen that before?
A Yes.
Q And, generally speaking, that's a notice of foreclosure hearing, correct?
A It says, "notice of hearing prior to foreclosure sale."
Q And, again, filed in Catawba County and served on the Respondents; is that correct?
MR. KAHANE: Objection as to form. Objection as to any requirement for him to analyze this legal document and make legal determinations.
A I don't know if it was served or not.
Q Okay. Dated December 18, 2024 and sent to you by Mr. Koromilas, correct?
A I don't know. It says here, "Hawks Partners, please see public notice attached," but I don't see an attachment.
Q Okay. And the attachment, because we actually produced this document, is at MaxMez 7865 onwards. We put it at the end, as required in the arbitration.
A I have no idea. If that's what you say.

Q Okay. And down below there, we see a Koromilas email October 28th of 2024, Correct?
A Yes.
Q It says, "Following our 10/11 communication below and later extensions of the deadlines for forbearance acceptance to October 21, 2024, no forbearance agreement was reached. The September 15, 2024 default interest payment remains unpaid. There has been no executed purchase contract provided for Regions' review."
Do you believe there was an executed purchase contract for the Hawks property provided to Regions on October 28, 2024?
A I don't remember.
Q Do you believe the September 2024 default interest payment had been made at that time?
A I don't know.
Q Do you believe you had requested or agreed to any sort of forbearance of the Regions loan at that time?
A I don't remember.
MR. ANDERSON: Tab 31, please.
(Exhibit 34, Email to Mr. Wolfson

from Mr. Kahane, dated February 3, 2025, Bates stamped 005202 - 5203, was marked for Identification.)

Q Exhibit 34, Mr. Meisels.

A Okay. Have you seen this email before?

A No.

Q Okay. So the first time seeing this one?

A Yes.

Q And calling your attention to the third paragraph of the opening email, it says, "Borrower has opportunity to sell its position if Regions will accept payoff of $19ML."

Do you see that?

A Yeah.

Q That's $19,000,000?

A Yes.

Q And this is Hawks? The subject line says Hawks Landing. Is that the Hawks property?

A Yes.

Q "That can happen now. If Regions is interested, we should discuss today. Once a reorganization is filed, we will be in for a long

ride with the trustee and other creditors, and borrower's bankruptcy counsel feels confident that a restructure in favor of the borrower will be approved."

Do you see that?

A Yes.

Q Had there been consultation with bankruptcy counsel by the borrowers?

A Yes.

Q When did that begin?

A I don't remember.

Q Was it before the start of 2025?

A Don't remember.

Q What had you done to prepare for bankruptcy filing?

A We had conversations with a bankruptcy attorney.

Q Anything else?

A No.

Q Did you advise MaxMez of any intention to file for bankruptcy?

A We didn't have an intention to file for bankruptcy.

Q But you mention bankruptcy counsel in this correspondence to Regions, correct?

A We had a conversation with bankruptcy counsel, and they felt that it would be a pretty straightforward thing to do. And they said if we want to do it, we should reach out to them. That was the extent of the conversation.

Q Okay. And up above, it says, "MaxMez has been paid its equity redemption payment."

Do you see that?

A Yes.

Q Do you believe that to be true?

A Yes.

Q Do you recall looking at Interrogatories with me in the corporate rep deposition?

A Yes.

Q Okay. And do you remember that there was an amount that was still listed as due?

A I don't remember. If you have it, I'd be happy to look at it.

Q Any Interrogatory response you would have sent would be correct, right?

A What's the question?

Q Any Interrogatory response you would have sent would have been correct, right?

A Yes.

MR. ANDERSON: So, Mrs. Kahane, do you want to give me just a couple minutes to see if I'm definitely done with Mr. Meisels? And then there's a couple items that I would -- just a few items I'm going to clean up on the corporate rep. But another 30 minutes to 45 minutes is my expectation.

MR. KAHANE: Okay. So we're not finishing at 5? We're looking at 6?

MR. ANDERSON: We did run longer than I wanted to. Are you getting drilled on your flight?

MR. KAHANE: No. We are here to make sure you can get this done. I'm following what you said.

MR. ANDERSON: I completely agree. There were some pauses in there I didn't anticipate, for what that's worth. And I'm not --

MR. KAHANE: Well, do you need to take a break now, or can we just roll in?

MR. ANDERSON: No, we could just roll in, if that's okay. I know the reporter wants to --

THE VIDEOGRAPHER: I need five minutes

for me to do a thing and then --

So going off the record?

MR. ANDERSON: Yeah. This is -- yeah.

THE VIDEOGRAPHER: All right. The time is 4:58 and we are going off the record.

(A short recess was taken.)

THE VIDEOGRAPHER: The time is 5:09 and we are back on the record.

MR. ANDERSON: Yes. Briefly in regard to Exhibit 31, there were some questions in regard to Bates stamp numbers and this document not having a Bates stamp on it. This document is from MaxMez production, MaxMez 00007875, starting point. Thank you.

May I turn over Mr. Meisels?

MR. KAHANE: Okay. You are completed on Mr. Meisels?

MR. ANDERSON: Yes.

MR. KAHANE: Okay. I have no questions for him.

THE VIDEOGRAPHER: Okay. So then we are going off the record. The time is 5:10 and we are off the record.

(The deposition concluded at 5:10 p.m.)

CERTIFICATE

I, BARBARA A. BRADEY, a Notary Public and Certified Court Reporter of the State of New Jersey, License No. 30XI00202900, do hereby certify that prior to the commencement of the examination, the Witness, ELI MEISELS, was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Notary Public of the State of New Jersey
My Commission expires June 30, 2026
Dated:  August 12, 2025